Exhibit 1

1 Ch.                          S.I.B. v. Pantell S.A.                    Sir Nicolas
                                                                  Browne-Wilkinson V.-C.

A   the jurisdiction of the Guernsey court. However, if the branch of
Barclays Bank in Guernsey is holding moneys belonging to either of the
defendants, the bank (being a bank locally resident in England) will,
after service of the order, be required not to part with such moneys
from the accounts held with the bank with their Guernsey branch.

    I should make it clear that, although I in fact decided this case on
the basis that I have mentioned (namely on the basis of sections 3 and 6
B   of the Act of 1986), my researches overnight suggest that an alternative,
and possibly clearer, route would be under section 57 of the Act, which
deals specifically with advertisements, in relation to which section 61
confers on the Secretary of State (and therefore on the S.I.B.) powers
which are very similar to those contained in section 6 of the Act, which
I have considered.

C     Finally, I should point out that these orders do not in any way
preclude customers of Pantell individually from enforcing their rights
against any assets of Pantell: see sections 6(9) and 61(9) of the Act.

*Order accordingly.*

D   *Solicitors: Booth & Blackwell.*

S. W.

E                  ————

[COURT OF APPEAL]

F   ADAMS AND OTHERS v. CAPE INDUSTRIES PLC. AND ANOTHER

[1984 A. No. 2597]

| 1988 | Feb. 15, 16, 17, 18, 19, 24, 25, 26, 29; | Scott J. |
|------|------------------------------------------|----------|
|      | March 1, 2, 3, 4, 7, 8, 9, 10, 11, 14,   |          |
|      | 15, 16, 17, 18, 21, 22, 23, 24, 25;      |          |
|      | April 11, 12, 13, 14, 18, 19;            |          |
|      | June 17;                                 |          |
|      | July 26;                                 |          |
| 1989 | April 5, 6, 7, 10, 11, 13, 14, 17,       | Slade, Mustill and |
|      | 18, 20, 21, 24, 25, 27, 28;              | Ralph Gibson L.JJ. |
|      | May 2, 3, 24;                            |          |
|      | July 27                                  |          |

H   *Conflict of Laws—Foreign judgment—Jurisdiction to enforce—English
companies mining asbestos in South Africa—Marketing subsidiary
of English parent company incorporated in Illinois—Subsidiary
trading in asbestos but having no authority to bind English*

434

*companies in contract—Claim against English companies arising* A
*from sale of English companies' asbestos for use in Texas settled*
*by consent judgment in Texas—Whether submission to Texas*
*court's jurisdiction—Further claims—Whether English companies*
*having presence within jurisdiction—Default judgment given in*
*Texas court against English companies—Damages assessed without*
*evidence relating to individual plaintiffs—Whether contrary to*
*natural justice—Whether default judgment enforceable*

Until 1979 the first defendant, Cape, an English company,            B
presided over a group of subsidiary companies engaged in the
mining in South Africa, and marketing, of asbestos. The
marketing subsidiary in the United States of America was a
wholly owned subsidiary, N.A.A.C., incorporated in Illinois in
1953. The marketing subsidiary worldwide was the second
defendant, Capasco, a wholly owned English company. Asbestos        C
from the South African mines was sold for use in an asbestos
factory at Owentown, Texas. In 1974, some 462 plaintiffs,
mainly employees or ex-employees at the Owentown factory,
brought actions in the United States Federal District Court at
Tyler, Texas, for damages for personal injuries allegedly suffered
as a result of exposure to asbestos dust ("the Tyler 1 actions").
The defendants included Cape, Capasco, N.A.A.C., the South
African mining subsidiary and other parties including the United    D
States Government. Those actions were settled in September
1977 for U.S.$20m. of which Cape and its subsidiaries were to
bear over $5m. Cape and Capasco had entered motions
protesting the jurisdiction of the Tyler court and had filed
defences as to the merits which, inter alia, repeated the
jurisdiction protests. The settlement of the Tyler 1 actions was
recorded by a consent order made on 5 May 1978.

Between April 1978 and November 1979, a further 206               E
plaintiffs instituted actions in the Tyler court against the same
defendants ("the Tyler 2 actions"). Cape and Capasco took no
part in the Tyler 2 actions maintaining that that court lacked
jurisdiction over them. They were prepared to let default
judgments be entered against them but to resist their enforcement
in England. Cape decided to put N.A.A.C. into liquidation
and, as from 31 January 1978, N.A.A.C. ceased to carry on         F
business. Cape promoted the incorporation of a new Illinois
corporation, C.P.C., and a Liechtenstein entity, A.M.C. The
shares in C.P.C. were held by M., the chief executive of
N.A.A.C., and those in A.M.C. were held by a nominee on
trust for a Cape subsidiary, C.I.O.L. Arrangements were made
for C.P.C. to carry out much the same marketing function for
the sale of Cape asbestos in the United States as had previously
been carried out by A.M.C. Those arrangements continued         G
until 1979 when Cape sold its asbestos mining and marketing
subsidiaries. In 1983, 133 plaintiffs in the Tyler 2 actions settled
their actions against the main United States defendants, including
N.A.A.C. but excluding the United States Government. Later
all the 206 plaintiffs in the Tyler 2 actions agreed to settle their
actions against the United States Government on terms that
they would obtain default judgments against Cape and Capasco     H
and that the United States Government would finance the steps
to be taken to enforce those judgments against Cape and
Capasco in England. The Tyler court fixed 12 September 1983
as the date for the hearing of the default judgment applications.

A    Under the United States Federal Rules, since Cape and Capasco were in default, the pleaded allegations against them were, save in relation to damage, taken to be admitted. But no judicial hearing took place. On 12 September the judge signed a default judgment for over U.S.$15½m. The awards made to individual plaintiffs fell into a number of bands: 67 were awarded $37,000, 31 $60,000, 47 $85,000 and 61 $120,000. The judge directed that the total award should represent an average award of $75,000 per plaintiff but it was the plaintiffs' counsel who selected the level of the bands and who identified the plaintiffs to be placed in each band in order to produce the directed average award. All those plaintiffs, but one, sought to enforce the default judgment against Cape and Capasco by the present proceedings. They contended that Cape and Capasco had submitted to the jurisdiction in the Tyler 1 actions, and that the submission to the jurisdiction in the Tyler 1 actions constituted a submission to the jurisdiction in the Tyler 2 actions or, alternatively, an agreement to submit to the jurisdiction in the Tyler 2 actions. Secondly, the plaintiffs contended that the Tyler court was entitled to take jurisdiction over Cape and Capasco by reason of their presence in Illinois when the Tyler 2 actions were commenced.

D    Scott J. dismissed the actions holding, inter alia, that the jurisdiction of a foreign court over defendants could be established either on a territorial basis by showing that the defendants were present within the territory of the foreign court or on a consensual basis by showing that the defendants had consented to the foreign court exercising jurisdiction over them; that Cape and Capasco by participating in the application in the Tyler 1 actions to the judge to make the consent order of 5 May 1978 submitted to the jurisdiction of the Tyler court, but that the Tyler 1 actions and the Tyler 2 actions were distinct and separate actions so that submission to the jurisdiction in the Tyler 1 actions could not be regarded as a submission to the jurisdiction in the Tyler 2 actions; that an agreement to submit to the jurisdiction of a foreign court might be evidenced either by a term of an agreement binding in contract or by a unilateral representation of willingness to submit to the jurisdiction, but if such a representation was to be relied on, it should be clear and unequivocal and have been acted on by the plaintiff and that Cape and Capasco had not contracted to submit nor made any representation of willingness to submit in the Tyler 2 actions; that, on the basis that the same principles applied to the question whether a corporation was present in the territory of a foreign court as applied to the question whether a corporation had a sufficient presence in England to enable service of a writ on the corporation to be effected by service on its agent in England, the presence of N.A.A.C. and C.P.C. in Illinois and the business carried on from their respective offices in Illinois did not constitute the presence of Cape or Capasco in Illinois; and that the procedure adopted by the judge in the Tyler court in giving the default judgment of 12 September 1983 offended against English principles of natural justice, in that there had been no judicial assessment of the defendants' liability and the award of damages had been arbitrary, not based on evidence and not related to the individual entitlements of the various plaintiffs.

On an appeal by the plaintiffs:—

436

*Held*, dismissing the appeal, (1) that an overseas trading corporation was likely to be treated by the English court as present within the jurisdiction of the courts of another country only where either such a corporation had established and maintained at its own expense in that other country a fixed place of business and had carried on from there its business for more than a minimal period of time through its servants or agents or through a representative; that in either of those two cases presence could only be established where the overseas corporation's business, whether together with the representative's own business or not, had been transacted at or from the fixed place and, in order to ascertain whether the representative had carried on the corporation's business or his own, it would be necessary to investigate his functions and his relationship with the overseas corporation (post, p. 530D–G).

*Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715, C.A.; *Littauer Glove Corporation v. F. W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746 and *Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133 applied.

*Quaere.* Whether residence without presence will suffice (post, p. 518C–D).

(2) That, on the facts, C.P.C. was an independently owned company and by the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C. Cape wanted sales of asbestos from its subsidiaries to continue in the United States but intended, by any lawful means which it was entitled to do, to reduce the appearance of its, or its subsidiaries', involvement there and to reduce the risk of its being held liable for United States taxation or subject to the jurisdiction of the United States courts, and that, accordingly, since it was not a mere facade concealing the true facts it was not appropriate to pierce the corporate veil; that furthermore, since it was accepted that N.A.A.C. was incorporated so as to assist in marketing and to be a marketing agent of the Cape group in the United States and, since a substantial part of its business at all material times was, in every sense, its own business, it did not act as an agent of the Cape group; that, in any event, since N.A.A.C. had no general authority to enter into contracts binding Cape or Capasco and third parties no such transactions were ever entered into by N.A.A.C.; and that, accordingly, the defendants were not present in the United States of America through N.A.A.C., C.P.C. or A.M.C. (post, pp. 541F–H, 544A–C, 544H—545B, G—546A, 547A–D, 549C–D).

(3) That, as a matter of principle, the onus fell on the plaintiff, who sought to enforce a judgment of a foreign court, to demonstrate the competence of that court and that it was only the judgment of the competent foreign court recognised as such by English law which would bind the defendant; that, if the onus fell on the defendants to disprove the competence of the Tyler court to give judgment against them, they had discharged that onus because they had shown that they were not present in the United States (post, p. 550C–F).

(4) That the method by which the Tyler court came to a decision as to the amount of the default judgment was contrary to the requirements of substantial justice contained in English law (post, p. 568F).

(5) That the failure of the defendants to apply to set aside the default judgment did not preclude them from relying on

A    that breach of natural justice by way of defence to the present
action to enforce that judgment, since the plaintiffs had failed
to give prior notice to the defendants of the unusual course they
were proposing to take, did not seek to dissuade the judge from
adopting that method of assessment of damages and drew up
and served a form of judgment which did not show the
procedure adopted, and the effect on the defendants, although
everything was done by the plaintiffs in good faith, was that
B    they remained unaware of any basis for seeking relief from the
Tyler court in respect of the defect in the judgment (post,
p. 572B–E).

Pemberton v. Hughes [1899] 1 Ch. 781, C.A. and Jacobson
v. Frachon (1928) 138 L.T. 386, C.A. applied.

Decision of Scott J., post, p. 441G, affirmed.

