A consent is even faintly arguable. Nor is there any evidence that these steps were relied on by any of the plaintiffs. Moreover, many of the plaintiffs intervened in the Tyler 2 actions long after it must have become apparent that Cape and Capasco were taking no part therein. For all these reasons there was, in my judgment, no agreement to submit sufficient under English law to establish on a consensual basis the jurisdiction of the Tyler court to give the default judgment against Cape

B and Capasco.

*Issues 4 and 5*

The territorial basis of jurisdiction entitles a foreign court, in the eyes of English law, to exercise in personam jurisdiction over persons present in the country of the foreign court. Whether temporary presence

C is sufficient is a matter that does not arise in the present case. Presence is a clear enough concept when applied to individuals. It is otherwise with corporations that have no physical existence. Where is a corporation resident or present? In what circumstances will the territorial basis of jurisdiction permit jurisdiction to be exercised over a foreign corporation? The answers to these questions, at least where a trading company is concerned, depend upon the extent to which the company has a place of

D business in the relevant territory. In *Littauer Glove Corporation v. F.W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746, 747, Salter J. said that "there must be some carrying on of business at a definite and, to some reasonable extent, permanent place," within the jurisdiction. The case was one in which an action had been brought in England on a money judgment given against an English company by a New York court. The

E action failed on the ground that the company, although transacting business in New York through the medium of an agent, was not in any sense resident in New York. In *La Bourgogne* [1899] P. 1 the question for decision was whether an English court was entitled to take jurisdiction over a French company. It was held that it was. The French company had acquired business premises in London and had installed in the premises a manager whose duties included the carrying on of the

F company's business. A. L. Smith L.J. expressed the question for the court, at p. 12:

"The question is whether the defendant company, at the date when this writ was served, was carrying on business in this country under such circumstances as would enable it to be said that it was resident in this country."

G He concluded, on the facts, at p. 15:

"the company came over here and took premises within the jurisdiction for the purpose of carrying on its business, and it put in M. Fanet as manager . . . for the purpose of carrying on its business, though it may be in conjunction with his own business."

H So the company was, he held, at p. 15: "carrying on business here in such a way as to constitute residence in this country." Collins L.J. agreed.

The critical feature in *La Bourgogne* was that the business premises in London at which the French company's business was transacted were

the French company's premises, cf. *The Princesse Clémentine* [1897]
P. 18. The cases establish that jurisdiction on the territorial basis may be
taken by an English court over a foreign company if the foreign
company has business premises in England from which or at which its
business is carried on. A striking example of this principle may be found
in *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-Gesellschaft für Motor und
Motorfahrzeugbau Vorm. Cudell & Co.* [1902] 1 K.B. 342 where a
foreign corporation, manufacturer of motor cars abroad, hired a stand at
a Crystal Palace exhibition and for a period of nine days exhibited a
motor car on the stand. It was held by the Court of Appeal that service
of a writ on the person in charge of the stand was good service on the
foreign corporation. Sir Richard Henn Collins M.R. said, at p. 346:

> "In order to see whether they were liable to be so served, it is
> necessary to consider whether, upon the facts, they can be said to
> have been resident in England when the service was effected."

He then referred to *La Bourgogne* [1899] P. 1 and said, at p. 347:

> "There, a foreign company employed as their agent in this country
> a person who also acted as agent for two other companies, and
> transacted their business on the same premises; and we held that
> the defendants were through him carrying on business in such a way
> as to be resident within the jurisdiction. No such difficulty arises
> here as arose in that case. Here the defendants hired premises for
> their own exclusive use, and did not resort for their purposes to
> some person who was carrying on an independent business, but
> employed their own servant to conduct the business."

There are, however, cases where residence or presence of a foreign
company in England has been held established notwithstanding that the
foreign company did not itself own or lease any business premises in
England. A feature of these cases has been that the foreign company
had a resident English agent who had authority to contract on behalf of
and thereby to bind the principal. In those circumstances the presence
or residence in England of the agent has been treated as the presence or
residence of the foreign company, the principal. In the *Dunlop* case
[1902] 1 K.B. 342, 349, Romer L.J. said:

> "The result of the authorities appears to me to be that, if for a
> substantial period of time business is carried on by a foreign
> corporation at a fixed place of business in this country, through
> some person, who there carries on the corporation's business as
> their representative and not merely his own independent business,
> then for that period the company must be considered as resident
> within the jurisdiction for the purpose of service of a writ."

In *Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden
Aktiengesellschaft* [1911] 2 K.B. 516 the defendant, a foreign company,
employed a sole agent who had business premises at Fenchurch Street,
London. From these premises he carried on the defendant company's
business as well as his own business. He had general authority to enter
into contracts in the defendant's name for the sale of the defendant's
goods. Vaughan Williams, L.J. said, at pp. 522–523:

A      "The question is whether on these facts it is true to say that the defendants carried on their own business at their own place of business in London. It cannot reasonably be suggested that they must necessarily be lessees or tenants of the place of business, though if they were, that would be a cogent piece of evidence against them. I have no doubt myself that a foreign corporation can carry on business at a place in this country within the meaning of the rule, if, although the corporation is not the lessee of the place, it is in any sense its own place of business."

B

Fletcher-Moulton L.J. cited the passage from Romer L.J.'s judgment in the *Dunlop* case [1902] 1 K.B. 342, 349, that I have cited and continued, at p. 524:

C      "The question before us therefore seems to me to be purely one of fact. We must look at all the evidence given by both parties and consider whether the plaintiffs have brought the case to such a point that if falls within the principle enunciated by Romer L.J. The question being one of fact, it is safer to decide it by looking at the things which are done rather than at the words which are used. For example, Blasius is called an agent. That may signify a variety of things. Let us see, therefore, what his position as agent of the defendants entitles him to do."

D

Having reviewed the evidence, Fletcher-Moulton L.J. said, at p. 525:

     "the result is that in my opinion a very strong case is made out . . . in . . . that the defendants do carry on business in England at Blasius' address by means of Blasius."

E

Farwell L.J. said, at p. 526:

     "These facts are in my opinion sufficient to prove that the defendants do carry on their business in England. Then, do they carry it on at a fixed place in England? It is said that for this purpose it is necessary they should be the owners or tenants of the place where their business is alleged to be carried on. To my mind that proposition is quite untenable. That the foreign corporation must have a fixed place of business in this country is quite clear, but the particular tenure on which it occupies that fixed place is quite immaterial."

F

He concluded, at p. 527: "the evidence shows that the defendants do carry on their business at the office of their agent in Fenchurch Street."

G    The *Saccharin Corporation* case [1911] 2 K.B. 516 may be contrasted with *Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715. Here, too, a foreign company employed sole agents in London. But these agents had no general authority to contract on behalf of their principal. Special authority had to be obtained in the case of each proposed contract. It was held by the Court of Appeal, distinguishing the *Saccharin Corporation* case [1911] 2 K.B. 516, that the foreign company was not carrying on business at the agents' office in London. Buckley L.J. expressed the problem in this way [1914] 1 K.B. 715, 718–719:

H

470
Scott J.                        Adams v. Cape Industries Plc. (Ch.D.)                        [1990]

> "It is not enough to show that the corporation has an agent here;    A
> he must be an agent who does the corporation's business for the
> corporation in this country. This involves the still more difficult
> question, what is meant exactly by the expression 'doing business'."

He said, at p. 721:

> "The agents have never sold any steel manufactured by the    B
> defendants except as agents and in the manner indicated. They have
> no control over the way in which the defendants do their business
> and have no general authority from them with regard to making
> contracts. . . . These being the facts, 101, Leadenhall Street is really
> only an address from which business is from time to time offered to
> the foreign corporation; the question whether any particular business
> shall or shall not be done is determined by the foreign corporation    C
> in Sweden and not by any one in London. In my opinion the
> defendants are not 'here' by an alter ego who does business for
> them here, or who is competent to bind them in any way. They are
> not doing business here by a person but through a person.
> That person has to communicate with them, and the ultimate
> determination, resulting in a contract, is made not by the agents in
> London, but by the defendants in Sweden. It follows from this that    D
> one of the essential elements which must be present before a writ
> can be served in this country on the agent of a foreign corporation
> is lacking in this case."

Phillimore L.J. said, at p. 724:

> "The important distinction between the two cases is that in the    E
> *Saccharin Corporation* case [1911] 2 K.B. 516, the agent in London
> had authority to enter into contracts on behalf of the defendants
> without submitting the orders to them for their approval; whereas in
> the present case the agents have not that authority, their duty being
> merely to submit the orders to the defendants; and until they have
> signified their approval no contract can be entered into. In these
> circumstances it seems to me impossible to say that the position of    F
> the defendants is in any way analogous to that of a person residing
> or a firm carrying on business in this country."

The significance of the manner in which and place at which contracts
with the foreign company, the principal, are made can be noticed also in
*Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a*    G
*Vapore del Lloyd Austriaco* (1914) 111 L.T. 97 where it was held that
the foreign company was carrying on business at its agent's London
offices. Buckley L.J. treated the fact that contracts were made at the
London offices as the critical factor. In *The World Harmony* [1967]
P. 341 the foreign company was a Liberian shipping company which
owned a ship, *World Harmony*. An independent English company in
London acted as shipping agent and broker for the foreign company    H
and, in effect, operated and controlled *World Harmony*. It was held by
Hewson J. that the foreign company had a place of business in England
through the English agent.

A    In *The Lalandia* [1933] P. 56 on the other hand, the English agents did not make contracts for their foreign principal and it was held that the foreign principal was not carrying on business at the agent's London offices. To the same effect was *The Holstein* [1936] 2 All E.R. 1660 where Sir Boyd Merriman P. said, at p. 1664:

B    "When . . . you find that the agency is merely selling the foreign corporation's contract, then the foreign corporation is not carrying on the business in this country."

    In *F. & K. Jabbour v. Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139, 146, Pearson J. said:

C    "A corporation resides in a country if it carries on business there at a fixed place of business, and, in the case of an agency, the principal test to be applied in determining whether the corporation is carrying on business at the agency is to ascertain whether the agent has authority to enter into contracts on behalf of the corporation without submitting them to the corporation for approval."

D    Most of the authorities to which I have referred were dealing with the question whether a foreign corporation had a sufficient presence or residence in England to enable service of a writ on its agent in England to represent good service on the foreign corporation. That question turned upon the meaning to be attributed to sections of English statutes (e.g. section 412 of the Companies Act 1948) or of particular rules which prescribe the means by which service of process on corporations may be effected. The *Littauer Glove Corporation* case, 44 T.L.R. 746 and *Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133, on the other hand, were cases where the question was whether English common law would recognise the legitimacy of the jurisdiction taken by a foreign court. Both counsel before me have treated the statements of principle to be found in the authorities as applicable equally to both classes of cases. I am content to proceed on that footing although I confess to a feeling of a little unease. It does not seem to me self-evident that the statutory provisions which enable service of English process to be effected in England on foreign corporations represent, without any material variation, the principles of common law that determine whether a corporation is to be regarded as resident or present in a foreign country so as to permit the courts of that country to exercise jurisdiction over it. I will assume, however, that the statements of principle in the authorities do apply equally to both classes of case.

G    The question in the present case is whether Cape and Capasco were, when the Tyler 2 actions were instituted, resident or present in Illinois. Reliance is placed by the plaintiffs on the activities and presence first of N.A.A.C. and later of C.P.C. at their respective Illinois offices at 150, North Wacker Drive, Chicago. I must describe the relevant facts and then endeavour to apply to those facts the principles established by the authorities to which I have referred. The object of doing so is to decide whether the United States federal court was entitled, on a territorial basis, to assume jurisdiction over Cape and Capasco in the Tyler 2 actions.

