502

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

do not, in my view, have to answer those questions. The damages   A
awarded to the individual plaintiffs were not assessed by reference to
their respective individual circumstances. So the question whether by
reference to those circumstances the damages awarded were outrageously
excessive does not arise.

Nonetheless, Mr. Playford was, in my opinion, able to demonstrate,
in relation to a number of plaintiffs and their respective medical records,
inconsistencies in the levels of damages awarded to them. There were   B
some in respect of whom it was difficult to accept that any real injury
had been suffered at all. These examples served, in my view, to confirm
that no consideration had been given to the individual deserts of the
plaintiffs, to underline, in short, the arbitrariness of the awards, rather
than to establish that the awards were exorbitant.

(vii) There are a few other minor matters that I should deal with.   C
(1) The damages awarded to the plaintiffs in the action to which Capasco
was not a party are not enforceable against Capasco. That is accepted.
(2) There are some plaintiffs who were intervenors in one or other of
the Tyler 2 actions but notice of whose intervention was never served on
Cape or Capasco. Prima facie this failure represents a procedural defect
of substance. Why should the default judgment in favour of these   D
plaintiffs be enforced? Cape and Capasco were not in default and had
no opportunity to file an answer to the pleadings. Mr. Falconer's answer
was that since Cape and Capasco had for tactical reasons decided to
take no part in the Tyler 2 actions, the failure to give notice of the
interventions did not prejudice them. They would, in any event, have
taken no steps to defend the claim. I accept Mr. Falconer's premise but
not his conclusion. I agree that it is as certain as anything can be certain   E
that, if served with notice of the interventions, Cape and Capasco would
have done nothing. Nonetheless, notice to the defendants of the claims
was, in my view, an essential preliminary to recognition of the default
judgments. Substantial justice requires at least, and in all cases, that
notice of the claims be given to the defendants. If that is not done, I do
not think the resultant judgment is enforceable in this country.   F
Accordingly, I would, on this ground also, have dismissed the actions of
those plaintiffs in respect of whom notice of intervention was not served
on the defendants. (3) Finally, it is accepted by Mr. Morison that, if,
contrary to my view, the default judgment is enforceable in England,
the defendants are entitled to set off against their liability thereunder
the sums recovered by the plaintiffs in the 1983 settlement. Otherwise
there would be double recovery. This point does not affect the Unarco   G
plaintiffs.

I must conclude by expressing my indebtedness to counsel for their
very great assistance in a case that has been for me of unprecedented
interest both on the law and the facts and my regret that this final part
of my judgment has been delayed.

H

*Action dismissed.*
*Plaintiffs to pay four-fifths*
*of defendants' costs.*

A    *Solicitors: Herbert Oppenheimer Nathan & Vandyk; Davies Arnold & Cooper.*

APPEAL from Scott J.

The plaintiffs appealed on the grounds, which were amended at the hearing, inter alia, that (1) the judge misdirected himself in law in
B    holding (a) that the defendants were not present in the United States of America at the relevant dates and (b) that it would be contrary to natural justice for the judgment of the United States Federal Court of the Tyler District, Texas, dated 12 September 1983 to be enforced in this country; (2) at the trial, the plaintiffs contended that the defendants were present at 150, North Wacker Drive, Chicago, Illinois, from where asbestos mined in South Africa by the Cape group was marketed
C    throughout the United States of America and that the defendants were present there (a) by their wholly owned subsidiary, North American Asbestos Corporation ("N.A.A.C."), (b) by a company called Continental Productions Corporation ("C.P.C."), which was set up to replace N.A.A.C. in such a way as to disguise the defendants' continued involvement in the marketing of the group's asbestos in the United
D    States of America; (3) the judge failed to apply the correct test to determine whether the presence of a third party might constitute the presence of the defendant and instead he asked himself the fundamental question whether the United States court was entitled, on territorial grounds, to take jurisdiction over Cape; (4) the judge erred in law in rejecting the approach of the European Court to the question of jurisdiction where a parent outside the market set up a subsidiary within
E    it; (5) the judge misdirected himself as to the burden of proof in holding that the plaintiffs had the burden of proving that Cape were present in the United States, whereas the burden was on the defendants to prove that the judgment of the federal court was not enforceable; (6) on the facts as found, in particular with regard to N.A.A.C. the judge ought to have held that the defendants were present through it, which was
F    carrying on the group's business and not, in any real sense, its own business; (7) as to C.P.C. the judge wrongly concluded that it was an independently owned company and even if that conclusion were correct, C.P.C. was Cape's presence in the United States of America and the judge was wrong to conclude that C.P.C. and N.A.A.C. were carrying on their own business rather than the business of Cape; (8) the judge erred in law in his approach to the question whether it would be
G    contrary to natural justice to enforce the judgment and having stated that "the fundamental criterion for the success of natural justice objection" was whether the proceedings offended "against English views of substantial justice," he wrongly concluded that that criterion permitted him to investigate and make findings in relation to (a) the procedural rules relevant to the entering of the judgment and (b) the circumstances
H    in which the judgment was entered and then he applied that criterion, without qualification or limit, to the facts. The correct approach was to treat the boundaries of natural justice as a defence to the enforcement of a foreign judgment as confined to an examination of whether the defendant had had notice of the hearing or of the intention to enter

504

judgment and a fair opportunity of presenting his case: *Jacobson v. Frachon* (1928) 138 L.T. 386, 392, *per* Atkin L.J. If the judge had applied the correct test he would have been bound to conclude that the natural justice defence failed and that a large part of the evidence on behalf of the defendants was irrelevant on that issue. Any defects in the manner in which the judgment was obtained or given were capable of being corrected on appeal or by application to the federal judge at the first instance.

By a respondent's notice under R.S.C., Ord. 59, r. 6(1)(*b*) the defendants gave notice of their intention of contending that the judgment should be affirmed on additional grounds, inter alia, that the judge misdirected himself in law in holding that if, contrary to his primary findings, the defendants were resident or present in Illinois, then such residence or presence was sufficient to give the Federal District Court for the Eastern District of Texas, Tyler Division ("the Tyler court") jurisdiction over the defendants recognisable according to English law. The question which had to be decided was whether at the time each suit was commenced the defendants were resident or present in the "country" of the Tyler court. The judge misdirected himself in holding (a) that the question had to be answered by investigating the source of the authority of the court, (b) that a resident of Illinois was, according to English private international law, subject by reason of that residence to the jurisdiction of the Tyler court and (c) that a resident anywhere in the United States was, according to English private international law, within the jurisdiction of the Tyler court and that the United States was one "country" or "law district." The Tyler court did not claim jurisdiction on the grounds of the defendants' residence in Illinois. No American court would regard a federal court sitting in one state as having jurisdiction over a defendant resident in another state on the ground that that defendant was resident within the United States. According to the judge's decision, English rules of private international law would regard as subject to the jurisdiction of the Tyler court many residents of the United States whom no American court would hold to be so subject.

T. R. A. Morison Q.C. and Charles Falconer for the plaintiffs.
Sir Godfray Le Quesne Q.C., Jonathan Playford Q.C. and Adrian Brunner for the defendants.
The main submissions of counsel are dealt with in the judgment: see post, pp. 514E–F, 518E–H, 519E–F, 528A–D, F—529C, 530B–C, 532B–E, F–G, 535D–F, 536C–H, 537E—538B, G—539C, 540G—541D, 544D–545A, 549F—550C, 555B, F—557G, 561G—562D, 565D–H, 566D–E, 567E–F, 568H—569B, 570D.

*Cur. adv. vult.*

27 July 1989. The following judgment of the court was handed down.

1 Ch.                          Adams v. Cape Industries Plc. (C.A.)

A        SLADE L.J.

## I Introduction

This is the judgment of the court, to which all its members have contributed, on an appeal by the plaintiffs in 205 consolidated actions. On 27 July 1988, Scott J. dismissed all their claims. The trial in the court below lasted some 35 days and the argument before this court extended over some 17 days. The case raises important points of law and some substantial issues of fact.

Having reserved judgment at the end of the argument on 3 May 1989, we subsequently came to the firm conclusion that the appeal must be dismissed and that in the particular circumstances of this case it was right that the parties should be informed of our decision at once, rather than having to wait for some more weeks before we were in a position to give the reasons for our decision. On 24 May we accordingly announced that the appeal would be dismissed and that we would give the reasons for our decision in writing at a later date, at which date the order dismissing the appeal would be drawn up. This we now do.

The plaintiffs in these proceedings are persons, or the personal representatives of persons, in whose favour awards of damages were made by the judgment, dated 12 September 1983, of Judge Steger, a United States Federal District Court judge, in the District Court for the Eastern District of Texas, United States of America ("the Tyler court"). The judgment was a default judgment against Cape Industries Plc. ("Cape") and Capasco Ltd. ("Capasco"), companies registered in England and the sole defendants in all the actions before this court. They had taken no part in the proceedings in which the judgment was made. The judgment was for the specific sums payable to individual plaintiffs set out in an appendix to the judgment: $37,000 each for 67 plaintiffs; $60,000 each for 31 plaintiffs; $85,000 each for 47 plaintiffs and $12,000 each for 61 plaintiffs. The total of the individual awards was $15.654m. and the awards were directed to bear interest at 9 per cent. from judgment until payment.

The awards were made in respect of claims for damages for personal injuries and consequential loss allegedly suffered by each plaintiff as a result of exposure to asbestos fibres emitted from the premises of a primary asbestos insulation factory in Owentown, Smith County, Texas, which was operated from 1954 to 1962 by Unarco Industries Inc. ("Unarco") and from 1962 to 1972 by Pittsburgh Corning Corporation ("P.C.C."). The basis of liability of Cape and Capasco was alleged to be negligent acts and omissions and breaches of implied and express warranties.

The relationship of Cape and Capasco to the emission of asbestos fibres fibres from the Owentown factory was, in summary, that Cape owned the shares in subsidiary companies in South Africa which had mined the asbestos and in its subsidiary Capasco. Capasco was concerned in organising the sale of asbestos, mined in South Africa, throughout the world to those who wished to use it in various industrial processes. Between 1953 and 1978 when it was dissolved, another subsidiary of Cape, North American Asbestos Corporation ("N.A.A.C.") assisted in the marketing of asbestos of the Cape group in the United States of America. The plaintiffs' contention was that the defendants had been

506

responsible for the supply of asbestos fibres directly or indirectly to Unarco and P.C.C. without giving proper warning of the dangers thereof.

*Summary of the proceedings in the Tyler court*

Different sets of proceedings with reference to claims arising from the processing of asbestos in the Owentown factory had extended over many years. An account of what took place is unnecessary for a proper understanding of the course of the present proceedings. The first action was commenced in the Tyler court in January 1974 and was framed as a "class" action in which the plaintiffs sued "on behalf of themselves and all others similarly situated." A second action was commenced in the same month. They were assigned to Judge Steger. Cape was one of the defendants. Capasco was added as a defendant in 1976. Egnep (Proprietary) Ltd. ("Egnep"), a wholly owned South African subsidiary of Cape, engaged in mining asbestos, was also a defendant. All filed motions to quash service on the ground of lack of jurisdiction.