C    The following cases are referred to in the judgment of the Court of Appeal:
Abouloff v. Oppenheimer & Co. (1882) 10 Q.B.D. 295, C.A.
Albazero, The [1977] A.C. 774; [1976] 3 W.L.R. 419; [1976] 3 All E.R.
129, H.L.(E.)
Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45; [1986] 3 W.L.R. 414;
[1986] 3 All E.R. 468, C.A.
Baroda (Maharanee of) v. Wildenstein [1972] 2 Q.B. 283; [1972] 2 W.L.R.
1077; [1972] 2 All E.R. 689, C.A.
D    Boys v. Chaplin [1971] A.C. 356; [1969] 3 W.L.R. 322; [1969] 2 All E.R.
1085, H.L.(E.)
Bulova Watch Co. Inc. v. K. Hattori & Co. Ltd. (1981) 508 F. Supp. 1322.
Burnet v. Francis Industries Plc. [1987] 1 W.L.R. 802; [1987] 2 All E.R.
323, C.A.
Canada Enterprises Corporation Ltd. v. MacNab Distilleries Ltd. (Note)
[1987] 1 W.L.R. 813, C.A.
E    Carrick v. Hancock (1895) 12 T.L.R. 59
Castrique v. Imrie (1870) L.R. 4 H.L. 414, H.L.(E.)
Colt Industries Inc. v. Sarlie [1966] 1 W.L.R. 440; [1966] 1 All E.R. 673,
C.A.
Crawley v. Isaacs (1867) 16 L.T. 529
D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council
[1976] 1 W.L.R. 852; [1976] 3 All E.R. 462, C.A.
F    Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft für Motor und
Motorfahrzeugbau vorm. Cudell & Co. [1902] 1 K.B. 342, C.A.
Emanuel v. Symon [1908] 1 K.B. 302, C.A.
Employers' Liability Assurance Corporation Ltd. v. Sedgwick, Collins & Co.
Ltd. [1927] A.C. 95, H.L.(E.)
Erie Railroad Co. v. Tompkins (1938) 304 U.S. 64
Firestone Tyre and Rubber Co. Ltd. v. Lewellin (Inspector of Taxes) [1957]
G    1 W.L.R. 464; [1957] 1 All E.R. 561, H.L.(E.)
General Steam Navigation Co. v. Guillou (1843) 11 M. & W. 877
Godard v. Gray (1870) L.R. 6 Q.B. 139
Grant v. Anderson & Co. [1892] 1 Q.B. 108, C.A.
Guaranty Trust Co. v. York (1945) 326 U.S. 99
Haggin v. Comptoir d'Escompte de Paris (1889) 23 Q.B.D. 519, C.A.
Holdsworth (Harold) & Co. (Wakefield) Ltd. v. Caddies [1955] 1 W.L.R.
352; [1955] 1 All E.R. 725, H.L.(Sc.)
H    Holstein, The [1936] 2 All E.R. 1660
Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation
v. Commission of the European Communities (Cases 6 and 7/73) [1974]
E.C.R. 223, E.C.J.

438

Adams v. Cape Industries Plc. (C.A.)    [1990]

*Jabbour (F. & K.) v. Custodian of Israeli Absentee Property* [1954] 1    A
    W.L.R. 139; [1954] 1 All E.R. 145

*Jacobson v. Frachon* (1928) 138 L.T. 386, C.A.

*Jeannot v. Fuerst* (1909) 100 L.T. 816

*Jet Holdings Inc. v. Patel* [1990] 1 Q.B. 335; [1988] 3 W.L.R. 295, C.A.

*Jones v. Lipman* [1962] 1 W.L.R. 832; [1962] 1 All E.R. 442

*La Bourgogne* [1899] P. 1; sub nom. *Compagnie Générale Transatlantique v.*
    *Thomas Law & Co.* [1899] A.C. 431, H.L.(E.)

*Lalandia, The* [1933] P. 56    B

*Littauer Glove Corporation v. F. W. Millington (1920) Ltd.* (1928) 44
    T.L.R. 746

*Littlewoods Mail Order Stores Ltd. v. Inland Revenue Commissioners* [1969]
    1 W.L.R. 1241; [1969] 3 All E.R. 855, C.A.

*Local Government Board v. Arlidge* [1915] A.C. 120, H.L.(E.)

*Merchandise Transport Ltd. v. British Transport Commission* [1962] 2 Q.B.    C
    173; [1961] 3 W.L.R. 1358; [1961] 3 All E.R. 495, C.A.

*Miller v. B.C. Turf Ltd.* (1969) 8 D.L.R. (3d) 383

*Mississippi Publishing Corporation v. Murphree* (1946) 326 U.S. 438

*Moore v. Mercator Enterprises Ltd.* (1978) 90 D.L.R. (3d) 590

*Newby v. Von Oppen & The Colt's Patent Firearms Manufacturing Co.*
    (1872) L.R. 7 Q.B. 293

*Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715,    D
    C.A.

*Omni Capital International v. Rudolph Wolff & Co. Ltd.* (1987) 108 S. Ct.
    404

*Pemberton v. Hughes* [1899] 1 Ch. 781, C.A.

*Princesse Clementine, The* [1897] P. 18

*Revlon Inc. v. Cripps & Lee Ltd.* [1980] F.S.R. 85, C.A.

*Reynolds v. Fenton* (1846) 16 L.J. C.P. 15

*Roberta, The* (1937) 58 Ll. L.R. 159    E

*Robinson v. Fenner* [1913] 3 K.B. 835

*Rousillon v. Rousillon* (1880) 14 Ch.D. 351

*Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesell-*
    *schaft* [1911] 2 K.B. 516, C.A.

*Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22, H.L.(E.)

*Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155

*Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324;    F
    [1958] 3 W.L.R. 404; [1958] 3 All E.R. 56, H.L.(Sc.)

*Sfeir & Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1 Lloyd's
    Rep. 330

*Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, P.C.

*South India Shipping Corporation Ltd. v. Export-Import Bank of Korea*
    [1985] 1 W.L.R. 585; [1985] 2 All E.R. 219, C.A.

*Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a*    G
    *Vapore del Lloyd Austriaco* (1914) 111 L.T. 97, C.A.

*Theodohos, The* [1977] 2 Lloyd's Rep. 428

*Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133; [1971] 3 W.L.R. 537;
    [1971] 2 All E.R. 1428

*Wallersteiner v. Moir* [1974] 1 W.L.R. 991; [1974] 3 All E.R. 217, C.A.

*Williams v. Jones* (1845) 13 M. & W. 628

*Woolfson v. Strathclyde Regional Council*, 1978 S.L.T. 159    H

*World Harmony, The* [1967] P. 341; [1965] 2 W.L.R. 1275; [1965] 2 All
    E.R. 139

*X Bank Ltd. v. G.* (1985) 82 L.S.G. 2016, C.A.

A     The following additional cases were cited in argument in the Court of Appeal:

    *Badcock v. Cumberland Gap Park Co.* [1893] 1 Ch. 362
    *Blohn v. Desser* [1962] 2 Q.B. 116; [1961] 3 W.L.R. 719; [1961] 3 All E.R. 1
    *Calvin's Case* (1608) 7 Co. Rep. 1a
    *Hercules v. Grand Trunk Pacific Railway Co.* [1912] 1 K.B. 222
    *Joyce v. Director of Public Prosecution* [1946] A.C. 347, H.L.(E.)

B     The following cases are referred to in the judgment of Scott J.:

    *Albazero, The* [1977] A.C. 774; [1976] 3 W.L.R. 419; [1976] 3 All E.R. 129, H.L.(E.)
    *Bank of Tokyo v. Karoon (Note)* [1987] A.C. 45; [1986] 3 W.L.R. 414; [1986] 3 All E.R. 468, C.A.
    *Blohn v. Desser* [1962] 2 Q.B. 116; [1961] 3 W.L.R. 719; [1961] 3 All E.R. 1
    *Boissière & Co v. Brockner & Co.* (1889) 6 T.L.R. 85
C     *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-Gesellschaft für Motor und Motorfahrzeugbau Vorm. Cudell & Co.* [1902] 1 K.B. 342, C.A.
    *Emanuel v. Symon* [1908] 1 K.B. 302, C.A.
    *Erie Railroad Co. v. Tompkins* (1938) 304 U.S. 64
    *Firestone Tyre and Rubber Co. Ltd. v. Lewellin* [1957] 1 W.L.R. 464; [1957] 1 All E.R. 561, H.L.(E.)
D     *Godard v. Gray* (1870) L.R. 6 Q.B. 139, D.C.
    *Holstein, The* [1936] 2 All E.R. 1660
    *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v. Commission of the European Communities* (Cases 6 and 7/73) [1974] E.C.R. 223, E.C.J.
    *Jabbour (F. & K.) v. Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139; [1954] 1 All E.R. 145
E     *Jacobson v. Frachon* (1928) 138 L.T. 386, C.A.
    *La Bourgogne* [1899] P. 1, C.A.
    *Lalandia, The* [1933] P. 56
    *Littauer Glove Corporation v. F. W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746
    *Ochsenbein v. Papelier* (1873) L.R. 8 Ch.App. 695
    *Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715, C.A.
F     *Pemberton v. Hughes* [1899] 1 Ch. 781, C.A.
    *Point Landing Inc. v. Omni Capital International Ltd.* (1986) 795 F. 2d 415
    *Prima Paint Corporation v. Flood & Conklin Manufacturing Co.* (1967) 388 U.S. 395
    *Princesse Clementine, The* [1897] P. 18
    *Rein v. Stein* (1892) 66 L.T. 469, C.A.
    *Robinson v. Fenner* [1913] 3 K.B. 835
G     *Russell v. Smyth* (1842) 9 M. & W. 810
    *S.A. Consortium General Textiles v. Sun and Sand Agencies Ltd.* [1978] Q.B. 279; [1978] 2 W.L.R. 1; [1978] 2 All E.R. 339, Parker J. and C.A.
    *Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesellschaft* [1911] 2 K.B. 516, C.A.
    *Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155
H     *Sfeir & Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1 Lloyd's Rep. 330
    *Sirdar Gurdyal Singh v. The Rajah of Faridkote* [1894] A.C. 670, P.C.
    *South India Shipping Corporation Ltd. v. Export-Import Bank of Korea* [1985] 1 W.L.R. 585; [1985] 2 All E.R. 219, C.A.

440

A

*Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a Vapore del Lloyd Austriaco* (1914) 111 L.T. 97, C.A.

*Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133; [1971] 3 W.L.R. 537; [1971] 2 All E.R. 1428

*Williams & Glyn's Bank Plc. v. Astro Dinamico Compania Naviera S.A.* [1984] 1 W.L.R. 438; [1984] 1 All E.R. 760, H.L.(E.)

*World Harmony, The* [1967] P. 341; [1965] 2 W.L.R. 1275; [1965] 2 All E.R. 139

B

The following additional cases were cited in argument before Scott J.:

*Abouloff v. Oppenheimer & Co.* (1882) 10 Q.B.D. 295, C.A.

*Actiesselskabet Dampskib "Hercules" v. Grand Trunk Pacific Railway Co.* [1912] 1 K.B. 222, C.A.

*Attorney-General for Alberta v. Cook* [1926] A.C. 444, P.C.

*Bank of Australasia v. Nias* (1851) 16 Q.B. 717

C

*Béguelin Import Co. v. G. L. Import-Export S.A.* (1972) 11 C.M.L.R. 81, E.C.J.

*Bergerem v. Marsh* (1921) 91 L.J.K.B. 80

*Berliner Industriebank Aktiengesellschaft v. Jost* [1971] 2 Q.B. 463; [1971] 3 W.L.R. 61; [1971] 2 All E.R. 1513, C.A.

*Casdagli v. Casdagli* [1919] A.C. 145, H.L.(E.)

*Castrique v. Imrie* (1870) L.R. 4 H.L. 414, H.L.(E.)

*Crawley v. Isaacs* (1867) 16 L.T. 529

D

*Deverall v. Grant Advertising Inc.* [1955] Ch. 111; [1954] 3 W.L.R. 688; [1954] 3 All E.R. 389, C.A.

*Elefanten Schuh GmbH. v. Pierre Jacqmain* [1981] E.C.R. 1671, E.C.J.

*Europemballage Corporation and Continental Can Co. Inc. v. Commission of European Communities* (1973) 12 C.M.L.R. 199, E.C.J.

*Fender v. St. John-Mildmay* [1938] A.C. 1; [1937] 3 All E.R. 402, H.L.(E.)

*Ferguson v. Mahon* (1839) 11 Ad. & E. 179

E

*Gatty (F.A.) and Gatty (P.V.) v. Attorney-General* [1951] P. 444

*Gray(orse. Formosa) v. Formosa* [1963] P. 259; [1962] 3 W.L.R. 1246; [1962] 3 All E.R. 419, C.A.

*Henderson v. Henderson* (1844) 6 Q.B. 288

*Houlditch v. Marquess of Donegal* (1834) 2 Cl. & Fin. 470

*Imperial Chemical Industries Ltd. v. Commission of European Communities* (1972) 11 C.M.L.R. 557, E.C.J.