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

I have already described the corporate structure of the Cape group      A
and the business activities of the various subsidiaries. Cape, the parent
company, was incorporated in 1893. The amosite mines at Penge, in the
Transvaal, were owned and worked by Egnep, a wholly owned subsidiary
of Casap. The first Tyler 2 action, the Ray action, was commenced in
April 1978. Since 1975 Casap had been a wholly owned subsidiary of
C.I.O.L. which, in turn, was a wholly owned subsidiary of Cape.
N.A.A.C. incorporated in 1953 as a wholly owned subsidiary of Cape,      B
and from November 1975 a wholly owned subsidiary of C.I.O.L. was
the marketing agent of the Cape group in the United States. Capasco,
incorporated in 1958 or 1959, was a wholly owned subsidiary of Cape
and was responsible for the supply, marketing and sales promotion
throughout the world of Cape asbestos and asbestos products.

On 1 December 1970 Mr. Morgan, a United States citizen and a            C
resident of Illinois, became vice-president of N.A.A.C. He became
president on 1 July 1974, an office he retained until the dissolution of
N.A.A.C. in 1978. At all times relevant to the Tyler actions, the vice-
president of N.A.A.C. was a Mr. Meyer, an attorney and a partner in
the firm Lord, Bissell & Brook of Chicago. Lord, Bissell & Brook were
the United States attorneys for the Cape group of companies. N.A.A.C.
had offices on the fifth floor of 150, North Wacker Drive, Chicago.     D
N.A.A.C. was the lessee and the rent was paid by N.A.A.C. The office
furniture and fittings were owned by N.A.A.C. N.A.A.C. maintained a
staff of some four people. Mr. Morgan was, of course, in charge. He
had, however, an imporant assistant, a Mrs. Holtze. In addition, there
were two or three other office staff.

N.A.A.C.'s dominant business purpose was to assist and encourage       E
sales in the United States of asbestos mined by the Cape subsidiaries,
one of which was Egnep. Contracts with United States customers for the
supply of asbestos were entered into by Egnep or Casap—I am not clear
which and it does not matter. The contracts tended to be long term but
did not usually specify the quantity of asbestos to be sold. The practice
was for the United States customer to specify from time to time the
quantity of asbestos it wished to purchase and the time when it desired   F
delivery to be made. This information would be conveyed via N.A.A.C.
to Casap and Egnep. Whether the information went directly from
N.A.A.C. to Casap and Egnep or whether it went via Capasco is not
clear. Shipping arrangements and delivery dates would be arranged by
Casap or Egnep and communicated to the United States customer via
N.A.A.C. The vagaries of production in the mines had the consequence     G
that Egnep was not always able to provide the United States customer
with the full amount of asbestos that had been ordered. When a
shortfall between the customers' requirements and Egnep's delivery
capacity emerged, N.A.A.C. would endeavour to fill the gap by
purchasing asbestos from United States Government stocks and selling
the asbestos to the United States customers.

These were the two main forms of business carried on by N.A.A.C.       H
First, it acted as intermediary in respect of contracts between the United
States customers and Egnep. For these services it received a commission
from Casap. Secondly, N.A.A.C. sold asbestos to United States

A    customers in order from time to time to supplement sales from Egnep. In respect of these transactions N.A.A.C. contracted, both in purchasing the asbestos and in selling on to the United States customers, as principal. In addition, N.A.A.C. carried on business in purchasing asbestos textiles, mainly from Japan, and selling the textiles in the United States. In transacting this business, N.A.A.C. acted as principal on its own account. N.A.A.C. also, it seems from the evidence, from

B    time to time purchased asbestos from Egnep or Casap and sold on to United States customers. These purchases and sales it transacted as principal. For the purpose of storing asbestos which it had purchased, whether from United States Government stocks or from Egnep or Casap, N.A.A.C. rented warehousing facilities in the United States. These facilities were in N.A.A.C.'s name and were paid for by N.A.A.C.

C    Prior to 11 July 1975 the board of directors of N.A.A.C. included two senior officers of Cape. Until 1974 a Mr. Dent, chief executive of Cape, was chairman of N.A.A.C. In 1979, however, Mr. Higham succeeded Mr. Dent as chief executive of Cape and succeeded also to the chairmanship of N.A.A.C. The other Cape director of N.A.A.C. was Dr. Gaze who was, at all material times, chairman of Capasco and an executive director of Cape. In July 1975 Mr. Higham and Dr. Gaze

D    resigned from the board of N.A.A.C. This change was directly attributable to the involvement of Cape and Capasco in the Tyler 1 actions and was explained thus by Mr. Morgan in a deposition he gave in the Tyler 1 actions. The intention, he said, was

    "to dissociate the parent company as fully as possible from the operating companies . . . It does not imply any change whatever in
E    the method of operation or the present responsibilities of individuals concerned . . ."

The "method of operation" and "the present responsibilities" of, in particular, Mr. Morgan, did not permit either N.A.A.C. or Mr. Morgan, its chief executive, to bind Cape, Capasco, Casap or Egnep, or any other of the Cape subsidiaries to any contract for the supply or sale of

F    asbestos. It was suggested by Mr. Morison that Mr. Morgan's evidence given in depositions in the Tyler 1 actions showed that he considered he had authority to accept orders for asbestos to be supplied by Casap or one of the mining companies. I do not accept that the passage relied on justifies the suggestion. I think it clear from the evidence that N.A.A.C. and Mr. Morgan had no such authority.

G    There is no doubt, on the other hand, that N.A.A.C. did constitute the channel of communication between United States customers, such as P.C.C., and Capasco or Casap. There is undoubtedly a sense in which N.A.A.C. was, if the Cape group of companies is viewed as a whole, part of the selling organisation of the group and Cape's agent in the United States.

H    There is also evidence, as perhaps might be expected, that the corporate, as opposed to commercial, activities of N.A.A.C. were controlled by Cape. Thus, each year an indication would come from Cape as to the dividend that N.A.A.C. was to declare. The correspondence reveals some argument and representations from Mr.

Morgan regarding the amount of the suggested dividend but, in the last    A
resort, and subject to compliance with Illinois law, the parent company
was in a position to and did direct the level of the dividend. In addition,
the financial controllers in London were consulted about the level of
borrowing permitted to N.A.A.C. in each financial year. This corporate
financial control exercised by a parent company over its subsidiary is, in
my view, no more and no less than one would expect to find in a group
of companies such as the Cape group. There is, however, no evidence of    B
any like control exercised by Cape and Capasco over the conduct by
N.A.A.C. of its commercial activities. Mr. Morgan was in executive
control of N.A.A.C.'s conduct of its business. Both Dr. Gaze and, to a
lesser extent, Mr. Higham, visited the United States from time to time,
discussed with United States customers their asbestos supply requirements
and dealt with their complaints in that regard. They did so, not as    C
directors of N.A.A.C. but as directors and representatives of Cape or
Capasco.

   Mr. Morison argued that if N.A.A.C.'s offices at 150, North Wacker
Drive, Chicago, had been a branch office belonging to Cape, the
business transacted at that office would have been well sufficient to
justify the conclusion that Cape was present in Illinois for jurisdiction
purposes. This submission has support from *South India Shipping*    D
*Corporation Ltd. v. Export-Import Bank of Korea* [1985] 1 W.L.R. 585
and is, in my view, probably right. But it is equally pertinent to observe
that if the offices had been those of an independent Illinois corporation,
the nature of the business transacted thereat would not have justified the
conclusion that Cape was present in Illinois. The offices were not Cape's
branch office. Nor were they the offices of an independent Illinois    E
corporation. They were the offices of N.A.A.C., a wholly owned
subsidiary in the Cape group of companies.

   Mr. Morison argued that, on the facts of this case, N.A.A.C. should
be treated as Cape's alter ego in Illinois or, alternatively, that the
corporate veil distinguishing N.A.A.C. from Cape should be lifted.
There is no reasonable basis, in my view, for regarding N.A.A.C. as the
alter ego of Cape. N.A.A.C. was an Illinois corporation, carrying on    F
business in the United States from which it earned profits and on which
it paid United States taxes. Its debtors were *its* debtors, not Cape's
debtors. Its creditors were *its* creditors, not Cape's creditors. Cape was
not taxed in the United Kingdom or in the United States on N.A.A.C.'s
profits. The return to N.A.A.C.'s shareholders took the form of an
annual dividend passed by a resolution of N.A.A.C.'s board of directors.    G
The corporate forms applicable to N.A.A.C. as a separate legal entity
were observed. N.A.A.C. made its own warehousing arrangements for
the storage of its own asbestos. It had its own pension scheme for its
own employees. The expression "alter ego" when used to describe the
relationship between a company and its shareholders is not a term of art
and can bear a flexible meaning. But I do not think it is in the least apt
to describe the relationship between N.A.A.C. and Cape.    H

   The question whether the corporate veil should be lifted is more
difficult. It is, I think, one which raises an issue of general importance.
Is a parent company to be treated, for jurisdiction purposes, as resident

A  in a country in which its wholly owned subsidiary is resident and carries on business? Should the answer be dependent on whether the subsidiary's business is associated with and, in a group sense, a part of the business of the parent company?

Mr. Morison argued the point by concentrating on the economic unity of the asbestos trade carried on by the Cape group. N.A.A.C. was a non-autonomous part of the Cape group which, as a unit, was mining
B  and marketing asbestos. So, he argued, N.A.A.C.'s presence and business activity at 150, North Wacker Drive should be regarded as the presence and business activity of Cape. He prayed in aid, by analogy, *Firestone Tyre and Rubber Co. Ltd. v. Lewellin* [1957] 1 W.L.R. 464 in which the House of Lords had upheld an assessment to tax on the footing that the business of a subsidiary was carried on as agent for its
C  parent company and so was the business of its parent company. But that case was not one in which the corporate veil was lifted. It turned on the factual finding of agency. He referred also to E.E.C. cases in which the question for decision had been whether actions of a subsidiary could, for the purpose of article 86 of the E.E.C. Treaty, be attributed to the parent company. In *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v. Commission of the European*
D  *Communities* (Cases 6 and 7/73) [1974] E.C.R. 223, 263, Advocate-General Warner said:

"neither article 85 nor article 86 anywhere refers to 'persons.' In both articles the relevant prohibitions are directed to 'undertakings,' a much wider and looser concept. This indeed is what one would expect, because it would be inappropriate to apply rigidly in the
E  sphere of competition law the doctrine referred to by English lawyers as that of *Salomon v. Salomon & Co. Ltd.* [1897] A.C. 22—i.e. the doctrine that every company is a separate legal person that cannot be identified with its members. Basically that doctrine exists in order to preserve the principle of limited liability. It is concerned with the rights of creditors in the context of company law. It has been applied, with more or less happy results, in other
F  spheres, such as those of conveyancing, of contracts and of liability for tort. But to export it blindly into branches of the law where it has little relevance, could, in my opinion, serve only to divorce the law from reality. Suppose, my Lords, that C.S.C. had traded in Italy through a branch office. There could have been no doubt then that it was amenable to the jurisdiction of the Commission and of
G  this court. Could it have made any difference if C.S.C. has chosen to trade in Italy through a wholly owned subsidiary? The difference would have been one only of legal form, not of reality. Why then should it make any difference that it chose to trade in Italy through a subsidiary that it controlled by a 51 per cent. majority rather than by a 100 per cent. majority? What matters in this field, in my view, is control, not extent of beneficial ownership."
H
He said, at p. 264:

"It is, my Lords, with these considerations in mind that I approach the argument of C.S.C. in the present case. In my opinion those

considerations import at least: 1. that there is a presumption that a subsidiary will act in accordance with the wishes of its parent because according to common experience subsidiaries generally do so act; 2. that, unless that presumption is rebutted, it is proper for the parent and the subsidiary to be treated as a single undertaking for the purposes of articles 85 and 86 of the E.E.C. Treaty . . ."