By July 1974 it was apparent that hundreds of claimants, alleging injury caused by the amosite asbestos used in the Owentown plant, were intending to pursue claims. Judge Steger in December 1974 ruled that the actions should not proceed as class actions; that they should be conducted under the federal "Rules for Complex and MultiDistrict Litigation;" and that intervention in the proceedings should be allowed freely for those claimants who wished to join. In consequence a large number of claimants were added. In December 1974 a third action with reference to asbestos from the Owentown plant was commenced in the Tyler court in which the only defendant was the United States of America. All these proceedings together have been known as the Tyler 1 proceedings. They were separate and distinct from the proceedings in which the plaintiffs, now before this court, obtained their judgment in September 1983.

The motions by Cape, Capasco and Egnep to dismiss the Tyler 1 proceedings as against them on the ground of lack of jurisdiction were dismissed by Judge Steger in August 1977. That dismissal was not final and it was open to the Cape companies to take the jurisdiction point at the trial of the action. They filed answers in which they pleaded to the merits of the claim while maintaining their objection to jurisdiction.

The number of claimants in the Tyler 1 proceedings had by mid 1977 risen to more than 400 and was still increasing. Trial was set for 12 September 1977. The purpose of Judge Steger in fixing that date included that of causing the parties to consider settlement. On 12 September 1977 settlement discussions proceeded in which Judge Steger took part in a manner which would be unusual, if not impossible, in this country but which was effective and normal under the United States system of civil justice. By 28 September 1977 a settlement figure of $20m. was agreed for all the claimants who then numbered 462. Upon agreement of the settlement figure it was ordered that as from 28 September 1977 no further intervention in any of the Tyler 1 actions would be permitted.

A      The sum of $20m. was provided by the defendants in agreed proportions: £5.2m. by N.A.A.C., Cape and Egnep; $1m. by Unarco (who had operated the Owentown plant from 1954 to 1962); $8.05m. by P.C.C. (who had operated the plant from 1962 to 1972) and its shareholders; and $5.75m. by the United States Government. The settlement was recorded and approved in a final judgment in the Tyler 1 actions dated 5 May 1978. The reference to shareholders in P.C.C. is to

B   Pittsburgh P.G. Industries Inc. ("P.P.G.") and to Corning Glassworks Inc. who had been joined as defendants on the basis that each had taken such part in the management decisions regarding the use of asbestos as to be liable for injuries arising from that use.

     Upon prohibition by the order of Judge Steger of further interventions in the Tyler 1 proceedings, new actions were commenced by claimants in what have been called the Tyler 2 proceedings. There were eight

C   separate actions. They were assigned to Judge Steger. The first was commenced on 19 April 1978 and the last on 19 November 1979. There followed intervention by a very large number of claimants. Cape, Egnep and N.A.A.C. were defendants in all the actions. Capasco was a defendant in three only. P.C.C., P.P.G., Corning Glassworks Inc. and O.C.A.W., a trade union to which some claimants had belonged, were

D   also defendants in all actions. The United States Government was a defendant in some actions and third party defendant in others.

     In December 1981 Judge Steger gave directions by which each claimant was required to provide specified information with reference to his claim "on personal knowledge and attested to under penalty of perjury." As a result of those directions, and of the response, or lack of response, thereto, a large number of claimants had their claims summarily

E   dismissed "without prejudice." The number of plaintiffs left in the Tyler 2 actions was about 206. It is to be assumed that each of those remaining claimants had responded to the order of December 1981 by alleging some physical condition that was capable of having been caused by exposure to asbestos dust and of constituting an injury.

     Cape, Capasco and Egnep took the decision to play no part in any of the Tyler 2 actions. They had initially regarded the Tyler 1 actions as

F   having little more than nuisance value. They could not understand how tortious liability to the Owentown workers could be imposed upon the Cape companies merely on the ground that Cape subsidiary companies had mined the asbestos and sold it into the United States of America. They had had expectations of success on their jurisdiction objection. They had, however, succumbed to the pressure for settlement. They were unwilling to be left as the only defendants in a large and expensive

G   jury trial. Having joined in the settlement of the Tyler 1 actions they decided, since they had no assets in the United States of America, to take no part in the Tyler 2 proceedings; to allow default judgments to be obtained against them; and to defend any actions brought in this country for enforcement of any such judgment on the ground that, under the law of this country, the Tyler court had no jurisdiction over

H   Cape, Capasco or Egnep with reference to the claims of the claimants.

*The settlement against some defendants of the Tyler 2 proceedings*

     In circumstances which will be considered in more detail later in this judgment, the Tyler 2 proceedings were in February 1983 settled, as

508

A

against the effective defendants other than the Cape companies, for a sum of $1.33m. The figure of $1.33m. was based upon an average award of $10,000 for each of 133 plaintiffs represented in the settlement negotiations. The sum of $1.33m. was to be provided as to $900,000 by P.C.C., the firm which had operated the Owentown factory from 1962 to 1972, and by P.P.G., one of the corporations owning shares in P.C.C.; $130,000 by Corning Glassworks Inc., the other corporation holding shares in P.C.C.; $150,000 by O.C.A.W., and $250,000 by N.A.A.C. Such was the considered value of the claims, as it emerged from the settlement process between the judge and the parties, as against the parties which included those alleged to have had some direct concern in connection with the emission of asbestos particles at or from the Owentown factory. On payment of those sums the settling defendants were to be released from all claims by the 133 plaintiffs.

B

C

That settlement was complicated by a "device" devised by Mr. Bailey, who was the attorney negotiating the settlement on behalf of the claimants and which was intended, it was said, to give the claimants the chance of additional recovery against the United States. The form of this device, and the part which it was alleged to have played in the formulation of the terms of the default judgment against the Cape companies, was important to the allegations of fraud put forward against Mr. Bailey, which, as stated below, were rejected by Scott J. It is necessary to describe what happened to render intelligible some of the matters discussed later in this judgment. The device was described by Scott J., ante, p. 452c–f:

D

"The device was this: the settlement figure would be expressed in the intended settlement agreement not as $1.33m. but instead as $6.65m., an average of $50,000 per plaintiff. The defendants would be obliged to pay only $1.33m. The balance of $5.32m. ($40,000 per plaintiff) would be payable only if and to the extent that the defendants' third party claims against the United States succeeded. The prosecution of those claims in the names of the defendants was to be the responsibility of the plaintiffs' counsel, no cost in respect thereof falling on any of the defendants. The $6.65m. was a figure proposed by Mr. Bailey. It was not a figure which mattered at all to the defendants since their obligation to pay was limited to the $1.33m. They did not bargain about the amount. They simply agreed to Mr. Bailey's proposal which would cost them nothing. Mr. Bailey told me that the figure was based upon what he thought might be awarded against the United States at the suit of the settling defendants. How it could have been supposed that the liability of the United States under the third party claims could exceed the $1.33m. that the settling defendants, the third party claimants, had agreed to pay the plaintiffs, defeats me."

E

F

G

On 2 February 1983 Judge Steger approved the settlement of the Tyler 2 proceedings as against the settling defendants, and that approval extended to the fairness and reasonableness of the settlement in the case of any minor claimants. The trial date for the outstanding Tyler 2 claims against the United States was fixed for 20 June 1983. Settlement was

H

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    discussed. An agreement of compromise dated 15 June 1983 was signed.
The United States Government contributed nothing directly to the
claimants but, in settlement of their claims against the United States, it
was agreed that the United States would bear the costs of enforcement
of default judgments against Cape, Capasco and Egnep in the United
Kingdom or in South Africa. It is in performance of that promise that
these proceedings have been pursued in this country.

B        The default judgment in the Tyler court, upon which the present
proceedings in this country are based, was, as stated above, signed on 12
September 1983. The nature of the process in which that judgment came
to be signed will be examined in detail later in this judgment when the
issue of natural justice is considered.

C    *The consolidated actions in this country*
         There is no statutory provision for the registration in this country of
the judgments of the federal or state courts of the United States of
America. The plaintiffs, therefore, took proceedings in this country
seeking to recover the amount of their judgments from Cape and
Capasco. The writ in the lead action of Mr. Jimmy Adams was issued on
D    1 August 1984 and claimed the amount of his separate award with
interest. In law the claims of all the plaintiffs are based upon the
principle of common law that, subject to certain qualifications, the
judgment in personam of a foreign court of competent jurisdiction may
be sued on in this country as creating a debt between the parties to it.
         It would have been open to the plaintiffs in the first place to sue the
defendants in this country rather than the United States of America,
E    provided that they could have shown that the acts complained of were
actionable as a tort both under English law and the law of the place or
places where they were committed: see *Boys v. Chaplin* [1971] A.C.
356. However, they chose to bring the proceedings in the United States
of America and then to seek to enforce them in this country, where
presumably the defendants are believed to have substantial assets.

F    *The issues at the trial before Scott J. and his decision*
         The circumstances in which our courts will recognise a foreign court
as competent to give a judgment in personam capable of enforcement in
this country are stated thus in *Dicey & Morris, The Conflict of Laws,*
11th ed. (1987), vol. 1, pp. 436–437, rule 37:

G        "*First Case*—If the judgment debtor was, at the time the proceedings
         were instituted, resident (or, perhaps, present) in the foreign
         country.
         "*Second Case*—If the judgment debtor was plaintiff in, or
         counterclaimed, in the proceedings in the foreign court.
         "*Third Case*—If the judgment debtor, being a defendant in the
         foreign court, submitted to the jurisdiction of that court by
H        voluntarily appearing in the proceedings.
         "*Fourth Case*—If the judgment debtor, being a defendant in the
         original court, had before the commencement of the proceedings
         agreed, in respect of the subject matter of the proceedings, to

510

submit to the jurisdiction of that court or of the courts of that    A
country."

At the trial the plaintiffs relied on three separate grounds for
enforcement of the judgment of the Tyler court in England, namely:
(i) that the defendants had voluntarily appeared in the proceedings in
the Tyler court; (ii) that the defendants had, before the proceedings
commenced, agreed to submit to the jurisdiction of the Tyler court;    B
(iii) that the defendants were resident in the United States of America
at the time of the commencement of the plaintiffs' proceedings in the
Tyler court. (A fourth pleaded ground, referred to as "comity or
reciprocity," was not in the event relied on at the trial.)

Scott J. concluded that the Tyler court had been competent to give a
judgment against Cape and Capasco on none of the three grounds relied
on (*Dicey & Morris'* First, Third and Fourth Cases). The plaintiffs'    C
claim, therefore, failed for this reason, if no other.

However, the judge proceeded to consider certain additional points
raised by the defendants by way of defence. The first point arose in this
way. According to the case made for the plaintiffs, the presence (if any)
of Cape and Capasco was in the State of Illinois where Cape's subsidiary,
N.A.A.C. had its office in Chicago from 1953 to 1978 when it was    D
wound up; and where in the same building from 1978 onwards
Continental Products Corporation ("C.P.C."), also an Illinois corporation
but not a subsidiary of Cape, carried out similar marketing functions in
the United States of America for the sale of asbestos produced by
Cape's South African subsidiaries. The plaintiffs did not contend that
Cape or Capasco had been present in Texas. In these circumstances, the    E
defendants contended that under English law presence in Illinois did not
suffice to give the Tyler court (a federal district court sitting in Texas)
jurisdiction to hear a claim in tort against the defendants governed by
the law of Texas. This argument, which we will call "the country issue,"
Scott J. rejected. He said, ante, p. 491F, that if he had felt able to
conclude that Cape and Capasco were present in Illinois when the Tyler
2 actions were commenced, he would have held that to be a sufficient    F
basis in English law for the exercise by the Tyler court of jurisdiction
over them.