F

*Jeannot v. Fuerst* (1909) 25 T.L.R. 424

*Jet Holdings Inc. v. Patel* [1990] 1 Q.B. 335; [1988] 3 W.L.R. 295, C.A.

*Local Government Board v. Arlidge* [1915] A.C. 120, H.L.(E.)

*Macalpine v. Macalpine* [1958] P. 35; [1957] 3 W.L.R. 698; [1957] 3 All E.R. 134

*Meyer, In re* [1971] P. 298; [1971] 2 W.L.R. 401; [1971] 1 All E.R. 378

*Newby v. Von Oppen and the Colt's Patent Firearms Manufacturing Co.* (1872) L.R. 7 Q.B. 293

G

*Price v. Dewhurst* (1837) 8 Sim. 279

*Reg. v. Chief Registrar of Friendly Societies, Ex parte New Cross Building Society* [1984] Q.B. 227; [1984] 2 W.L.R. 370; [1984] 2 All E.R. 27, C.A.

*Rousillon v. Rousillon* (1880) 14 Ch.D.351

*Secretary of State for Foreign Affairs v. Charlesworth Pilling & Co.* [1901] A.C. 373, P.C.

H

*Smith, Stone and Knight Ltd. v. Birmingham Corporation* [1939] 4 All E.R. 116

*Syal v. Heyward* [1948] 2 K.B. 443; [1948] 2 All E.R. 576, C.A.

441

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    *Trottier v. Rajotte* [1940] 1 D.L.R. 433
     *Vadala v. Lawes* (1890) 25 Q.B.D. 310, C.A.
     *Vervaeke (formerly Messina) v. Smith* [1983] 1 A.C. 145; [1982] 2 W.L.R.
        855; [1982] 2 All E.R. 144, H.L.(E.)
     *Wahl v. Attorney-General* (1932) 147 L.T. 382, H.L.(E.)
     *Weiss, Biheller and Brooks Ltd. v. Farmer* [1923] 1 K.B. 226, C.A.

B    ACTION
     By a writ and statement of claim dated 1 August 1984, the plaintiff,
     Jimmy Wayne Adams commenced an action against Cape Industries Plc.
     and its wholly owned subsidiary, Capasco Ltd., seeking to enforce a
     default judgment which had been awarded to him in the United States
     of America. In the statement of claim it was alleged that (1) on 21 April
     1978, the plaintiff commenced an action against the defendants in the
C    United States District Court for the Eastern District of Texas, Tyler
     Division, in the State of Texas in the United States of America; (2) the
     court was duly constituted and held in accordance with the laws of
     the state and had jurisdiction in that behalf; (3) on 12 September 1983
     the court gave judgment in favour of the plaintiff for damages and
     assessed the damages to which the plaintiff was entitled in the sum of
D    U.S.$37,000 and ordered the defendants to pay the plaintiff forthwith
     the sum of $37,000 and interest at the rate of 9 per cent. per annum
     from that date until payment. Payment was claimed accordingly, it being
     certified that at the appropriate rate $37,000 amounted to £25,298.28.
     The writ was one of 205 claims to enforce the default judgment of
     the Tyler court in consolidated actions by plaintiffs with similar claims in
     respect of personal injuries alleged to have been caused by asbestos
E    dust. The defendants denied that the Tyler court had, for the purposes
     of English law, jurisdiction over them.
     The facts are stated in the judgments of Scott J. and the Court of
     Appeal.

F    *T. R. A. Morison Q.C.* and *Charles Falconer* for the plaintiffs.
     *Sir Godfray Le Quesne Q.C., Jonathan Playford Q.C., Adrian
     Brunner* and *George Alliott* for the defendants.

                                                   *Cur. adv. vult.*

     17 June 1988.  SCOTT J. read the following judgment. The judgment
     I am about to give is nearly but not quite my complete judgment. After
G    reserving judgment on Tuesday 19 April my judicial duties required me
     to sit in the North of England until the end of May. A consequence has
     been that preparation of my judgment in this important case has been
     unavoidably delayed. Representations have been made to me on behalf
     of Cape Industries Plc. to the effect that if the result of the case remains
     uncertain beyond this week, serious financial damage may ensue to the
     company and to its shareholders. I need not elaborate on the nature of
H    the fears but will say that they did not seem to me to be without
     substance.
     I would think it unacceptable in principle that litigants or those
     connected with them should be brought to suffer financial loss by a

442

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

judge's delay in preparing a reserved judgment, if that result can be    A
avoided. Since the outcome of this case is now clear in my mind and it is
only the expression of that outcome that is incomplete, the result can, I
think, be avoided. I have proposed to both sides that I should deliver
now my judgment to the extent that it is complete—something over
three-quarters is in fact complete—and express, in summary form, my
conclusions on the issues to be covered by that part of my judgment that
is not yet complete.                                                      B

The defendants have pressed me to take that course. The plaintiffs
have asked that I should hold my hand until my complete judgment is
ready for delivery. I have decided, however, that I ought to proceed in
the manner I have indicated. I do not think any injustice will be
occasioned thereby to the plaintiffs or anyone connected with them.

I will make clear the point at which my definitive judgment ends.    C
What I say thereafter will not form part of my definitive judgment but
will be an indication in summary terms of what will be contained in the
final part of my judgment when it is complete. I will reconvene the court
in due course for the delivery of that final part. The delay will, I trust,
be a short one. The order to be made consequent upon my judgment
will not be drawn up until the final part has been delivered. So time for
appeal will not start running. I will deal with costs at that stage.      D

I have before me 205 consolidated actions. In each action the
defendants are Cape Industries Plc. ("Cape") and Capasco Ltd.
("Capasco"). Each of the plaintiffs is a person or the personal
representative of a person in whose favour a damages award was made
on 12 September 1983 in the United States District Court for the
Eastern District of Texas, Tyler Division, in the State of Texas, United    E
States of America. I shall refer to this federal district court as the "Tyler
court."

The judgment of 12 September 1983 was a default judgment given by
Judge Steger, a federal district judge, sitting in the Tyler court. The
judgment, after setting out a number of findings of fact and conclusions
of law, concluded:

"By virtue of defaulting defendants' acts and omissions of negligence    F
and breaches of warranty, this court finds that defaulting defendants
are liable jointly and severally to each plaintiff listed in appendix A
for the amounts of money indicated for each plaintiff. It is therefore
ordered and adjudged by the court that plaintiffs recover from
defendants, jointly and severally, $15,654,000 and further that such
judgment shall run with 9 per cent. interest per annum from the    G
date hereof until paid . . ."

The awards made to the individual plaintiffs as set out in appendix A
to the judgment fell into a number of bands. 67 plaintiffs were awarded
$37,000, 31 plaintiffs were awarded $60,000, 47 plaintiffs were awarded
$85,000 and 61 plaintiffs were awarded $120,000. There were thus 206
awards in all. The surviving plaintiffs and the personal representatives of    H
all bar one of the plaintiffs who have died since 12 September 1983 have
brought actions in this country for payment of the damages and interest
ordered to be paid by the judgment of 12 September 1983. The cause of

A    action asserted and sued on in each action is the judgment of the Tyler
     court. These are the consolidated actions before me.

          A judgment of a foreign court can be enforced by action in this
     country only if the jurisdiction of the foreign court to have given the
     judgment is recognised by the law of this country. The jurisdiction of
     the Tyler court over Cape and Capasco is in issue in these actions. It is
     well settled also that a foreign judgment given by a court of competent
B    jurisdiction will not be enforced in this country if the judgment can be
     shown to have been obtained by fraud or if its enforcement would
     offend natural justice or public policy. These defences are relied on by
     Cape and Capasco. So the actions and the defences thereto raise a
     number of issues both of fact and of law and I must, in order to enable
     the issues to be comprehensible, start by briefly relating the history that
C    has led to these actions. When I have done so I will endeavour to
     describe the issues that arise for decision.

     *History*

          Cape until 1979 presided over a group of subsidiary companies
     engaged in the mining and marketing of asbestos. On 29 June 1979 the
D    mining and marketing companies were sold by Cape to a South African
     company, Transvaal Consolidated Exploration Co. Ltd. It was, however,
     the mining and marketing of the asbestos in the period before the 1979
     sale that gave rise to the litigation against Cape that culminated in the
     12 September 1983 default judgment. The mines from which the asbestos
     came were situated in South Africa. The mining companies, the most
     important of which for present purposes was Egnep Pty. Ltd. ("Egnep"),
E    were South African companies. Egnep mined amosite asbestos. The
     shares in Egnep and the other mining companies were held by Cape
     Asbestos South Africa (Pty.) Ltd. ("Casap"), also a South African
     company. Prior to 2 December 1975 the shares in Casap were held by
     Cape.

          One of the important markets for sale of the asbestos produced by
     the South African mines was the United State of America. On 14
F    October 1953, Cape had caused to be incorporated in Illinois a company
     called North American Asbestos Corporation ("N.A.A.C."). The shares
     in N.A.A.C. were held by Cape. The function of N.A.A.C. which I
     shall have to examine in more detail later, was to assist in the marketing
     of the asbestos in the United States of America. N.A.A.C. acted as a
     liaison between the United States purchasers of the asbestos and the
G    seller, either Egnep or Casap. N.A.A.C. also purchased asbestos on its
     own account and sold the asbestos in the U.S. market. In the later 1950s
     Capasco, an English company, was incorporated. Its shares were and
     still are held by Cape. Capasco, formerly called Cape Asbestos Fibres
     Ltd., was responsible for the marketing world wide of Cape's asbestos
     and asbestos products. But the prior existence of N.A.A.C. had the
     result that marketing in the United States of America was left in the
H    main to N.A.A.C.

          In 1975 an organisational change took place. Cape International &
     Overseas Ltd. ("C.I.O.L.") was incorporated. C.I.O.L. was an English
     company and its shares were held by Cape. The shares in Casap and the

444

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

shares in N.A.A.C. were transferred to C.I.O.L. But the manner in         A
which Capasco, N.A.A.C., and Casap and the mining companies carried
on business and managed their affairs was not materially altered by the
insertion of C.I.O.L. between Cape, on the one hand, and Casap and
N.A.A.C. on the other hand. The sale to Transvaal Consolidated
Exploration Co. Ltd. in 1979 took the form of a sale of the shares in
C.I.O.L. So, to rehearse the corporate structure, Cape was the parent
company; N.A.A.C. was the marketing subsidiary for the United States     B
of America; Capasco was the marketing subsidiary world wide; Casap
was the subsidiary which owned the mining companies and Egnep
owned the asbestos mines from which came the amosite asbestos which
was sold into the United States of America.

One of the main customers in the United States for Egnep's amosite
asbestos was Pittsburg Corning Corporation ("P.C.C."). In 1962, P.C.C.
purchased from Union Asbestos and Rubber Corporation ("Unarco")          C
an asbestos factory at Owentown in Texas. Unarco had been a customer
for Egnep's amosite asbestos. After its purchase of the Owentown
factory in 1962 P.C.C. became a customer. Egnep's amosite asbestos
was purchased by P.C.C. and used in the factory for 10 years from 1962
until 1972 when the factory was closed.

Awareness of the potential long-term damage capable of being         D
caused by asbestos dust to those exposed to it reached the point in the
mid-1970s in the United States of America at which personal injuries
actions began on a large scale to be instituted. Many of those who had
worked or were working in the Owentown factory and those who lived
in the neighbourhood of the factory commenced actions in the period
1974 to 1979. An accurate estimate is difficult to make but from what I   E
have heard in the course of this action it seems that over that period
some 2,000 to 3,000 plaintiffs issued proceedings based upon allegations
of injury caused by exposure to asbestos dust emanating from the
Owentown factory. There were several defendants to the actions. Unarco
and P.C.C., the successive owners of the factory, were defendants. The
corporate shareholders of P.C.C., namely P.P.G. Industries Inc.
("P.P.G.") and Corning Glassworks Inc., were joined as defendants on     F
the basis that each had taken sufficient part in management decisions
regarding the use of asbestos at the Owentown factory to subject itself
to tortious liability arising from that use. N.A.A.C., Cape and Egnep
became defendants.