In my opinion, however, this approach is not suitable to a resolution of the question with which I am faced. The question in the present case is not whether the economic reality of the activities of the Cape group justifies the conclusion that Cape, the parent, was trading in the United States. Perhaps it was. But trading in a country is insufficient, by the standards of English law, to entitle the courts of the country to take in personam jurisdiction over the trader: see the *Littauer Glove Corporation* case, 44 T.L.R. 746. The trading must be reinforced by some residential feature, be it a branch office or a resident agent with power to contract.

Mr. Morison pointed out that the economic function being discharged by N.A.A.C. from its Illinois office served, in the context of the trading activities of the Cape group as a whole, the same function as could have been discharged by a branch office at the same address. Since in the latter case Cape would have been resident in Illinois, why should it not be held to be resident in the former case? In my opinion, however, this argument overlooks the nature of the fundamental question at issue. The fundamental question is whether the United States court was entitled, on territorial grounds, to take jurisdiction over Cape. Cape was entitled, if it wished, to organise its group activities so as to avoid being present in the United States of America. The group traded in the United States through subsidiaries, Egnep, Casap, N.A.A.C. and Capasco. Each discharged a function relevant to the group business in the United States, but N.A.A.C. was the only one with a United States office. If Cape had been an individual, it would not, in my view, have been arguable that in trading in such a fashion Cape had subjected itself to the territorial jurisdiction of the United States' courts. Why should Cape's corporate character justify any different conclusion?

The approach to be adopted to parent companies trading through subsidiaries was considered by Roskill L.J. in *The Albazero* [1977] A.C. 774. He said, at p. 807:

"each company in a group of companies (a relatively modern concept) is a separate legal entity possessed of separate legal rights and liabilities so that the rights of one company in a group cannot be exercised by another company in that group even though the ultimate benefit of the exercise of those rights would enure beneficially to the same person or corporate body irrespective of the person or body in whom those rights were vested in law."

He referred to this principle as one of the "fundamental principles of English law long established." The decision of the Court of Appeal was reversed by the House of Lords, but nothing was said to detract from the principle referred to by Roskill L.J.

In *Bank of Tokyo Ltd. v. Karoon* [1987] A.C. 45, 53 Ackner L.J. said:

A    "It is however quite fundamental to Mr. Hoffmann's submission, (and he readily accepts this) that the public policy on which he relied requires the court to overlook the corporate distinctions in law between B.T. and B.T.T.C. While accepting that B.T. and B.T.T.C. are separate legal entities, Mr. Hoffmann contends that from a practical point of view it makes no difference whether B.T.T.C. was a branch of B.T. or a subsidiary. He argues that if one looks at the substance of the matter, B.T. are being sued in New York on account of the evidence which they gave in their own defence in proceedings brought against them by Mr. Karoon in London. The protection of B.T.'s own interests required the giving of this information and accordingly B.T., which must in practice be treated as having this information in their possession, was not in breach of its implied obligation of secrecy: see *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461. The reality of the matter is that B.T.T.C. is not a branch of B.T. That is not the way in which B.T. has chosen to organise its business as a bank."

D    Robert Goff L.J. said, at p. 64:

    "Mr. Hoffmann suggested beguilingly that it would be technical for us to distinguish between parent and subsidiary company in this context; economically, he said, they were one. But we are concerned not with economics but with law. The distinction between the two is, in law, fundamental and cannot here be bridged."

E    These statements of principle seem to me to be an answer to the submission that in the present case the separate corporate identity of N.A.A.C. should be ignored and that the corporate veil should be lifted. On the facts of this case neither Cape nor Capasco had an office in Illinois. The 150, North Wacker Drive offices were N.A.A.C.'s offices. N.A.A.C.'s business was its own business, not the business of Cape or of Capasco. N.A.A.C. had no authority to contract on behalf of Cape or Capasco or any other company in the Cape group. Accordingly, in my judgment, the presence of N.A.A.C. at 150, North Wacker Drive, Chicago, Illinois, did not constitute the presence in Illinois of Cape or of Capasco so as to subject them, on a territorial basis, to the jurisdiction of United States courts.

G    On 1 November 1977 Cape resolved to place N.A.A.C. in liquidation and on 31 January 1978 a liquidating trust agreement for N.A.A.C. was signed. N.A.A.C. executed articles of dissolution on 18 May 1978 and a certificate of dissolution was issued on 19 May 1978. It was the intention of all concerned that N.A.A.C.'s functions in the United States in respect of the sale of Cape's amosite asbestos would come to an end on 31 January 1978. They did so. However, N.A.A.C. at that date was the owner of a quantity of asbestos held in United States warehouses. Over the period of 31 January to 18 May 1978 sales of this asbestos took place. These sales were not made in the course of N.A.A.C. carrying on business as a going concern. They were made for the purposes of the intended liquidation of N.A.A.C.

478
Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

The decision to put N.A.A.C. into liquidation was a consequence of
the experience of Cape in the Tyler 1 actions. It had become apparent
to the senior management of Cape by, at latest, the summer of 1977 that
actions in the United States brought against Cape by plaintiffs
complaining of injury caused by exposure to asbestos dust presented a
very real problem. This had, perhaps, become apparent a good deal
earlier. It was in 1975 that Mr. Higham and Dr. Gaze had resigned from
the board of N.A.A.C., a step taken in order to reduce the appearance
of Cape involvement with N.A.A.C. But by 1977 Cape's motions on
jurisdiction had been dismissed by Judge Steger and in September 1977
Cape had agreed to pay some $5m. in order to dispose of the Tyler 1
actions. It was clear to all that a multitude of similar actions lay ahead.
It was in these circumstances that the decision to liquidate N.A.A.C.
was taken.

Mr. Penna was the main witness for Cape as to the circumstances in
which N.A.A.C. was placed in liquidation and in which A.M.C. and
C.P.C. were formed. He was, in the period 1975 to 1979, employed by
Cape as its group solicitor. In 1982 he became company secretary, a
position he held until 1985 when he left to take up other employment.
He told me of meetings in Chicago and in London in November and
December 1977 at which discussions took place between senior executives
of the Cape group, including Mr. Morgan, and at which decisions were
taken to place N.A.A.C. in liquidation and to form A.M.C. and C.P.C.
as the corporate vehicles for the sale of Cape asbestos in the United
States. Mr. Penna was inclined to suggest that the decision to place
N.A.A.C. in liquidation and the decision by means of A.M.C. and
C.P.C. to create a new sales framework for the United States were
independent of one another. He also suggested that the idea of
incorporating C.P.C., a new and independent Illinois corporation, to
take over part of the selling function formerly discharged by N.A.A.C.
came from Mr. Morgan who, in effect, offered Cape the services of his
new company, C.P.C. This slant on the facts is one that I found myself
unable to accept. I am satisfied from the evidence that the arrangements
made regarding N.A.A.C., A.M.C. and C.P.C. were part of one
composite arrangement designed to enable Cape asbestos to continue to
be sold into the United States while reducing, if not eliminating, the
appearance of any involvement therein of Cape or its subsidiaries.

The decision to put into effect this composite arrangement was
associated with Cape's decision to take no part in any other asbestos
related action brought against it in the United States, whether in Tyler,
Texas, or elsewhere. Cape was prepared to let default judgments be
taken against it or its subsidiaries. Cape had no assets in the United
States apart from its shares in N.A.A.C., which, by reason of N.A.A.C.'s
own contingent liability to plaintiffs in asbestos related actions, were
worthless. Cape's intention and concern was to resist enforcement in
England of any default judgments. Enforcement was intended to be
resisted by contesting the legitimacy, under English common law, of the
jurisdiction taken by the United States courts over foreign companies. A
defence on these lines would require the trading connection between
Cape and its subsidiaries and the United States to be kept to a

A minimum. Hence the need to liquidate N.A.A.C., Cape's United States subsidiary, and to allow at least some of N.A.A.C.'s trading functions to be assumed by an Illinois corporation that was not a subsidiary, i.e. C.P.C. If and to the extent that Mr. Penna's evidence suggests a different provenance or motive for the arrangements that were made, I do not accept it.

B But the question whether C.P.C.'s presence in Illinois can, for jurisdiction purposes, be treated as Cape's presence, must, in my view, be answered by considering the nature of the arrangements that were implemented, not the motive behind them. The documentary evidence I have seen has made clear that the senior management of Cape, including Mr. Penna, were very anxious that Cape's connections with C.P.C. and with A.M.C. should not become publicly known. Some of the letters and memoranda have a somewhat conspiratorial flavour to them. But this too, although interesting to notice, is not, in my opinion, relevant to the main question.

C The new trading arrangements involved these features: (i) A.M.C., a Liechtenstein corporation, was incorporated by a Dr. Ritter, a well-known Liechtenstein lawyer. The bearer shares in A.M.C. were held by Dr. Ritter upon trust for C.I.O.L. The cost of incorporating A.M.C. was, I think, borne by Capasco. It was certainly borne within the Cape group. The intention was that all sales of Cape asbestos to United States customers would be made by A.M.C. The exact nature of the arrangements with Egnep and Casap whereby A.M.C. became the owner of the asbestos has not been disclosed by the evidence adduced before me. This is not surprising since the relevant documentation has, since the sale of C.I.O.L. and Casap to Transvaal Consolidated Exploration Co. Ltd., been under the control of Transvaal Consolidated. It seems clear, however, that A.M.C. was no more than a corporate name. It was described by Mr. Penna as "an invoicing company" with no employees of its own. I would expect to find, if all the relevant documents were available, that A.M.C. acted through employees or officers of either Casap or Egnep.

D 

E 

F (ii) C.P.C. was incorporated on 12 December 1977. The shares were issued to Mr. Morgan. The lawyers acting in the incorporation were Lord, Bissell & Brook. There is no clear evidence as to who paid the costs of incorporation. I am prepared to assume that, directly or indirectly, the funds came from Cape or Capasco. This assumption does not lead to the conclusion that Cape or Capasco was the beneficial owner of the C.P.C. shares. It was an essential feature of the new trading arrangements that the new Illinois corporation would be an independent corporation outside the Cape group owned as well as managed by Mr. Morgan. There would not, in these circumstances, be any equity in the shares that Cape could claim as against Mr. Morgan. In my opinion, the C.P.C. shares were, in equity as well as in law, owned by Mr. Morgan.

G 

H (iii) An agency agreement dated June 1978 was entered into. The parties were A.M.C., C.P.C. and Mr. Morgan. This is an important agreement. Under paragraph 1, A.M.C. appointed C.P.C.:

480
Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

"as its exclusive advice and consultancy bureau to assist the sale of     A
its asbestos fibre (the product) in the United States of America,
Canada and Mexico (hereinafter jointly called 'the territory') for a
period of 10 years from 1 February 1978 to 31 January 1988 . . ."