The defendants further contended that, even if any grounds of
jurisdiction in the Tyler court had existed, yet the judgment should not
be enforced because (i) the judgment had been obtained by the fraud of
Mr. Blake Bailey, the attorney who had represented some of the
plaintiffs before Judge Steger in the proceedings upon the making of the    G
default judgment and who had drafted the terms in which the default
judgment was finally expressed; and (ii) it would be contrary to the
standards of natural justice required by our law, and contrary to
the principles of public policy applied by our law, to enforce the
judgment having regard to the circumstances in which, and the
procedures by which, it came to be made. Scott J. considered these    H
issues again on the assumption that, contrary to his conclusion, the
plaintiffs had made out a ground for jurisdiction in the Tyler court over
Cape and Capasco. He acquitted Mr. Bailey of having had any intention

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    to deceive and of having deceived anyone with reference to the terms
and form of the judgment. The allegations that the judgment had been
obtained by fraud accordingly failed. However, the defendants succeeded
before Scott J. on the natural justice point. The judge found that the
judgment was not such that it could be enforced in the courts of this
country. The primary ground of that finding was that the procedure
adopted in this particular case by the judge of the Tyler court offended
B    against the principles of substantial justice contained in our law.

Scott J. gave his judgment in two parts, which together covered 150
pages of transcript. On 17 June 1988 he announced that the claims of all
the plaintiffs would be dismissed and he gave his reasons for rejecting
each of the three grounds upon which the plaintiffs had claimed that
their judgment in the Tyler court should be enforced in this country. He
C    also stated in summary form his reasons for rejecting the allegations of
fraud against Mr. Bailey and for upholding the contentions of
Cape/Capasco on the natural justice issue. On 26 July 1988 he gave his
full reasons with reference to the issues of fraud and natural justice. The
plaintiffs have invited this court to take a different view on some parts
of the facts in this case, and to apply principles of law which the judge
considered to be inapplicable. Mr. Morison, however, began his
D    submissions by rightly acknowledging the great care expended in, and
the great accuracy and clarity of, the judgment of the judge, to which
we also pay tribute.


*The issues on this appeal*

E    On this appeal the plaintiffs do not seek to challenge those parts of
Scott J.'s judgment by which he rejected their submissions based on the
alleged voluntary appearance by the defendants in the Tyler court
proceedings or their alleged agreement to submit to the jurisdiction of
that court. The defendants do not challenge his rejection of their
allegation of fraud against Mr. Bailey. The plaintiffs do, however, seek
to challenge those parts of his judgment by which (a) he rejected their
F    submissions based on the alleged residence or presence of Cape and
Capasco in the United States of America ("the presence issue"); (b) he
accepted the defendants' submissions based on natural justice ("the
natural justice issue").

As part of their answer to the plaintiffs' case on presence, the
defendants have cross-appealed on what we have described as "the
G    country issue."

To sum up, the three issues which have been argued on this appeal
are (a) the presence issue; (b) the country issue; and (c) the natural
justice issue. A decision on any one of these issues in favour of the
defendants would strictly render a decision on the other two issues
unnecessary. However, we think it right to deal fully with all three
issues, not only out of deference to the excellent arguments which have
H    been presented to us on both sides, but also because these issues are
important and we suppose that the case could proceed to a higher court.
Furthermore, at least the first two of the three issues are closely
connected with one another.

512

*Adams v. Cape Industries Plc. (C.A.)*                          [1990]

## II *The presence issue*                                      A

[Their Lordships referred to the depositions placed before Scott J. at the hearing, listed the facts found by the judge relevant to the presence issue, and continued:]

*The plaintiffs' challenge to Scott J.'s finding of facts relevant to the "presence" issue*                                            B

The plaintiffs' challenge to the judgment of Scott J. on the "presence" issue is based not so much on the findings of primary fact which were made, but on his supposed failure to find all the material facts and to draw the correct inferences and conclusions which should have been drawn from such facts. In their amended notice of appeal (which we gave leave to amend at the hearing) the plaintiffs included a "Schedule    C of facts which ought to have been found." This schedule included 25 paragraphs. For convenience we will set out and deal with the issues of fact raised by this schedule in an appendix to this judgment, which in our view would not need to be reported.* We observe at this point that, having been taken through the evidence relating to such of these 25 paragraphs as are disputed, we think that the majority of them (though    D by no means all) are in broad terms borne out by the evidence. However, we do not think that those which are substantiated add very much to the strength of the plaintiffs' case on the presence issue or that they suffice to invalidate the ultimate conclusion of the judge on that issue.

On the basis of the findings of fact made by Scott J. and the further facts which they submit he ought to have found, the plaintiffs in their    E amended notice of appeal submit that he was wrong to conclude:

"(1) N.A.A.C.'s business was its own business and not the business of Cape or Capasco;

"(2) C.P.C. . . . was . . . an independently owned company and carried on its own business;

"(3) As from 31 January 1978 N.A.A.C. ceased to act on behalf of    F any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating its assets;

"(4) Mr. Morgan was in executive control of N.A.A.C.'s conduct of its business."

Two important inferences of fact made by the judge (numbers (1) and (2)) and two important findings of primary fact (numbers (3) and    G (4)) are thus challenged on this appeal. We shall consider contention (4) in the section of this judgment dealing with the "single economic unit" argument and in the appendix. We shall consider the contention that C.P.C. was "not an independently owned company" in the section dealing with the "corporate veil argument." We shall consider contention (3) and the contentions that N.A.A.C.'s business was not "its own business" and that C.P.C.'s business was not "its own business" in the    H section dealing with what we will call the "agency" argument.

* *Reporter's Note:* The appendix has not been included in this report.

A    *Some leading authorities relevant to the presence issue*

   Provision has been made by statute for the enforcement in this
country of the judgments of the courts of Commonwealth and foreign
countries in a number of different circumstances: see in particular
section 9 of the Administration of Justice Act 1920; section 4 of the
Foreign Judgments (Reciprocal Enforcement) Act 1933 and the Civil
Jurisdiction and Judgments Act 1982. However, none of these statutory
B    provisions applies in the present case. We are concerned solely with the
common law: *Dicey & Morris*, vol. 1, p. 436, "First Case."

   So far as appears from the many cases cited to us, neither this court
nor the House of Lords has ever been called on to consider the
principles which should guide an English court in deciding whether or
not a foreign court was competent to assume jurisdiction over a
C    corporation (as opposed to an individual) on a territorial basis; and we
have seen only two decisions of courts of first instance in which these
principles fell to be considered. We will begin by mentioning some of
the leading cases relating to judgments given against individuals.

   Two points at least are clear. First, at common law in this country
foreign judgments are enforced, if at all, not through considerations of
D    comity but upon the basis of a principle explained thus by Parke B. in
*Williams v. Jones* (1845) 13 M. & W. 628, 633:

      "where a court *of competent jurisdiction* has adjudicated a certain
      sum to be due from one person to another, a legal obligation arises
      to pay that sum, on which an action of debt to enforce the judgment
      may be maintained. It is in this way that the judgments of foreign
E    and colonial courts are supported and enforced . . . " (Emphasis
      added.)

   Blackburn J. stated and followed the same principle in delivering the
judgment of himself and Mellor J. in *Godard v. Gray* (1870) L.R. 6
Q.B. 139, 147, and the judgment of the Court of Queen's Bench in
*Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155, 159. In the latter case
F    he said, at p. 159:

      "It is unnecessary to repeat again what we have already said in
      *Godard v. Gray*. We think that, for the reasons there given, the
      true principle on which the judgments of foreign tribunals are
      enforced in England is that stated by Parke B. in *Russell v. Smith*
      (1842) 9 M. & W. 810, 819, and again repeated by him in *Williams
G    v. Jones*, 13 M. & W. 629, 633, that the judgment of a court of
      competent jurisdiction over the defendant imposes a duty or
      obligation on the defendant to pay the sum for which judgment is
      given, which the courts in this country are bound to enforce; and
      consequently that anything which negatives that duty, or forms a
      legal excuse for not performing it, is a defence to the action."

H    Secondly, however, in deciding whether the foreign court was one of
competent jurisdiction, our courts will apply not the law of the foreign
court itself but our own rules of private international law. As
Lindley M.R. put it in *Pemberton v. Hughes* [1899] 1 Ch. 781, 791:

514

"There is no doubt that the courts of this country will not enforce the decisions of foreign courts which have no jurisdiction in the sense above explained—i.e., over the subject matter or over the persons brought before them . . . But the jurisdiction which alone is important in these matters is the competence of the court in an international sense—i.e., its territorial competence over the subject matter and over the defendant. Its competence or jurisdiction in any other sense is not regarded as material by the courts of this country."

Subsequent references in this section of this judgment to the competence of a foreign court are intended as references to its competence under our principles of private international law, which will by no means necessarily coincide with the rules applied by the foreign court itself as governing its own jurisdiction. As the decision in *Pemberton v. Hughes* [1899] 1 Ch. 781 shows, our courts are generally not concerned with those rules.

Under the plaintiffs' case as pleaded, the obligation of the defendants to obey the judgment of the Tyler court is said to arise because "the defendants were resident in the United States of America at the time the plaintiffs' proceedings were commenced in the Tyler court." The jurisdiction of the Tyler court is thus said to be founded on territorial factors.

Nearly 120 years ago in *Schibsby v. Westenholz,* L.R. 6 Q.B. 155, the "residence" of an individual in a foreign country at time of commencement of suit was recognised by the Court of Queen's Bench as conferring jurisdiction on the court of that country to give a judgment in personam against him. In that case the court declined to enforce a judgment of a French tribunal obtained in default of appearance against defendants who at the time when the suit was brought in France were neither subjects of nor resident in France. On these facts the court decided, at p. 163, "there existed nothing in the present case imposing on the defendants any duty to obey the judgment of a French tribunal." However, it regarded certain points as clear on principle, at p. 161:

"If the defendants had been at the time of the judgment subjects of the country whose judgment is sought to be enforced against them, we think that its laws would have bound them. Again, if the defendants had been at the time when the suit was commenced resident in the country, so as to have the benefit of its laws protecting them, or, as it is sometimes expressed, owing temporary allegiance to that country, we think that its laws would have bound them."

In *Rousillon v. Rousillon* (1880) 14 Ch. D. 351, Fry J., after referring to *Schibsby v. Westenholz* and in enumerating the cases where the courts of this country regard the judgment of a foreign court as imposing on the defendant the duty to obey it, at p. 371, similarly referred to one such case as being "where he was resident in the foreign country when the action began."