Liability was alleged on the ground that they had been responsible
for the supply of the amosite asbestos used in the Owentown factory
and, notwithstanding knowledge of its dangers, had failed to warn        G
against those dangers. In addition, the United States itself became a
defendant in some of the actions and a third party defendant in others.
So did the union to which most of the Owentown factory workers
belonged, the Oil Chemical and Atomic Workers International Union.
Not all these defendants were residents of Texas. Moreover, the
defendants included the United States of America itself. So the actions  H
were brought not in a Texas state court but in a federal court under its
diversity of citizenship jurisdiction, which I will later endeavour to
explain.

A    The first action was commenced in the Tyler court on 2 January 1974. There were some seven plaintiffs. The action was framed as a "class" action with the plaintiffs purporting to sue "on behalf of themselves and all others similarly situated." This was the "Yandle" action. On 17 January 1974 a second action was commenced in the Tyler court, the "Kay" action. Both actions were assigned to Judge Steger.

B    On 25 February 1974 Cape filed a motion in the Yandle action to quash service on the ground of lack of jurisdiction. On 26 March 1974 Cape filed a similar motion in the Kay action. On 10 April 1974 Egnep did likewise. In 1976 Capasco became a defendant and filed similar motions.

On 31 July 1974, by which time it must have been apparent that hundreds of claimants alleging injury caused by the amosite asbestos used in the Owentown factory were queueing up in the wings, a

C    conference took place between Judge Steger and counsel for the parties in the two actions. It was decided that the Rules for Complex and Multi-District Litigation would be followed. I shall have to describe these more fully later. For the moment, it suffices to say that they are rules set out in the *Manual for Complex Litigation for use with Federal Practice and Procedure*, the authors of which are Professor Charles

D    Wright and Professor Arthur Miller. The latter gave evidence before me. The rules, widely used in federal courts, represent in substance management techniques for the efficient management and conduct of complex civil litigation.

One of the first procedural questions which needed to be decided was whether or not the actions would proceed as "class" actions. A hearing on this issue took place on 17 December 1974. On 31 December

E    1974 Judge Steger ruled that the actions should not have "class" action status. His judgment contains a useful summary of the litigation and the issues therein. In the penultimate paragraph of his judgment, Judge Steger said:

F    "The court is of the opinion that the superior method for adjudication of this case is to continue to allow intervention freely for those who wish to join and to maintain firm control over this litigation by utilising the tools set forth in the *Manual for Complex and Multi District Litigation*. It is therefore ordered that the plaintiffs' motion for class action status be and the same is hereby in all things denied . . ."

G    I must explain the reference to "intervention." Under rule 24 of the Federal Rules of Civil Procedure, a person may, with leave of the court, intervene in an action and become a party thereto if the "applicant's claim or defence and the main action have a question of law or fact in common." Following Judge Steger's order of 31 December 1974 a large number of claimants intervened in the Yandle and Kay actions. On 31 December 1974 a third action was commenced in the Tyler court, the

H    "McNeece" action. The United States of America was the only defendant. The three actions I have mentioned (the Yandle action, the Kay action and the McNeece action) have become known compendiously as Tyler 1. I shall so refer to them.

446

I have already referred to the motions based upon an alleged lack of jurisdiction. Those motions were not dealt with until 19 April 1977. In the meantime, Cape and Capasco took a number of procedural steps in or in connection with the actions. The effect of these steps is one of the issues before me.

On 19 August 1977 Judge Steger dismissed the motions. He gave no written judgment or reasons. The dismissal was not, however, final. It did not bar Cape and Capasco from taking the same jurisdiction point at trial. In substance, the dismissal was, I think, no more than a decision that the point was not so obvious as to warrant a summary dismissal of Cape and Capasco from the action, and that the point should be left for final decision at trial.

Following the dismissal of the motions, Cape and Capasco filed answers in the Yandle action and the Kay action. They pleaded to the merits of the claims while nonetheless maintaining their jurisdiction objection. By this time, mid-1977, the process of intervention had swelled the number of claimants for damages in the Tyler actions to well over 400. The number was, moreover, still increasing. On 15 July 1977 Judge Steger set 12 September 1977 as the trial date for the three Tyler actions.

One of the most striking features of the Tyler litigation, to English eyes at least, is the personal involvement of Judge Steger in the negotiations for a settlement between the claimants and the defendants. It is a fair inference from the evidence before me that the judge set 12 September 1977 as the trial date in order to concentrate the minds of all parties on the need for a settlement and without any real expectation that an effective trial would commence on that date.

When, on 12 September 1977, the actions were called on, the defendants applied for an adjournment on the ground that they were not yet ready for trial. Judge Steger, without ruling on the application, sent the parties away to negotiate. It is interesting to recall the evidence of Mr. Richard Bernays, counsel for N.A.A.C. He said:

"Judge Steger then asked the marshall to show us all—and we were quite an aggregation—into his conference room in his chambers, and he was completing the call of his docket and said he would join us shortly, which he did. There were a number of us round a very large conference table and the judge finally appeared and directed us to stay there and work until we had settled the cases. He gave us orders that nobody was to leave Tyler, that we could set our own hours of work, come and go as we pleased with that one restriction, that nobody was to leave Tyler without his permission, and he ordered us to stay and work as long as was required to get these cases settled—period."

The negotiations continued in Tyler for some three days. The judge played a broking role, putting pressure on the plaintiffs' counsel to reduce the demands they were making and putting pressure on the defendants' counsel to make offers he regarded as realistic. Sometimes it was the judge himself who communicated the offers and counter-offers to the other side. After the initial three days, counsel were permitted by

A    the judge to leave Tyler in order to confer with their clients and to obtain fresh instructions. They returned to Tyler about a week later and a further three days of negotiations took place. Final negotiations at which agreement was reached took place over the period 28 September to 30 September 1977. The agreed settlement figure was $20m.

One of the difficulties which had apparently stood in the way of settlement had been the ever increasing number of plaintiffs. Accordingly

B    on 28 September, after I think agreement in principle on the $20m. figure had been reached, Judge Steger announced that no further intervention in any of the Tyler 1 actions would be permitted. There were then 462 plaintiffs. No more would be added. A formal order to that effect was in due course made on 16 December 1977 and was expressed to be "nunc pro tunc as of 28 September 1977."

C    The burden of providing the $20m. was shared among the defendants in agreed proportions. A sum of $5.2m. was to be contributed by N.A.A.C., Cape and Egnep; $8.05m. by P.C.C. and its shareholders; $1m. by Unarco; and $5.75m. by the United States Government. The $20m. was intended to settle all claims of the existing 462 plaintiffs.

Notwithstanding that effective agreement was reached in the negotiations on 28, 29 and 30 September 1977, the final judgment

D    disposing of the Tyler 1 actions was not given until 5 May 1978. The judgment provided:

"all parties agreed to waive a jury herein and submit all matters to the court without the intervention of a jury, whereupon all parties made it know to the court that all matters in controversy between them and each of them had been settled by an agreement made in

E    open court which agreement has been transcribed, and the court finds from the evidence that said agreement is fair, reasonable, just, and to the best interests of plaintiffs herein, including the minor plaintiffs, and that said agreement should be in all things approved, it is therefore, ordered, adjudged and decreed by the court that the compromise settlement agreement evidenced by the record of proceedings made herein on 28, 29 and 30 September 1977, and 15

F    February 1978, be and the same is hereby in all things approved. It is accordingly ordered, adjudged and decreed by the court that the plaintiffs and intervenor, and each of them, take nothing by reason of these suits and said causes are hereby dismissed with prejudice."

G    Judge Steger's oral direction given on 28 September 1977, confirmed by the written order of 16 December 1977, had prevented any further interventions in the Tyler 1 actions. New actions had, therefore, been commenced by claimants who would, no doubt, have otherwise intervened in the Tyler 1 actions. These new actions are referred to as the Tyler 2 actions. They, too, were assigned to Judge Steger. There are eight actions in all. The first was commenced on 19 April 1978. The last

H    was commenced on 19 November 1979. Intervention by other claimants into one or other of the Tyler 2 actions took place on an even greater scale than had been the case with the Tyler 1 actions. Cape, Egnep and N.A.A.C. were defendants in each of the eight Tyler 2 actions. But Capasco was a defendant in only three of them, namely those identified

by the numbers 78–102, 78–104, and 79–114. P.C.C., P.P.G., Corning    A
Glass and O.C.A.W. were defendants in all actions. The United States
Government was a defendant in some of the actions and a third party
defendant in others.

On 28 December 1981 an important procedural order was made by
Judge Steger. The order commences with this explanatory passage:

"There are several issues in these massive tort actions which should    B
be addressed in order that the court may exercise more control over
the proceedings as this litigation progresses. First, the defendants
have filed motions in which they contend that the claims of many of
the plaintiffs are premature because no injury has yet been suffered
by the party allegedly exposed to asbestos. Second, it appears that a
pretrial statement of damages would improve the court's ability to
take a more active role in managing the progress of these actions."    C

The operative part of the order provided:

"It is ordered that each plaintiff asserting a claim for money/damages
in this action shall provide the information requested by the court
on or before 1 February 1982. The answers shall be based on
personal knowledge and attested to under penalty of perjury. Every    D
person providing the information requested has an obligation to
exercise good faith in disclosing all material facts that are relied on
in asserting the respective claims. Non-responsive or evasive answers
will not be permitted. Counsel shall assist in preparing the responses
when appropriate. This case has been pending for several years and
there has been ample time for counsel to evaluate the claims of
their clients.                                                          E

"For the present time, a plaintiff whose deposition has previously
been taken in this action, need not provide the requested
information. However, the court urges counsel for the plaintiffs to
carefully examine and analyze the claims asserted by every individual
they purport to represent to determine whether the claims asserted
are premature or frivolous. If so, counsel should take whatever
action necessary to protect the rights of their clients.               F

"In the event a plaintiff determines that the claim he or she is
asserting has been filed prematurely, he or she may file a motion to
voluntarily dismiss under rule 41(a)(2) of the Federal Rules of Civil
Procedure. Unless good cause to the contrary is demonstrated, the
court will grant said motions and dismiss the claims without
prejudice.                                                             G

"In the event a plaintiff fails to provide the requested information
within the time allowed, his or her claim will be subject to dismissal
without prejudice in accordance with the provisions contained in
rule 37(b)(2) and rule 41(b) of the Federal Rules of Civil Procedure."

Under headings "Preliminary information," "Has the cause of action
accrued," and "Pre-trial statement of damages" the information to be    H
supplied was specified.

As a result of the order of 28 December 1981 and the response, or
lack of response, thereto by the respective plaintiffs, a large number

A    thereof had their claims summarily dismissed "without prejudice." The number of plaintiffs left in the Tyler 2 actions was 206 or thereabouts. It may be assumed that each of the 206 had responded to the order of 28 December 1981 by alleging some physical condition that was at least capable of having been caused by exposure to asbestos dust and was capable of constituting an injury.

B    Cape, Capasco and Egnep took no part in any of the Tyler 2 actions. This was a deliberate tactical decision. It appears from the evidence I have seen and heard that the senior officers of Cape regarded the Tyler 1 actions, initially at least, as of little more than nuisance value. They could not understand how tortious liability to the Owentown workers could be visited upon the Cape companies simply on the ground that Cape subsidiary companies had mined the asbestos and sold it into the United States of America. It may be that they underestimated the breadth of the net of tortious product liability as applied in the United States of America. They also, it seems, expected to succeed on their jurisdiction objection, either at the interlocutory stage or, later, at trial. But the Tyler 1 settlement negotiations and the pressure for a settlement exerted by Judge Steger shattered any previous complacency. If the other defendants had stood firm, Cape would, I think, have preferred to go to trial and to have endeavoured to win on the jurisdiction point. But if all the other defendants were to settle, Cape would be left as the only defendant in potentially big and expensive jury trials. So they agreed to participate in the Tyler 1 settlement at a group cost of $5.2m.