There was a proviso for termination on 12 months' notice. Paragraph 3
set out the duties of C.P.C. It provided:

"C.P.C. will carry out this appointment diligently exercising all     B
reasonable care and skill and will without limiting the generality
hereof (a) keep A.M.C. advised at regular intervals as to competitor
products market conditions and other commercial matters of mutual
interest; (b) perform such services as may be required to facilitate
or expedite the delivery of products contracted to be sold by
A.M.C. in the territory; (c) endeavour to seek out and promote     C
prospective business on behalf of A.M.C. and forward to A.M.C.
requests for supplies of products provided always that supplies shall
only be at prices and upon terms and conditions determined by
A.M.C."

Under paragraph 4, C.P.C. agreed to "use its best endeavours to
promote the sale of the product on behalf of A.M.C. within the     D
territory." Paragraph 4(d) provided inter alia:

"nothing herein shall be construed to give C.P.C. any authority to
accept any orders to make any sales or to conclude any contracts on
its behalf."

"Its behalf" in that context was a reference to A.M.C. Paragraph 5
coupled with paragraph 4(b) left C.P.C. free to sell material and     E
products other than asbestos fibre and to involve itself in other
commercial activities. Paragraph 6 required C.P.C.

"at its own cost and expense [to] provide proper office accommoda-
tion and staff for the purpose of running an efficient advice and
consultancy bureau and will pay all expenses incurred in maintaining
and operating the same."     F

Paragraph 7 provided for C.P.C. to be remunerated by a percentage
commission based on the cost of all asbestos sales by A.M.C. in the
territory. Paragraph 11 gave A.M.C. an option in certain circumstances
to acquire the C.P.C. shares:

"C.M. shall in such event offer all shares owned by him in C.P.C.
for sale to A.M.C. (or such nominee as it may appoint) at their net     G
book value excluding goodwill . . ."

Paragraph 12 contained an acknowledgement that beneficial ownership
of the name "Continental Products Corporation" belonged to A.M.C.

I have endeavoured to give a broad indication of the contents of this
agency agreement. C.P.C. commenced business on 1 February 1978—in
order to dovetail with N.A.A.C.'s cesser of business on 31 January     H
1978—but there is no evidence that between 1 February and 5 June
1978, or for that matter thereafter, C.P.C. did any business inconsistent
with the terms of the agency agreement. I conclude, therefore, that the

A terms of the agreement are a reliable guide to the nature of the relationship between C.P.C. and A.M.C. and, hence between C.P.C. and Cape.

  (iv) C.P.C. leased offices on the 12th floor of 150, North Wacker Drive. N.A.A.C.'s offices had been on the fifth floor. A.M.C.'s employees became C.P.C.'s employees. A good deal, though not all, of the furniture and fittings in N.A.A.C.'s offices were removed to C.P.C.'s

B offices. C.P.C. took over N.A.A.C.'s telephone number.

  (v) The financial agreements in connection with the commencement by C.P.C. of business are, on the evidence I have seen, somewhat obscure. It is clear that C.P.C. would have had an immediate need of funds. N.A.A.C.'s furniture and fittings had to be paid for. Rent had to be paid for the 12th floor offices at 150, North Wacker Drive. The

C salaries of the employees, all ex-N.A.A.C. employees, had to be paid. There were, no doubt, other outgoings as well. But commission under the agreement with A.M.C. would not be payable immediately. There is evidence that a sum of $12,000 was paid to C.P.C. by N.A.A.C. In one of his depositions Mr. Morgan described this sum as made up of $10,000 severance pay due to him from N.A.A.C. and paid at his request to

D C.P.C., and $2,000 as C.P.C.'s charge for storing various files. It seems likely that this sum of $12,000 was calculated to assist C.P.C. in meeting the cost of establishing itself at its new offices: see the letter of 23 November 1977, Mr. Morgan to Dr. Gaze, and Mr. Penna's memorandum of 2 December 1977. But, in addition, there is a mysterious sum of $160,000 that was paid to C.P.C. on 4 January 1978. The Cape documents that reveal this payment show it to have been a payment

E from a bank account of Cape with Chase Manhattan Bank in London. Mr. Penna said that he thought it was a payment on account of future commission. He said he did not think it would have been a loan.

  In the absence of any clear alternative explanation of the payment of this $160,000 to C.P.C., I infer that it was intended to enable C.P.C. to meet its overheads until payment of commission began to come in.

F Whether it was intended that the $160,000 should be set off against future commission is not clear. This is no evidence one way or the other. I shall assume that it was not so intended and that it was a payment made by Cape to enable C.P.C. to set up in business and to perform the agency obligations expected of it. Acting as agent in connection with sales of Cape asbestos was not C.P.C.'s only business activity. In addition, it traded in asbestos textiles on its own account,

G buying and selling as principal.

  The conclusions of fact that I have set out above are not consistent with the contents of an affidavit sworn by Mr. Morgan on 16 March 1988 and introduced into evidence under the Civil Evidence Act 1968. In paragraph 5 of his affidavit, Mr. Morgan deposes:

H   "Prior to 6 January 1978 I had negotiated with a representative of an entity known as Associated Minerals Corporation (hereinafter called 'A.M.C.'). I understood that this company was an independent South African trading company which distributed asbestos for sale in international commerce."

482

This evidence is, in my opinion, disengenuous and false. Negotiations regarding the new trading arrangements in which Mr. Morgan took part were negotiations, as he must have known, with Cape. I reject as false his evidence that he understood A.M.C. to be an independent South African trading company. I am satisfied that he knew very well it was a creature of Cape. It follows from the falsity of paragraph 5 that I am unable to place any reliance on the accuracy of the rest of the affidavit. The conclusions I have expressed about the $160,000 derive from my opinion as to the probabilities inherent in the incorporation of C.P.C. and its commencement of business. They do not derive from Mr. Morgan's evidence.

C.P.C.'s conduct of its affairs was much the same as N.A.A.C.'s had been. It paid the rent for its offices and paid its employees. It received commission from A.M.C. as well as incurring expenditure and receiving payments in connection with its independent trading activities.

Does the manner in which C.P.C. was established and carried on business justify the conclusion that C.P.C.'s presence in Illinois can, for jurisdiction purposes, be treated as the residence or presence of Cape? In my judgment, the answer is "No." I do not think, on analysis, that the plaintiffs' case is any stronger than their case regarding N.A.A.C. If anything, I think the case is weaker. N.A.A.C. was at least a wholly owned subsidiary. C.P.C. even if incorporated and launched with Cape money, was, on my reading of the facts, an independently owned company. Like N.A.A.C., C.P.C. acted as agent for the purpose of facilitating the sale in the United States of Cape's asbestos. The seller of the asbestos in N.A.A.C.'s time was Egnep or Casap. The seller in C.P.C.'s time was, nominally, A.M.C. but, in reality, still, I think, Egnep or Casap. C.P.C., like N.A.A.C., had no authority to bind Egnep, Casap or any other of the Cape subsidiaries to any contract. C.P.C. like N.A.A.C. carried on its own business from its own offices at 150, North Wacker Drive. The provision by Cape of the $160,000 as a starting-up fund does not make the offices Cape's offices or the business Cape's business.

Mr. Morison made a number of points on the evidence regarding N.A.A.C. and C.P.C. with which I agree. He drew attention to the paucity of documents dealing with and revealing the true nature of the $160,000 and commented that there must be officers or ex-officers of Cape who could have given evidence about this. I agree. He invited me to infer that the $160,000 was a necessary payment to discharge the initial running expenses of C.P.C. I do so infer. He criticised Mr. Penna's evidence regarding A.M.C. and C.P.C. and pointed out that it was Mr. Penna who had co-ordinated the setting up of A.M.C. I think this criticism was well founded. But none of this is, in my opinion, critical. What is critical is what C.P.C. and N.A.A.C. actually did on behalf of Cape or Capasco. Each company, C.P.C. and N.A.A.C., assisted in the sale of Egnep's asbestos in the United States. That is not enough. Mr. Morison invited me to infer from, in particular, Mr. Penna's evidence that the corporate form of the Cape group was form only. I am not prepared to infer this. The evidence does not, in my view, justify it. Each corporate member of the Cape group had its own

A  well-defined commercial function designed to serve the over-all commercial purpose of mining and marketing asbestos. But that does not constitute a reason why Cape, the parent company, should be treated as present and amenable to be sued in each country in which a subsidiary was present and carrying on business.

Finally, Mr. Morison submitted that the onus was on Cape to establish that it was not resident in the United States and that I should

B  hold that Cape had failed to discharge that onus. I am not satisfied that it is correct to say that the onus lies on Cape to establish that it was not resident in the United States. The position seems to me to be this. The plaintiffs sue Cape on a judgment given by a United States court. The judgment is an apparently regular one. Cape disputes jurisdiction on the ground that it is a foreign company with no place of business

C  in the United States. The plaintiffs' answer is to assert that the presence in the United States of N.A.A.C. and C.P.C. is to be treated as Cape's presence. But each of N.A.A.C. and C.P.C. is in law an individual legal persona. A contention that the presence in the United States of either is to be treated as the presence of Cape requires, in my opinion, he who so contends to establish facts sufficient to support the contention. This, in my judgment, the plaintiffs have failed to do.

D  The plaintiffs' main case on "presence" was based upon the presence in the United States of N.A.A.C. and C.P.C. In his reply, Mr. Morison raised a third possibility. He suggested that A.M.C. may have been present in Illinois at the relevant time and that, whatever the position regarding N.A.A.C. and C.P.C., A.M.C. was, in effect, Cape. This suggestion was based on the evidence of Mr. Summerfield who testified

E  that an inspection of 150, North Wacker Drive in August 1984 revealed a notice-board giving the names of both C.P.C. and A.M.C. as the occupants of the 12th floor offices. Whether this notice-board was in the same state in 1979 when the sale to Transvaal Consolidated Exploration Co. Ltd. took place is not known. There is an allegation in the pleadings that, when the Tyler 2 actions were commenced, A.M.C. was present at 150, North Wacker Drive and, if I understood Mr. Morison correctly,

F  his submission was that since the onus was on Cape to satisfy me that it was not present in the United States, it was for Cape to establish that A.M.C. was not present in the United States at any material time. I do not accept this approach. There is no positive evidence to suggest that A.M.C. was an occupant of the 150, North Wacker Drive offices at the time the Tyler 2 actions were commenced.

G  I should also mention, in connection with Mr. Morison's wielding of the onus argument, a point made by him arising out of evidence given by Mr. Penna that there had at one time been an agency agreement between Cape and Capasco under which all of Capasco's business had been carried on by Capasco as agent for Cape. In effect, Capasco's business was Cape's business. This agreement had, said Mr. Penna, been terminated in the mid 1970s. He said that he had never seen any like

H  agency agreement between Cape and N.A.A.C. and did not think there had been one, but that he could not exclude the possibility. Mr. Morison submitted that the burden lay on Cape to satisfy me that there was no agency agreement between Cape and N.A.A.C. comparable to that

484
Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

between Cape and Capasco. I was so satisfied from, in particular, the A
form of N.A.A.C.'s annual accounts. These were drawn on the footing
that N.A.A.C.'s business was its own business. There is nothing to
suggest that the accounts were drawn on a false footing. The
correspondence between N.A.A.C. and Cape concerning the amount of
the annual dividend to be declared by N.A.A.C. is entirely consistent
with the inferences to be drawn from the accounts. But, in any event,
there is no positive evidence to suggest that there was ever an agency B
agreement between N.A.A.C. and Cape on the lines of that between
Cape and Capasco to which Mr. Penna had referred.