In *Emanuel v. Symon* [1908] 1 K.B. 302, this court had to consider whether the fact of possessing property situate in Western Australia or

1 Ch.                    **Adams v. Cape Industries Plc. (C.A.)**

A    the fact of entering into a contract of partnership in that country was
sufficient to give a Western Australian court jurisdiction (in the private
international law sense) over a British subject not resident in Western
Australia at the start of the action, who had neither appeared to the
process nor expressly agreed to submit to the jurisdiction of that court.
This question was answered in the negative. Buckley L.J. said, at
p. 309:

B
"In actions in personam there are five cases in which the courts of
this country will enforce a foreign judgment: (1) Where the
defendant is a subject of the foreign country in which the judgment
has been obtained; (2) where he was resident in the foreign country
when the action began; (3) where the defendant in the character of
plaintiff has selected the forum in which he is afterwards sued;
C    (4) where he has voluntarily appeared; and (5) where he has
contracted to submit himself to the forum in which the judgment
was obtained. The question in the present case is whether there is
yet another and a sixth case."

After referring to the principles established by, inter alia, *Godard v.
Gray*, L.R. 6 Q.B. 139, and *Schibsby v. Westenholz*, L.R. 6 Q.B. 155,
D    Buckley L.J. observed, at p. 310:

"In other words, the courts of this country enforce foreign judgments
because those judgments impose a duty or obligation which is
recognised in this country and leads to judgment here also."

In agreement with the rest of the court, he considered that the factors
E    relied on by the plaintiff mentioned above did not suffice to impose a
duty on the defendant to obey the Western Australian judgment which
should be recognised in this country.

We pause to observe that Buckley L.J.'s second, third, fourth and
fifth cases mentioned in his statement broadly correspond with *Dicey &
Morris'* respective four cases. It is doubtful whether the first case
mentioned in his statement would still be held to give rise to jurisdiction:
F    see *Dicey & Morris,* 11th ed., vol. 1, pp. 447–448, and the cases there
cited. With this point we are not concerned.

Residence will much more often than not import physical presence.
On the facts of the four cases last mentioned, any distinction between
residence and presence would have been irrelevant. However, the brief
statements of principle contained in the judgments left at least three
G    questions unanswered. First, does the temporary presence of a defendant
in a foreign country render the court of that country competent (in the
private international law sense) to assume jurisdiction over him?
Secondly, what is the relevant time for the purpose of ascertaining such
competence? Thirdly, what is to be regarded as the "country" in the
case of a political country, such as the United States of America
comprising different states which have different rules of law and legal
H    procedure?

We will have to revert to the third question in the section of this
judgment dealing with the "country" issue; in the present section we will
assume in favour of the plaintiffs that the United States of America,

516

rather than the state of Texas, is to be regarded as the relevant country.    A
As to the first and second questions, we think that the most helpful
guidance is to be obtained from the decision of the Privy Council in
*Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, the decision
of Lord Russell of Killowen in *Carrick v. Hancock* (1895) 12 T.L.R. 59
and the decision of the House of Lords in *Employers' Liability Assurance
Corporation Ltd. v. Sedgwick Collins & Co. Ltd.* [1927] A.C. 95.

In the *Sirdar Gurdyal Singh* case the Privy Council on an appeal    B
from the Chief Court of the Punjab considered the question whether the
courts of British India ought to have enforced against the defendant two
judgments obtained against him ex parte in the native state of Faridkote,
which for this purpose fell to be regarded as foreign judgments. The
defendant had ceased to reside in the state before the actions were
brought, and though he had received notice of the proceedings, he had    C
never appeared in either of them or otherwise submitted to the
jurisdiction of the Faridkote court. The Privy Council held the judgments
to be a nullity under international law. Lord Selborne, delivering their
opinion, said, at pp. 683–684:

"Under these circumstances there was, in their Lordships' opinion,
nothing to take this case out of the general rule, that the plaintiff    D
must sue in the court to which the defendant is subject at the time
of suit ('Actor sequitur forum rei'); which is rightly stated by Sir
Robert Phillimore (*International Law*, vol. 4, section 891) to 'lie at
the root of all international, and of most domestic, jurisprudence on
this matter.' All jurisdiction is properly territorial, and 'extra
territorium jus dicenti, impune non paretur.' Territorial jurisdiction
attaches (with special exceptions) upon all persons either permanently    E
or temporarily resident within the territory while they are within it;
but it does not follow them after they have withdrawn from it, and
when they are living in another independent country. . . . no
territorial legislation can give jurisdiction which any foreign court
ought to recognise against foreigners, who owe no allegiance or
obedience to the power which so legislates. In a personal action, to    F
which none of these causes of jurisdiction apply, a decree
pronounced in absentem by a foreign court, to the jurisdiction of
which the defendant has not in any way submitted himself, is by
international law an absolute nullity."

The Privy Council held, at p. 684, that the mere fact that the cause of
action had arisen in one country did not operate to confer jurisdiction    G
on the courts of that country over a defendant not otherwise subject to
it.

In *Carrick v. Hancock*, 12 T.L.R. 59, the principle of territorial
dominion was again referred to. In that case an action was brought upon
a monetary judgment obtained in Sweden by an Englishman domiciled
in Sweden against a defendant who resided and carried on business at
Newcastle. The writ was served on the defendant during a short visit he    H
was paying to Sweden and he duly appeared to answer it. Though he
did not himself remain in Sweden, he was represented throughout the
subsequent proceedings. He put in a defence and counterclaim and on

A    three separate occasions appealed to the Court of Appeal at Gota. It may be that in those circumstances, notwithstanding his protestations that he had "only appeared under pressure, duress and compulsion of law," the English court could properly have enforced the foreign judgment on the ground that the defendant had submitted to the jurisdiction of the Swedish court. However, Lord Russell of Killowen did not decide the case in favour of the plaintiff on that ground. After reviewing the facts and arguments, he is reported as saying, at p. 60:

B

"that the jurisdiction of a court was based upon the principle of territorial dominion, and that all persons within any territorial dominion owe their allegiance to its sovereign power and obedience to all its laws and to the lawful jurisdiction of its courts. In his opinion that duty of allegiance was correlative to the protection given by a state to any person within its territory. This relationship and its inherent rights depended upon the fact of the person being within its territory. It seemed to him that the question of the time the person was actually in the territory was wholly immaterial. This being so it was quite clear that under the facts of this case it was properly and lawfully initiated, and all its subsequent proceedings were lawful and valid, and that the Swedish courts had ample jurisdiction to enforce the plaintiff's claim against the defendant."

C

D

In the *Employers' Liability* case, Lord Parmoor said [1927] A.C. 95, 114–115:

"My Lords, in the case of actions in personam, in which a writ has been regularly served on foreigners or foreign corporations, when present in this country, and a judgment has been obtained, it seems to be clear, as a general rule, that, under the obligations of that branch of international law, which governs the application of foreign judgments, other countries, whose governments have been recognised de jure and de facto by the government of this country, will accept the jurisdiction of the courts of this country, and regard their judgments as valid. In the case of such actions, it may also be stated negatively that, where a writ cannot be served on a defendant foreigner, or foreign corporation, when in this country, and no submission to jurisdiction is proved, any consequent judgment has no validity in any other country, on the ground that the courts of this country have no jurisdiction under international law over the person of an absent foreign defendant. In other words, the right to serve a writ, in an action in personam, on a foreign defendant, only becomes effective, as a source of jurisdiction, to be recognised in other countries when, at the date of service, such defendant is within the territorial jurisdiction of the English courts."

E

F

G

Lord Parmoor was in terms referring to the recognition by foreign countries of judgments given by our courts, but he was speaking generally in terms of private international law and would presumably have regarded the same principles as applicable (mutatis mutandis) in a case where our courts were asked to enforce a foreign judgment.

H    From the three last mentioned authorities read together, the following principles can, in our judgment, be extracted. First, in determining the

518

jurisdiction of the foreign court in such cases, our court is directing its    A
mind to the competence or otherwise of the foreign court "to summon
the defendant before it and to decide such matters as it has decided:"
see *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, *per* Lindley M.R.
Secondly, in the absence of any form of submission to the foreign court,
such competence depends on the physical presence of the defendant in
the country concerned at the time of suit. (We leave open the question
whether residence without presence will suffice.) From the last sentence    B
of the dictum of Lord Parmoor cited above, and from a dictum of
Collins M.R. in *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft
für Motor und Motorfahrzeugbau vorm. Cudell & Co.* [1902] 1 K.B.
342, 346, it would appear that the date of service of process rather than
the date of issue of proceedings is to be treated as "the time of suit" for
these purposes. But nothing turns on this point in the present case and    C
we express no final view on it. Thirdly, we accept the submission of Sir
Godfray Le Quesne (not accepted by Mr. Morison) that the temporary
presence of a defendant in the foreign country will suffice provided at
least that it is voluntary (i.e. not induced by compulsion, fraud or
duress). Some further support for this submission is to be found in dicta
of Parke B. in *General Steam Navigation Co. v. Guillou* (1843) 11 M. &
W. 877.    D

    The decision in *Carrick v. Hancock*, 12 T.L.R. 59, has been the
subject of criticism in *Cheshire & North's Private International Law*,
11th ed. (1987), p. 342, and in *Dicey & Morris*, 11th ed., vol. 1, where
it is said, at pp. 439–440:

    "It may be doubted, however, whether casual presence, as distinct
    from residence, is a desirable basis of jurisdiction if the parties are    E
    strangers and the cause of action arose outside the country
    concerned. For the court is not likely to be the forum conveniens,
    in the sense of the appropriate court most adequately equipped to
    deal with the facts or the law. Moreover, the English case referred
    to above is open to the comment that the jurisdiction of the foreign
    court might just as well have been based on the defendant's
    submission as on his presence."    F

Our own courts regard the temporary presence of a foreigner in England
at the time of service of process as justifying the assumption of
jurisdiction over him: see *Colt Industries Inc. v. Sarlie* [1966] 1 W.L.R.
440 and *H.R.H. Maharanee Seethadevi Gaekwar of Baroda v. Wildenstein*
[1972] 2 Q.B. 283. However, *Cheshire & North*, 11th ed., comment, at    G
p. 342:

    "any analogy based on the jurisdiction of the English courts is not
    particularly convincing, since the rules on jurisdiction are operated
    in conjunction with a discretion to stay the proceedings, and the
    exercise of the discretion is likely to be an issue when jurisdiction is
    founded on mere presence."

   H

    We see the force of these points. They highlight the possible
desirability of a further extension of reciprocal arrangements for the
enforcement (or non-enforcement) of foreign judgments by convention.

A    Nevertheless, while the use of the particular phrase "temporary allegiance" may be a misleading one in this context, we would, on the basis of the authorities referred to above, regard the source of the territorial jurisdiction of the court of a foreign country to summon a defendant to appear before it as being his obligation for the time being to abide by its laws and accept the jurisdiction of its courts while present in its territory. So long as he remains physically present in that country,

B    he has the benefit of its laws, and must take the rough with the smooth, by accepting his amenability to the process of its courts. In the absence of authority compelling a contrary conclusion, we would conclude that the voluntary presence of an individual in a foreign country, whether permanent or temporary and whether or not accompanied by residence, is sufficient to give the courts of that country territorial jurisdiction over

C    him under our rules of private international law.