E    After the settlement had been concluded the future did not look attractive to Cape. It was known, or at least feared, that there were hundreds more claimants waiting to step forward and press claims. The $5.2m. contribution to the $20m. settlement had been borne as to $4.1m. by N.A.A.C.'s insurers. But the insurance cover was, apparently, virtually exhausted. Cape had no assets in the United States of America save for the shares in N.A.A.C. held by C.I.O.L. The N.A.A.C. shares were, by reason of the number of outstanding asbestos related claims, assets of no value. So the decision was taken by the senior management of Cape that Cape, Capasco and Egnep would take no step at all in any of the Tyler 2 actions. They were prepared to allow default judgments to be obtained. There were no United States assets against which any judgments could be enforced and they were prepared to defend actions brought in England to enforce any judgments on the ground that under English law, the United States courts had no jurisdiction over Cape, Capasco or Egnep. The decision to take no step in the Tyler 2 actions was necessary in order to avoid anything being done that might be represented as a submission to the jurisdiction of the Tyler court. In addition it was decided to put N.A.A.C. into liquidation.

    These decisions were taken at a meeting of the board of Cape Industries held on 1 November 1977. The minutes of the meeting record:

H    "The managing director stated that, having regard to the opinion of Mr. J. Fox-Andrews Q.C., it was proposed in respect of any future United States claims not to contest the proceedings in the American courts and to accept the risk of a default judgment being given

450
Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                [1990]

against the company in the United States of America, it being       A
considered most unlikely that such a judgment would be enforced
by an English court. . . . Reference was made to a proposed re-
organisation of the group's asbestos selling arrangements, particularly
in the United States of America, which in future would be more
closely controlled from South Africa. As part of this re-organisation
it is proposed that North American Asbestos Corporation should be
wound up."                                                          B

The minutes do not so state but there can really be no doubt but that
the decision to wind up N.A.A.C. was taken in order to try and avoid
the danger of an argument that under English law Cape's interest in
N.A.A.C.'s United States business sufficed to give the Tyler court
jurisdiction over Cape.
      It was not, however, desired that the United States of America, as a    C
market for Cape's asbestos, should be abandoned. The liquidation of
N.A.A.C. was accompanied by the devising and implementation of
alternative marketing arrangements. First, a Liechtenstein corporation,
Associated Mineral Corporation ("A.M.C."), was formed, the bearer
shares in which were held by Dr. Ritter, a Liechtenstein lawyer, as
fiduciary for C.I.O.L. All sales of Cape's asbestos into the United States    D
of America were to be sales by A.M.C. The second step involved the
creation of a new United States marketing entity. The president of
N.A.A.C. for the past four years or so had been a Mr. Morgan. On 12
December 1977 a new Illinois corporation, Continental Productions
Corporation ("C.P.C.") was formed. The shares in C.P.C. were held by
Mr. Morgan. Under an agreement dated 5 June 1978 made between          E
C.P.C. and A.M.C. it was agreed that C.P.C. would act as agent for
A.M.C. in the U.S.A. for the purpose of the sale of asbestos. C.P.C.
was to be remunerated on a commission basis but had no authority to
contract on behalf of its principal, A.M.C., or any other Cape company.
It was to act as a link between A.M.C. and the United States purchasers
in connection with shipping arrangements, insurance and the like.
      As from 31 January 1978, N.A.A.C. ceased to act on behalf of any       F
of the Cape companies or to carry on any business on its own account
save for the purpose of liquidating its assets. N.A.A.C. executed articles
of dissolution on 18 May 1978. The relationship between N.A.A.C.,
C.P.C., A.M.C. and the Cape companies is a matter on which a good
deal turns and to which I shall have to return in more detail. My
intention for the moment is simply to give an outline of events. Through    G
the medium of A.M.C. and with the assistance of C.P.C., Egnep's
amosite asbestos continued to be sold into the U.S. until the sale in 1979
to Transvaal Consolidated Exploration Co. Ltd. What happened
thereafter I do not know.
      I must return to the Tyler 2 actions. Between 1981 and 1982, it will
be recalled, the number of plaintiffs had been thinned down to about
206. On 3 November 1982 Judge Steger fixed 2 February 1983 as the      H
trial date. Shortly before the hearing date, settlement negotiations took
place. On 24 January 1983 there was a meeting between defence
counsel. The purpose was to discuss the forthcoming trial. The possibility

1 Ch.                         Adams v. Cape Industries Plc. (Ch.D.)

A   of settlement of the Tyler 2 actions was also discussed. No one on behalf of Cape, Capasco or Egnep was present. They were taking no part in the proceedings. No one for Unarco was present. Unarco had entered into bankruptcy proceedings and, as I understand it, the actions against it had consequently been stayed. But the other defendants, including N.A.A.C. were represented. When discussion of a possible settlement began, counsel for the United States made clear that the United States

B   would not agree to make any payment by way of settlement. A policy decision had apparently been taken by the Justice Department that the industry and not the taxpayer should bear the cost of compensating claimants for asbestos related disease.

     On the following day another conference took place. On this occasion the plaintiffs' counsel, too, were present. So was the judge, who seems

C   to have played a part comparable to that which he played in the 1978 settlement of the Tyler 1 actions. It is important to record that the plaintiffs represented at this conference did not include those plaintiffs, for convenience called "the Unarco plaintiffs," who had worked at the Owentown factory during its ownership by Unarco pre-1962 but not during its ownership by P.C.C. post-1962. The Unarco plaintiffs obviously had no claim against P.C.C. or its shareholders. So they were not

D   represented in the settlement negotiations that took place on 25 January 1983 and thereafter. The plaintiffs represented at these negotiations numbered 133.

     Offers were made on behalf of the plaintiffs. Offers were made by the defendants. It is a feature of the negotiations that the plaintiffs' demands were presented in the form of an average figure per plaintiff.

E   Initially, a sum of $40,000 per plaintiff was sought. This, given 133 plaintiffs, would have led to a settlement figure of $5.32m. The defendants offered a total sum of only $619,000. So there was a wide gap between the two sides. In the course of the day, the plaintiffs' figure came down and the defendants' figure went up. Judge Steger was closely involved in the negotiations, discussing quantum sometimes with plaintiffs' counsel, sometimes with all counsel together. He made plain

F   that he thought the plaintiffs were asking for too much and that the defendants were not offering enough. He was instrumental in bringing the plaintiffs down to an average of $10,000 per plaintiff, a total of $1.33m.

     This figure was within reach of a figure that defendants' counsel would have been prepared to accept. But they lacked authority from their clients to go that high. So the negotiations were adjourned to 2

G   February 1983. The lead counsel for the plaintiffs in these negotiations was Mr. Blake Bailey. He occupied this position not because he represented more plaintiffs than anyone else, but simply because he had been appointed by Judge Steger to be liaison counsel on behalf of the plaintiffs. In the course of the discussions on 25 January Mr. Bailey raised the question of the possible liability of the United States

H   Government. The United States had indicated an unwillingness to agree to make any payment to the plaintiffs. But Mr. Bailey, apparently after discussions with Judge Steger, thought there was a good chance that a judgment against the United States Government could be obtained, at

452

Scott J.    Adams v. Cape Industries Plc. (Ch.D.)    [1990]

least on the third party claims, if not on the plaintiffs' direct claims. Mr. **A**
Bailey conceived the idea that the terms of settlement might keep alive,
for the benefit of the plaintiffs, the third party claims of the settling
defendants against the United States Government.

On 2 February 1983 the parties met once more. Agreement was
reached on a settlement at an average of $10,000 per plaintiff, a total of
$1.33m. This figure was that which on 25 January Judge Steger had told
Mr. Bailey that the plaintiffs should accept and had told the defendants **B**
that they should offer. As between the settling defendants, the $1.33m.
was to be provided as to $900,000 by P.C.C. and P.P.G., $130,000 by
Corning Glass, $50,000 by O.C.A.W. and $250,000 by N.A.A.C. On
payment of these sums the settling defendants were to be released from
all claims by the 133 plaintiffs.

In addition, however, Mr. Bailey put to the defendants' counsel, and **C**
obtained their agreement to, a device intended to give the plaintiffs the
chance of additional recovery against the United States Government.
The device was this: the settlement figure would be expressed in the
intended settlement agreement not as $1.33m. but instead as $6.65m.,
an average of $50,000 per plaintiff. The defendants would be obliged to
pay only $1.33m. The balance of $5.32m. ($40,000 per plaintiff) would **D**
be payable only if and to the extent that the defendants' third party
claims against the United States succeeded. The prosecution of those
claims in the names of the defendants was to be the responsibility of the
plaintiffs' counsel, no costs in respect thereof falling on any of the
defendants. The $6.65m. was a figure proposed by Mr. Bailey. It was
not a figure which mattered at all to the defendants since their obligation
to pay was limited to the $1.33m. They did not bargain about the **E**
amount. They simply agreed to Mr. Bailey's proposal which would cost
them nothing. Mr. Bailey told me that the figure was based upon what
he thought might be awarded against the United States at the suit of the
settling defendants. How it could have been supposed that the liability
of the United States under the third party claims could exceed the
$1.33m. that the settling defendants, the third party claimants, had
agreed to pay the plaintiffs, defeats me. But there it is. I shall have to **F**
return to the implications of this device later.

Terms having been reached between plaintiffs and settling defendants,
the agreement was announced to Judge Steger in open court on the
same day, 2 February 1983. There is a transcript of what was said. Judge
Steger approved the settlement. He certainly knew of the true settlement
figure of $1.33m. Indeed, the $10,000 average had been suggested and
recommended by him. Whether he had any knowledge of the $6.65m. **G**
figure is an important matter to which I must return.

On 8 April 1983 Judge Steger fixed 20 June 1983 as the trial date for
the outstanding Tyler 2 claims against the United States. In addition to
the third party claims, a few of the plaintiffs had direct claims against
the United States. The lead counsel for the United States in the Tyler 2
actions was Peter Nowinski. He and Mr. Bailey met and discussed the **H**
possibility of settlement. Mr. Nowinski again made clear that the United
States Government thought that the industry, not the taxpayers, should
bear the burden of compensation for asbestos related injury. Mr. Bailey

A    then suggested an agreement under which, in settlement of the claims against the United States, the United States would agree to bear the costs of enforcement of default judgments against, Cape, Capasco and Egnep. Agreement on these lines was reached. A compromise agreement dated 15 June 1983 was signed. Paragraphs 3 and 4 thereof provided:

B    "Plaintiffs or third-party plaintiffs, or both, will promptly make due application to the Texas court for judgment against the Cape companies, or any of them, for damages suffered as a result of exposure to asbestos at or from the Texas plant. Such application shall not be presented to the Texas court without the prior approval of the United States of America, both as to form and content, which approval shall not be unreasonably withheld.

C    "Upon satisfaction of the promises made in clauses 1, 2 and 3 above and upon entry of judgment or judgments against the Cape companies, or any of them, the United States agrees diligently to cause to be taken or assist in taking of such appropriate action as may be reasonably required to enforce or attempt to enforce such judgment or judgments in the United Kingdom of Great Britain or the Union of South Africa, or in such other countries as may be appropriate against the judgment debtors, their predecessors, successors, assigns or other appropriate entities."

    The stage was therefore set for applications for default judgments against Cape, Capasco and Egnep, none of which had taken any part in the Tyler 2 actions and each of which therefore was in default in filing an answer to the plaintiffs' pleadings. The purpose of obtaining these default judgments was that they should be enforced in England. It is not surprising, therefore, that the application should have been preceded by consultations between Mr. Bailey, Mr. Nowinski and Messrs. Oppenheimers, solicitors for the plaintiffs. The advice given by Oppenheimers is protected by privilege, but it is not hard to infer that it dealt with the English law on enforcement of foreign judgments.

    The application for the default judgment and the judgment itself were drafted by Mr. Bailey. Various preliminary drafts are in evidence and there is some difficulty in following the development of the original draft to the final version. Mr. Bailey testified to consultations both with Mr. Nowinski and with Judge Steger on the matter. Cape and Capasco were informed by notice that the application for the default judgment would be heard on 12 September 1983. This notice was not strictly required under the relevant Federal Rules of Procedure but, I expect, was given ex abundanti cautela on the advice of the plaintiffs' English lawyers.