ᵢₙ my judgment, therefore, neither the presence in Illinois of
N.A.A.C. nor the presence in Illinois of C.P.C. can be represented, for
jurisdiction purposes, as the presence in Illinois of Cape or Capasco. It
follows that there was, in my judgment, no territorial basis that entitled C
the Tyler court, by English common law standards, to take jurisdiction
over Cape or Capasco.

*Issue 6*

The question whether the residence or presence of Cape and Capasco
in Illinois entitled the Federal Court of Tyler, Texas, to take jurisdiction
over them does not, if my conclusions under 4 and 5 above are right, D
arise. But it is clear that this case is likely to go further, and I think,
therefore, that I should deal with all the questions argued before me.
For the purpose of this question I must assume that Cape and Capasco
were present in Illinois when the Tyler 2 actions were commenced. I
must start by describing, in outline, the nature, function and jurisdiction
of a United States district court. To enable me to do so, I have had E
great assistance from the eminent United States jurists who have given
evidence in this case.

Section 1 of article III (the judicial article) of the United States
Constitution vests the judicial power of the United States in a Supreme
Court and such inferior courts as Congress may from time to time
establish. Federal circuit courts and federal district courts have been
established by Congress pursuant to this power. The procedure to be F
observed by federal courts may be laid down either by Congress or the
Supreme Court.

Judges of federal courts are appointed by the President of the United
States and confirmed by the Senate. They are appointed for life and can
be removed only by Congress. Their salaries and expenses are a charge
on federal funds. They take oaths of allegiance to the United States G
Constitution. All this is in contrast to judges of state courts who are
appointed by a state authority, are paid for by the state and take oaths
of allegiance to the state. The federal court system is headed by the
Supreme Court. Below the Supreme Court are the circuit courts, the
courts of appeals. The United States is divided into 13 judicial circuits,
each of which has a court of appeals. The Fifth Circuit includes
Louisiana, Mississippi and Texas. Judges of the circuit courts of appeals H
are the circuit judges. The federal courts of first instance are the district
courts. Each state is, according to its population, allocated a number of
districts. Each district is allocated a number of judges. Texas has four

A    districts, one of which is the eastern district. The eastern district of
Texas comprises seven divisions, one of which is the Tyler Division and
another of which is the Marshall Division. Judge Steger was a district
judge of the eastern district of Texas. He sat both at Tyler and at
Marshall, as well as at other venues in the eastern district.

The subject matter jurisdiction of federal district courts established
by Congress is set out in Chapter 85 of Title 28 of the United States
B    Code, entitled "Judicial Code and Judiciary." Section 1331 entitled
"Federal question," provides: "The district courts shall have original
jurisdiction of all civil actions arising under the constitution, laws or
treaties of the United States." This is an exclusive jurisdiction. Actions
of this character cannot be entertained by state courts unless specific
statutory authorisation is given.

C    Section 1332 is headed "Diversity of citizenship." Paragraph (a) of
the section provides:

"(a) The district courts shall have original jurisdiction of all civil
actions where the matter in controversy exceeds the sum or value of
$10,000, exclusive of interest and costs, and is between (1) citizens
of different states . . ."

D    Diversity jurisdiction, unlike federal question jurisdiction, is not an
exclusive jurisdiction. An action involving diversity of citizenship which
could have been brought in a federal district court can be commenced, if
the plaintiff so elects, in a state court. Any defendant, however, may
apply to the federal district court for the removal of the action, as of
right, to the district court. But in the absence of any such application
E    the case may be prosecuted to judgment in the state court.

The necessity for Congress to have endowed federal district courts
with federal question jurisdiction is, perhaps, obvious. Laws passed by
Congress, treaties of the United States, the Constitution of the United
States, may give rise to civil justiciable issues. Courts for the trial of
such issues are necessary. Chapter 85 also gives district courts original
jurisdiction over actions brought against foreign states (section 1330) or
F    brought by or against the United States itself (section 1345 and 1346). In
addition, original jurisdiction over a number of specified types of actions
is given to district courts. These include admiralty and maritime cases
(section 1333), bankruptcy cases (section 1334), patent cases (section
1338), civil rights cases (section 1343) and many others. The explanation
for the jurisdiction given to the federal courts can in all these cases be
G    found in the nature of the actions in question.

Diversity of citizenship jurisdiction, however, has a different
provenance from any of these. There is no obvious constitutional reason
why diversity jurisdiction should have been conferred on federal courts.
A breach of contract action between two citizens of the State of New
York can be entertained by the courts of New York. So can an action in
contract between a citizen of New York and a citizen of Illinois. The
H    need to have provided in the latter case for federal district courts to
have an overriding jurisdiction is not in the least obvious. The
explanation for diversity jurisdiction given by the commentators and
accepted by the witnesses before me is, broadly, that at the time of

486

Scott J.    Adams v. Cape Industries Plc. (Ch.D.)    [1990]

A

union there was not the same confidence as there would be today in the judicial qualities of state judges, and, in particular, in their impartiality when trying an action between a citizen of their own state and a citizen of another state. It was, so the explanation goes, thought necessary to provide defendants with an opportunity, when sued by a citizen of another state, to have the action heard in a federal court. Consistent with this explanation for the conferring of diversity jurisdiction on federal district courts is the opinion of some distinguished United States jurists that diversity jurisdiction has served its purpose and could with no disadvantage now be abolished.

B

It is inherent in diversity of citizenship jurisdiction that it is the identity of the parties, not the nature of the action, that confers jurisdiction on the district court.

A federal district court exercising its diversity of citizenship jurisdiction does not, save as to matters of procedure, apply federal law to the determination of the rights which are in issue. It applies state law. Thus, in the case of a contract governed by the law of Illinois, a breach of contract action may be brought by a citizen of Illinois against a citizen of Texas in a federal district court in Illinois; the law applied will be the law of Illinois. If there is a car accident in New York, the law of New York will determine the rights of any injured persons. That will be so whether an action for redress is brought in a New York state court or in a New York federal district court. That this is so was established by the seminal decision of the United States Supreme Court in *Erie Railroad Co. v. Tompkins* (1938) 304 U.S. 64. Justice Brandeis said, at p. 78:

C

D

"Congress has no power to declare substantive rules of common law applicable in a state whether they be local in nature or "general," be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts."

E

In a later Supreme Court case, *Prima Paint Corporation v. Flood & Conklin Manufacturing Co.* (1967) 388 U.S. 395, 404, Justice Fortas said:

F

"Since the decision in *Erie Railroad Co. v. Tompkins* . . . federal courts are bound in diversity cases to follow state rules of decision in matters which are 'substantive' rather than 'procedural,' or where the matter is 'outcome determinative.'"

The decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 is, I think, broadly accepted by U.S. jurists as resting

G

"on the principle that the federal government as a whole, including Congress and the federal courts, has no more authority than that given to it by the Constitution. This principle, which is inherent in the political theory underlying the very concept and structure of the federal government, is reinforced by the 10th Amendment, which reserves to the states or to the people those powers not delegated to the federal government by the Constitution": see *Federal Practice and Procedure* by Wright, Miller & Cooper, vol. 19, para. 4505.

H

A    Federal district courts sitting in diversity have, therefore, a dual character. In one sense they are national courts established and funded centrally; but they are applying state substantive law and, in that sense, may be regarded as state courts.

In order to entertain an action, a federal district court must not only have subject matter jurisdiction but also in personam jurisdiction over the defendants in the suit. It is an important and somewhat curious
B    feature of the manner in which federal district courts are established that, save in cases specially provided for by Congress or the Supreme Court, each district court exercises the in personam jurisdiction permitted by the law of the state in which it sits: see Federal Rules of Procedure, rule 4. Thus, if an action for personal injuries is commenced in New York against a defendant resident in California, the jurisdiction of the
C    New York court over that defendant will depend upon the "long arm" statute of the state of New York. Each state has its own "long arm" statute serving, broadly, the purpose that R.S.C., Ord. 11 serves for our own jurisdiction. There is no separate federal "long arm" statute that Congress or the Supreme Court have enacted so as to confer special federal in personam jurisdiction on federal district courts. They must rely on the laws of the respective forum states. In *Point Landing Inc. v.*
D    *Omni Capital International Ltd.* (1986) 795 F. 2d 415, 419, a decision of the Court of Appeals for the Fifth Circuit, it was held:

> "Absent a rule or statute to the contrary, Federal Rule of Civil Procedure 4(*e*) permits a federal court to exercise jurisdiction over only those defendants who are subject to the jurisdiction of courts of the state in which the court sits."

E
This rule applies not only when the court is sitting in diversity but also when it is dealing with a federal question case or indeed any other type of case in which it has original jurisdiction.

Accordingly, whether a federal district court is exercising federal question jurisdiction or whether it is exercising diversity jurisdiction, its entitlement to take jurisdiction over a particular defendant depends on
F    the "long arm" statute of the forum state. The jurisdiction objections taken by Cape in Tyler 1 were taken on the ground that the "long arm" statute of Texas did not entitle the federal district court at Tyler, Texas, to take jurisdiction over Cape.

The effect of this rule and authority is that the Tyler court in the Tyler 2 actions was sitting in diversity, was applying to the causes of action Texas state law and relied for its in personam jurisdiction over
G    Cape on the Texas "long arm" statute.

The question for me is whether presence in Illinois is, under English law, a sufficient foundation for jurisdiction to be taken by the federal district court sitting in Tyler, Texas.

There is no doubt but that, for conflict of law purposes, each state within the United States is a "country" and that for many conflicts of
H    law purposes the United States is not a "country." Each state, for example, has its own common law. The United States has no common law. A person may be domiciled in a state. Domicile in the United States as a whole is a meaningless concept. The proper law of a contract

A

or of a tort may be the law of a state, but cannot be the law of the United States as a whole. In *Dicey's & Morris's Conflict of Laws*, 11th ed. (1987), p. 26 there is this statement:

B

> "Meaning of 'country.' This word has from long usage become almost a term of art among English-speaking writers on the conflict of laws, and it is vitally important to appreciate exactly what it means. It was defined by Dicey as 'the whole of a territory subject under one sovereign to one body of law.' He suggested that a better expression might be 'law district': but this phrase has never found much favour with English-speaking writers, who prefer the more familiar word 'country.' England, Scotland, Northern Ireland, the Isle of Man, Jersey, Guernsey, Alderney, Sark, each British colony, each of the American and the Australian states and each of the Canadian provinces is a separate country in the sense of the conflict of laws, though not one of them is a state known to public international law."

C

As part of the discussion of the meaning of the word "state," the text contains this statement, at p. 27:

D

> "A state may or may not coincide with a country in the sense of the conflict of laws. Unitary states like Sweden, the Netherlands and New Zealand, where the law is the same throughout the state, are 'countries' in this sense. But composite states like the United Kingdom, the United States, Australia and Canada are not."

E

I find it difficult to accept that for some private international law purposes the United States may not be a "country." Take the case of a federal district court hearing a federal anti-trust damages suit. The suit would be a federal question case, not a diversity case. The law being applied would be United States law, not state law. Professor Baade, giving evidence for the defendants, said that in a federal anti-trust case the "country" would be the United States. He accepted that this would be so even though the in personam jurisdiction of the court was determined by the forum state's "long arm" statute. This seems to me to correspond with reality. Federal anti-trust law is the product of United States statute, not state statute, and applies to the whole of the United States. It is the United States Congress that has established the federal courts in which anti-trust suits may be litigated. They are United States courts. The in personam jurisdiction that enables a defendant in an anti-trust suit to be brought before a federal district court sitting in Texas is dependent upon the Texas "long arm" statute but that is because Congress has not chosen to confer any specific federal in personam jurisdiction upon federal district courts. I did not understand it to be suggested that Congress could not, with constitutional propriety, do so if it so desired.