     In the forefront of his argument on this issue, Mr. Morison submitted that the essential feature of this country's rules relating to the enforcement of foreign judgments is "curial allegiance," which arises "where there is sufficient connection between the debtor and the rendering court at the date of suit so as to make it 'just' to enforce a judgment of that court." The relevance of residence or presence, in his

D    submission, is that it provides the requisite connection. This, in our judgment, is not quite the correct way to look at the matter. While residence or presence will ex hypothesi give rise to a connection, it is the residence or presence, not the connection as such, which gives rise to the jurisdiction of the court. The question whether residence or presence existed at the time of suit is determined by our courts not by

E    reference to concepts of justice or by the exercise of judicial discretion; it is a question of fact which has to be decided with the help of the guidance given by the authorities.

     However, none of the authorities so far referred to was concerned with the question of enforcement of a foreign judgment against a corporate body. The residence or presence of a corporation is a difficult concept. A corporation is a legal person but it has no corporeal

F    existence. It can own property. It can by its agents perform acts. It is clear that if an English corporation owns a place of business in a foreign state from which it carries on its business that English corporation is, under our law, present in that state for the purposes of in personam jurisdiction. Those clear circumstances, however, may be varied in many different ways. The corporation may not own the place of business but

G    have only the use of it or part of it. It may, instead of carrying on its business by its own servants, cause its business to be done by an agent, or through an agent, in the foreign state. The question will then arise whether the commercial acts done are, for the purposes of our law, to be regarded as done within the jurisdiction of the foreign state (a) by the agent in the course of the agent's business or (b) by the corporation itself. Further, and this is of central importance in this case, if the

H    English corporation causes to be formed under the law of the foreign state a separate but wholly owned corporation to carry out the business or commercial acts which it requires to be done, are those acts within the jurisdiction of the foreign state to be regarded, for the purposes of

520

enforcement of a judgment of the courts of that state, as the acts of the   A
English corporation within that jurisdiction merely by reason that it
owns all the shares of its foreign corporation; and, if not, what degree of
power of control, or of exercise of control, and/or what other factors
will suffice, in our law, to cause the English corporation to be held to be
"present" within the jurisdiction of the foreign state?

The earliest case cited to us in which this court had to consider the   B
concept of residence or presence of a corporation in the context of a
claim to enforce a foreign judgment was *Littauer Glove Corporation v.
F. W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746. In that case the
plaintiffs were manufacturers in the State of New York. The defendant
company, which conducted the business of clothiers' merchants, had its
principal place of business in Manchester. It bought from manufacturers
in various parts of the world and sold to wholesalers. On 17 March 1922   C
its managing director, Mr. Millington, arrived in New York on a
business visit with a view to seeing samples and making purchases. He
stayed in a New York hotel for four or five nights, where he did some
business for his company. Thereafter he visited various other states
where he also did business. On 1 April the plaintiffs took out a
summons against the defendant company. On 3 April Mr. Millington
returned to New York. On that date, while he was in the sale office in   D
New York of Union Mills Corporation, the defendant's principal United
States suppliers, he was served with process in the action. He entered no
appearance, took no steps in the proceedings and did not submit to the
jurisdiction of the American court. On 4 April he sailed for England.
The plaintiffs, having in due course obtained judgment against the
defendant company in default of appearance in New York, sought to
enforce the judgment against it in England. The defendant contended   E
that, under the rules of private international law, the New York court
had no jurisdiction to make the order against it. Many authorities were
cited to Salter J. From the report of the argument, it appears to have
been common ground that the question turned on the "residence" or
otherwise of the defendant company in the State of New York on 1
April 1922 when the proceedings were instituted. Salter J. identified the   F
question for his decision as being whether on 1 April 1922: "the
defendant company were resident in the State of New York so as to
have the benefit and be under the protection of the laws of that state."
The plaintiffs' counsel had contended that it was not necessary for them
to show that the defendant company was carrying on business at a fixed
place. In his submission, it was resident in New York because it carried
on business there: "the company is resident by its travellers and would   G
be subject to process of the country in which they happened to be."
Salter J. rejected this contention, saying, at p. 747:

"What was meant by saying that a business corporation was resident
in a foreign jurisdiction for that purpose? That depended on
whether, on the day in question, it was carrying on business in the
foreign state so that it could fairly and properly be said to be then   H
resident in that state. If the defendant company were resident in the
State of New York on 1 April 1922, where in that state were they
resident? Mr. Le Quesne said that they were resident in Broadway,

521

A    New York, but there must be some place of residence on which one
could put a finger. There was no suggestion that the name of the
defendant company was in any way displayed at the address in
Broadway, or that any letter paper of the company was used there,
or that any business was done there except what the company did
with firms in other parts of the United States. If the defendant
company were resident in Broadway, it would follow that they were
B    resident wherever Mr. Millington did business. He was, however,
nothing more than a commercial traveller on that tour.

"If the company had 40 or 50 travellers ranging all over the
world, was it to be said that the company were resident wherever
the travellers put up at an hotel and took orders? He (his Lordship)
did not rely on the expression 'fixed place,' but on what was the fair
C    meaning of 'residence.' The inference which he drew from the cases
cited was that there must be some carrying on of business at a
definite and, to some reasonable extent, permanent place. There
was no residence within the jurisdiction on the part of the defendant
company, and the action on that point must fail."

Thus, the effect of Salter J.'s decision was that if a foreign judgment
D    is to be enforced in this country against a corporation, it must be shown
that at the relevant time (a) the corporation was carrying on business,
and (b) it was doing so at a definite and "to some reasonable extent
permanent place." This test is significantly different from that applicable
in the case of judgments against individuals. *Littauer* does not bind this
court, but we see no reason to doubt the correctness of this test so far as
E    it goes. It seems to us consistent with authority and to represent a
common sense approach to the question of "presence" in the case of a
corporation. The difficulty may be to determine whether it can properly
be said in any given case that the corporation is itself carrying on
business in the country concerned.

The other, and most recent, leading case relating to the enforcement
of foreign judgments against corporations is *Vogel v. R. and A.*
F    *Kohnstamm Ltd.* [1973] Q.B. 133. There the defendants were a company
registered in England. They sold leather skins to the plaintiffs through a
Mr. Kornbluth who had an office in Tel Aviv. The defendants had no
office of their own in Israel. All the material correspondence was
conducted with them in England. The contract of sale was not made in
Israel. The court in Israel gave judgment for the plaintiff on a claim for
breach of contract and the plaintiff sought to enforce it in England.
G    Ashworth J. dismissed the plaintiff's claim. In his judgment he described
the functions of Mr. Kornbluth vis-à-vis the defendants, at p. 136A–B:

"Mr. Kornbluth's role was that of a person seeking customers who
would buy the defendants' goods. For this purpose he was provided
with samples for which he paid, and having found a potential
customer he would act as a go-between between that person and
H    the defendants. Correspondence would pass between the defendants
and Mr. Kornbluth regarding a proposed order and Mr. Kornbluth
would be in communication with the customer. If as a result a
contract was made it would be made between the defendants and

522

the customer and at no time had Mr. Kornbluth any authority to    A
make a contract on behalf of the defendants."

He said, at p. 136G:

> "in order to succeed the plaintiff here has to persuade me either
> that the defendants were resident in Israel through Mr. Kornbluth
> as their agent or that they were carrying on business through him in
> such a way as to give rise to an implied agreement on their part to    B
> submit to the jurisdiction of Israeli courts."

With reference to the first of these two points, he observed, at p. 141:

> "As has been said in many cases, residence is a question of fact and
> when one is dealing with human beings one can normally approach
> the matter on the footing that residence involves physical residence
> by the person in question. I keep open the possibility that even in    C
> regard to such a person he may be constructively resident in another
> country although his physical presence is elsewhere. But in the case
> of a corporation there is broadly speaking no question of physical
> residence. A corporation or company, if resident in another country,
> is resident there by way of agents."

He recognised that the *Littauer* case was distinguishable on the ground:    D

> "the person through whom the defendant corporation was said to
> have residence in the United States was not a person with any fixed
> or reasonably permanent place . . ."

However, Ashworth J. pointed out, at p. 142, that the defendants in the
case before him had no office of their own in Israel, and that "All the    E
material correspondence was conducted with them in England and their
connection with the State of Israel was limited . . . to their dealings
through Mr. Kornbluth." He continued:

> "In examining how far the presence of a representative or agent
> will, so to speak, impinge on the absent company so as to render
> that absent company subject to the relevant jurisdiction, I find help    F
> to be obtained from cases in which the converse situation has been
> considered: namely, where the English courts have been invited to
> allow process to issue to foreign companies on the footing that such
> foreign companies are 'here.'"

He expressed his ultimate conclusion, at p. 143:

> ". . . I have asked myself anxiously in this case whether in any real    G
> sense of the word the defendants can be said to have been there in
> Israel: and all that emerges from this case is that there was a man
> called Kornbluth who sought customers for them, transmitted
> correspondence to them and received it from them, had no authority
> whatever to bind the defendants in any shape or form. I have come
> to the conclusion really without any hesitation that the defendants    H
> were not resident in Israel at any material time."

On this appeal, in accordance with the approach of the courts in the
*Littauer* and *Vogel* cases, it has been common ground that the Tyler

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A   court was competent to exercise jurisdiction over Cape and Capasco, if at all, only if they could properly be said to be resident or present in the United States of America at the relevant time. (In view of their contentions on the "country" issue, the defendants do not accept that the Tyler court would have been competent, even if the latter condition had been fulfilled.) The words "resident" or "present" or equivalent

B   phrases have been used interchangeably in argument, just as they have been used in the cases; we see no objection to this terminology if it is understood that in the case of a corporation the concept of "residence" or "presence" in any particular place must be no less of a legal fiction than the existence of the corporation itself. The argument has centred on the features which this concept embodies in the case of a corporation.

In considering these features, Salter J. in the *Littauer* case and

C   Ashworth J. in the *Vogel* case clearly attached great weight to a long line of cases where the English court has considered whether it should allow process to issue to foreign companies as being amenable to its jurisdiction. We will call this line "the *Okura* line of cases," because a leading example is the decision of this court in *Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715.

D   The origin of this line requires some brief explanation. After it had been decided in *Newby v. Von Oppen & Colt's Patent Firearms Manufacturing Co.* (1872) L.R. 7 Q.B. 293 that in appropriate circumstances a foreign corporation was capable of being sued in this country, our courts in a number of cases had to consider (a) whether on the facts the foreign corporate defendant was amenable to the jurisdiction of the English court, and if so (b) whether it had been properly served

E   with the process. Most of these cases were concerned with the old Ord. 9, r. 8 of the Rules of the Supreme Court 1883, which provided:

"In the absence of any statutory provision regulating service of process, every writ of summons issued against a corporation aggregate may be served on the mayor or other head officer, or on the town clerk, clerk, treasurer or secretary of such corpora-

F   tion . . ."

The rule contained no such expressions as "reside" or "carry on business." However, as Ackner L.J. pointed out in *South India Shipping Corporation Ltd. v. Export-Import Bank of Korea* [1985] 1 W.L.R. 585, 589:

G   "Those expressions were used as convenient tests, to ascertain whether the corporation had a sufficient 'presence' within the jurisdiction, since 'generally,' courts exercised jurisdiction only over persons who 'are within the territorial limits of their jurisdiction.' Apart from statute 'a court has no power to exercise jurisdiction over anyone beyond its limits,' *per* Cotton L.J. in *In re Busfield* (1886) 32 Ch.D. 123, 131, quoted by Lord Scarman in *Bethlehem*

H   *Steel Corporation v. Universal Gas* (unreported), 17 July 1978, House of Lords."