    A hearing of the application, or at least some judicial adjudication thereon, was necessary in order that the unliquidated damages claims of the respective plaintiffs should be quantified. The documents in support of the application were lodged with Judge Steger on 12 September 1983 and sought for each plaintiff one or other of four levels of damages, $150,000, $115,000, $85,000 and $60,000. The sum allocated to each plaintiff was designed to produce an average of $120,000 per plaintiff. On 12 September 1983 Judge Steger was sitting not in Tyler but in

454

Marshall, Texas. The documents handed in on 12 September 1983    A
included medical records relating to each of the 206 plaintiffs. In relation
to a few of the plaintiffs there were doctors' reports. With the records
and reports relating to each plaintiff was a summary. Each summary
gave the name and age of the plaintiff, a short statement of the
plaintiff's exposure to asbestos dust, the name of the person or
organisation by whom the plaintiff had been medically examined and a
short statement of the result of the examination. The summaries had    B
been prepared by the plaintiffs' respective attorneys.

The default judgment itself was signed by Judge Steger and dated 12
September 1983. It was presumably signed on that day. It was certainly
signed earlier than 14 September 1983 since on that date the judgment
was formally recorded on the court docket sheets relating to the Tyler 2
actions. At some point, perhaps in the afternoon of 12 September, Mr.    C
Bailey was informed on the telephone by Judge Steger's law clerk that
the judge was not prepared to give judgment for an average of $120,000
per plaintiff but was prepared to give judgment for an average of
$75,000 per plaintiff. It was left to Mr. Bailey and Mr. Charles Clark,
counsel for some 181 of the plaintiffs, to re-work the details in the
appendix to the judgment so as to produce an average award of $75,000.
They did so by reducing the four levels of damages to $115,000, $85,000,    D
$60,000 and $37,000. Thus the directed average of $75,000 was produced.
The re-worked appendix was handed in at the Tyler courthouse and was
annexed to the signed judgment. All this must have taken place earlier
than 14 September and before Judge Steger signed the judgment. No
hearing as such had taken place. No witness had given evidence, orally
or by affidavit. The extent to which Judge Steger looked at, or could    E
have looked at, the medical records and reports is in doubt. I will return
to this later. The propriety of the judge dealing with the assessment of
damages without any evidence, in the strict sense, is also in issue. It is
not necessary for me at this stage to do more than outline the manner in
which the default judgment came to be produced.

The actions before me were commenced by specially endorsed writs
most of which were issued on 1 August 1984. Each statement of claim    F
pleaded the Tyler 2 action in which the plaintiff had been a party,
asserted that the Tyler court had had jurisdiction to deal with the action,
pleaded the default judgment of 12 September 1983, and claimed the
amount allocated by that judgment to the plaintiff with interest thereon.

*The issues*

The plaintiffs cannot enforce the default judgment by action in this    G
country unless, by the standards of English law, the Tyler court was
entitled to take jurisdiction over Cape and Capasco. The plaintiffs rely
on three alternative grounds. First, the plaintiffs contend that Cape and
Capasco voluntarily appeared in the proceedings in the Tyler court. This
contention requires some explanation since it is common ground that
Cape and Capasco took no part at all in the Tyler 2 actions. The    H
plaintiffs rely, however, on the steps taken by Cape and Capasco in the
Tyler 1 actions and on the relationship between the Tyler 1 actions and
the Tyler 2 actions. The first step in the argument is that Cape and

A    Capasco voluntarily appeared in the Tyler 1 actions. Cape and Capasco
     deny this. They contend that each step they took in the actions was
     taken subject to the protest to the jurisdiction they had made at the
     outset and that, notwithstanding the interlocutory dismissal of their
     motions, jurisdiction remained a live issue for the trial. In the
     circumstances they contend that nothing was done in the Tyler 1 actions
B    that could constitute a voluntary appearance or submission to the
     jurisdiction. The plaintiffs' second step in the argument is their assertion
     that the Tyler 1 actions and Tyler 2 actions represent "one litigation
     unit" so that a voluntary appearance or submission to the jurisdiction in
     any of the actions was sufficient to give the Tyler court jurisdiction over
     Cape and Capasco in all the actions. This somewhat startling proposition
     is based upon the alleged effect of bringing Owentown asbestos related
C    litigation under the umbrella of the Rules for Complex and Multi
     District Litigation.

         Second, the plaintiffs contend that even if they are wrong on their
     first point, nonetheless Cape and Capasco must be taken to have agreed
     to submit to the jurisdiction of the Tyler court in the Tyler 2 actions.
     The plaintiffs rely on the inferences which it is contended must be drawn
D    from the various steps taken by Cape and Capasco in the Tyler 1
     actions. Cape and Capasco deny that those steps can be represented as
     their agreement to submit to the jurisdiction in other actions.

         Third, the plaintiffs contend that the Tyler court was entitled to take
     jurisdiction over Cape and Capasco by reason of their presence in
     Illinois either in January 1974, when the Tyler 1 actions commenced or
     in April 1978 to November 1979, the period over which the Tyler 2
E    actions were commenced. This contention raises issues both of law and
     fact. For the fact of presence, the plaintiffs rely on N.A.A.C.'s Illinois
     presence up to its dissolution in 1978 and on C.P.C.'s Illinois presence
     from 31 January 1978 up to the sale to Transvaal Consolidated in June
     1979. It is contended that the relationship between each of these
     companies and Cape and Capasco justifies treating their presence in
F    Illinois as, for jurisdiction purposes, the presence of Cape and Capasco.
     This contention is in issue. It is also in issue whether, under English law,
     presence in Illinois is sufficient to give jurisdiction to a federal district
     court sitting in Texas on a tort claim governed by the law of Texas. The
     last of the Tyler 2 actions was commenced in November 1979, some
     months after the sale to Transvaal Consolidated. But, if the plaintiffs'
G    presence in Illinois is sound so far as the earlier Tyler 2 actions are
     concerned, the plaintiffs rely on the "one litigation unit" argument for
     the purpose of bringing the last action under the same umbrella.

         Finally, the plaintiffs have a comity or reciprocity ground. It is
     pleaded in the further and better particulars of the statement of claim
     that, if the situation had been in reverse, the English courts would have
     assumed jurisdiction and that the English courts should therefore
H    recognise the jurisdiction of the Tyler court. Mr. Morison, however, in
     opening the plaintiffs' case gave me the welcome news that he would not
     be relying before me on this fourth ground. There is apparently clear
     authority, binding at least on courts of first instance, that comity or

456
Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

reciprocity is an inadequate ground for enforcement in England of the **A**
judgment of a foreign court.

Cape and Capasco deny that the Tyler court had, for the purposes of
English law, jurisdiction over them on any of the three grounds relied
on by the plaintiffs. Cape and Capasco have, however, additional
defences. They allege that the default judgment is impeachable and
unenforceable, first upon the ground that it was obtained by the fraud of
Mr. Bailey, second that it was obtained in circumstances opposed to **B**
natural justice; and, finally, that to enforce it would be contrary to
public policy. Broadly the same particulars are relied on in support of
each of the three grounds. It is alleged that the default judgment, as
drafted by Mr. Bailey and signed by Judge Steger, contained to the
knowledge of Mr. Bailey a number of mis-statements of fact. It is
alleged that, to Mr. Bailey's knowledge, the procedure employed for **C**
quantification of the plaintiffs' damages did not represent a judicial
determination or assessment thereof. It is alleged that Mr. Bailey
induced the judge to award more than he would otherwise have awarded
by misrepresenting that the February 1983 settlement between the 133
plaintiffs and the settling defendants had been agreed at an average
figure of $50,000 per plaintiff, rather than the true figure of $10,000 per
plaintiff. It is alleged that the damages awarded by the default judgment **D**
were to Mr. Bailey's knowledge, arbitrary, exorbitant and manifestly
unjust. There are additional allegations, but I have mentioned the
principal ones. These allegations are all denied and have been bitterly
contested. Apart from the issues of fact raised by these allegations they
raise also issues of law as to the criteria that must be satisfied if an
otherwise enforceable foreign judgment is to be rejected on grounds of **E**
fraud, natural justice or public policy.

In summary, therefore, there are the following issues with which I
must deal. (1) Did Cape and Capasco voluntarily appear or submit to
the jurisdiction in the Tyler 1 actions? (2) If so, did they thereby submit
to the jurisdiction in the Tyler 2 actions? (3) Alternatively, did they
thereby agree to submit to the jurisdiction in the Tyler 2 actions?
(4) Did the presence of N.A.A.C. in Illinois represent the presence of **F**
Cape and Capasco in Illinois for jurisdiction purposes? (5) Did the
presence of C.P.C. in Illinois represent the presence of Cape and
Capasco in Illinois for jurisdiction purposes? (6) Did the presence in
Illinois of Cape and Capasco entitle the Tyler court to take jurisdiction
over Cape and Capasco in the Tyler 2 actions? (7) Is the default
judgment impeachable on any of the fraud, natural justice and public **G**
policy grounds pleaded by Cape and Capasco?

I will take these issues in turn, but it is worth first emphasising that
each falls to be decided in accordance with English law. Questions as to
whether certain acts represent a submission to the jurisdiction of the
Tyler court must be decided by reference to English law. It may be that
English law will answer certain questions by applying the law of Texas
or United States federal law, as the case may be, but that will be **H**
because English law requires that approach. My task is to try and
identify the rule of English law that applies to each question and then to
apply that rule.

A      I can conveniently start by identifying the basis on which English courts will enforce the in personam judgments of foreign courts. In *Russell v. Smyth* (1842) 9 M. & W. 810, 818, Lord Abinger C.B. said: "Foreign judgments are enforced in these courts because the parties liable are bound in duty to satisfy them." Parke B. expressed the same principle, at p. 819: "Where the court of a foreign country imposes a duty to pay a sum certain, there arises an obligation to pay, which may
B   be enforced in this country." In *Godard v. Gray* (1870) L.R. 6 Q.B. 139, 148–149, Blackburn J. said:

> C   "But in England and in those states which are governed by the common law, such judgments are enforced, not by virtue of any treaty, nor by virtue of any statute, but upon a principle very well stated by Parke B. in *Williams v. Jones* (1845) 13 M. & W. 628, 633: 'Where a court of competent jurisdiction has adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained. It is in this way that the judgments of foreign and colonial courts are supported and enforced.' And taking this as the principle, it seems to follow that anything which negatives
> D   the existence of that legal obligation, or excuses the defendant from the performance of it, must form a good defence to the action. It must be open, therefore, to the defendant to show that the court which pronounced the judgment had no jurisdiction to pronounce it, either because they exceeded the jurisdiction given to them by the foreign law, or because he, the defendant, was not subject to that jurisdiction; and so far the foreign judgment must be examinable. Probably the defendant may show that the judgment
> E   was obtained by the fraud of the plaintiff, for that would show that the defendant was excused from the performance of an obligation thus obtained . . ."

F   In *Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155 judgment was delivered on the same day as the judgment in *Godard v. Gray*, L.R. 6 Q.B. 139. The same judge, Blackburn J., repeated the principle stated in *Godard v. Gray*, and added, at p. 159, that "anything which negatives that duty, or forms a legal excuse for not performing it, is a defence to the action."

G   The "obligation to pay" to which Blackburn J. referred in *Godard v. Gray* may, under English law, arise in two ways. First, it is accepted that a foreign court is entitled to take jurisdiction on a territorial basis. "All jurisdiction is properly territorial" said the Earl of Selbourne L.C. in *Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, 683. He expanded the proposition thus:

> H   "Territorial jurisdiction attaches (with special exceptions) upon all persons either permanently or temporarily resident within the territory while they are within it; but it does not follow them after they have withdrawn from it, and when they are living in another independent country. It exists always as to land within the territory, and it may be exercised over moveables within the territory; and, in questions of status or succession governed by domicil, it may exist

458
Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

as to persons domiciled, or who when living were domiciled, within    A
the territory. As between different provinces under one sovereignty
(e.g. under the Roman Empire) the legislation of the sovereign may
distribute and regulate jurisdiction; but no territorial legislation can
give jurisdiction which any foreign court ought to recognise against
foreigners, who owe no allegiance or obedience to the power which
so legislates."
                                                                      B
It is the territorial basis of jurisdiction that the plaintiffs invoke in
asserting that Cape, through N.A.A.C. or C.P.C., was present in
Illinois.