F

G

It was suggested that when sitting in federal question jurisdiction a federal district court was, on analysis, applying state law. The analysis was based upon the provisions in the United States Constitution that give federal legislation national efficacy. Federal legislation becomes, in effect, it was argued, state law. Accordingly a federal district court in a

H

A   federal question case may be regarded as applying state substantive law just as a federal district court in a diversity case will be applying state substantive law.

This analysis is, in my opinion, little more than sophistry. The distinction between federal law derived from federal statute, on the one hand, and state law, whether derived from common law or state statute, on the other hand, seems to me a clear one. It must have seemed clear, B  too, to Congress in enacting paragraph 1331 of the United States Code which refers to "civil actions arising under the Constitution, laws or treaties of the United States." In my opinion, when a federal district court is dealing with a federal question case, it is applying federal substantive law, not state law.

Suppose then, in a federal question case, a defendant who did not appear or take any part in the case had a damages default judgment C  entered against him. If the federal district court was sitting in Texas and the defendant was resident in Illinois, would an English court decline to enforce the judgment against the defendant on the ground that the "country" of the court was Texas and the court, by the standards of English law, lacked jurisdiction over the defendant? I do not see any reason why it should do so. The court would be a United States court D  applying United States law. Why should not such a court in such a case command the obedience of a resident anywhere in the United States? I justify my reaction by relying on the fundamental principle underlying territoriality as a basis of jurisdiction. The sovereignty of the United States in its own territory is, of course, recognised by English law. The entitlement of the United States to establish in its territory courts in E  which issues arising under its laws may be adjudicated upon and disposed of is an attribute of its sovereignty. It is also an attribute of its sovereignty that the United States is entitled to invest its courts with jurisdiction over any persons resident in its territory. If Congress had chosen to establish a federal district court at Washington D.C. for the purpose of dealing with federal anti-trust cases, and with in personam jurisdiction over any persons resident in the United States, the F  proposition that, under English law, that jurisdiction was excessive, would, in my view, have been unarguable. Under English law a resident in Alaska would owe the same obligation of obedience to such a court as would a resident of Washington D.C. The "country" of the court would, unarguably, be the United States as a whole.

I have been discussing that which for present purposes is hypothetical. G  The Tyler court was sitting in diversity and was not dealing with a federal question case. But the arguments addressed to me by Sir Godfray Le Quesne on this issue have had at their core the proposition that the United States as a whole cannot be a "country" for private international law purposes nor, in particular, for the purpose of enforcement in England of a damages award made by a federal district court. I am unable to accept that proposition. In my judgment, where a H  federal district court is exercising federal question jurisdiction it is doing so as a court of the United States in circumstances in which the "country" of the court is, for English law purposes, the United States. I therefore decline to approach the question before me on the footing that

490

Scott J.                  Adams v. Cape Industries Plc. (Ch.D.)                  [1990]

the United States cannot be a "country" for enforcement of foreign    A
judgment purposes.

The question before me is whether a federal district court sitting in
diversity in a tort case is to be regarded, for enforcement purposes, as a
court of the state in which it is sitting and whose law it is applying, or as
a court of the United States which established it. There is no authority
that provides an answer. A convenient starting point, however, is the
judgment of Blackburn J. in *Schibsby v. Westenholz*, L.R. 6 Q.B. 155.    B
He said, at p. 161—I have cited the passage before but I do so again:

> "If the defendants had been at the time of the judgment subjects of
> the country whose judgment is sought to be enforced against them,
> we think that its laws would have bound them. Again, if the
> defendants had been at the time when the suit was commenced
> resident in the country, so as to have the benefit of its laws    C
> protecting them, or, as it is sometimes expressed, owing temporary
> allegiance to that country, we think that its laws would have bound
> them."

How is this statement of principle to be applied where one sovereign
state has a number of different systems of law that apply in different
parts of its territory? Sir Godfray suggested that the critical question to    D
be asked was whether the defendant was present within the territorial
jurisdiction of the court which had given the judgment. He reminded me
of the statement by Lord Selborne L.C. in the *Rajah of Faridkote* case
[1894] A.C. 670, 683, that "all jurisdiction is properly territorial." If the
defendant was not within the territorial jurisdiction of the court
concerned, then, said Sir Godfray, it would be immaterial that he might    E
be resident in the jurisdiction of another court set up by the same
sovereign power. I do not find difficulty in accepting these submissions,
but they do not seem to me to point the way towards a solution to the
main problem. The question whether Cape was present within the
territorial jurisdiction of the federal district court at Tyler, Texas, is one
which must be answered by reference to English international law. It is
the attitude of English law to the territorial jurisdiction and competence    F
of a federal district court that I am trying to discover.

Sir Godfray submitted that the criterion to be applied in answering
the question depended on the function of the district court. If the
function of the court when sitting in diversity was the administration of
justice in Texas, then it should be regarded as a state court with a
territorial jurisdiction covering Texas. Unless its function was the    G
administration of justice in the United States as a whole, it should not
be regarded as a United States court with a territorial jurisdiction
covering the whole of the United States.

Sir Godfray then analysed the characteristics of a federal district
court and submitted that they showed the court, when sitting in diversity,
to be part of the system for the administration of justice in the state in
which it sat.    H

If Sir Godfray's approach is correct, I do not think his analysis or
conclusions can be faulted. But I am not satisfied that his approach is
correct. The question as to whether a foreign court has, in the eyes of

A  English law, jurisdiction over a defendant, may receive an affirmative answer if a sufficient territorial connection between the defendant and the court can be established. But the territorial basis of jurisdiction is dependent upon and cannot, in my opinion, be divorced from, the sovereignty of the "country" that has established the court in question. It is, I think, recognition of the sovereignty of a foreign country that leads to recognition of the entitlement of its courts to take jurisdiction

B  over persons resident in its sovereign territory. I do not regard the United Kingdom with its constituent private international law "countries" as inconsistent with this thesis. It would be open to Parliament, if it so desired, to create a court structure for the whole of the United Kingdom for a specified class of case. I can see no reason of principle why foreign countries, with a private international law similar to ours, should decline

C  to recognise the jurisdiction of such a court over persons resident anywhere in the United Kingdom. The United States is a sovereign power with a territory over which its sovereignty extends. It has established courts whose in personam jurisdiction, although subject to limits and derived from state statutes, is capable of extending to individuals anywhere in the United States.

D    As a matter of principle, in my view, if a United States court exercises jurisdiction over a person resident in the United States, it is exercising powers inherent in the sovereignty which adheres to the United States. As a matter of principle, too, in my view, English law should recognise the legitimacy of that exercise of jurisdiction.

    It follows that I agree with Mr. Morison that the answer to the question which I must answer does not lie in investigating the function

E  discharged by the court but lies in investigating the source of the authority of the court. Whatever the function of a federal district court in a diversity case, the source of its authority is to be found in the sovereign power which established it. For those reasons I conclude that the exercise of jurisdiction by a federal district court over a person resident in the United States is, by the standards of English law, a legitimate and not an excessive exercise of jurisdiction. If I had felt able

F  to conclude that Cape and Capasco were, when the Tyler 2 actions were commenced, present in Illinois, I would have held that to be a sufficient basis, in English law, for the exercise by the Tyler court of jurisdiction over them.

    There is one final point I wish to make before leaving this issue. Cape and Capasco protested the jurisdiction in the Tyler 1 actions. They

G  contended that the Texas "long arm" statute did not entitle the Tyler district court to exercise in personam jurisdiction over them. Their objections were overruled by Judge Steger at an interlocutory stage but were never the subject of a final ruling. The objections were not renewed in the Tyler 2 actions for the obvious reason that Cape and Capasco took no part therein. But it remains the contention of Cape and Capasco that, under the Texas "long arm" statute, the Tyler district

H  court was not entitled to exercise in personam jurisdiction over them. In the course of argument before me, I thought for a time, wrongly, that the alleged absence of in personam jurisdiction of the Tyler court was being advanced as a reason why the English courts should not recognise

492

Scott J.                    **Adams v. Cape Industries Plc. (Ch.D.)**                    [1990]

the jurisdiction exercised over Cape and Capasco by the Tyler court. Sir     A
Godfray made plain to me, however, that I was under a misapprehension
and that the contention that under the Texas "long arm" statute the
Tyler court lacked in personam jurisdiction was not being relied on as a
defence. Nonetheless, evidence was given by, in particular, Mr. Bernays
and Mr. Hall as to the consequences under United States law if that had
been so. Their evidence satisfied me that if a default judgment against a     B
defendant who has taken no part in the proceedings is given by a federal
district court in circumstances in which the court has erroneously
assumed in personam jurisdiction over the defendant, the defendant can
raise the error in collateral proceedings in order to resist the enforcement
of the judgment against him. In the instant case, Cape, if it owned
assets in California against which the plaintiffs sought to enforce the
default judgment, could, if its jurisdiction contention were a good one,     C
resist enforcement by establishing in collateral proceedings in California
the lack of jurisdiction of the Tyler court.

Mr. Morison submitted, and I think Sir Godfray agreed, that a
domestic lack of jurisdiction was not a ground upon which enforcement
of a foreign judgment in England could be resisted. *Pemberton v.
Hughes* [1899] 1 Ch. 781 was cited as authority: see especially *per* Sir
Nathaniel Lindley M.R. at p. 790. But *Pemberton v. Hughes* was a case     D
dealing with status, where special considerations apply.

I am not for a moment suggesting that the merits of a foreign
judgment can be re-examined in enforcement proceedings in this country.
But where enforcement of a foreign money judgment is sought, it seems
to me odd and anomalous that English courts should give to the
judgment an efficacy denied it by the courts of the forum. If, as I think,     E
the United States as a whole is the "country" of a federal district court
and if, within that country, collateral objection to the enforcement of a
default judgment is possible, I do not see, in principle, why that same
collateral objection should not be raised to resist enforcement of the
judgment in England. I need not and do not propose to express a final
opinion on this point since it does not arise as an issue in the present
case. But the matter has been touched on in argument as well as in     F
evidence and I would not wish this judgment to be taken as tacit support
for the view that, provided by English law standards the foreign court
was not claiming excessive jurisdiction, the judgment of the foreign
court would be enforceable in England notwithstanding that under the
law of the forum the court had lacked jurisdiction. My present view is to
the contrary.
                                                                                G

*Summary of issue 7*

It is at this point that the definitive part of my judgment comes to an
end. I have still to deal with issue 7—fraud, natural justice and public
policy. My conclusions and findings on this issue are, in summary, these:

(1) The allegations against Mr. Blake Bailey of dishonesty and of
procuring the default judgment by fraud fail. (a) The several statements     H
contained in the findings of fact in the default judgment that were based
on the proposition that the Tyler 1 actions and the Tyler 2 actions could
be treated as one composite unit of litigation were not untrue statements

A  of fact but were statements based upon a legal theory that Mr. Bailey, as counsel for the plaintiffs, was entitled to espouse in the interests of his clients. The theory was, in my view, misconceived but it was not, in my judgment, dishonest for Mr. Bailey to draft the default judgment on the basis of that legal theory. (b) Paragraph 11 of the findings of fact contains statements of fact that were, in my judgment, untrue in that the court did not review the medical records of any of the plaintiffs and did

B  not make any determination in respect of any individual plaintiff of the amount of damages that would properly compensate that plaintiff for his or her medical treatment or pain and anguish or physical disability. But I do not find that in drafting the default judgment with paragraph 11 included therein or in submitting the draft to Judge Steger, Mr. Bailey was acting dishonestly. (c) Mr. Bailey did not, I find, dishonestly

C  procure Judge Steger to award the damages sum of $15,654,000 or to award an average of $75,000 per plaintiff. The allegations of misrepresentation based on the contents of the conversations between Judge Steger and Mr. Bailey prior to 12 September 1983 fail. (d) Mr. Bailey did not, I find, mislead Judge Steger either in respect of the findings of fact in the default judgment or in respect of the quantum of damages awarded. (e) It was not dishonest for Mr. Bailey to procure

D  Judge Steger to award the $15,654,000 whether or not that level of award can be categorised as exorbitant or as arbitrary.