Phrases referring to residence or presence within the jurisdiction, or equivalent phrases, have been used by way of shorthand reference to

524

the condition (or one of the conditions) which a foreign corporation has    A
to satisfy if it is to be amenable to the jurisdiction of the English court.
And indeed they have been used more or less interchangeably by the
courts. One typical example is the phraseology used by the Earl of
Halsbury L.C. in *La Compagnie Générale Transatlantique v. Thomas
Law & Co., La Bourgogne* [1899] A.C. 431, who said, at p. 433:

> "It appears to me that as a consequence of these facts the appellants    B
> are resident here in the only sense in which a corporation can be
> resident—to use the phrase which Mr. Joseph Walton has so
> constantly referred to, they are 'here;' and, if they are here, they
> may be served."

Perhaps the most helpful guidance in determining whether a foreign
corporation is "here" so as to be amenable to the jurisdiction of our
courts is the following passage from the judgment of Buckley L.J. in the    C
*Okura* case [1914] 1 K.B. 715, 718–719:

> "The point to be considered is, do the facts show that this
> corporation is carrying on its business in this country? In determining
> that question, three matters have to be considered. First, the acts
> relied on as showing that the corporation is carrying on business in    D
> this country must have continued for a sufficiently substantial period
> of time. That is the case here. Next, it is essential that these acts
> should have been done at some fixed place of business. If the acts
> relied on in this case amount to a carrying on of a business, there is
> no doubt that those acts were done at a fixed place of business. The
> third essential, and one which it is always more difficult to satisfy, is
> that the corporation must be 'here' by a person who carries on    E
> business for the corporation in this country. It is not enough to
> show that the corporation has an agent here; he must be an agent
> who does the corporation's business for the corporation in this
> country. This involves the still more difficult question, what is
> meant exactly by the expression 'doing business?'"

It is clear that (special statutory provision apart) a minimum    F
requirement which must be satisfied if a foreign trading corporation is to
be amenable at common law to service within the jurisdiction is that it
must carry on business at a place within the jurisdiction: see *The
Theodohos* [1977] 2 Lloyd's Rep. 428, 430, *per* Brandon J.
   (All the authorities cited to us have been directed, and all the
statements later in this judgment will be directed, to trading corporations.
In the case of non-trading corporations, the same principles would    G
presumably apply, with the substitution of references to the carrying on
of the corporation's corporate activities for references to the carrying
on of business.)
   The court will not find much difficulty in holding that a foreign
corporation is present in this country if it has a fixed place of business of
its own here (whether as owner, lessee or licensee) and for more than a    H
minimal period of time has carried on its own business from such
premises by its servants or agents. Typical example of such cases (which
we will call "branch office cases") which have been cited to us are

A    (1) *Newby v. Von Oppen & Colt's Patent Firearms Manufacturing Co.*, L.R. 7 Q.B. 293; (2) *Haggin v. Comptoir d'Escompte de Paris* (1889) 23 Q.B.D. 519; (3) *La Bourgogne* [1899] P. 1; [1899] A.C. 431; (4) *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft für Motor und Motorfahrzeugbau vorm. Cudell & Co.* [1902] 1 K.B. 342.

B    However, the cases also show that it may be permissible to treat a foreign corporation as resident in this country so as to be amenable to the jurisdiction of our courts even if it has no fixed place of business here of its own, provided that an agent acting on its behalf carries on its business (as opposed to his own business) from some fixed place of business in this country. Typical examples of such cases are:

    (1) *Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesellschaft* [1911] 2 K.B. 516 where the agent, Blasius, occupied
C   and paid rent for offices in London, and in the words of Fletcher Moulton L.J., at p. 524:

       "He carries on business at a fixed place in London as sole agent for the defendants in the United Kingdom, though it is true that he is also agent for another firm. He has power to enter into contracts of sale for the defendants."

D    (2) *Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a Vapore del Lloyd Austriaco* (1914) 111 L.T. 97, where Buckley L.J. began his judgment with the following statement of principle, at p. 98:

       "If contracts have been habitually made for a reasonably sub-stantial period of time at a fixed place of business within the juris-diction by a firm or a person there, without referring each time to
E     the foreign corporation for instructions, and with the result that the foreign corporation has become bound to another party, then the foreign corporation for the present purpose carries on business at that place."

F    The ultimate problem in such cases may lie in determining whether the business carried on by the agent on behalf of the principal should properly be regarded on the one hand as his own business or on the other hand as the business of the foreign corporation. This must necessitate an investigation both of the activities of the agent and of the relationship between him and the corporation.

    In a few of the *Okura* line of cases which have been cited to us, the
G   court has had to consider the question whether a foreign corporation was carrying on business in this country in a context other than that of the old Ord. 9, r. 8, but nevertheless the like investigation was necessary. In *Grant v. Anderson & Co.* [1892] 1 Q.B. 108 the context was the old Ord. 48A, r. 1, which provided that any two or more persons claiming or being liable as co-partners "and carrying on business within the jurisdiction" might sue or be owed in the name of the respective firms.
H   The defendants, who were a Scottish firm of manufacturers carrying on business in Glasgow, employed an agent in London to obtain orders for them in London. He occupied an office in London, the rent of which he paid himself, and received a commission if, but only if, he got an order

which the firm accepted. In rejecting the contention that the firm carried    A
on business in London, the Court of Appeal attached great weight to
the fact that, in the words of Lord Esher M.R., at p. 116 "when he gets
an order, he has no power himself to accept it." As he put it, at p. 117:
"One might as well say that the defendants carry on business in any
place through which their goods pass while being sent to their customers."

    *Sfeir & Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1
Lloyd's Rep. 330 concerned a claim covered by section 9(2) of the    B
Administration of Justice Act 1920, of which paragraph (*b*) precluded
the registration of a judgment under the section if the judgment debtor

> "being a person who was neither carrying on business nor ordinarily
> resident within the jurisdiction of the original court, did not
> voluntarily appear or otherwise submit or agree to submit to the
> jurisdiction of that court . . ."    C

The first question Mocatta J. had to determine (see, at p. 336) was
whether the defendants at any material time carried on business in
Ghana. If they did so, this could only have been through a Ghanaian
company called Glyndova. He expressed his conclusion on this point, at
p. 339:    D

> "In my judgment, Mr. Mustill was right in submitting that the
> decision of the court at the end of the day after considering the
> guidance contained in the authorities and their application to
> the facts of a particular case is one of impression. The conclusion I
> have reached is that the limited authority possessed by Glyndova to
> bind the defendants by settlements of claims arising in Ghana under
> the defendants' policies issued elsewhere, even when coupled with    E
> the other matters relied upon which I have recited, did not amount
> to a carrying on of business by the defendants in Ghana. The
> business carried on in Ghana by Glyndova was their own and not
> that of the defendants."

    At least in cases other than branch office cases it is obvious that the    F
activities of the agent by whom the foreign corporation is said to be
present in this country and the extent of the authority of that agent will
be of particular importance in determining whether or not the corporation
is amenable to our courts' jurisdiction. Counsel on both sides have
referred us to numerous examples from the *Okura* line of cases in which
a number of different aphorisms have been used to express the relevant
test. Buckley L.J. (later Lord Wrenbury) "who made this subject    G
particularly his own" (see *The Lalandia* [1933] P. 56, 62, *per* Langton J.)
himself used a variety of expressions to state it on the facts of particular
cases. In the *Thames and Mersey* case he stated it thus, 111 L.T. 97, 98–
99:

> "Does the agent in carrying on the foreign corporation's business
> make a contract for the foreign corporation, or does the agent, in    H
> carrying on the agent's own business, sell a contract with the foreign
> corporation? In the former case the corporation is and in the latter
> it is not carrying on business at that place."

527

**1 Ch.**                    Adams v. Cape Industries Plc. (C.A.)

A    In the *Okura* case itself, Buckley L.J. [1914] 1 K.B. 715, 721, summarised his reasons for concluding that the defendant corporation was not present in this country as follows:

> "In my opinion the defendants are not 'here' by an alter ego who does business for them here, or who is competent to bind them in any way. They are not doing business here by a person but through
B    a person."

At the trial of the present case a number of decisions from the *Okura* line of authorities were cited to Scott J. He said that counsel before him had treated the statements of principle to be found in the authorities as applicable equally to both classes of case. While expressing "a little unease" in this context, ante, p. 471F, he therefore assumed that
C    the statements of principle applied equally to both classes of case.

Having made this assumption, he extracted the following propositions from the *Okura* line of cases:

(1) "The cases establish that jurisdiction on the territorial basis may be taken by an English court over a foreign company if the foreign company has business premises in England from which or at
D    which its business is carried on:" ante, p. 468A.

(2) "There are, however, cases where residence or presence of a foreign company in England has been held established notwithstanding that the foreign company did not itself own or lease any business premises in England. A feature of these cases has been that the foreign company had a resident English agent who had authority to contract on behalf of and thereby to bind the principal.
E    In those circumstances the presence or residence in England of the agent has been treated as the presence or residence of the foreign company, the principal:" ante, p. 468E–F.

(3) "trading in a country is insufficient, by the standards of English law, to entitle the courts of the country to take in personam jurisdiction over the trader: see the *Littauer* . . . case. . . . The
F    trading must be reinforced by some residential feature, be it a branch office or a resident agent with power to contract:" ante, p. 476c.

These conclusions as to the law were of critical importance because the judge later found as facts, ante, p. 477E–F, that the 150, North Wacker Drive offices were N.A.A.C.'s offices and that N.A.A.C. had
G    no authority to contract on behalf of Cape or Capasco or any other company in the Cape group. He also found as facts, ante, p. 482E "C.P.C., like N.A.A.C., had no authority to bind Egnep, Casap or any other of the Cape subsidiaries to any contract," and the offices at 150, North Wacker Drive were C.P.C.'s "own offices."

Mr. Morison did not challenge these particular findings of fact.
H    However, he submitted that Scott J. erred in law in holding that, in cases other than branch office cases, "the trading must be reinforced by . . . a resident agent *with power to contract.*" This conclusion, he pointed out, was based primarily on the judge's analysis of the *Okura* line of cases. However, this line of cases, in Mr. Morison's submission,

Adams v. Cape Industries Plc. (C.A.)                    [1990]

while of some relevance and interest, does not provide the correct        A
yardstick to be applied in the present context. Contrary to the suggestion
made by Ashworth J. in the *Vogel* case [1973] Q.B. 133, he said, those
authorities do not represent the situation truly converse to the
enforcement of a foreign judgment; the true converse would be a
foreign court applying its own conflict rules, adjudicating on the
enforcement of an English judgment. Comity, as Blackburn J. pointed
out in *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, 159, is not the basis        B
on which our courts enforce foreign judgments. Furthermore, the
circumstances in which an English court will assume jurisdiction over a
foreign corporation are closely bound up with our own rules of procedure
which are derived largely from statute or statutory instrument and will
be amended from time to time.