   The alternative basis of jurisdiction, where in personam money
judgments are concerned, is that of consent. Prima facie, a foreign court
does not, in the eyes of English law, have jurisdiction over an absent
foreigner. But if the foreigner consents to the court exercising jurisdiction    C
over him, the position is different. The element of consent is clearly
present if the foreigner, as plaintiff, commences proceedings in the
foreign court. It is also present if the foreigner, as defendant, makes a
voluntary appearance without protest in the foreign court. In either case
there is a submission by the foreigner to the jurisdiction of the foreign
court that, in the eyes of English law, may give rise to an "obligation to    D
pay." Further, whether or not a defendant takes any part in an action in
a foreign court, he may have contractually bound himself to accept the
jurisdiction of the foreign court. Accordingly, the jurisdiction of a
foreign court over a defendant may be established, on a consensual
basis, either by the defendant's participation in the proceedings or by
the defendant's agreement to submit to the jurisdiction. This consensual
basis is relied on by the plaintiffs both in its voluntary submission    E
argument and in its contention that there was an agreement by Cape
and Capasco to submit.

   It is important, to my mind, to keep clear and distinct the two
alternative bases upon which the jurisdiction of a foreign court over a
defendant may be established. Jurisdiction on the ground of presence in
the foreign country is based on territoriality. Consent on the part of the    F
defendant is not necessary and is irrelevant. On the other hand,
jurisdiction on the ground of voluntary submission or of an agreement to
submit is based upon consent. An actual consent is, in principle,
necessary. The over-riding consideration, however, relevant to each of
the issues with which I must deal is whether the default judgment in the
Tyler 2 actions created an "obligation to pay" which, under English law,
the defendants are bound to discharge.    G

### Issue 1

   The principle that a foreign court has jurisdiction to give an in
personam judgment if the judgment debtor, the defendant in the foreign
court, submitted to the jurisdiction of the foreign court, is well settled in
English law. Application of this principle presents no difficulty if the    H
defendant took no part at all in the proceedings, nor if the defendant
simply appeared therein and fought the case on its merits. Difficulty
arises where the defendant has objected to the jurisdiction of the foreign

A  court and, while maintaining that objection, has taken part in the proceedings. The difficulty has, in part, been remedied by Parliament. Section 33(1) of the Civil Jurisdiction and Judgments Act 1982 provides:

"For the purposes of determining whether a judgment given by a court of an overseas country should be recognised or enforced in England and Wales or Northern Ireland, the person against whom

B  the judgment was given shall not be regarded as having submitted to the jurisdiction of the court by reason only of the fact that he appeared (conditionally or otherwise) in the proceedings for all or any one or more of the following purposes, namely (*a*) to contest the jurisdiction of the court; (*b*) to ask the court to dismiss or stay the proceedings on the ground that the dispute in question should be submitted to arbitration or to the determination of the courts of

C  another country; (*c*) to protect, or obtain the release of, property seized or threatened with seizure in the proceedings."

Problems, obviously, still remain, particularly in cases where the steps taken by the defendant in the foreign proceedings were taken not only for the purpose of contesting the jurisdiction but also for the purpose of preparing for a trial on the merits. Some authority suggests that in such

D  cases the defendant will be regarded as having submitted to the jurisdiction of the foreign court: see e.g. *Boissière & Co. v. Brockner & Co.* (1889) 6 T.L.R. 85. But in *Williams & Glyn's Bank Plc. v. Astro Dinamico Compania Naviera S.A.* [1984] 1 W.L.R. 438 the House of Lords approved a dictum of Cave J. in *Rein v. Stein* (1892) 66 L.T. 469, 471 that

E  "in order to establish a waiver, you must show that the party alleged to have waived his objection has taken some step which is only necessary or only useful if the objection has been actually waived, or if the objection has never been entertained at all."

It is time I identified the various steps taken by Cape and Capasco in the Tyler 1 actions which bear upon this issue.

F  (i) The first step taken by each was to file a motion challenging the jurisdiction of the Tyler court. Cape did so on 25 February 1974 in the Yandle action and on 28 March 1974 in the Kay action. I am not clear on what date Capasco filed its motion in the Yandle action. The operative part of each motion declared that the applicant was

"specially appearing . . . for the sole and only purpose of making this motion to assert lack of jurisdiction of this Honorable Court

G  over its person and for said purpose only moves this Honorable Court to set aside and quash the supposed service of summons upon this defendant . . ."

(ii) On 31 July 1974 Judge Steger called the conference of counsel at which it was agreed that the Rules for Complex and Multi-District Litigation would be followed. Mr. Richard Bernays, who acted as

H  counsel for Cape and Capasco until 14 September 1977, attended the conference.

(iii) On 26 September 1974 another conference of counsel took place. It was agreed that there would be limited discovery for the

460

purpose of dealing with the question whether the Yandle and Kay    **A**
actions should proceed as "class" actions. Cape and Capasco were
represented at this conference.

(iv) On 7 November 1974 Cape answered written interrogatories
which had been filed by the plaintiffs.

(v) On 29 November 1974 Cape filed a brief on the "class" action
question. The brief was expressed to be subject to Cape's objection to
the jurisdiction. In the brief Cape opposed "class" action status for the    **B**
Yandle and Kay actions.

(vi) On 17 December 1974 the hearing on the "class" action issue
took place. Cape was represented at the hearing. On 31 December 1974
Judge Steger denied "class" action status for the two actions.

(vii) On 4 June 1975 the deposition of Mr. Godfrey Higham was
taken in London. This was part of the pre-trial discovery normal under    **C**
the procedure of American courts. Mr. Higham gave the deposition as a
witness on behalf of Cape. Mr. Bernays, Cape's counsel, took part in
the taking of the deposition. Subsequently, depositions were taken from
other Cape witnesses and from a Mr. Buckley on behalf of P.C.C. with
counsel for Cape in attendance.

(viii) On 19 April 1977 Cape's and Capasco's motions on the
jurisdiction question were dismissed by Judge Steger. The jurisdiction    **D**
objection remained alive, however, as an objection to be taken, finally,
at trial. I have already commented that Judge Steger did not purport to
deal definitively with the jurisdiction point. He cut short Mr. Bernay's
submissions on behalf of Cape and gave no reasons for his decision. An
appeal by Cape was theoretically possible, but only theoretically. First,
Judge Steger would have had to be persuaded to certify the point as    **E**
suitable for an immediate interlocutory appeal. Second, the United
States Court of Appeals for the Fifth Circuit would have had to be
persuaded to give leave for the appeal to proceed. I was satisfied by the
evidence I heard from Mr. Bernays and Mr. Brin, both of whom were
Texan attorneys with wide experience in the federal courts, that the
prospects of getting an appeal heard would have been practically nil.
Both Judge Steger and the United States Court of Appeals would have    **F**
left the jurisdiction point to be taken at trial and, if necessary, to be
appealed thereafter.

(ix) On 6 May 1977 Cape and Capasco sought and obtained an
extension of time to answer interrogatories. They answered the
interrogatories on 17 June 1977.

(x) On 23 May 1977 Cape and Capasco filed answers in the two
actions. The answers commenced with this paragraph "These defendants    **G**
and each of them still insist that this Honorable Court does not have
jurisdiction over the person of said defendants." The answers proceeded
to plead to the merits of the case. In addition, and in the same
document, Cape and Capasco made cross-claims against the other
defendants claiming an indemnity against or contribution towards any
sum they might be adjudged liable to pay the plaintiffs. The pleading
ended with a demand for a jury trial.    **H**

(xi) On the same day, 23 May 1977, Cape and Capasco filed written
material opposing the plaintiffs' motion to be permitted to use depositions
taken in previous asbestos cases.

A    (xii) The date of trial was fixed for 12 September 1977. Cape and Capasco were represented in court on that day by Mr. Bernays; he also represented N.A.A.C. Mr. Bernays joined in the application for an adjournment. Thereafter Mr. Bernays represented only N.A.A.C. and Mr. Millwid participated on Cape and Capasco's behalf in the settlement negotiations which took place. The negotiations took place not simply in the face of the judge but at the insistence of the judge.

B    (xiii) Settlement terms were agreed. Cape and Capasco were represented before Judge Steger on 5 May 1978 when the consent was made. The order dismissed with prejudice both the plaintiffs' actions and the defendants' cross-claims.

These were the steps taken in the Tyler 1 actions by Cape and Capasco. Did they, taken cumulatively, represent a submission by Cape and Capasco to the jurisdiction of the Tyler court in the Tyler 1 actions?

C    Mr. Morison, for the plaintiffs, has submitted that they did. He relies, particularly, on the consent order. He is, in my view, right to do so. The various steps taken prior to the settlement negotiations on 23 September 1977 were all, either expressly or implicitly, accompanied by a re-assertion of the jurisdiction objection. I am satisfied that none of the steps taken would, under the law governing the Tyler court, have been

D    regarded as a submission by Cape and Capasco to the jurisdiction or as a waiver of the jurisdiction objection. If the steps would not have been regarded by the domestic law of the foreign court as a submission to the jurisdiction, they ought not, in my view, to be so regarded here, notwithstanding that if they had been steps taken in an English court they might have constituted a submission. The implication of procedural

E    steps taken in foreign proceedings must, in my view, be assessed in the context of the foreign proceedings.

But the consent order is another matter. It represented a clear exercise by the Tyler court of jurisdiction over the Tyler 1 actions. Cape and Capasco participated in inviting Judge Steger to make the order. If any of the Tyler 1 plaintiffs sought to sue Cape in England on the causes of action sued on in Tyler 1, Cape would be entitled to rely on the

F    consent order of 5 May 1978 as a bar to the action. The order extinguished the causes of action against Cape that the Tyler 1 plaintiffs had been asserting. So, in my judgment, the conclusion is inescapable that by participating in the application to Judge Steger to make the consent order of 5 May 1978 Cape and Capasco recognised the jurisdiction of the Tyler court to deal with, and dispose of, the claims made against them in the Tyler 1 actions and waived the jurisdiction

G    objection that was then still on foot.

*Issue 2*

Did the submission to the jurisdiction in the Tyler 1 actions represent also a submission to the jurisdiction in the Tyler 2 actions? The plaintiffs

H    contend that Cape and Capasco, by accepting the court's jurisdiction in the Tyler 1 actions, submitted to the jurisdiction of the court in the Tyler 2 actions. This contention is, in my opinion, for a number of reasons, unsustainable.

462
Scott J.                     **Adams v. Cape Industries Plc. (Ch.D.)**                    [1990]

First and foremost, the basis of the contention is, in my judgment,    A
unsound. The argument advanced by Mr. Morison was that the Tyler 1
actions and the Tyler 2 actions were to be regarded as "one unit of
litigation." This followed, it was suggested, from Judge Steger's decision
to apply to the litigation the Rules for Complex and Multi-District
Litigation. But these rules represent no more than management
techniques designed to facilitate the handling of complex cases. They
have, in themselves, no direct procedural effect. The adoption of the    B
rules by Judge Steger on 31 July 1974 did not have the consequence that
discovery in Tyler 1 could be automatically used in Tyler 2. On the
contrary, specific orders to that effect were later necessary. It did not
have the effect that pleadings from plaintiffs and defendants in Tyler 2
were unnecessary. It did not have the effect that defendants' appearances
in Tyler 1 sufficed as appearances in Tyler 2. It did not have the effect    C
that the dismissal "with prejudice" of the Tyler 1 actions barred the
commencement of the Tyler 2 actions. It did not have any procedural
effect whatsoever in the Tyler 2 actions, save that the Tyler 2 actions,
like the Tyler 1 actions, became subjected for management purposes to
the Rules for Complex and Multi-District Litigation.