But: (2) the default judgment is not, in my judgment, a judgment that should be enforced in an English court. (a) No evidence of damage or injury to any of the plaintiffs, whether oral or in affidavit form, was placed before Judge Steger. (b) Medical records together with counsel's

E  summary of each plaintiff's case were placed before the court on 12 September 1983 but the judgment was given before Judge Steger had had any sufficient opportunity to peruse them and, as I find, without him having done so. (c) The damages award was quantified either as a total figure to be divided among all the plaintiffs or on the basis of an average figure per plaintiff and, in either case, without any determination

F  in respect of any individual plaintiff of the amount of damages that that plaintiff ought to recover from the defendants for the injuries he or she had received. (d) The classification of the plaintiffs into bands for damages purposes was carried out by the plaintiffs' counsel and did not represent any judicial assessment made by Judge Steger of the relative seriousness of the individual plaintiff's injuries. (e) In the circumstances,

G  the individual awards of damages were arbitrary and did not follow upon a judicial determination of the quantum of damages that the individual plaintiffs were entitled to recover against the defendants.

For these reasons, expressed in summary form, the default judgment was obtained, in my judgment, in circumstances that, by the standards of English law, were contrary to natural justice.

H  In my view, a judgment obtained in the circumstances revealed by the evidence of this case does not give rise to any obligation of obedience enforceable in any English court.

26 July.  Scott J. read the following conclusion to his judgment:

494

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

*Issue 7: fraud, natural justice and public policy*                                                A

    If my conclusion that, under English law, the Tyler court did not
have jurisdiction over Cape and Capasco is right, the issue whether
enforcement of the default judgment should be refused on the ground
that it was procured by fraud, or that its enforcement would offend
principles of natural justice or public policy, does not arise. But the
defendants' case under this head has involved allegations of dishonesty     B
against Mr. Blake Bailey. He, it is alleged, dishonestly procured the
default judgment. Allegations made against a professional man of
dishonesty in the course of his profession are allegations which, once
made, must be dealt with. Any other course would not be fair to Mr.
Bailey. For this reason, in particular, I must, notwithstanding my
conclusions on the other points in this case, deal in some detail with the
allegations of professional dishonesty made against Mr. Bailey. I propose     C
first to relate the circumstances in which, on my reading of the evidence,
the default judgment came to take the form it did. [His Lordship then
examined in detail the evidence as to the manner in which the default
judgment given by Judge Steger on 12 September 1983 came to be
delivered, concluded that the allegations against Mr. Bailey of dishonesty
and fraud based on the contents of the judgment failed, and continued:]
The defence that the default judgment was procured by fraud, therefore,     D
fails. That leaves the question whether, in the circumstances in which
the judgment was obtained its enforcement in England can be resisted
on natural justice or public policy grounds.
    The circumstances in which the judgment was obtained involve these
particular features. (i) The judgment was not based on evidence in the
strict sense. There was none. Nor was it based on the unauthenticated     E
medical records that Mr. Bailey and Mr. Clark had lodged on 12
September 1983. Judge Steger had not had time to peruse them. (ii) The
medical material lodged by Mr. Bailey and Mr. Clark did not purport to
establish that the medical condition of the respective plaintiffs had been
caused by exposure to asbestos dust. Nor did the material deal with pain
and suffering, present or future physical disability, past or future medical
expenses or, indeed, any special damage of any kind. (iii) Judge Steger     F
indicated his willingness to grant an average of $75,000 per plaintiff.
This was his only contribution to the amount of the damages award. The
$200,000-odd by which the total award of $15,654,000 exceeded
the $75,000 average was simply the mathematical consequence of the
appendix A amendments effected by Mr. Bailey and Mr. Clark. (iv) The
provenance of the $75,000 average is uncertain. It is likely that it     G
derived from Judge Steger's knowledge of the statistics regarding the
level of current settlements in asbestos-related suits. It is possible that it
owed something to the arguments that Mr. Bailey addressed to the
judge at their third meeting. It could not, in my view, have owed
anything to the medical material lodged with the court on 12 September
1983. (v) The decision as to the category of damages into which each
plaintiff should be placed was made by counsel, Mr. Bailey and Mr.     H
Clark, not by Judge Steger. The decision as to the level of the four
categories and their relationship to one another was made by counsel,
not by Judge Steger. Judge Steger required the average award to be

A   reduced from $120,000 to $75,000. It was counsel, not the judge, who decided how that should be achieved. It was counsel, not the judge, who decided to shift two plaintiffs from the respective categories in which they had originally been placed into new categories. The judge was not told that this had been done and could not have known that it had been done. (vi) The features that I have mentioned justify, in my judgment, these conclusions. First, no judicial hearing, worthy of the

B   name, at which quantum of damages was assessed took place. Second, the attribution of specific damages to the individual plaintiffs was not the result of a judicial assessment of the individual entitlements of the respective plaintiffs. Third, the total sum of damages awarded was based on the judge's opinion as to what would represent an appropriate average award.

C      The procedure adopted by Mr. Bailey and Judge Steger that led to the award of damages was not, in my judgment, in accordance with the requirements of the relevant federal rules. I base this conclusion on the evidence in particular of Mr. Hall and Mr. Bernays, but also on that of Mr. Brin and Mr. Davis, all of whom were critical of the procedure that had been adopted. Mr. Bailey and Mr. Patrick gave evidence to the effect that Judge Steger was not required to hold a judicial hearing for

D   the purpose of assessment of damages, was entitled to take into account unauthenticated medical reports, could inform himself by whatever means he chose of the significance of the plaintiffs' medical condition, did not require evidence causally connecting the plaintiffs' medical condition with the defendants' negligence, and did not require evidence of the plaintiffs' pain and suffering, medical expenses past and future, or

E   disability in order to award damages in respect of these items. In preferring the evidence to the contrary given by the defendants' witnesses, I am influenced by my own instinctive reaction as a judge in a common law jurisdiction. The United States is—with all respect to Louisiana and its civil law heritage—one of the great common law jurisdictions. The federal rules relating to default judgments and the federal rules of evidence seemed to me familiar. They embody in broad

F   substance rules of evidence and of procedure similar to those which apply in this country. The proposition that a judge assessing tortious damages where liability has been established against defendants in default can dispense with a judicial hearing or with the rules of evidence, or with the need of evidence, offends my understanding of the role and function of a judge in a common law jurisdiction. I found it easy to accept the evidence of Mr. Bernays, Mr. Hall, Mr. Brin and Mr. Davis

G   and to conclude therefrom that that proposition forms no part of United States law and procedure.

      Whether it is relevant to find, as I do, that the procedure leading to the damages award of 12 September 1983 was not in accordance with the federal rules is another matter. It may be that it is not. But I would wish it to be clear that criticisms of that procedure are not criticisms of

H   the procedure prescribed by the federal rules. It has not been suggested on the defendants' side, and could not have been suggested, that the content of the federal rules relating to the manner in which default judgments can be obtained and to the procedure for an assessment of

damages are in any respect offensive to natural justice. Indeed, the **A**
contrary is the case. Those rules, like our own corresponding rules, are
designed to enable justice to be done and, from a procedural point of
view, are unimpeachable. Criticism in the present case has been directed
to what actually happened. If Mr. Bailey had been correct in representing
the procedure followed as being consistent with the federal rules, the
criticism would have been a criticism also of the federal rules. But Mr.
Bailey was not, in my judgment, correct. So that point of criticism does **B**
not arise.

I must now consider the criteria to be applied in order to decide
whether or not a foreign judgment is impeachable on natural justice or
public policy grounds. I should say at once that, in my judgment,
natural justice and public policy cover, in the present case, the same
ground. If the judgment of 12 September 1983 is objectionable on **C**
natural justice grounds, it is easy to conclude that it would be contrary
to public policy to permit its enforcement in this country. If it is not
objectionable on natural justice grounds, then, on the footing that no
jurisdictional objection can be taken, I cannot see any public policy
reason for not enforcing it.

Mr. Falconer submitted that since due notice of the default application
had been given, no natural justice objection to the default judgment **D**
could be maintained. On the authorities, he submitted, the requirements
of natural justice, at least in the context of enforcement of foreign
judgments, amount to no more than that sufficient notice of the
proceedings must be given, together with an opportunity for the
defendant to have its case heard. He referred to the service on Cape
and Capasco of the notice of the plaintiffs' application for a default **E**
judgment and submitted that the defendants' natural justice defence
must, accordingly, fail.

There are, I agree, authorities which give some support to this
approach. Thus in *Ochsenbein v. Papelier* (1873) L.R. 8 Ch. App. 695,
700, Mellish L.J. said:

> "It was always held that a foreign judgment could be impeached at **F**
> law as contrary to the principles of natural justice, as, for instance,
> on the ground of the defendant having had no notice of the foreign
> action, or not having been summoned, or of want of jurisdiction, or
> that the judgment was fraudulently obtained."

In *Robinson v. Fenner* [1913] 3 K.B. 835, 842–843, Channell J. said: **G**

> "It is not enough, therefore, to say that the result works injustice in
> the particular case, because a wrong decision always does. So far as
> I can see, all the instances given of what is 'contrary to natural
> justice' for the purpose of preventing a foreign judgment being sued
> on here are instances of injustice in the mode of arriving at the
> result, such as deciding against a man without hearing him or
> without having given him any notice or the like." **H**

In *Jacobson v. Frachon* (1927) 138 L.T. 386, 390, Lord Hanworth M.R.
referred to Channell J.'s judgment in *Robinson v. Fenner* [1913] 3 K.B.
835 and said:

A    ". . . I am inclined to agree with the view that he presents there, that the question of natural justice is almost, if not entirely, comprised in considering whether there has been an opportunity of having had a hearing, and whether the procedure of the court has been in accordance with the instincts of justice whereby both parties are to be given a full opportunity of being heard."

B    In my view, however, the references in the dicta to service of notice of the hearing and to an opportunity to be heard are references, by way of examples, to circumstances which will constitute a want of natural justice and are not to be taken as exhaustive.

In *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, 159, Blackburn J. referred to the obligation on a defendant to obey an order of a foreign court of competent jurisdiction but went on to say that "anything which negatives that duty, or forms a legal excuse for not performing it, is a defence to the action."

In *Pemberton v. Hughes* [1899] 1 Ch. 781, 790–791, Lindley M.R. said:

D    "If a judgment is pronounced by a foreign court over persons within its jurisdiction and in a matter with which it is competent to deal, English courts never investigate the propriety of the proceedings in the foreign court, unless they offend against English views of substantial justice. Where no substantial justice, according to English notions, is offended, all that English courts look to is the finality of the judgment and the jurisdiction of the court, in this sense and to this extent—namely, its competence to entertain the sort of case which it did deal with, and its competence to require the defendant to appear before it. If the court has jurisdiction in this sense and to this extent, the courts of this country never inquire whether the jurisdiction has been properly or improperly exercised, provided always that no substantial injustice, according to English notions, has been committed."