Pausing at this point, we would not go so far as to say that in every        C
case one can determine whether a foreign court was competent at
common law on territorial grounds to give a judgment against a
corporation merely by ascertaining whether in like circumstances, and
mutatis mutandis, our courts would have assumed jurisdiction over a
foreign corporation. Nevertheless, enough has been said to demonstrate
that in each case the same broad question falls to be answered by the
court under our own common law: "Was the corporation present in the        D
relevant jurisdiction at the relevant time?" In our judgment, Scott J. was
fully entitled to derive guidance from the *Okura* line of cases in deciding
whether Cape and Capasco were resident in the United States of
America at the relevant time.

Mr. Morison went on to submit that in any event the *Okura* line of
cases does not establish a universal rule that in cases where the foreign        E
corporation has no fixed place of business of its own "the trading must
be reinforced by . . . a resident agent *with power to contract*." There
are, it is true, many dicta which suggest that the existence of power in
the agent to bind his principal to contracts, without reference back to
the principal, is an important indication that the principal himself is
carrying on business by the agent. However, it has apparently never
been held that this is an essential feature of "presence" in cases where        F
the corporation has no branch office in this country. Many of the
reported cases were concerned with selling agencies, particularly in the
shipping field, which were usually not exclusive to the principal
concerned. It is therefore hardly surprising, Mr. Morison submitted, that
the courts concentrated on the question of authority to contract, because
the agency was in a real sense carrying on its own agency business. In        G
the present case it is not alleged that N.A.A.C. or C.P.C. had power to
enter into sales contracts on behalf of Cape or Capasco. However, it is
said, they were carrying out a recognised business activity for the
exclusive benefit of Cape and Capasco, that is to say, the function of
marketing agents. The question whether N.A.A.C. or C.P.C. were
properly to be described as doing their own business or that of their
principals was not to be determined by asking whether or not they had        H
authority to contract, but by asking whether they had authority to
market and were carrying out this function. Mr. Morison invited us to
follow the general approach adopted by the court in two Canadian

A   cases, *Miller v. B. C. Turf Ltd.* (1969) 8 D.L.R. (3d) 383 and *Moore v. Mercator Enterprises Ltd.* (1978) 90 D.L.R. (3d) 590.

We would agree with Mr. Morison that the existence of a power in the resident agent to bind the foreign corporation to contracts can be neither an exclusive nor conclusive test of the residence of the corporation itself. As he pointed out, there are many cases in which the corporation has been held *not* to be carrying on business at the agency
B   notwithstanding the existence of authority of this kind: see for example *The Princesse Clementine* [1897] P. 18; *The Lalandia* [1933] P. 56 and *The Holstein* [1936] 2 All E.R. 1660. Conversely, we can conceive hypothetical cases in which it might be absurd to regard the test as conclusive. If in any given case all other factors indicate that the business carried on by the representative of a corporation in a particular
C   country was clearly the business of the corporation (rather than that of its representative), it could make no difference that the corporation required him to take its instructions before he actually concluded contracts on its behalf; the existence of such a requirement would not by itself prevent the corporation from being present in the country concerned and thus from being amenable to the jurisdiction of its courts.

Nevertheless, it is a striking fact that with one possible exception
D   (*The World Harmony* [1967] P. 341) in none of the many reported English decisions cited to us has it been held that a corporation has been resident in this country unless either (a) it has a fixed place of business of its own in this country from which it has carried on business through servants or agents, or (b) it has had a representative here who has had the power to bind it by contract and who has carried on business at or
E   from a fixed place of business in this country.

We do not find this surprising as a matter of principle. Indubitably a corporation can carry on business in a foreign country by means of an agent. "It may be stated as a general proposition that whatever a person has power to do himself he may do by means of an agent:" *Halsbury's Laws of England*, 4th ed., vol. 1 (1973), p. 420, para. 703. However, though the terms "agency" and "agent" have in popular use a number of
F   different meanings:

"in law the word 'agency' is used to connote the relation[ship] which exists where one person has an authority or capacity to create legal relations between a person occupying the position of principal and third parties:" *Halsbury's Laws of England*, vol. 1, p. 418, para. 701.
G

Where the representative of an overseas corporation has general authority to create contractual relations between the corporation and third parties and exercises this authority, there may be little difficulty in applying the maxim "qui facit per alium facit per se." Where no such authority exists, there may be much greater difficulty. We were not persuaded by Mr. Morison's submission, based primarily on a dictum of
H   Verchere J. in *Miller v. B. C. Turf Ltd.*, 8 D.L.R. (3d) 383, 386, that the capacity (or possible capacity) of N.A.A.C. or C.P.C. to render Cape/Capasco vicariously liable for negligence (and thereby to create relations in tort between them and third parties) is of any weight in

530

deciding whether Cape/Capasco were present in the United States of    A
America. The mere authority given by Cape/Capasco to N.A.A.C. or
C.P.C. to convey a message to a third party could render Cape/Capasco
potentially liable in tort to a third party if that message was carelessly
transmitted. The existence of such potential liability would go no way
towards establishing the presence of Cape/Capasco in the United States
of America.

B

*General principles derived from the authorities relating to the "presence"
issue*

    In relation to trading corporations, we derive the three following
propositions from consideration of the many authorities cited to us
relating to the "presence" of an overseas corporation.

    (1) The English courts will be likely to treat a trading corporation    C
incorporated under the law of one country ("an overseas corporation")
as present within the jurisdiction of the courts of another country only if
either (i) it has established and maintained at its own expense (whether
as owner or lessee) a fixed place of business of its own in the other
country and for more than a minimal period of time has carried on its
own business at or from such premises by its servants or agents (a
"branch office" case), or (ii) a representative of the overseas corporation    D
has for more than a minimal period of time been carrying on *the
overseas corporation's* business in the other country at or from some
fixed place of business.

    (2) In either of these two cases presence can only be established if it
can fairly be said that the *overseas corporation's* business (whether or
not together with the representative's own business) has been transacted    E
at or from the fixed place of business. In the first case, this condition is
likely to present few problems. In the second, the question whether the
representative has been carrying on the overseas corporation's business
or has been doing no more than carry on his own business will
necessitate an investigation of the functions which he has been performing
and all aspects of the relationship between him and the overseas
corporation.    F

    (3) In particular, but without prejudice to the generality of the
foregoing, the following questions are likely to be relevant on such
investigation: (a) whether or not the fixed place of business from which
the representative operates was originally acquired for the purpose of
enabling him to act on behalf of the overseas corporation; (b) whether
the overseas corporation has directly reimbursed him for (i) the cost of    G
his accommodation at the fixed place of business; (ii) the cost of his
staff; (c) what other contributions, if any, the overseas corporation
makes to the financing of the business carried on by the representative;
(d) whether the representative is remunerated by reference to
transactions, e.g. by commission, or by fixed regular payments or in
some other way; (e) what degree of control the overseas corporation
exercises over the running of the business conducted by the representative;    H
(f) whether the representative reserves (i) part of his accommodation,
(ii) part of his staff for conducting business related to the overseas
corporation; (g) whether the representative displays the overseas

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A   corporation's name at his premises or on his stationery, and if so,
whether he does so in such a way as to indicate that he is a representative
of the overseas corporation; (h) what business, if any, the representative
transacts as principal exclusively on his own behalf; (i) whether the
representative makes contracts with customers or other third parties in
the name of the overseas corporation, or otherwise in such manner as to
bind it; (j) if so, whether the representative requires specific authority in

B   advance before binding the overseas corporation to contractual
obligations.

    This list of questions is not exhaustive, and the answer to none of
them is necessarily conclusive. If the judge, ante, p. 476B–C, was
intending to say that in any case, other than a branch office case, the
presence of the overseas company can *never* be established unless

C   the representative has authority to contract on behalf of and bind the
principal, we would regard this proposition as too widely stated. We
accept Mr. Morison's submission to this effect. Every case of this
character is likely to involve "a nice examination of all the facts, and
inferences must be drawn from a number of facts adjusted together and
contrasted:" *La Bourgogne* [1899] P. 1, 18, *per* Collins L.J.

    Nevertheless, we agree with the general principle stated thus by

D   Pearson J. in *F. & K. Jabbour v. Custodian of Israeli Absentee Property*
[1954] 1 W.L.R. 139, 146:

    "A corporation resides in a country if it carries on business there at
    a fixed place of business, and, in the case of an agency, the
    principal test to be applied in determining whether the corporation
    is carrying on business at the agency is to ascertain whether the

E   agent has authority to enter into contracts on behalf of the
    corporation without submitting them to the corporation for
    approval . . ."

    On the authorities, the presence or absence of such authority is
clearly regarded as being of great importance one way or the other. A
fortiori the fact that a representative, whether with or without prior

F   approval, never makes contracts in the name of the overseas corporation
or otherwise in such manner as to bind it must be a powerful factor
pointing against the presence of the overseas corporation.

### *The plaintiffs' submissions on the "presence" issue*

    Ordinarily the three propositions set out above will fall to be applied

G   in the same way whether or not the representative is an individual or
itself a corporate body. However, the present case has the peculiar
feature that one of the representatives in the United States of America,
whose acts are relied on as the carrying on of business by Cape, was
itself a subsidiary of Cape—a feature which has not been present in any
of the directly relevant authorities cited to us. We will make some
further observations on the legal relevance, if any, of this feature when

H   we come to consider the second of Mr. Morison's main submissions on
the presence issue.

    These three main submissions were substantially as follows: (1) Cape
and Capasco were present and carrying on business in the United States

532

A

of America, namely, marketing and selling the Cape group's asbestos, through N.A.A.C. until May 1978, and through C.P.C. (or Associated Mineral Corporation ("A.M.C."), a Liechtenstein corporation) until June 1979 from a place of business in Illinois because N.A.A.C. and C.P.C. were the agents of Cape. (We will call this "the agency argument"). (2) Cape/Capasco and N.A.A.C. constituted a single commercial unit and for jurisdictional purposes, N.A.A.C.'s presence in Illinois therefore sufficed to constitute the presence of Cape/Capasco. Likewise, Cape/Capasco and C.P.C., which performed the same functions as those previously carried on by N.A.A.C., constituted a single economic unit, and C.P.C.'s presence in Illinois sufficed to constitute the presence of Cape/Capasco. (We will call this "the single economic unit argument"). (3) In relation to C.P.C./A.M.C., the corporate veil should be lifted so that C.P.C.'s and A.M.C.'s presence in the United States of America should be treated as the presence of Cape/Capasco. (We will call this argument, which does not extend to N.A.A.C., "the corporate veil" argument.)

B

C

We find it convenient to deal with the second and third of these arguments before coming to the first.

*The "single economic unit" argument*

D

There is no general principle that all companies in a group of companies are to be regarded as one. On the contrary, the fundamental principle is that "each company in a group of companies (a relatively modern concept) is a separate legal entity possessed of separate legal rights and liabilities:" *The Albazero* [1977] A.C. 774, 807, *per* Roskill L.J.

E

It is thus indisputable that each of Cape, Capasco, N.A.A.C. and C.P.C. were in law separate legal entities. Mr. Morison did not go so far as to submit that the very fact of the parent-subsidiary relationship existing between Cape and N.A.A.C. rendered Cape or Capasco present in Illinois. Nevertheless, he submitted that the court will, in appropriate circumstances, ignore the distinction in law between members of a group of companies treating them as one, and that broadly speaking, it will do so whenever it considers that justice so demands. In support of this submission, he referred us to a number of authorities.