The proposition that because of the adoption of the "Complex
Rules" Cape's participation in the Tyler 1 actions can be treated as it    D
had been participation in the Tyler 2 actions is, in my view, a fanciful
one with no substance to it, either in American law or in English law.
Support for the proposition was given in evidence by Professor Miller, a
professor of law at Harvard University and co-author of the *Manual for
Complex and Multi-District Litigation*. Professor Miller is a highly
distinguished academic lawyer but in his evidence that all the Owentown
asbestos related litigation had become "one unit of litigation" he did not    E
give me the impression that he was testifying on a matter of current
procedural or substantive law applicable to United States federal courts.
Rather he seemed to me to be flying an academically attractive kite. In
so far as there was a conflict between the evidence of Professor Miller
and that of Mr. Brin and Mr. Bernays, I far preferred, on this point at
least, the evidence of Mr. Brin and Mr. Bernays. I am satisfied that    F
under the law applicable to United States federal courts the Tyler 2
actions were new actions separate and distinct from the Tyler 1 actions.

Second, the "one unit of litigation" theory, when used to translate a
submission to the jurisdiction in Tyler 1 into a submission to the
jurisdiction in Tyler 2, ignores the essential basis of English law
concerning submissions to the jurisdiction. Where steps taken in    G
proceedings are being examined in the context of an alleged submission
to the jurisdiction, what is being sought is evidence of consent on the
part of the defendant to the exercise by the court of jurisdiction over
him. Until the settlement negotiations in September 1977 the jurisdiction
objection which Cape and Capasco had taken was being maintained. I
have already expressed the view that the pre-settlement procedural steps
taken by Cape and Capasco in Tyler 1 could not, in the context of the    H
federal procedure applicable in the Tyler court, be regarded as a waiver
of the jurisdiction objection. But even if that is wrong, those steps could
not possibly be regarded as evidencing Cape's and Capasco's consent to

A   jurisdiction being exercised over them in future actions not yet started. Nor could Cape's participation in the application to Tyler 1 for a consent order, under which the existing actions against Cape were to be dismissed "with prejudice," be regarded as evidencing that consent. Any other conclusion would, in my view, be grossly unfair to Cape and would divorce a submission to the jurisdiction from the bedrock of consent that ought to underlie it. Accordingly, in my judgment, there

B   was no submission to the jurisdiction by Cape or Capasco in the Tyler 2 actions.

*Issue 3*

Did the steps taken by Cape and Capasco in the Tyler 1 actions represent their agreement to submit to the jurisdiction in the Tyler 2

C   actions? The rule that an agreement by a party to submit to the jurisdiction of a foreign court will, under English law, justify the foreign court in taking jurisdiction over that party (see *Dicey & Morris' Conflict of Laws*, 11th ed. (1987), pp. 444–445) is another example of the consensual basis whereby a party may, under English law, come under an obligation to obey a judgment of a foreign court. Consent may be

D   evidenced by a term in a contract. A term expressly providing for disputes to be referred to the foreign court is the most obvious and common example. A unilateral statement by a party that he would accept the jurisdiction of a foreign court is an alternative means by which an agreement to submit might be constituted. But, here, caution is in my view needed. A contract containing a foreign court submission clause is one thing. A party to such a contract is prima facie bound by

E   its terms. But a unilateral statement of willingness to accept the jurisdiction of a foreign court does not, of itself, have any obvious binding effect. It ought, in my view, like any other non-contractual statement of future intention, to be capable of being withdrawn, at any rate until acted upon.

In the present case, the "agreement to submit" that is relied on is not contractual. Nor can any unequivocal statement of willingness to

F   submit be identified. The plaintiffs' contention is that Cape and Capasco, by participating in the Tyler 1 actions, impliedly agreed to submit to the jurisdiction in the Tyler 2 actions. The steps relied on are the same steps as were relied on as evidencing Cape and Capasco's submission to the jurisdiction in the Tyler 2 action. I have already detailed them, and need not do so again. The plaintiffs' argument, as initially advanced by Mr.

G   Morison, was based upon implied agreement. The use of the verb "agree" in this formulation of the argument is, however, misleading. It was not contended that Cape or Capasco had entered into any contract with any of the plaintiffs. Rather it was contended that Cape and Capasco, by their conduct in the Tyler 1 actions, had represented that they would similarly participate in future asbestos related actions brought in the Tyler court by other Owentown plaintiffs, and, in that sense, had

H   impliedly agreed to submit to the jurisdiction.

So, it seems to me, two questions arise. First, can the conduct of Cape and Capasco in Tyler 1 be fairly regarded as a representation that they would accept the jurisdiction of the court in the Tyler 2 actions?

464

Scott J.                  Adams v. Cape Industries Plc. (Ch.D.)                [1990]

Second, is a representation by conduct of the sort contended for a  A
sufficient basis, in English law, to justify the taking by a foreign court of
jurisdiction?

The first question is one of fact. Mr. Morison relied heavily on the
circumstances that under the directions for intervention given by Judge
Steger in Tyler 1, any Owentown claimant could, until intervention was
stopped on 23 September 1977, have become a plaintiff in Tyler 1.   B
Intervention was stopped in order to facilitate a settlement of the claims
of the then plaintiffs and in the expectation that claimants who had not
yet intervened would become plaintiffs in new actions. All parties to
Tyler 1, including the judge as well as Cape and Capasco, had that
expectation. All parties contemplated that Cape and Capasco would be
among the defendants in the new actions. I agree with Mr. Morison that
all of this is borne out by the evidence. I accept also that counsel acting  C
for the Tyler 1 plaintiffs, counsel acting for the non-Cape defendants
and Judge Steger would, if they addressed their minds to the matter,
which they did not, have assumed that Cape and Capasco would be
participating in the new actions as they had done in the Tyler 1 actions.
Nonetheless, in my judgment, Cape's and Capasco's conduct in Tyler 1
cannot fairly be regarded as a representation by them that they would
be participating in Tyler 2. Nothing they did in Tyler 1 justified any  D
observer in making assumptions about what they would do in or about
the expected new actions. If they had been asked their intentions and
had given a false or misleading answer, the position might have been
different. But, as it was, they were, in my judgment, entitled to chest
their cards, to keep their options open and to leave others who were
minded to speculate about the future to do so at their own risk.   E

There is a further point to be made on the facts. To whom was the
alleged representation made? Who acted on it? Who relied on it to his
detriment? No answer to any of these questions has been given by the
pleadings, by the evidence or by the arguments addressed to me. In
particular none of the Tyler 2 plaintiffs has pleaded or has claimed, or,
on the evidence, could claim, to have refrained from intervening in
Tyler 1 in reliance on a representation by Cape that it would submit to  F
the jurisdiction in Tyler 2, or to have joined Cape as a defendant in
Tyler 2 in that reliance, or in any other way to have acted on such a
representation.

The second question requires some reference to authority. In both
*Cheshire and North's Private International Law,* 11th ed. (1987), p. 344
and in *Dicey & Morris' Conflict of Laws,* vol. 1, p. 446, the view is
expressed that an agreement to submit must be express and cannot be  G
implied. Cape and Capasco certainly did not expressly agree to submit
to the jurisdiction in the Tyler 2 actions.

Mr. Morison referred me to *Blohn v. Desser* [1962] 2 Q.B. 116 in
which Diplock J., in an ex tempore judgment, considered the
requirements of an agreement to submit to the jurisdiction. The
defendant had been a sleeping partner in a firm carrying on business in  H
Vienna, and her name, together with the names of the other partners,
was registered on the commercial register in Vienna. The defendant was
resident in England, took no part in the business and received no

A  income from it. But she remained, in Austrian law, a partner, and her name was on the register in Vienna. The plaintiff obtained judgment in the commercial court of Vienna against the partnership firm. The defendant took no part in the proceedings. The plaintiff sued the defendant in England on the Austrian judgment. Diplock J. said, at p. 123:

B     "It is also, I think, clear law that the contract referred to in the fifth case, to submit to the forum in which the judgment was obtained, may be express or implied. It seems to me that, where a person becomes a partner in a foreign firm with a place of business within the jurisdiction of a foreign court, and appoints an agent resident in that jurisdiction to conduct business on behalf of the partnership at that place of business, and causes or permits, as in the present case, these matters to be notified to persons dealing with that firm by registration in a public register, he does impliedly agree with all persons to whom such a notification is made—that is to say, the public—to submit to the jurisdiction of the court of the country in which the business is carried on in respect of transactions conducted at that place of business by that agent."

C

D  Diplock J. went on, however, to hold that the foreign judgment against the firm was an insufficient basis for enforcement of the judgment debt against the defendant personally. So the plaintiff's action failed and the remarks I have cited are only obiter. Nonetheless, Mr. Morison naturally relies on them. There are, however, two authorities which cast doubt on the dicta from *Blohn v. Desser* on which Mr. Morison relies.

E     In *Sfeir Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1 Lloyd's Rep. 330, 340, Mocatta J. said of an alleged implied agreement to submit:

      "However, in considering whether conduct or oral or written agreements give rise to the implication, it is not in my judgment sufficient to reach the conclusion from the evidence that it would be reasonable to find the implied submission or agreement; the court must also conclude from the evidence that the implication is a necessary one."

F

G  The facts and circumstances from which Diplock J. was prepared to imply an agreement to submit do not satisfy the criterion suggested by Mocatta J. It could not, I think, have been argued that the implication was a necessary one. In *Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133 Ashworth J. declined to follow the dicta from *Blohn v. Desser* [1962] 2 Q.B. 116 that I have cited and held that an agreement to submit to the jurisdiction of a foreign court must, to be effective, be express and that an implied agreement would be insufficient.

H     I do not think Diplock J. was right in regarding it as settled law that an agreement to submit to the jurisdiction need not be expressed but could be implied. The leading text books suggest otherwise and there are dicta in two cases which suggest otherwise: see Lord Selborne in *Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, 686, and Kennedy L.J. in *Emanuel v. Symon* [1908] 1 K.B. 302, 314. But,

accepting that an implied agreement to submit might suffice, nonetheless it is, in my judgment, a clear indication of consent to the exercise by the foreign court of jurisdiction that is required. I find it very difficult to accept that the defendant's name in the commercial register in Vienna was a clear indication of her consent to submit to the jurisdiction of the Austrian court. She had entered into no contract to submit, implied or otherwise, with anyone. The entry of her name in the register had, obviously, a commercial purpose. But it seems to me an unacceptably flimsy basis from which to imply that she was consenting to the exercise by the court in Vienna of jurisdiction over her.

Mr. Morison referred also to *S.A. Consortium General Textiles v. Sun and Sand Agencies Ltd.* [1978] Q.B. 279. One of the points discussed in the judgments in the Court of Appeal was the meaning to be attributed to the expression "agreed . . . to submit to the jurisdiction" in paragraph (iii) of section 4(2)(*a*) of the Foreign Judgments (Reciprocal Enforcement) Act 1933. Goff L.J. said, at p. 303: "It was argued that 'agreed' in paragraph (iii) means no more than consented. That is probably right . . ." Shaw L.J. said, at pp. 307–308:

> "In this context it seems to me that 'agreed' must mean expressed willingness or consented to or acknowledged that he would accept the jurisdiction of the foreign court. It does not require that the judgment debtor must have bound himself contractually or in formal terms so to do."

Mr. Morison argued that the requirements for an agreement to submit at common law should be co-extensive with the requirements for an agreement to submit for the purposes of paragraph (iii). This may very well be a sound approach. But in the *Sun and Sand Agencies Ltd.* case the expression of willingness, the consent to accept the jurisdiction of the foreign court, had been signified to and had been acted upon by the plaintiffs.

If the alleged "consent" does not form part of a contractually enforceable agreement, it ought, in my view, to be treated not as an agreement—for it is not one—but as a representation. As with any representation it ought, in my view, to be of no legal effect if not acted upon or if withdrawn before being acted on. It ought, in my opinion, to follow that if proceedings in the foreign court were instituted and brought to judgment against the absent defendant without reliance on the representation of willingness to submit to the jurisdiction, or a fortiori, in ignorance of it, the representation could not subsequently be relied on by the plaintiff as a consensual basis for establishing the court's jurisdiction. Finally, in my view, if a non-contractual representation is to be relied on as establishing the court's jurisdiction, it must be a representation intended to be acted upon or, at least, be a representation that the plaintiff believed and had reasonable ground for believing was intended to be acted upon.

In my judgment, the steps taken by Cape and Capasco in the Tyler 1 actions do not indicate the consent of Cape and Capasco to accept the jurisdiction of the court in the Tyler 2 actions. Not only do these steps fail to constitute the necessary consent, I do not see how an inference of