F    That passage expresses, in my judgment, the fundamental criterion for the success of a natural justice objection to the enforcement of a foreign judgment. The proceedings in the foreign court must "offend against English views of substantial justice."

Atkin L.J. in *Jacobson v. Frachon*, 138 L.T. 386 referred to *Pemberton v. Hughes* [1899] 1 Ch. 781 and to Lindley M.R.'s judgment and continued, at p. 392:

G    "By that it is quite plain from the context that Lindley M.R. is dealing with proceedings offending against English views of substantial justice. He is not dealing with the merits of the case or the actual decision, because he goes on to say in the same case, at p. 792, 'A judgment of a foreign court having jurisdiction over the parties and subject matter—i.e., having jurisdiction to summon the defendants before it and to decide such matters as it has decided—cannot be impeached in this country on its merits.' It is plain that the Master of the Rolls is dealing only with the proceeding, because it is obvious if a court gives judgment on the merits for the plaintiff,

498

Scott J.                       Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

A

when it is plain it ought to have given judgment for the defendant, or vice versa, that is a judgment which offends against the English views of substantial justice. Nevertheless as the Master of the Rolls says, it cannot be impeached upon that ground, but it can be impeached if the proceedings, the method by which the court comes to a final decision, are contrary to English views of substantial justice. The Master of the Rolls seems to prefer, and I can quite understand the use of the expression, 'contrary to the principles of natural justice;' the principles it is not always easy to define or to invite everybody to agree about, whereas with our own principles of justice we are familiar. Those principles seem to me to involve this, first of all that the court being a court of competent jurisdiction, has given notice to the litigant that they are about to proceed to determine the rights between him and the other litigant; the other is that having given him that notice, it does afford him an opportunity of substantially presenting his case before the court.

"Both those considerations appear to be essential if they are to be in accordance with natural justice. I think the expression of opinion of the late Professor Dicey in his great book on the *Conflict of Laws*, dealing with this subject matter is a little narrowly expressed. He says in rule 107 (4th ed., p. 444): 'A foreign judgment may sometimes be invalid on account of the proceedings in which the judgment was obtained being opposed to natural justice.' Then he says that is owing to want of due notice. 'But, in such a case, the court is generally not a court of competent jurisdiction.' It may be that the court is generally not a court of competent jurisdiction, but that seems to me by no means the whole of the rule. A court of competent jurisdiction, as I have said, may very well, either in accordance with its rules or in violence of them, refuse a substantial hearing to the party, and, if so, it appears to me that the judgment would be invalidated on the ground that it was contrary to natural justice for the reasons I have already to give. That gives quite free play for a variation between different countries and different jurisprudences of the method in which they shall hear the parties and the nature of the evidence to be given in the court. The case here depends upon whether or not the procedure of this foreign court did offend against our principles of substantial justice."

B

C

D

E

F

Despite Atkin L.J.'s particular reference to notice of the hearing being given to the litigant and to an opportunity for the litigant to present his case, he was not, in my view, purporting to limit natural justice objections to objections based on the absence of one or other of those features. He was limiting natural justice objections to objections based upon the procedure that had been adopted, but that, in my opinion, is the only limitation that can be spelled out of the judgment. The criterion expressed by Atkin L.J. in the last sentence of the passage I have cited, namely, whether "the procedure of this foreign court did offend against our principles of substantial justice," is a broad one.

G

H

In my judgment, therefore, I must consider the procedure which led to the 12 September 1983 default judgment and ask myself whether or not it offends against English principles of substantial justice.

1 Ch.                    Adams v. Cape Industries Plc. (Ch.D.)                    Scott J.

A     I must start with the important circumstance that Cape and Capasco were in default and were thereby taken to have admitted the pleaded allegations made against them save in relation to damage. They had forfeited any entitlement to a hearing save on the issue of damages. There is no injustice in that. Second, Cape and Capasco were given notice of the plaintiffs' application for a default judgment. They were given notice that the application would be heard on 12 September 1983.

B     Venue was not specified, but I do not think that omission can be regarded as material.

      It is important, however, to notice the nature of the relief which the plaintiffs were proposing to seek. Their application, according to the document served on Cape and Capasco, was to

C     "move the court to enter default judgment in favour of plaintiffs . . . and against defendants . . . and further, to hold hearing to determine the amount of relief entitled to plaintiffs."

      This was notice to Cape and Capasco of a judicial hearing at which a judicial assessment of damages would take place.

      The effect of the notice given to Cape and Capasco cannot be

D     divorced from the content of the federal rules regarding default judgments. Under the federal rules, as under our own rules, a judicial assessment of damages where a defendant is in default is only necessary if the claim is for an unliquidated sum: see federal rule 55($b$). If the claim is "for a sum certain or for a sum which can by computation be made certain," the court clerk is required "upon request of the plaintiff and upon affidavit of the amount due [to] enter judgment for that amount . . . against the defendant." A default judgment on a claim for

E     a liquidated sum can, therefore, be obtained without any judicial hearing or any judicial assessment of the amount of the claim. There is no injustice in that.

      The point can be taken further. It would be possible for procedural rules to provide, in the case of an unliquidated claim and a defendant in default, that the plaintiff be entitled, upon giving to the defendant a

F     written estimate of the recoverable damages, to enter judgment for the amount of the estimate, unless within some specified time the defendant gave notice of intention to dispute the amount. In that way an unliquidated claim could lead to a judgment against a defendant in default without any judicial hearing and without any judicial assessment of the damages. The case is hypothetical, but I do not think that a

G     judgment so obtained could be described as offending against English principles of substantial justice. The defendant would have received notice of the amount of the claim and would have been able to have disputed the quantum of damages and to have put the plaintiff to proof thereof if so advised.

      I conclude that neither the absence of a judicial hearing nor the absence of a judicial assessment of damages is per se a procedural

H     feature that is objectionable. The context is all-important.

      In the present case, the context is provided by the federal rules. The federal rules make provision, in actions for unliquidated damages where the defendant is in default, for a judicial process in the course of which

evidence will be adduced and which will lead to due judicial consideration     A
by the judge, in the light of the pleadings and of the evidence, of the
amount of damages to which the plaintiff is entitled. A defendant in
default in an action for unliquidated damages is entitled to expect that
his liability to the plaintiff will be assessed by the judge in the light of
evidence which the judge has considered and which, in the judge's
opinion, justifies the award that is made.

The requirements of substantial justice in a particular case cannot, in     B
my judgment, be divorced from the legitimate expectation of both the
plaintiff and the defendant in the context of the procedural rules
applicable to the case.

Moving from the general to the particular, the defendants in the
present case, Cape and Capasco, were, in my view, entitled to expect
that their liability to the plaintiffs would be assessed by Judge Steger at     C
the hearing of which they had been given notice, in accordance with
evidence laid before and considered by the judge and in accordance with
the judge's assessment in the light of that evidence of the respective
plaintiffs' entitlements in damages. That is not what happened. There
was no consideration given by the judge to the medical material relating
to the individual plaintiffs and to the individual plaintiffs' entitlements in
the light of that medical material. If there had been, the judge would     D
not simply have said that he would award an average of $75,000 per
plaintiff. Damages calculated on an average-per-plaintiff basis may make
very good sense for the purposes of a settlement. The defendants who
pay are not concerned as to how the total sum is divided up among the
individual plaintiffs. But a judicial award so calculated is the antithesis
of an award based upon the individual entitlements of the respective     E
plaintiffs. Judge Steger's approach demonstrated, in my opinion, that he
was not considering the individual cases and how much the respective
individuals were entitled to recover against Cape and Capasco. The
judge purported to award sums for pain and suffering, for medical
expenses, for disability. But the judge's approach via an average sum
per plaintiff demonstrated that he was not giving any consideration to
these heads of damage in respect of plaintiffs individually.     F

Nor did Judge Steger have any material before him from which a
judicial estimate of pain and suffering or of medical expenses could have
been made. Nor did he, as opposed to counsel, determine the levels of
the four categories of damages or select the plaintiffs to be placed in
each of these categories. There was, in short, in my opinion, no judicial
assessment of damages.     G

In my judgment, the procedure adopted by Judge Steger offended
against English principles of substantial justice. The defendants were
entitled to a judicial assessment of their liability. They did not have one.
The award of damages was arbitrary in amount, not based on evidence
and not related to the individual entitlements of the plaintiffs. Many of
the features of the procedure to which I have drawn attention might,
taken singly, have been insufficient to meet the yardstick of substantial     H
injustice. Taken together, the criterion is, in my judgment, satisfied.

Mr. Falconer submitted that the procedural defects to which I have
drawn attention could have been the basis for an attack on the judgment

A    in the federal courts, whether by way of collateral action to have the judgment set aside or by way of appeal. This may well be right, although by now I suspect that such an attack or appeal would be time-barred. Mr. Falconer then submitted that where the foreign courts themselves provide a procedural remedy, the English courts should not entertain the objection. He referred me to *Cheshire and North's Private International Law*, 11th ed. (1987), p. 378, where it is stated that "the

B    defence will not succeed if the alleged unfairness consisted of something that might have been combatted and removed in the foreign action." *Jacobson v. Frachon*, 138 L.T. 386, is referred to in support of that proposition. But that case turned on the question whether the course of proceedings in the foreign court whereby the judgment was obtained offended English notions of substantial justice. It was held it did not.

C    The question whether, if the proceedings had offended, the defect would have been cured by the availability of an appeal procedure did not arise. As a matter of principle, in my opinion, Mr. Falconer's submission is unacceptable. If the procedure adopted by a foreign court offends English notions of substantial justice, whether or not the procedure be in accordance with the procedural rules of the foreign court, I cannot see any good reason why the resulting judgment should

D    be enforceable in England. It does not, in my view, create any obligation of obedience binding on the defendant that an English court should be required to recognise. So it is, in my judgment, with the default judgment of 12 September 1983. I do not accept that English law recognises any obligation on Cape or Capasco of obedience to a judgment so obtained, and I decline to enforce it.

E    It was argued, in addition, by Mr. Playford that the default judgment for $15,654,000 was exorbitant in amount, that the sums awarded to the individual plaintiffs were in a like state and that the default judgment should on that account, too, be rejected as offending against English notions of substantial justice. Mr. Playford reminded me of Dr. Bidstrup's evidence that had sought to establish that many of the plaintiffs were, judged by the medical records, suffering from no lung

F    injuries at all. Mr. Falconer justifiably pointed out that a defence on the merits is not a ground for declining to enforce a foreign judgment and that a complaint based on the allegedly excessive amount of the award was an attempt to re-open the merits. Mr. Playford's point about the amount of the award is not, in my view, a separate ground of complaint but is part and parcel of the complaint that there was no judicial

G    assessment.

    Judge Steger did not, in the present case, review the medical material relating to each individual plaintiff and then assess the damages to which that plaintiff was entitled. If he had done so and if he had awarded the same amounts as are contained in appendix A to the default judgment, Mr. Playford's complaint would, I agree, have represented an attempt to re-open the merits. I would then have had to decide whether there could

H    ever come a point at which an English court would feel so outraged by the excessive amount of a damages award that a refusal to enforce the award would be justified and, if so, whether that point had been reached in the present case. On the facts of the present case, however, I