F

In *The Roberta* (1937) 58 Ll.L.R. 159 agents, acting on behalf of the Dordtsche Co., had signed bills of lading. It was conceded at the trial that in so doing the agents had made Walford Lines Ltd., the parent company of Dordtsche Co., responsible for the bills of lading. Langton J., who described the concession as properly made, said, at p. 169:

G

"The Dordtsche Co. are a separate entity from Walford Lines Ltd., in name alone, and probably for the purposes of taxation. Walford Lines Ltd. own all the issued shares of the Dordtsche Co., and in fact supply two out of the three directors."

In *Harold Holdsworth & Co. (Wakefield) Ltd. v. Caddies* [1955] 1 W.L.R. 352 the question arose whether the respondent company, which had entered into a service agreement with Mr. Caddies under which he was appointed managing director of the company, was entitled to require him to devote his whole time to duties in relation to subsidiaries of the

H

A   company. It was argued that the subsidiary companies were separate legal entities each under the control of its own board of directors, that in law the board of the appellant company could not assign any duties to anyone in relation to the management of the subsidiary companies, and that therefore the agreement could not be construed as entitling them to assign any such duties to Mr. Caddies. Lord Reid, in agreement with the majority, rejected this argument, saying, at p. 367:

B

> "My Lords, in my judgment this is too technical an argument. This is an agreement in re mercatoria and it must be construed in light of the facts and realities of the situation."

In *Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324 the respondent based his complaint on section 210 of the Companies Act 1948, which provided:

C

> "(1) Any member of a company who complains that the affairs of the company are being conducted in a manner oppressive to some part of the members (including himself) . . . may make an application to the court by petition for an order under this section."

The appellant society had formed a subsidiary company, of which the respondent was a member. It was submitted on behalf of the society that even if it had acted in an oppressive manner, yet it had not conducted the affairs *of the company* in an oppressive manner within the meaning of the section. The House of Lords unanimously rejected this submission. Lord Simonds said, at p. 342:

D

E

> "My Lords, it may be that the acts of the society of which complaint is made could not be regarded as conduct of the affairs of the company if the society and the company were bodies wholly independent of each other, competitors in the rayon market, and using against each other such methods of trade warfare as custom permitted. But this is to pursue a false analogy. It is not possible to separate the transactions of the society from those of the company. Every step taken by the latter was determined by the policy of the former."

F

A little later, at p. 343, Lord Simonds expressly approved words which had been used by Lord President Cooper on the first hearing of the case:

> "In my view, the section warrants the court in looking at the business realities of a situation and does not confine them to a narrow legalistic view."

G

In *D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council* [1976] 1 W.L.R. 852 a group of three companies, "D.H.N.," "Bronze" and "Transport," all in voluntary liquidation at the relevant time, were seeking compensation under the Land Compensation Act 1961 following a compulsory purchase made by the respondent council. D.H.N. held all the shares in Bronze and Transport. The business of the group was owned by D.H.N. The land was owned by Bronze. The vehicles were owned by Transport. The Lands Tribunal held that D.H.N. were licensees of Bronze and had no claim to compensation for

H

534

disturbance beyond that which could be allowed under section 20 of the    A
Compulsory Purchase Act 1965, which was negligible. This court allowed
D.H.N.'s appeal on three separate grounds. We are concerned with only
one of them, which Lord Denning M.R. explained, at p. 860:

> "Third, lifting the corporate veil. A further very interesting point
> was raised by Mr. Dobry on company law. We all know that in
> many respects a group of companies are treated together for the    B
> purpose of general accounts, balance sheet, and profit and loss
> account. They are treated as one concern. Professor Gower in
> *Modern Company Law*, 3rd ed. (1969), p. 216 says: 'there is
> evidence of a general tendency to ignore the separate legal entities
> of various companies within a group, and to look instead at the
> economic entity of the whole group.' This is especially the case
> when a parent company owns all the shares of the subsidiaries—so    C
> much so that it can control every movement of the subsidiaries.
> These subsidiaries are bound hand and foot to the parent company
> and must do just what the parent company says. A striking instance
> is the decision of the House of Lords in *Harold Holdsworth & Co.
> (Wakefield) Ltd. v. Caddies* [1955] 1 W.L.R. 352. So here. This
> group is virtually the same as a partnership in which all the three    D
> companies are partners. They should not be treated separately so as
> to be defeated on a technical point. They should not be deprived of
> the compensation which should justly be payable for disturbance.
> The three companies should, for present purposes, be treated as
> one, and the parent company D.H.N. should be treated as that one.
> So D.H.N. are entitled to claim compensation accordingly. It was
> not necessary for them to go through a conveyancing device to get    E
> it."

Goff L.J. said at p. 861:

> "this is a case in which one is entitled to look at the realities of the
> situation and to pierce the corporate veil. I wish to safeguard myself
> by saying that so far as this ground is concerned, I am relying on    F
> the facts of this particular case. I would not at this juncture accept
> that in every case where one has a group of companies one is
> entitled to pierce the veil, but in this case the two subsidiaries were
> both wholly owned; further, they had no separate business operations
> whatsoever; thirdly, in my judgment, the nature of the question
> involved is highly relevant, namely, whether the owners of this
> business have been disturbed in their possession and enjoyment of    G
> it."

In *Revlon Inc. v. Cripps & Lee Ltd.* [1980] F.S.R. 85 the question
(among many other questions) arose as to whether the goods in question
were "connected in the course of trade with the proprietor . . . of the
trade mark" within the meaning of section 4(3) of the Trade Marks Act
1938." The proprietor of the trade mark was Revlon Suisse S.A., a    H
subsidiary of Revlon Inc. Buckley L.J., in the course of deciding that
the goods were connected in the course of trade with Revlon Suisse
S.A., said, at p. 105:

A

"Since, however, all the relevant companies are wholly owned subsidiaries of Revlon, it is undoubted that the mark is, albeit remotely, an asset of Revlon and its exploitation is for the ultimate benefit of no one but Revlon. It therefore seems to me to be realistic and wholly justifiable to regard Suisse as holding the mark at the disposal of Revlon and for Revlon's benefit. The mark is an asset of the Revlon group of companies regarded as a whole, which all belongs to Revlon. This view does not, in my opinion, constitute what is sometimes called 'piercing the corporate veil;' it recognises the legal and factual position resulting from the mutual relationship of the various companies."

B

Principally, in reliance on those authorities and the case next to be mentioned, Mr. Morison submitted that in deciding whether a company had rendered itself subject to the jurisdiction of a foreign court it is entirely reasonable to approach the question by reference to "commercial reality." The risk of litigation in a foreign court, in his submission, is part of the price which those who conduct extensive business activities within the territorial jurisdiction of that court properly have to pay. He invited us to follow the approach of Advocate General Warner in *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v. Commission of the European Communities* (Cases 6 and 7/73) [1974] E.C.R. 223 when considering whether a parent company and subsidiary were separate "undertakings" within the meaning of articles 85 and 86 of the E.E.C. Treaty. He said, at p. 263:

C

D

"One starts to my mind from this, that neither article 85 nor article 86 anywhere refers to 'persons.' In both articles the relevant prohibitions are directed to 'undertakings,' a much wider and looser concept. This indeed is what one would expect, because it would be inappropriate to apply rigidly in the sphere of competition law the doctrine referred to by English lawyers as that of *Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22—i.e. the doctrine that every company is a separate legal person that cannot be identified with its members. Basically that doctrine exists in order to preserve the principle of limited liability. It is concerned with the rights of creditors in the context of company law. It has been applied, with more or less happy results, in other spheres, such as those of conveyancing, of contracts and of liability for tort. But to export it blindly into branches of the law where it has little relevance, could, in my opinion, serve only to divorce the law from reality.

E

F

G

"Suppose my Lords, that C.S.C. had traded in Italy through a branch office. There could have been no doubt then that it was amenable to the jurisdiction of the Commission and of this court. Could it have made any difference if C.S.C. has chosen to trade in Italy through a wholly owned subsidiary? The difference would have been one only of legal form, not of reality. Why then should it make any difference that it chose to trade in Italy through a subsidiary that it controlled by a 51 per cent. majority rather than by a 100 per cent. majority? What matters in this field, in my view, is control . . . "

H

536

**Adams v. Cape Industries Plc. (C.A.)**    **[1990]**

Advocate General Warner said, at p. 264:

A

> "(1) that there is a presumption that a subsidiary will act in
> accordance with the wishes of its parent because according to
> common experience subsidiaries generally do so act; (2) that, unless
> that presumption is rebutted, it is proper for the parent and the
> subsidiary to be treated, as a single undertaking for the purposes of
> articles 85 and 86 of the E.E.C. Treaty . . ."

B

We have some sympathy with Mr. Morison's submissions in this
context. To the layman at least the distinction between the case where a
company itself trades in a foreign country and the case where it trades in
a foreign country through a subsidiary, whose activities it has full power
to control, may seem a slender one. Mr. Morison referred us to *Bulova
Watch Co. Inc. v. K. Hattori & Co. Ltd.* (1981) 508 F. Supp. 1322,     C
where the United States District Court held that it had jurisdiction over
a Japanese corporation which was expanding into a new market by
setting up subsidiaries and dealing with competition, both on the theory
that the corporation was "doing business" in New York and under the
New York "long-arm statute." In the course of his judgment, Weinstein
C.J. said, at p. 1342: "these subsidiaries almost by definition are doing
for their parent what their parent would otherwise have to do on its     D
own." It is not surprising that in many cases such as *Holdsworth* [1955] 1
W.L.R. 352, *Scottish Co-operative* [1959] A.C. 324, *Revlon* [1980] F.S.R.
85 and *Commercial Solvents* [1974] E.C.R. 223, the wording of a
particular statute or contract has been held to justify the treatment of
parent and subsidiary as one unit, at least for some purposes. The
relevant parts of the judgments in the *D.H.N.* case [1976] 1 W.L.R. 852     E
must, we think, likewise be regarded as decisions on the relevant
statutory provisions for compensation, even though these parts were
somewhat broadly expressed, and the correctness of the decision was
doubted by the House of Lords in *Woolfson v. Strathclyde Regional
Council*, 1978 S.L.T. 159 in a passage which will be quoted below.

Mr. Morison described the theme of all these cases as being that
where legal technicalities would produce injustice in cases involving     F
members of a group of companies, such technicalities should not be
allowed to prevail. We do not think that the cases relied on go nearly so
far as this. As Sir Godfray submitted, save in cases which turn on the
wording of particular statutes or contracts, the court is not free to
disregard the principle of *Salomon v. A. Salomon & Co. Ltd.* [1897]
A.C. 22 merely because it considers that justice so requires. Our law,     G
for better or worse, recognises the creation of subsidiary companies,
which though in one sense the creatures of their parent companies, will
nevertheless under the general law fall to be treated as separate legal
entities with all the rights and liabilities which would normally attach to
separate legal entities.

In deciding whether a company is present in a foreign country by a
subsidiary, which is itself present in that country, the court is entitled,     H
indeed bound, to investigate the relationship between the parent and the
subsidiary. In particular, that relationship may be relevant in determining
whether the subsidiary was acting as the parent's agent and, if so, on