A  what terms. In *Firestone Tyre and Rubber Co. Ltd. v. Lewellin* [1957] 1
W.L.R. 464 (which was referred to by Scott J.) the House of Lords
upheld an assessment to tax on the footing that, on the facts, the
business both of the parent and subsidiary were carried on by the
subsidiary as agent for the parent. However, there is no presumption of
any such agency. There is no presumption that the subsidiary is the
parent company's alter ego. In the court below the judge, ante, p. 484B,

B  refused an invitation to infer that there existed an agency agreement
between Cape and N.A.A.C. comparable to that which had previously
existed between Cape and Capasco and that refusal is not challenged on
this appeal. If a company chooses to arrange the affairs of its group in
such a way that the business carried on in a particular foreign country is
the business of its subsidiary and not its own, it is, in our judgment,

C  entitled to do so. Neither in this class of case nor in any other class of
case is it open to this court to disregard the principle of *Salomon v. A.
Salomon & Co. Ltd.* [1897] A.C. 22 merely because it considers it just
so to do.

In support of the single commercial unit argument, Mr. Morison
made a number of factual submissions to the following effect: the
purpose of N.A.A.C.'s creation was that it might act as a medium

D  through which goods of the Cape group might be sold. The purpose of
the liquidation of N.A.A.C. was likewise to protect Cape. Any major
policy decisions concerning N.A.A.C. were taken by Cape. Cape's
control over N.A.A.C. did not depend on corporate form. It exercised
the same degree of control both before and after the removal of the
Cape directors from the N.A.A.C. board. The functions of N.A.A.C.'s

E  directors were formal only. Dr. Gaze effectively controlled its activities.
Cape represented N.A.A.C. to its customers as its office in the United
States of America. In broad terms, it was submitted, Cape ran a single
integrated mining division with little regard to corporate formalities as
between members of the group in the way in which it carried on its
business.

F  The plaintiffs further submitted in their notice of appeal that
N.A.A.C. "did not deal and was not permitted to deal with Egnep or
Casap, but had to go through Cape or Capasco." It seems clear that
N.A.A.C., as principal, made direct purchases of raw asbestos from
Egnep. On the balance of probabilities, we accept the plaintiffs'
submission that it made similar direct purchases from Casap. In referring
to the absence of dealing with Egnep or Casap, the plaintiffs were, we

G  understand, intending to submit that as a matter of group policy, which
Cape could and did enforce by its power of control over the boards of
Egnep, Capasco and N.A.A.C., the transmission of information and
orders to or from customers had to be effected and was effected by
N.A.A.C. through Capasco. We accept that submission. We also accept
that the matters referred to in this paragraph lend some broad support
to the submission that Cape ran a single integrated mining division with

H  little regard to corporate formalities as between members of the group.
However, there has been no challenge to the judge's finding that the
corporate forms applicable to N.A.A.C. as a separate legal entity were
observed.

538

As to the plaintiffs' other factual submissions in this context we will    A
deal with the purpose of N.A.A.C.'s creation and existence in considering
the "agency" argument. As to the relationship between Cape and
N.A.A.C., it is of the very nature of a parent company-subsidiary
relationship that the parent company is in a position, if it wishes, to
exercise overall control over the general policy of the subsidiary. The
plaintiffs, however, submitted that Cape's control extended to the day-
to-day running of N.A.A.C. They challenged the finding of fact made by    B
Scott J. that "Mr. Morgan was in executive control of N.A.A.C.'s
conduct of its business." We explore further the facts relative to this
finding and to the extent of Cape's control over N.A.A.C.'s activities in
the appendix to this judgment. Our conclusion, shortly stated, is that the
finding was justified by the evidence. A degree of overall supervision,
and to some extent control, was exercised by Cape over N.A.A.C. as is    C
common in the case of any parent-subsidiary relationship—to a large
extent through Dr. Gaze. In particular, Cape would indicate to N.A.A.C.
the maximum level of expenditure which it should incur and would
supervise the level of expenses incurred by Mr. Morgan. Mr. Morgan
knew that he had to defer in carrying out the business activities of
N.A.A.C. to the policy requirements of Cape as the controlling
shareholders of N.A.A.C. Within these policy limits, such as Cape's    D
requirement that N.A.A.C.'s orders for asbestos for sale by N.A.A.C.
in the United States of America be placed through Capasco on behalf of
Egnep and Casap, the day-to-day running of N.A.A.C. was left to him.
There is no challenge to the judge's findings that (a) the corporate
financial control exercised by Cape over N.A.A.C. in respect of the
level of dividends and the level of permitted borrowing was no more and
no less than was to be expected in a group of companies such as the    E
Cape group, ante, p. 474A–B; (b) the annual accounts of N.A.A.C. were
drawn on the footing that N.A.A.C.'s business was its own business and
there was nothing to suggest that the accounts were drawn on a false
footing, ante, p. 484A–B.

In the light of the set up and operations of the Cape group and of
the relationship between Cape/Capasco and N.A.A.C. we see the    F
attraction of the approach adopted by Lord Denning M.R. in the
D.H.N. case [1976] 1 W.L.R. 852, 860c, which Mr. Morison urged us to
adopt: "This group is virtually the same as a partnership in which all the
three companies are partners." In our judgment, however, we have no
discretion to reject the distinction between the members of the group as
a technical point. We agree with Scott J. that the observations of Robert
Goff L.J. in Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45, 64,    G
are apposite:

"[Counsel] suggested beguilingly that it would be technical for us to
distinguish between parent and subsidiary company in this context;
economically, he said, they were one. But we are concerned not
with economics but with law. The distinction between the two is, in
law, fundamental and cannot here be bridged."    H

As to C.P.C., in Mr. Morison's submission, the replacement of
N.A.A.C. by C.P.C. was simply a substitute arrangement. The creation

A  of C.P.C. was affected and paid for by Cape so that it could perform the same functions on behalf of Cape as N.A.A.C. had previously performed. C.P.C., on behalf of A.M.C. (and thus Cape) made payment arrangements with third parties and received moneys for A.M.C. (Cape). While Mr. Morgan held all the shares in C.P.C. for his own benefit, the rights of pre-emption reserved to A.M.C. by the agency agreement of 5 June 1978 left him with little substantial financial interest in C.P.C.'s
B  business, save for the office furniture and a right to an account which would be of little value; effectively, it was submitted, C.P.C.'s business was owned by A.M.C. (Cape).

Our reasons for rejecting the "single economic unit" argument in relation to N.A.A.C. apply a fortiori in relation to C.P.C., because C.P.C. was not Cape's subsidiary and its shares were held by Mr.
C  Morgan for his own benefit. We give our reasons in the next section of this judgment for agreeing with the judge that C.P.C. was an independently owned company.

*The "corporate veil" point*

Quite apart from cases where statute or contract permits a broad
D  interpretation to be given to references to members of a group of companies, there is one well-recognised exception to the rule prohibiting the piercing of "the corporate veil." Lord Keith of Kinkel referred to this principle in *Woolfson v. Strathclyde Regional Council*, 1978 S.L.T. 159 in the course of a speech with which Lord Wilberforce, Lord Fraser of Tullybelton and Lord Russell of Killowen agreed. With reference to
E  the *D.H.N.* decision [1976] 1 W.L.R. 852, he said, at p.161:

"I have some doubts whether in this respect the Court of Appeal properly applied the principle that it is appropriate to pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts."

The only allegation of a façade in the plaintiffs' pleadings was that
F  the formation and use of C.P.C. and A.M.C. in the

"alternative marketing arrangements of 1978 were a device or sham or cloak for grave impropriety on the part of Cape or Capasco, namely to ostensibly remove their assets from the United States of America to avoid liability for asbestos claims whilst at the same time continuing to trade in asbestos there."

G  In their notice of appeal (paragraph 2(b)) the plaintiffs referred to their contention made at the trial that C.P.C. "was set up to replace N.A.A.C. in such a way as to disguise the defendants' continued involvement in the marketing of the group's asbestos in the United States of America."

Scott J. more or less accepted this contention. He found as a fact,
H  ante, p. 478F:

"the arrangements made regarding N.A.A.C., A.M.C. and C.P.C. were part of one composite arrangement designed to enable Cape asbestos to continue to be sold into the United States while

540

reducing, if not eliminating, the appearance of any involvement therein of Cape or its subsidiaries." **A**

However, he went on to say, ante, p. 479B–C:

"But the question whether C.P.C.'s presence in Illinois can, for jurisdiction purposes, be treated as Cape's presence, must, in my view, be answered by considering the nature of the arrangements that were implemented, not the motive behind them. The **B** documentary evidence I have seen has made clear that the senior management of Cape, including Mr. Penna, were very anxious that Cape's connections with C.P.C. and with A.M.C. should not become publicly known. Some of the letters and memoranda have a somewhat conspiratorial flavour to them. But this too, although interesting to notice, is not, in my opinion, relevant to the main question." **C**

If and so far as the judge intended to say that the motive behind the new arrangements was irrelevant as a matter of law, we would respectfully differ from him. In our judgment, as Mr. Morison submitted, whenever a device or sham or cloak is alleged in cases such as this, the motive of the alleged perpetrator must be legally relevant, and indeed **D** this no doubt is the reason why the question of motive was examined extensively at the trial. The decision in *Jones v. Lipman* [1962] 1 W.L.R. 832 referred to below was one case where the proven motive of the individual defendant clearly had a significant effect on the decision of Russell J.

The judge's finding of fact quoted above as to the motives of Cape behind the new arrangements is accepted (no doubt welcomed) by the **E** plaintiffs, so far as it goes. They submit, rightly in our judgment, that any such motives are relevant to the "corporate veil" point. They further submit that the judge (a) erred in concluding that C.P.C. was an "independently owned company;" and (b) failed to make a number of findings of fact which are relevant in the context of the "corporate veil" point.

Mr. Morison has taken us through the arrangements which led to the **F** extinction of N.A.A.C. and the emergence of A.M.C. and C.P.C. with care and in considerable detail. The additional facts which the plaintiffs say the judge ought to have found, and which are set out in the appendix to this judgment, all relate to these arrangements. It is true that, as the judge said, some of the letters and memoranda have a "somewhat conspiratorial flavour to them." Since, contrary to the judge's **G** view, we think motive is relevant in this context, we have thought it right to investigate these contentions in some detail in the appendix.

On analysis, much of the new material does little more than amply support the judge's finding quoted above as to the purpose of the composite arrangement. In this court Mr. Morison made it clear that the plaintiffs were not alleging any unlawful purpose or impropriety on the part of Cape in the sense of any intention to deceive or to do any **H** unlawful act, either in Illinois or in this country. It was, however, asserted for the plaintiffs that A.M.C. and C.P.C. together constituted a façade which concealed the real activities of Cape. We understand that

A    to mean that the purpose of Cape was to conceal, so far as it lawfully
could having regard to the requirements of the law in Illinois and this
country, any connection of Cape with A.M.C. or C.P.C.

     Before expressing our own views as to Cape's purpose, we will state
our conclusions as to Mr. Morgan's position. It is, in our judgment,
right to infer, substantially as submitted by Mr. Morison, that the
assistance derived from the presence of Mr. Morgan in Illinois,
B    undertaking the task through C.P.C. of marketing agent for the Cape
subsidiaries in the United States, was regarded as being at least of great
importance to the general purposes of the Cape group, and possibly
essential for those purposes, because, if it was not so regarded, there is
no apparent reason why Cape should assume the cost and such risk as
might have arisen from setting up C.P.C. Sir Godfray, however, was in
C    our view plainly right in submitting that the agreement of Mr. Morgan
was required for the creation of the alternative marketing arrangements
by means of a new independent Illinois company and that his agreement,
when given, was real. Cape had obligations of a moral nature to Mr.
Morgan and to the long serving staff of N.A.A.C. Cape also, for its own
purposes, wanted Mr. Morgan and Mrs. Holtze to continue with the
D    work previously done by them for N.A.A.C. If Mr. Morgan decided to
take on the task of providing services to the subsidiaries of the Cape
group through C.P.C., on the terms available to him as owner of the
shares in C.P.C., Cape would get the benefit of his knowledge and
experience as the person in charge of C.P.C. Nothing in the material to
which our attention was drawn under these headings, however, causes
E    us to doubt the correctness of Scott J.'s conclusion that the shares in
C.P.C. belonged both at law and in equity to Mr. Morgan. It is clear
that Cape intended C.P.C. to be in reality Mr. Morgan's company
because that was part of their purpose. Such as it was, and dependent
for almost all of its business on the Cape subsidiaries, C.P.C. was Mr.
Morgan's company. We therefore reject the challenge to the judge's
finding that C.P.C. was an independently owned company.

F         As to Cape's purpose in making the arrangements for the liquidation
of N.A.A.C. and the creation of A.M.C. and C.P.C., we think that the
extracts from the evidence set out in the appendix to this judgment
(particularly under item (17)), sufficiently reveal both the substance of
what the officers of Cape were doing and what they were trying to
achieve. The allegation of impropriety was, in our view, rightly
G    abandoned. The inference which we draw from all the evidence was that
Cape's intention was to enable sales of asbestos from the South African
subsidiaries to continue to be made in the United States while
(a) reducing the appearance of any involvement therein of Cape or its
subsidiaries, and (b) reducing by any lawful means available to it the
risk of any subsidiary or of Cape as parent company being held liable
for United States taxation or subject to the jurisdiction of the United
H    States courts, whether state or federal, and the risk of any default
judgment by such a court being held to be enforceable in this country.
Inference (a) was also made by the judge. Inference (b) is our own
addition.

Adams v. Cape Industries Plc. (C.A.)                    [1990]

A

The question of law which we now have to consider is whether the arrangements regarding N.A.A.C., A.M.C. and C.P.C. made by Cape with the intentions which we have inferred constituted a façade such as to justify the lifting of the corporate veil so as that C.P.C.'s and A.M.C.'s presence in the United States of America should be treated as the presence of Cape/Capasco for this reason if no other.

B

In *Merchandise Transport Ltd. v. British Transport Commission* [1962] 2 Q.B. 173, 206–207, Danckwerts L.J. referred to certain authorities as showing:

C

"where the character of a company, or the nature of the persons who control it, is a relevant feature the court will go behind the mere status of the company as a legal entity, and will consider who are the persons as shareholders or even as agents who direct and control the activities of a company which is incapable of doing anything without human assistance."

The correctness of this statement has not been disputed, but it does not assist in determining whether "the character of a company or the nature of the persons who control it" will be relevant in the present case.

D

Rather greater assistance on this point is to be found in *Jones v. Lipman* [1962] 1 W.L.R. 832. In that case the first defendant had agreed to sell to the plaintiffs some land. Pending completion the first defendant sold and transferred the land to the defendant company. The evidence showed that this company was at all material times under the complete control of the first defendant. It also showed that the acquisition by him of the company and the transfer of the land to the company had been carried through solely for the purpose of defeating the plaintiff's right to specific performance: see at p. 836. Russell J. made an order for specific performance against both defendants. He held that specific performance cannot be resisted by a vendor who, by his absolute ownership and control of a limited company in which the property is vested, is in a position to cause the contract to be completed. As to the defendant company, he described it, at p. 836, as being

E

F

"the creature of the first defendant, a device and a sham, a mask which he holds before his face in an attempt to avoid recognition by the eye of equity."

Following *Jones v. Lipman*, we agree with Mr. Morison that, contrary to the judge's view, where a façade is alleged, the motive of the perpetrator may be highly material.

G

Other cases were cited to us in which the court, on interlocutory applications, has to a greater or lesser extent been prepared to look behind the corporate veil and have regard to the persons ultimately interested in a company under a group's company structure. For example, it did so in exercising its *Mareva* injunction in *X Bank Ltd. v. G.* (1985) 82 L.S.G. 2016 and in considering stays of execution in *Canada Enterprises Corporation Ltd. v. MacNab Distillers Ltd. (Note)* [1987] 1 W.L.R. 813 and *Burnet v. Francis Industries Plc.* [1987] 1 W.L.R. 802. The two last-mentioned decisions contain no statement of relevant principle and the report of *X Bank Ltd. v. G.* is so brief that we think it would not be safe to rely on it for present purposes.

H

A    We were referred to certain broad dicta of Lord Denning M.R. in *Wallersteiner v. Moir* [1974] 1 W.L.R. 991, 1013, and in *Littlewoods Mail Order Stores Ltd. v. Inland Revenue Commissioners* [1969] 1 W.L.R. 1241, 1254. In both these cases he expressed his willingness to pull aside the corporate veil, saying in the latter:

B    "I decline to treat the [subsidiary] as a separate and independent entity. . . . The courts can and often do draw aside the veil. They can, and often do, pull off the mask. They look to see what really lies behind. The legislature has shown the way with group accounts and the rest. And the courts should follow suit. I think that we should look at the Fork Manufacturing Co. Ltd. and see it as it really is—the wholly-owned subsidiary of Littlewoods. It is the creature, the puppet, of Littlewoods, in point of fact: and it should C    be so regarded in point of law."

    However, in *Wallersteiner v. Moir* [1974] 1 W.L.R. 991 Buckley L.J., at p. 1027, and Scarman L.J., at p. 1032, expressly declined to tear away the corporate veil. In the *Littlewoods* case [1969] 1 W.L.R. 1241, 1255, Sachs L.J. expressly dissociated himself from the suggestion that the subsidiary was not a separate legal entity and Karminski L.J. refrained D    from associating himself with it. We therefore think that the plaintiffs can derive little support from those dicta of Lord Denning M.R.

    From the authorities cited to us we are left with rather sparse guidance as to the principles which should guide the court in determining whether or not the arrangements of a corporate group involve a façade within the meaning of that word as used by the House of Lords in E    *Woolfson*, 1978 S.L.T. 159. We will not attempt a comprehensive definition of those principles.

    Our conclusions are these. In our judgment, the interposition of A.M.C. between Cape and C.P.C. was clearly a façade in the relevant sense. Scott J., ante, p. 479E, said it seemed clear that A.M.C. was "no more than a corporate name" and that he would expect to find, if all the relevant documents were available, that "A.M.C. acted through F    employees or officers of either Casap or Egnep." He rejected, ante, p. 482A, Mr. Morgan's evidence that he understood A.M.C. to be an independent South African trading company, and was satisfied that he knew very well that it was a "creature of Cape." "The seller in C.P.C.'s time was, nominally, A.M.C. but in reality still, I think, Egnep or Casap:" ante, p. 482E. In our judgment, however, the revelation of G    A.M.C. as the creature of Cape does not suffice to enable the plaintiffs to show the presence of Cape/Capasco in the United States of America, since on the judge's undisputed findings, A.M.C. was not in reality carrying on any business in the United States of America.

    The relationship between Cape/Capasco and C.P.C. is the crucial factor, since C.P.C. was undoubtedly carrying on business in the United States of America. We have already indicated our acceptance of the H    judge's findings that C.P.C. was a company independently owned by Mr. Morgan and that the shares therein belonged to him in law and in equity. These findings by themselves make it very difficult to contend that the operation of C.P.C. involved a façade which entitles the court

544

A

to pierce the corporate veil between C.P.C. and Cape/Capasco and treat them all as one. Is the legal position altered by the facts that Cape's intention, in making the relevant arrangements (as we infer), was to enable sales of asbestos from the South African subsidiaries to be made while (a) reducing if not eliminating the appearance of any involvement therein of Cape or its subsidiaries, and (b) reducing by any lawful means available to it the risk of any subsidiary or of Cape as parent company being held liable for United States taxation or subject to the jurisdiction of the United States courts and the risk of any default judgment by such a court being held to be enforceable in this country?

B

We think not. Mr. Morison submitted that the court will lift the corporate veil where a defendant by the device of a corporate structure attempts to evade (i) limitations imposed on his conduct by law; (ii) such rights of relief against him as third parties already possess; and (iii) such rights of relief as third parties may in the future acquire. Assuming that the first and second of these three conditions will suffice in law to justify such a course, neither of them apply in the present case. It is not suggested that the arrangements involved any actual or potential illegality or were intended to deprive anyone of their existing rights. Whether or not such a course deserves moral approval, there was nothing illegal as such in Cape arranging its affairs (whether by the use of subsidiaries or otherwise) so as to attract the minimum publicity to its involvement in the sale of Cape asbestos in the United States of America. As to condition (iii), we do not accept as a matter of law that the court is entitled to lift the corporate veil as against a defendant company which is the member of a corporate group merely because the corporate structure has been used so as to ensure that the legal liability (if any) in respect of particular future activities of the group (and correspondingly the risk of enforcement of that liability) will fall on another member of the group rather than the defendant company. Whether or not this is desirable, the right to use a corporate structure in this manner is inherent in our corporate law. Mr. Morison urged on us that the purpose of the operation was in substance that Cape would have the practical benefit of the group's asbestos trade in the United States of America without the risks of tortious liability. This may be so. However, in our judgment, Cape was in law entitled to organise the group's affairs in that manner and (save in the case of A.M.C. to which special considerations apply) to expect that the court would apply the principle of *Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22 in the ordinary way.

C

D

E

F

G

The plaintiffs submitted (paragraph 7 of their notice of appeal) that the motive of the defendants in setting up the arrangements regarding N.A.A.C., A.M.C. and C.P.C. as revealed in the documentary evidence were "consistent only with an acceptance by Cape that they were present in the United States through N.A.A.C. and C.P.C." We think there is no substance in this point. These arrangements at most indicated an apprehension on the part of the defendants that they might be held to be so present and a desire that they should not be. They involved no admission or acceptance of such presence.

H

We reject the "corporate veil" argument.

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    *The "agency argument" in relation to N.A.A.C.*

We now proceed to consider the agency argument in relation to N.A.A.C. on the footing, which we consider to be the correct one, that N.A.A.C. must for all relevant purposes be regarded as a legal entity separate from Cape/Capasco. In an earlier section of this judgment we summarised three propositions which we derived from the authorities
B    relating to the "presence" of an overseas corporation. There we stated that, save in a "branch office" case (which the instant case is not), the English court will be likely to treat an overseas trading corporation as present within the jurisdiction of the courts of another country only if a representative of the overseas corporation has for more than a minimal period of time been carrying on the *overseas corporation's* business in the other country at or from some fixed place of business. In the present
C    case N.A.A.C., as representative of Cape/Capasco, unquestionably carried on business at a fixed place of business in the United States of America, 150, North Wacker Drive, for a substantial period of time. So no difficulty arises on that score. The crucial question is whether it can fairly be said that *Cape's* business has been transacted by N.A.A.C. at or from 150, North Wacker Drive. The judge's answer to it was that
D    "N.A.A.C.'s business was its own business and not the business of Cape or Capasco:" ante, p. 477ᴇ–ꜰ. The plaintiffs challenge the correctness of this answer to the question.

This question, as we said earlier, will necessitate an investigation of the functions which N.A.A.C. performed and all aspects of the relationship between it and Cape.

The factual material which we have principally in mind in considering
E    whether Cape's business was being transacted at or from 150, North Wacker Drive is to be found in the section of this judgment headed, "The facts on 'presence' as found by Scott J.," and in our observations in the appendix to this judgment. We summarise below what we consider the most material facts in context, having regard to the list of potentially relevant factors set out in an earlier section of our judgment.

F    We accept that the intention of Cape in procuring the incorporation of N.A.A.C. in the State of Illinois was that N.A.A.C. should assist in the marketing of asbestos in the United States of America upon sales by Egnep or Casap to purchasers in the United States of America and that it was to be the marketing agent of the Cape group in the United States of America. Nevertheless, in our judgment, it is indisputable that at very least a substantial part of the business carried on by N.A.A.C at all
G    material times was in every sense its own business. In these contexts we draw attention in particular to the following facts.

(1) Though we were referred to no evidence relating to the original acquisition by N.A.A.C. of its premises at 150, North Wacker Drive, we know that N.A.A.C. itself was the lessee of the premises and paid the rent for them. Furthermore, it owned the office furniture and employed
H    there its own staff of four persons for whom it ran its own pension scheme.

(2) From time to time it conducted the following activities as principal on its own account: (a) it bought asbestos from United States government stocks or from Egnep or Casap and sold it to United States

546

customers, such purchases representing about 25 per cent. of N.A.A.C.'s    A
business in terms of tonnage; (b) it imported asbestos goods from Japan
and sold them to United States customers. (While we accept that the
purchase by N.A.A.C. of asbestos goods was subordinate to its business
with or for Cape's subsidiaries, we do not accept the plaintiffs' submission
that such sales were trivial, having regard to the turnover of N.A.A.C.)

(3) For storing the asbestos which it has purchased from United
States Government stocks or Egnep or Casap, N.A.A.C. rented in its    B
own name and paid for warehousing facilities.

(4) N.A.A.C. earned profits and paid United States taxes thereon.

(5) N.A.A.C.'s creditors and debtors were its own (not those of
Cape).

(6) The return to Cape as N.A.A.C.'s shareholder took the form of
an annual dividend passed by a resolution of N.A.A.C.'s board of    C
directors.

(7) In other respects also the corporate forms applicable to N.A.A.C.
as a separate entity were observed.

In the face of these facts, now unchallenged, it is in our judgment
clear beyond argument that N.A.A.C. was carrying on business of its
own. The only question is whether, in performing the functions which it
performed on behalf of Cape/Capasco, it was carrying on its own    D
business or their business. What, then, were these functions? As we see
the position from the findings of the judge and the evidence put before
us, its functions were to assist in the marketing of asbestos in the United
States of America upon sales by Egnep or Casap and generally to assist
and encourage sales in the United States of America of asbestos of the
Cape group. It acted as the channel of communication between    E
Cape/Capasco and United States customers, such as P.C.C. It organised
and arranged the performance of contracts between United States
customers and Egnep. It had a co-ordinating role, particularly in
arranging delivery. The United States customer would specify to
N.A.A.C. from time to time the quantity of asbestos which it wished to
purchase and the time when it desired delivery to be made. This
information would be conveyed through N.A.A.C. to Casap and Egnep.    F
Shipping arrangements and delivery dates would be arranged by Casap
or Egnep and communicated to the United States customers via
N.A.A.C. N.A.A.C. would receive documents and pass them on to the
customers. It also received requests and complaints which it would
normally pass on to Capasco. Generally it assisted in "nursing" the
group's customers for asbestos and ensuring that they were satisfied. For    G
its services N.A.A.C. was remunerated by way of a commission paid to
it by Casap on sales effected by Egnep or Casap. There was no evidence
that N.A.A.C. reserved any part of its office premises or any part of its
staff exclusively for performing its agency functions.

Our further findings as to the functions which N.A.A.C. performed
and as to its relationship between N.A.A.C. and Cape are to be found
set out in the appendix. We bear in mind particularly the submissions    H
contained in item (9) that (i) when corresponding with United States
customers, Cape referred to N.A.A.C. as "our Chicago office" and
N.A.A.C. referred to Cape and Capasco as "our London office;"

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    (ii) N.A.A.C. held itself out to a large United States customer as being part of the Cape selling organisation, and (iii) N.A.A.C. was treated by the major customer "as the channel between them and Cape and Capasco." However, in the appendix we give our reasons for concluding that the matters shown in the evidence considered under this heading do not by themselves show anything inconsistent with the findings of Scott J. as to N.A.A.C.'s role and functions.

B    There is no doubt that the services rendered by N.A.A.C. in acting as intermediary in respect of contracts between the United States customers and Egnep or Casap were active and important services which were of great assistance to Cape/Capasco in arranging the sales of their group's asbestos in the United States of America. Nevertheless, for all the closeness of the relationship between Cape/Capasco and N.A.A.C.,

C    strictly defined limits were imposed on the functions which N.A.A.C. were authorised to carry out or did carry out as their representative. First, N.A.A.C. had no general authority to bind Cape/Capasco to any contractual obligation. Secondly, as Mr. Morison expressly accepted, there is no evidence that N.A.A.C., whether with or without prior authority from Cape/Capasco, ever effected any transaction in such manner that Cape/Capasco thereby became subject to contractual

D    obligations to any person. This significant factor renders the arguments in favour of "presence," at least in some respects, even less strong than they were in cases such as *The Lalandia* [1933] P. 56 and *The Holstein* [1936] 2 All E.R. 1660 where the argument failed. Having regard to the legal principles stated earlier in this judgment, and looking at the facts of the case overall, our conclusion is that the judge was right to hold

E    that the business carried on by N.A.A.C. was exclusively its own business, not the business of Cape or Capasco, and that Cape and Capasco were not present within the United States of America, through N.A.A.C. at any material time. We see no sufficient grounds for disturbing this finding of fact.

Under this section of our judgment we should mention one further point. The plaintiffs challenged the judge's finding that as from 31

F    January 1978, N.A.A.C. ceased to act on behalf of any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating its assets. The object of the challenge was to refute the suggestion that Cape could not be regarded as present in the United States of America through N.A.A.C. during the period between 31 January 1978 and N.A.A.C.'s formal dissolution on 19 May 1978.

G    (They accepted that after 19 May Cape could not be said to be present in the United States of America, by or through N.A.A.C.) The plaintiffs regard this point as having potential legal relevance, since two of the eight actions which comprise Tyler 2 were begun before 18 May 1978. In the appendix we give our reasons for rejecting the challenge to the judge's finding of fact.

H    *The agency argument in relation to C.P.C.*

We now consider whether Cape/Capasco were present in the United States of America by or through C.P.C. In dealing with the "corporate veil" point we have stated our inferences as to Cape's purpose in making

548

the arrangements for the liquidation of N.A.A.C. and the creation of   A
A.M.C. and C.P.C. Part of the very purpose of these arrangements was
to enable sales of asbestos from the Cape group to continue to be made
in the United States of America while creating a greater distance both in
appearance and reality between Cape and the company (C.P.C.) which
was intended to carry out the functions on its behalf in the United States
of America which had previously been carried out by N.A.A.C. Having
dealt with the "corporate veil" point, we agree with the following   B
passage in Scott J.'s judgment, ante, p. 482D–F:

> "I do not think, on analysis, that the plaintiffs' case is any stronger
> than their case regarding N.A.A.C. If anything, I think the case is
> weaker. N.A.A.C. was at least a wholly owned subsidiary. C.P.C.,
> even if incorporated and launched with Cape money, was, on my
> reading of the facts, an independently owned company. Like   C
> N.A.A.C., C.P.C. acted as agent for the purpose of facilitating the
> sale in the United States of Cape's asbestos. The seller of the
> asbestos in N.A.A.C.'s time was Egnep or Casap. The seller in
> C.P.C.'s time was, nominally, A.M.C. but, in reality, still, I think,
> Egnep or Casap. C.P.C., like N.A.A.C., had no authority to bind
> Egnep, Casap or any other of the Cape subsidiaries to any contract,   D
> C.P.C., like N.A.A.C., carried on its own business from its own
> offices at 150, North Wacker Drive. The provision by Cape of the
> $160,000 as a starting-up fund does not make the offices Cape's
> offices or the business Cape's business."

The interposition of A.M.C. in the new arrangements made in 1978
cannot one way or the other affect the question whether Cape/Capasco   E
were present in the United States of America thereafter. For all relevant
purposes, as we have already indicated, we are prepared to treat Cape
and A.M.C. as one. The functions performed by C.P.C. and its
relationship with Cape through A.M.C. are the relevant considerations
for present purposes. Since Mr. Morgan held all the shares in C.P.C.
beneficially, Cape had no control as a shareholder over the activities of
C.P.C. similar to the control which it had exercised over N.A.A.C. Mr.   F
Morison did not dispute the judge's finding that the terms of the agency
agreement of 5 June 1978 were a reliable guide to the nature of the
relationship between C.P.C. and A.M.C. and hence between C.P.C.
and Cape. Under the terms of this agreement, C.P.C. were left free to
sell materials and products other than asbestos fibre and to involve itself
in other commercial activities. It is clear that it did so. While there is no   G
evidence that it followed N.A.A.C. in buying raw asbestos from Egnep
or Casap or the United States Government, it undoubtedly bought and
sold manufactured textiles on its own behalf as principal.

It is thus quite plain that at least a substantial part of C.P.C.'s
business was in every sense its own business. As with N.A.A.C. the only
question is whether, in performing the functions which it performed on
behalf of Cape/Capasco, it was carrying on its own business or their   H
business. As the terms of the agency agreement show, these functions
were very similar to those which had been performed by N.A.A.C. The
services rendered by C.P.C. to Cape/Capasco were similarly active and

A     important. Again, however, strictly defined limits were imposed on the functions which C.P.C. was authorised to carry out or did carry out as the representative of Cape/Capasco (through A.M.C.). C.P.C. had no authority to bind A.M.C. or Cape or Capasco to any contractual obligation. Again too, there is no evidence that C.P.C., whether with or without prior authority from any of those three companies, ever carried out any transaction in such manner as to subject any of them to

B     contractual obligations to any person. In the light of the legal principles stated above and of the facts of the case looked at as a whole, we see no sufficient grounds for disturbing the judge's finding that the business carried on by C.P.C. was exclusively its own business and that Cape and Capasco were not present within the Unites States of America through C.P.C. (or A.M.C.) at any material time.

C     Under this heading, we refer to one further matter. The plaintiffs, on the evidence of Mr. Summerfield (that in August 1984 A.M.C.'s name was given as one of the occupants of the offices on the 12th floor at 150, North Wacker Drive), invited us to infer that A.M.C. had their plate up on those offices in 1978–79. Scott J. declined to draw any such inference. In our judgment, he was right to do so for the reasons given in the next section of this judgment dealing with burden of proof and under item

D     (25) in the appendix.

### The onus of proof

    The plaintiffs submitted to Scott J. that the onus was on Cape to establish that it was not resident in the United States of America and that he should hold that the defendants had failed to discharge that

E     onus. He rejected that argument, saying, ante, p. 483c–D:

> "The plaintiffs sue Cape on a judgment given by a United States court. The judgment is an apparently regular one. Cape disputes jurisdiction on the ground that it is a foreign company with no place of business in the United States. The plaintiffs' answer is to assert that the presence in the United States of N.A.A.C. and C.P.C. is to

F     > be treated as Cape's presence. But each of N.A.A.C. and C.P.C. is in law an individual legal persona. A contention that the presence of the United States of either is to be treated as the presence of Cape requires, in my opinion, he who so contends to establish facts sufficient to support the contention. This, in my judgment, the plaintiffs have failed to do."

G     Mr. Morison submitted that the judge misdirected himself as to the burden of proof. A foreign judgment, in his submission, prima facie gives rise to a legal obligation on the part of the defendant to obey the judgment and is thus prima facie enforceable in England. In support of this submission he invoked *Dicey & Morris,* 11th ed., vol. 1, p. 465, where it is said:

H     > "the statement of claim in an action upon such a judgment need not specifically assert that the foreign court was competent in terms either of the relevant foreign law or of the English rules of conflict of laws, though it is usual to insert an allegation of this sort."

550

We agree that generally no specific assertion need be made that the
foreign court was competent *in terms of the foreign law*, not because of
any question of burden of proof, but because such assertion is irrelevant.
As is stated in *Dicey & Morris*, 11th ed., vol. 1, pp. 464–465, a foreign
judgment cannot, in general, be impeached on the ground that the court
which gave it was not competent to do so according to the law of the
foreign country concerned.

However, as all the authorities show, it is only the judgment of a
foreign court recognised as competent by English law which will give
rise to an obligation on the part of the defendant to obey it. As a matter
of principle it seems to us that in the first place the onus must fall on the
plaintiff seeking to enforce the judgment of a foreign court to prove the
competence (in this sense) of such court to assume jurisdiction over him.
None of the authorities cited to us establish the contrary.

No doubt, in any case, the evidentiary burden may shift at the trial.
However, we agree with the judge that the presence of A.M.C.'s name
on a notice board at the office at 150, North Wacker Drive in 1984 did
not give rise to any presumption that it had been there in 1979.

More generally we should state that if, contrary to our view, the
onus fell on the defendants to disprove the competence of the Tyler
court to give judgment against them, they have discharged that onus by
showing that they were not "present" in any part of the United States of
America, at the time of commencement of the various suits between
April 1978 and November 1979.

This conclusion as to the presence issue means that this appeal must
fail on this account if no other. However, for reasons already stated,
and in case our conclusion on the "presence" issue is wrong, we think it
right to proceed to consider the "country" issue and the "natural justice"
issue. (As to the latter issue, there is no dispute that the onus of proof
falls on the defendants.)

### III *The country issue*

Thus far we have been considering the criteria for ascertaining
whether a defendant was present in a particular place, and whether on
the facts of this case the criteria were satisfied by Cape and Capasco.
For this purpose, it was unnecessary to decide how to identify the place
in the United States at which the defendant must have been present,
when the action commenced, in order to make the judgment enforceable
against him here, since if Cape and Capasco were not present in
Chicago, they were not present anywhere else in the United States. If,
however, the conclusion expressed in the preceding section of this
judgment were to be incorrect, so that the companies were present in
Chicago, Illinois, it would become necessary to decide whether that
presence was sufficient to render enforceable in the United Kingdom the
judgment given by the District Court in Tyler, Texas.

This question may conveniently be labelled the "country" issue,
echoing the language of *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, and
several of the later cases. We should, however, observe that this
terminology must be used with caution, lest it beg the very question
under consideration, and lead the reader to assume that the political

A   entity provides the geographical test. This point was not in issue in any of the cases from which we have already quoted, and no assumption as to the relevant principle can be drawn from the language in which the courts chose to express their opinions on the question of "presence."

  [Their Lordships summarised the evidence concerning the organisation of the federal courts, their jurisdiction and the law which they enforced;
B   referred to *Mississippi Publishing Corporation v. Murphree* (1946) 326 U.S. 438, *Omni Capital International v. Rudolph Wolff & Co. Ltd.* (1987) 108 S. Ct. 404, *Erie Railroad Co. v. Tompkins* (1938) 304 U.S. 64, *Guaranty Trust Co. v. York* (1945) 326 U.S. 99; and continued:]

  Against this background we may now trace the reasoning by which the judge arrived at his conclusion that, if Cape and Capasco had been present in Illinois when the Tyler 2 actions were commenced, this would have been a sufficient basis in English law for the exercise by the Tyler
C   court of jurisdiction over them. He began, by citing a passage from *Dicey & Morris,* 11th ed., vol. 1, pp. 26–27, which we may usefully repeat:

  "Meaning of 'country.' This word has from long usage become almost a term of art among English speaking writers on the conflict of laws, and it is vitally important to appreciate exactly what it
D   means. It was defined by Dicey as 'the whole of a territory subject under one sovereign to one body of law.' He suggested that a better expression might be 'law district;' but this phrase has never found much favour with English speaking writers, who prefer the more familiar word 'country.' England, Scotland, . . . the Isle of Man, Jersey, Guernsey, Alderney, Sark, each British colony, each of the
E   American and the Australian states and each of the Canadian provinces is a separate country in the sense of the conflict of laws, though not one of them is a state known to public international law. . . . A state may or may not coincide with a country in the sense of the conflict of laws. Unitary states like Sweden, the Netherlands and New Zealand, where the law is the same throughout the state,
F   are 'countries' in this sense. But composite states like the United Kingdom, the United States, Australia and Canada are not."

  The judge differed from this opinion. He did not accept that for some private international purposes the United States might not be a "country;" and he went on to develop an analysis of the position which would exist if the district court were sitting in a "federal question"
G   matter such as an anti-trust damages suit. In the result, the judge concluded that the "court would be a United States court applying United States law;" that it would command the obedience of a resident anywhere in the United States; and that the sovereign from which the district court derived its jurisdiction was the United States. The judge continued this line by stating that, if Congress had chosen to establish a Federal District Court at Washington D.C. with in personam jurisdiction
H   in respect of anti-trust cases, "the 'country' of the court would unarguably be the United States as a whole."

  Thus far, as the judge acknowledged, the discussion had been hypothetical, since the Tyler court was sitting in diversity not in a

552

federal question case. Nevertheless, the judge attached great weight to    A
the rebuttal of what he saw as the main plank of the defendants' case,
namely, that the United States could not be a "country" for private
international law purposes. Having concluded that it could, he went on
to consider and reject the argument which he attributed to the
defendants, namely that the district court when sitting in diversity was
part of the system for the administration of justice in the state in which
it sat.                                                                    B

   The judge then stated his own view as to the basis on which the English
court recognises the judgment of a foreign court, ante, p. 491A–B:

   "the territorial basis of jurisdiction is dependent upon and cannot, in
   in my opinion, be divorced from, the sovereignty of the 'country'
   that has established the court in question. It is, I think, recognition
   of the sovereignty of a foreign country that leads to the recognition    C
   of the entitlement of its courts to take jurisdiction over persons
   resident in its sovereign territory."

Founding on this principle, the judge concluded, ante, p. 491D–F:

   "As a matter of principle, in my view, if a United States court          D
   exercises jurisdiction over a person resident in the United States, it
   is exercising powers inherent in the sovereignty which adheres to
   the United States. As a matter of principle, too, in my view,
   English law should recognise the legitimacy of that exercise of
   jurisdiction. It follows that I agree with Mr. Morison that the
   answer to the question which I must answer does not lie in
   investigating the function discharged by the court but lies in           E
   investigating the source of authority of the court. Whatever the
   function of a federal district court in a diversity case, the source of
   its authority is to be found in the sovereign power which established
   it. For those reasons I conclude that the exercise of jurisdiction by a
   federal district court over a person resident in the United States is,
   by the standards of English law, a legitimate and not an excessive       F
   exercise of jurisdiction."

   Any attempt to weigh up the soundness of this or any other account
of the rules governing the recognition of foreign judgments should, as it
seems to us, begin with an exploration of the reasons why such
judgments are recognised at all. Unfortunately, the cases give virtually
no guidance on this essential question. Underlying it all must be some     G
notion of comity, but this cannot be comity on an individual nation-to-
nation basis, for our courts have never thought it necessary to investigate
what reciprocal rights of enforcement are conceded by the foreign
country, or to limit their exercise of jurisdiction to that which they
would recognise in others. The most one can say is that the duty of
positive law first identified in *Schibsby v. Westenholz,* L.R. 6 Q.B. 155,
must stem from an acknowledgement that the society of nations will          H
work better if some foreign judgments are taken to create rights which
supersede the underlying cause of action, and which may be directly
enforced in countries where the defendant or his assets are to be found.

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A   But this tells one nothing of practical value about how to identify the foreign judgments which have this effect.

One possibility is to explain the principle in terms of allegiance. This idea, of which traces are found in the earliest cases, may have provided at least a moral underpinning for the concept that a foreigner who has chosen to establish himself within the territory of a sovereign owes to him, in exchange for an obligation to ensure the stranger's personal

B   safety and well-being, a personal duty to pay the sovereign due respect, an obligation which involves an obligation to respect the sovereign's law as enforced by his courts. This concept may have served well enough in the case of an individual established in long-term residence, but the idea that the Dunlop Company, a foreign company of manufacturers, present in the United Kingdom for a few days only through having set up a stall

C   at an exhibition, thereby incurred a duty of fealty to the King-Emperor is surely fanciful.

Nor in our judgment can this concept be made to seem more persuasive by re-writing it in modern terminology. A foreigner who is physically present in a country does thereby acquire rights and duties expressed in terms of the local law, although not necessarily the same as those which apply to the local citizens; but these are not rights and

D   duties which in any sensible way can be described as arising reciprocally with the sovereign. The foreigner does not owe duties to the Queen, or to the United States of America. Rather, by making himself present he contracts-in to a network of obligations, created by the local law and by the local courts.

This is not to say that sovereignty is immaterial to the present problem, in the sense that an identification of the source from which the

E   local laws and the agencies which enforce them derive their powers must be part at least of the task of delineating the obligations, stemming from the judgments of those agencies, which a foreign court ought to regard as binding. Thus, we entirely accept the conclusion, flowing from the judge's premise, that if we had here been concerned with the enforcement of a judgment given by a state court in Texas, we should have been

F   obliged to have regard to the territory of Texas alone, so that if the judgment now in suit had been given (say) by a Texas Supreme Court sitting in Austin, it would not (on the hypothesis of Cape and Capasco's presence in Illinois) have been enforceable. For neither the states outside Texas, nor the federal organs established by or on the authority of the constitution, played any part in giving the State of Texas the right

G   and power to establish its own courts of local jurisdiction. But the converse need not be true. Merely to identify X as the ultimate law giver and creator of the agencies through which those laws are enforced, and then move on to the proposition that a judgment given anywhere in the territory governed by X against someone present anywhere else in those territories should be enforced by foreign courts, seems a large

H   step. Even today, Scotland and England are not the same jurisdictions, and if one looks to the past, it is hard indeed to acknowledge that in Imperial times, all persons present in one part of the Empire could properly be regarded as present everywhere else in the Empire, notwithstanding the immense variety of laws, courts and constitutional

554

Adams v. Cape Industries Plc. (C.A.)                    [1990]

systems which then prevailed, simply because as the ultimate source of power there was to be found a single sovereign. A

Another aspect of this idea is to be found in the functional test propounded by the judge. We take this to invoke an inquiry as to the task which the Tyler court was performing—a local or a national task. We would not dissent from this approach, but we would venture to ask whether the judge was not approaching it solely in terms of constitutional theory. Because Congress could have created a single "Federal Court" of which every court and every judge was a manifestation, it is assumed that this is what has really happened, notwithstanding the cessation of a state contribution in the sphere of substantive law and personal amenability to service. On the evidence, we cannot accept that this hypothesis is made out, any more than it is possible to say that the Queen in Parliament has chosen, whatever powers may exist in reserve, actually to give England and Scotland a unified judicial system applying a unified law. B

C

It is convenient to mention at this stage three suggested anomalies, relied upon as pointing to one answer rather than another. The first is that the need for the Tyler court in this case to have recourse to the Texan long-arm statute in order to entertain the suit demonstrates that the overseas defendants were not within the "country." We do not think that this helps. The use of the long-arm statute shows no more than we already know, namely, that the direct personal jurisdiction of a district court is not for American purposes recognised as extending beyond the boundaries of the state within which that particular court happens to sit. The same can be said of another apparent anomaly on which stress was laid, namely that, if the plaintiffs' submissions are correct, a judgment which would be unenforceable in some other state such as Illinois might nevertheless be effective to give recourse against the defendants' assets in England. We do not regard this as a surprising result, or one which points to any particular solution of the present problem, for if (contrary to the defendants' contentions) the whole of the United States is to be regarded as the territory within which the district court had jurisdiction, the infraction of what must on this view be regarded as an internal procedural rule is not something of which the English court should take account. D

E

F

The third suggested anomaly is this. On the judge's own analysis, the jurisdiction of the Texas State Court, as recognised by the English court, would not extend beyond the Texan borders. Thus if the judge's view is right, the enforceability of the judgment in a case such as this would depend upon whether the action was removed by the defendants into the district court: and this notwithstanding that the courts would sit in the same place and apply the same law. This is certainly a striking result, but it must we believe follow from any tenable view of the law. As we understand the arguments, Sir Godfray would have been disposed to accept that if there were a single federal court of unitary jurisdiction, applying a single law, a defendant could be present anywhere in the United States and still have the judgment enforceable against him: and we should ourselves be of this opinion. All this shows, however, is that a person may be present in two different "countries" at the same time. G

H

1 Ch.                        Adams v. Cape Industries Plc. (C.A.)

A    This is a good reason for discarding the word "country" as a useful test,
     and discarding with it the simple and attractive argument that the
     United States is a country, the Tyler court was a court of that country,
     the defendants were present in the United States, and hence they must
     necessarily have been within the jurisdiction of the country for the
     purpose of enforcement in England. Further than this, the argument
     does not run.

B         If these ideas are rejected as inconclusive, where should we look for
     the test? To our minds, the only way to find an answer is to consider
     why a person who goes abroad thereby incurs a duty to abide in
     England by a foreign judgment. The only reason that we can see is that
     by going to a foreign place he invests himself by tacit consent with the
     rights and obligations stemming from the local laws as administered by
C    the local court: those laws including, of course, the local rules on the
     conflicts of laws.

          Thus far we have experienced no great difficulty. What has raised
     very real problems is to apply the principle just suggested to the facts of
     the present case. It may be helpful to summarise the way in which the
     respective arguments might run.

D         For the defendants, one might begin with the example of a foreigner
     who has set himself up in Scotland. Such a person could properly be
     regarded as having done so, and having been allowed to do so, on terms
     that his rights and duties were to be governed by the laws of Scotland.
     But not by English law, or by decisions of the English courts, even
     though the latter might without procedural impropriety purport to
     exercise a jurisdiction over him. Equally, an Englishman who has gone
E    to live in France and engaged in transactions there, might find himself
     sued on those transactions in Texas. Any resulting judgment would be
     unenforceable here, not because the Texas court had broken its own
     rules, or indeed had broken any rules of international comity, but simply
     because the Englishman had done nothing to bring himself into a
     relationship with the court in Texas and the law which it administered.

F         Now if these examples are sound, they may be transformed into
     something nearer the present case. If the Englishman had established
     himself in Chicago, would he be treated as having put himself into a
     relationship with the State Court in Austin, Texas? Surely not, the
     defendants could argue. The fact that Chicago is in the United States
     does not make Texas any the less a foreign court for a resident in
     Illinois than if Chicago were in France; and the fact that the long arm of
G    the Texas court does not have to reach out to another continent should
     not make any difference. This would be so, the defendants could argue,
     even if the laws of Illinois and Texas were identical in the minutest
     respect; and on the evidence before us it seems that this is not so.

          Let us now make the one alteration necessary to bring the example
     home to the present case: namely by assuming the court in Texas to be
     a federal district court of the Tyler Division of the Eastern Division of
H    the State of Texas. This is not a state court, but (so the defendants can
     argue) a local court in a real sense, administering local law. The juridical
     identity of the Tyler court might have been different if those invested
     with constitutional powers had chosen to exercise them differently, but

556

we must take the facts as they are. On these facts, the defendants can A
submit, there was no sufficient connection between the defendants,
resident as for present purposes we assume they were in Chicago, and
the federal court in Tyler, to justify the inference that by establishing
their residence there they had consented to the administration of Texan
laws as administered by the Tyler court.

For the plaintiffs, two preliminary points may be made. In the first
place, the decision to join Cape as defendant in the proceedings in the B
Tyler court, as contrasted with the institution of separate proceedings
against Cape in a federal court in Illinois, was no doubt influenced by
the wish to rely upon the arguments about submission and consent,
based upon Cape's participation in the Tyler 1 proceedings (which
arguments were rejected by Scott J. and not renewed in this court). But
the joining of Cape in the proceedings in the Tyler court had, as we C
understand it, no other element of forum shopping about it: no
advantage was gained, or present to be gained, as to the substantive law
which would be applicable in proceedings in the Tyler court as compared
with that applicable in a federal court sitting in Illinois. The joining of
Cape in the Tyler court proceedings was, in short, a normal and
appropriate course of proceeding viewed solely from the point of view of
United States law, whether federal or state law. If a default judgment D
obtained in such circumstances is not enforceable according to our law it
is because the relevant rule of our law requires our courts thus to
discriminate between a judgment given in default by a federal district
court sitting in Illinois and a default judgment given by a federal district
court sitting in Texas.

Secondly, it is true that the definition of facts, which justified the E
taking by the Tyler court of in personam jurisdiction over any person or
corporation throughout the United States, which is said to constitute
legitimate jurisdiction for the purposes of our private international law,
would also justify the taking of jurisdiction over any person or
corporation outside the territories of the United States, which, as is
common ground, would not be regarded as a legitimate jurisdiction for
our private international law. Nevertheless, there seems no doubt that F
Congress has established a system of federal courts of which each one
has jurisdiction, in the terms defined by the various long arm statutes of
the forum states (where no specific federal statute provides otherwise) to
exercise in personam jurisdiction over any person or corporation present
in any state of the Union.

More detailed arguments available in support of the plaintiffs'
proposition may be summarised. G

(i) The concept of "contracting in" by presence means that, in the
unitary state, the foreign resident is put in the same position, whether
the visitor be an individual or a corporation, as any other person or
corporation within that state so far as concerns obligations enforceable
by in personam judgments (i.e. not including matters dependent upon
domicile as opposed to mere presence). H

(ii) Our law sets no standard with which the network of local law is
required to comply other than that of natural justice and public policy.
Within those limits, the foreign law, substantive and procedural, may be

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    harsh, antiquated and unskilfully operated by the foreign court but the
     foreign resident must put up with the consequences.

          (iii) Our law, faced with a federal system of two networks of local
     laws as administered by two sets of local courts, should, if it is to be
     consistent, favour that court which will leave the resident visitor in
     Illinois subject to the two local networks, both state and federal, to the
     same extent as any other resident of Illinois so far as concerns the
B    validity of judgments rendered in the courts of either system, unless
     there is some clear reason to do otherwise.

          (iv) The limitations of the federal judicial system as it has in fact
     been established, which cause the present system to fall short of a fully
     realised national judicial system, arise from the history and political
     principles which produced them. In other words, a national judicial
C    system has been devised and established in terms in accordance with the
     political and social views of the peoples of the states which form the
     Union. The checks and limitations are available for the protection and
     convenience of the foreign resident as much as for the resident citizen.

          (v) In particular, the decision that federal courts shall apply the law
     of the forum state does not necessarily alter the fact that the federal
     court, in so doing, is doing what it is commanded to do by federal law.
D    Equally, the fact that choice of law rules are not the same in all of the
     states, does not necessarily alter the fact that the Supreme Court of
     Congress, as the effective authority under the Constitution, has directed
     or caused federal courts to continue to apply local choice of law rules as
     the law to be applied to cases in the national courts.

          (vi) Finally, if in personam jurisdiction is given by United States law
E    to federal courts to be exercised, within the circumstances stated, over
     any person or corporation present within the territories of the United
     States, the effectiveness of that jurisdiction for the purposes of our
     private international law, is not necessarily reduced by the fact that the
     jurisdiction is expressed in terms of and limited to the long arm
     jurisdiction statutes of the forum state. There is no reason to regard the
     in personam jurisdiction of the federal court of any federal state as
F    necessarily impaired, or as relegated to a local status within one state of
     the Union, because the federal authorities have seen fit so to express
     and limit that jurisdiction.

          We have set out the facts and arguments on the country issue at
     some considerable length, notwithstanding that our conclusion on the
     presence issue is sufficient to dispose of the appeal, because they serve
     to illuminate a question of general importance which may well arise for
G    decision in the future. In the event, as we have said, it is unnecessary to
     express a final decision on the country issue and in all the circumstances
     we think it better not to do so. All we should say is that we all incline to
     favour, albeit with varying degrees of doubt, the view that if the
     plaintiffs had not failed at the first hurdle, they would on the country
     issue have been entitled to succeed.
H

                    IV *The natural justice issue*

          The assumptions upon which we consider this defence are that our
     decision on the presence issue is wrong and that the assumed presence

558

of Cape/Capasco in Illinois at the commencement of the Tyler 2    A
proceedings rendered them subject to the jurisdiction of the Tyler
court in those proceedings for the purpose of our law of enforcement of
foreign judgments.

The conclusion of Scott J. on the issue of natural justice was
expressed, ante, p. 500G–H:

"There was, in short, in my opinion, no judicial assessment of    B
damages. In my judgment, the procedure adopted by Judge Steger
offended against English principles of substantial justice. The
defendants were entitled to a judicial assessment of their liability.
They did not have one. The award of damages was arbitrary in
amount, not based on evidence and not related to the individual
entitlements of the plaintiffs. Many of the features of the procedure
to which I have drawn attention might, taken simply, have been    C
insufficient to meet the yardstick of substantial injustice. Taken
together, the criterion is, in my judgment, satisfied."

The facts relevant to the defence of breach of natural justice were
stated in detail by Scott J. and no issue of primary fact has been raised
by either side. [Their Lordships referred to the material facts concerning
the procedure which led to the default judgment of 12 September 1983,    D
substantially in the words of Scott J., and continued:]

*The law applied by Scott J.*

In the view of Scott J. the fundamental criterion for the success of a
natural justice objection to the enforcement of a foreign judgment was
to be found in the judgment of Lindley M.R. in *Pemberton v. Hughes*    E
[1899] 1 Ch. 781, 790, where he said:

"If a judgment is pronounced by a foreign court over persons within
its jurisdiction and in a matter with which it is competent to deal,
English courts never investigate the propriety of the proceedings in
the foreign court, unless they offend against English views of
substantial justice. Where no substantial justice, according to English    F
notions, is offended, all that English courts look to is the finality of
the judgment and the jurisdiction of the court, in this sense and to
this extent—namely, its competence to entertain the sort of case
which it did deal with, and its competence to require the defendant
to appear before it. If the court had jurisdiction in this sense and to
this extent, the courts of this country never inquire whether the
jurisdiction has been properly or improperly exercised, provided    G
always that no substantial injustice, according to English notions,
has been committed."

Thus in the opinion of Scott J. if the natural justice objection were
to succeed, the proceedings in the foreign court must "offend against
English views of substantial justice:" ante, p. 497F–G. With reference to
that broad criterion he considered the procedure which led to the    H
default judgment of 12 September 1983. The route which led him to his
conclusion on this issue was very briefly as follows: (i) Cape/Capasco
were in default and had forfeited any entitlement to a hearing save on

1 Ch.                     Adams v. Cape Industries Plc. (C.A.)

A   the issue of damages. There was no injustice in that. (ii) Cape/Capasco
were given sufficient notice of the application for the default judgment
but the application for relief of which notice was given was for a judicial
assessment of damages at a judicial hearing. (iii) The effect of the notice
given to Cape/Capasco could not be divorced from the context of the
Federal Rules for default judgments. Having regard to that context a
defendant in default in an action for unliquidated damages in the Tyler
B   court was entitled to expect that his liability to the plaintiff would be
assessed by the judge in the light of evidence which the judge had
considered and which, in the judge's opinion, justified the award which
was made: ante, p. 500A–B.

C   (iv) "The requirements of substantial justice in a particular case
cannot . . . be divorced from the legitimate expectation of both the
plaintiff and the defendant in the context of the procedural rules
applicable to the case:" ante, p. 500B

(v) Since there was no judicial assessment of the damages the
proceedings offended our principles of substantial justice: ante, p. 500D.
(vi) The fact that the default judgment might have been set aside on
D   application to the judge, or an appeal, because of the breaches of local rules
of procedure, did not as a matter of principle make the judgment enforceable
notwithstanding the breach of natural justice: ante, p. 501c–E.


*Principles not in issue on this appeal: some general observations*

E       In the context of the natural justice issue certain principles are
common ground and appear to us to be indisputable. The first is that,
upon proof of private international law jurisdiction in the Tyler court,
Cape/Capasco would have come under an obligation to obey that
judgment unless they should be able to impeach it on the ground of
fraud, or breach of natural justice, or breach of the requirements of
public policy. For the proof of these grounds of defence, all are to be
F   judged in the courts of this country according to the law in force in
England and Wales and to the principles of that law. Further, whether
any alleged breach of natural justice based on procedural irregularity is
such as to render the foreign judgment unenforceable, the courts of this
country must have regard to fundamental principles of justice and not to
the letter of the rules which, either in our system, or in the relevant
foreign system, are designed to give effect to those principles.
G       The basis of the obligation, which our law would enforce against
Cape/Capasco upon proof of jurisdiction in the Tyler court, is that,
because Cape/Capasco were present within the territorial jurisdiction of
that court at the date of service of the proceedings, the command
contained in the document or process served upon them is regarded by
our law as validly and effectively made. It would regard Cape/Capasco
H   as obliged to make such answer as they could put forward against the
claims of the plaintiffs, and to make it in the Tyler court. If they chose
not to make any answer, they would not be permitted to dispute in our
courts the judgment of the Tyler court *upon the merits*. Subject to the

560

defences of fraud, breach of natural justice, and public policy,    A
Cape/Capasco would be liable upon the judgment.

It is clear that a corporate defendant, and those called upon to
advise it, may thus be placed in great difficulty by the working of our
rules of private international law. The directors of a defendant
corporation may reasonably believe, upon competent advice, that the
corporation was not, at the date of service of the proceedings present
within the jurisdiction of the foreign court. If they are right, they can    B
safely ignore the proceedings so far as concerns the assets of the
corporation within the jurisdiction of our courts. If they are wrong—and
the judgments of Scott J. and of this court show that the question may
be of considerable complexity—they may be sued in this country upon a
judgment which cannot be questioned as to the merits and substance of
the decision upon which the judgment is based. In particular, with    C
reference to the quantum of a judgment, whether for damages for tort
or for breach of contract, the corporate defendant is placed in difficulty.
Not infrequently plaintiffs, who are claiming damages, exaggerate their
injuries and their losses. When the defendant does not appear, and no
evidence is presented to answer the plaintiff's case, the court, which has
the task of assessing damages, can normally do no more than consider
the evidence put before it and base the assessment upon that evidence.    D
In adversarial systems, the court cannot normally do more in investigation
of the claims, or call for further evidence, and it is under no obligation
to do so. In particular, according to our law, a defendant corporation
which denies that it is subject to the jurisdiction of the foreign court,
could not effectively continue to dispute that jurisdiction while taking
part in the assessment of a damages claim because, if it did so take part,    E
it would thereby normally submit to the jurisdiction of the foreign court
and render itself liable to be sued in this country upon that judgment. In
the result, if the corporation is to be able effectively to maintain its
contention that it was not subject to the jurisdiction of the foreign court,
it must leave the plaintiff there to present a wholly uncontested claim
(as the defendants did in the present case). It will have no defence to an
action upon the ensuing judgment, if it is held by the courts of this    F
jurisdiction to have been in fact subject to the jurisdiction of the foreign
court, unless it can rely upon fraud, breach of natural justice or public
policy.

The plaintiff, too, in such a case may face the risk of an unjust
result. The defendant may have no answer on the merits to the plaintiff's
claim, and the judgment as entered in default may be in amount wholly    G
in accordance with substantial justice. Yet if, through no personal fault
of the plaintiff, the defendant can point to a sufficient breach of our
principles of natural justice simply in the procedure by which the
judgment was obtained, the plaintiff can recover nothing on the
judgment. He may, if the procedure of the foreign court permits him to
do so, start again at some point in the existing proceedings and continue
in a way which avoids the procedural defect. If the wrong is actionable    H
in this country, and the claim is not statute-barred here, he could sue
here. What he cannot do is to enforce the foreign judgment here to the
extent that it is unobjectionable and claim the assistance of our courts as

A    to the rest, unless, perhaps, some part of the judgment is clearly severable and unaffected by the defect in procedure. Thus, in these proceedings, upon the assumption that Cape/Capasco were present within the jurisdiction of the Tyler court, it would not be open to this court to enter judgment for the plaintiffs for damages to be assessed under the procedures of our court, although such an order would, if the plaintiffs cannot effectively start again in the Tyler court, get closer to substantial justice than dismissal of their claims. Nor was it suggested

B    that this court could direct that judgment be entered for the plaintiffs on liability, with a direction that the plaintiffs be at liberty to apply to enter judgment for such amount as may hereafter be assessed by the Tyler court. These are partial or alternative remedies which could only be provided by the terms of a statute, presumably to be based upon a treaty or convention. The position therefore is that, if through the

C    adoption of the procedure by which Judge Steger directed judgment to be entered for these 206 plaintiffs, there occurred a denial of the requirements of substantial justice, the plaintiffs would fail entirely although (as we assume for present purposes) Cape/Capasco were properly subject to the jurisdiction of the Tyler court. If, on the other hand, there was no such denial according to the established principles of

D    our law, then Cape/Capasco (on the same assumption) would be held liable for the full amount of the judgment notwithstanding the forceful objections of Cape/Capasco to the manner in which the Tyler court left so much of the assessment of the plaintiffs' claims to counsel acting for those plaintiffs.

E    *The plaintiffs' submissions on natural justice*

        Mr. Falconer's submissions for the plaintiffs may be summarised as follows.

        1. The natural justice defence has been limited by authority binding upon this court to lack of notice and denial of proper opportunity to be heard: see *Jacobson v. Frachon* (1928) 138 L.T. 386. The underlying

F    basis or reason for this limitation is that our law requires only that the judgment debtor be afforded by the foreign court a fair trial or the opportunity for a fair trial if the defendant chooses to take it. If the defendant is shown to have been deprived irremediably of a fair trial then the judgment is unenforceable here.

        2. The defendant will be held to have been irremediably deprived of a fair trial by reason of defective procedure in two cases: (i) if the rules

G    of procedure of the foreign court are themselves by our standards unfair, because, in that case, there can be no prospect of the foreign court correcting what has been done under its rules; and, (ii) if the rules of procedure of the foreign court are by our standards fair; and the defective procedure was caused by departure from those rules, but it is impossible or impracticable for the defect to have been corrected within

H    the foreign system: e.g. because the defendant only learned of the judgment too late to advance an effective appeal or procedure for setting the judgment aside.

        3. If the procedural defect was reasonably capable of remedy within the procedure of the foreign court, whether by application to set aside

562

the judgment, or by appeal, the defendant is not released from the      A
obligation to obey the judgment by reason of the procedural defect
because, being subject to the jurisdiction of the foreign court, he may
properly be required to have resort to the remedies provided by the
foreign system.

4. The basis and substance of those submissions for the plaintiffs
were said to be in accordance with justice, with practicality and with the
principles of our law in that (i) our law recognises that all courts make      B
procedural mistakes: the fact that a mistake is made, for which the
foreign court's procedure provides a remedy, should not release the
defendant who chooses not to avail himself of the remedy; (ii)
the argument is based upon the connection between the foreign court
and the defendant created by the voluntary act of the defendant in being
present within the foreign jurisdiction, or by submission thereto, etc.;      C
(iii) it is desirable that our courts should not be required to act as a
court of error for the examination and assessment of procedural defects
within the foreign system for which that system provides an effective
remedy; (iv) the submissions provide a framework of reasonable certainty
and clarity for the decision of pleas of breach of natural justice. By
contrast, the "broad criterion" applied by the judge, is too wide and too
uncertain a test.      D

5. The reliance placed by Scott J. on "legitimate expectation" was
unjustified. There had been no actual expectation on the part of
Cape/Capasco nor any reliance upon any expected form of procedure.
Nothing to that effect had been pleaded or proved. This concept of
legitimate expectation amounted, it was said, to no more than the
assertion that a defendant is entitled to expect that, in the conduct of      E
the proceedings in the foreign court, that court will correctly apply its
own procedure and that, if it does not, a sufficient breach of natural
justice is demonstrated. (We will refer to the submissions summarised in
this paragraph as "the legitimate expectation point.")

6. Upon the evidence and upon the findings of Scott J. the procedural
rules applicable in the Tyler court were fair and just. The defendants
could have applied to set aside the judgment on the grounds that the      F
procedure for the assessment of damages was irregular under the
relevant rules and such application would have been allowed if made in
due time. Further, an appeal to the Circuit Court was open to
Cape/Capasco. Since they took no step to correct the procedural defect,
and the consequences of it, they cannot rely upon it as a defence in
these proceedings.
      G

*The defendants' submissions on natural justice*

To these submissions Mr. Playford for Cape/Capasco replied by
contending that Scott J. was right in his conclusion for the reasons which
he gave. Further, if it should appear to this court that the defendants
could not impeach the judgment on the ground of a procedural defect
which was capable of remedy within the system of the federal courts,      H
then it was said that the defendants did not know in time of the
procedural defects and could not reasonably be required or expected to
have sought such remedy there.

A    *The decision in Jacobson v. Frachon*

A number of decisions were cited to us in the context of the natural justice issue. However, the most important of them was *Jacobson v. Frachon*, 138 L.T. 386, because it was said on behalf of the plaintiffs to establish legal principles which are binding on this court and render the natural justice defence unsustainable on the present facts by limiting that

B    defence to lack of notice and denial of proper opportunity to be heard. Furthermore, it was common ground that this is the only case in which the Court of Appeal has considered points relevant to the questions raised in this case under the heading of the natural justice issue.

In *Jacobson v. Frachon*, this court applied rigorously the principle that our courts will not impeach the judgment of a foreign court having competent jurisdiction on its merits. However, the crucial passage in

C    that case particularly relied upon by Mr. Falconer was a statement of Atkin L.J., who, after referring to the judgment of Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, said, at p. 392, that a judgment could be impeached "if the proceedings, the method by which the court comes to a final decision" are contrary to English views of substantial justice, and continued:

D    "The Master of the Rolls seems to prefer, and I can quite understand the use of the expression, 'contrary to the principles of natural justice;' the principles it is not always easy to define or to invite everybody to agree about, whereas with our own principles of justice we are familiar. *Those principles seem to me to involve this, first of all that the court being a court of competent jurisdiction, has*

E    *given notice to the litigant that they are about to proceed to determine the rights between him and the other litigant; the other is that having given him that notice, it does afford him an opportunity of substantially presenting his case before the court.* Both those considerations appear to be essential if they are to be in accordance with natural justice." (Emphasis added.)

F    We have had the benefit of very careful and detailed analyses in argument of the judgments in *Jacobson v. Frachon*. We intend no disrespect to such arguments if we do not prolong an already very long judgment (in which we have already decided that the defendants succeed on the presence issue) by recapitulating these analyses. We will summarise our conclusions in relation to *Jacobson v. Frachon*, 138 L.T.

G    386, as follows.

(1) Atkin L.J. in his judgment was not attempting to make an exclusive or comprehensive statement of the circumstances in which our courts will treat the procedure adopted by a foreign court in reaching its decision as offending against the principles of natural justice.

(2) Lord Hanworth M.R. was clearly of the view, at p. 390, which we share, that the requirements of due notice and proper opportunity to

H    be heard will, in the majority of cases which can be expected to arise, sufficiently comprise the concept of natural justice in a procedural context, but he prudently qualified his statement by saying that they "almost, if not entirely" comprise it.

564

Adams v. Cape Industries Plc. (C.A.)                [1990]

(3) We therefore reject the contention that the decision of this court        A
in *Jacobson v. Frachon* restricted the defence of breach of procedural
natural justice to the requirements of due notice and opportunity to put
a case. Scott J. was entitled, in our view, to direct himself by reference
to the test stated by Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch.
781, 790, and to consider whether the procedural defect alleged by Cape
was such as to constitute a breach of an English court's views of
substantial justice. The point was not concluded against the defendants        B
merely because they had been given proper notice of the application for
default judgment and would, if they had attended, have been allowed
full opportunity to put their case.

(4) However, this court in *Jacobson v. Frachon*, 138 L.T. 386, was
not required to consider the relevance, if any, of any remedy which
might have been available to Jacobson under the French legal system,            C
whether by way of appeal or by application for the judgment to be set
aside, if the hearing in the French court had itself constituted a breach
of natural justice.


*"No judicial assessment of damages"*

The next question is whether, as Scott J. considered, the "method by           D
which the Tyler court came to its final decision," to use Atkin L.J.'s
words, was contrary to our views of substantial justice on the grounds
that there had been no judicial assessment of damages.

We have found this to be a matter of difficulty. We have, although
well aware of its limited nature, some general knowledge of the working
of the system of civil justice in the federal courts of the United States;     E
and we are aware that it is a system which has been developed by
judges of great distinction and learning, and subjected to continuous and
searching examination and comment both by the legal profession and by
academic lawyers of similar distinction and learning. Scott J. expressed
his view that the system of civil justice evidenced by the Federal Rules
and explained by the witnesses was an unimpeachable system of justice
within one of the great common law jurisdictions of the world and was          F
plainly in accordance with the requirements of natural justice. We make
the same respectful acknowledgement. But, as Scott J. pointed out, the
defendants made no criticism of that system of justice. Their complaint
was that, at the invitation of the plaintiffs' counsel, Judge Steger did not
proceed in accordance with it.

We recognise, further, that the federal courts have been required to           G
determine, and to develop methods for the effective control and
management of, civil litigation in product liability cases in which large
numbers of plaintiffs have made claims against numerous defendants
arising out of similar classes of injury and having broadly similar
consequences but with differing degrees of severity. We have had some
experience in this country of such litigation but in smaller volume. Our
own procedures have to an extent been modified to deal with the                H
preparation and settlement of such cases but we have not, to the same
extent, developed the techniques of a class action or the role of the
judge in procuring settlements. We are aware that our present system

565

A    has been subjected to criticism in having failed, as it has been said, to respond sufficiently to the requirements of such litigation.

The circumstances of 206 plaintiffs making claims based upon a common cause of injury were, as it seems to us, directly relevant to the method of decision adopted by Judge Steger without objection by the plaintiffs' counsel. The purpose was, as we infer, to avoid the private costs and public expenditure of court time which would have been

B    necessary if there had been either individual judicial assessments or judicial assessment by reference to groups based upon evidence directed to the individual cases. The method was adopted for proper purposes. We accept, as submitted by Mr. Falconer, that Judge Steger had knowledge and experience of Mr. Bailey and the other counsel and that Judge Steger must have reposed trust in those counsel to act properly in

C    the matters left by the judge to them. Mr. Falconer submitted that there was nothing inherently objectionable, according to our standards of substantial justice, in a court leaving to the plaintiffs' lawyers the fixing of figures for individual plaintiffs after the court has indicated an average basis of award for all plaintiffs.

In reply to that contention Mr. Playford pointed out that the indication by Judge Steger of an average basis of award for all plaintiffs

D    was based on nothing in the way of evidence as to the fair sums due for compensation for any of them. It may be that an average figure for settlement of such claims was known by the judge to be $75,000 but that provided no basis for a holding that the condition of these 206 plaintiffs was such as to justify a total award of $15.45m. or any other total award. If the judge had had before him, and had considered, evidence,

E    perhaps from one expert, to the effect that, by reference to the listed apparent injuries suffered by the plaintiffs, they properly belonged in certain categories of gravity of injury; and if he had, by reference thereto, estimated a figure for general damages for each category; and, then, by reference to the numbers of plaintiffs in each category calculated a total award which would be fair to the defendants, we could see no valid objection, which the defendants could have put forward, if the

F    judge had then left it to plaintiffs' counsel to allocate precise sums within the total award to individual plaintiffs. But we agree with Mr. Playford's submission that that was not what happened. The defect in the procedure adopted was, as Scott J. found, that the total award was not in any real sense based upon an objective assessment by the judge upon evidence as to the condition of these plaintiffs.

G    It seems to us that, in truth, Judge Steger was applying to the process of assessment of damages in default, when only the plaintiffs were represented before him, the process and technique appropriate to a settlement negotiated between both the plaintiffs and defendants with the intervention of the judge. If we understand the position properly, the only basis upon which Judge Steger, as the judge responsible for assessment of the damages, could assert, without knowledge of the

H    evidence relating to the 206 plaintiffs, that $120,000 average, $24.72m. total, was too high a figure, and that $75,000 average, $15.45m. total, was a proper figure, was that, if the defendants had been present and taking part, they would in probability have refused to settle for $24.72m.,

566

so as to avoid the risk of having to pay more after individual assessment,   A
but would, in probability, have agreed to pay $15.45m. so as to avoid
that risk. If that was the basis of his decision, there is nothing to show
that he was in fact wrong upon the hypothesis upon which he acted and
nothing to show that he was right; but, as Scott J. observed, ante,
p. 56xxx, while damages calculated on an average per plaintiff basis may
make very good sense for the purposes of a settlement, because           B
defendants are not concerned with how the total will be divided up, a
judicial award so calculated is the antithesis of an award based upon the
individual entitlements of the respective plaintiffs.

   Mr. Playford referred us to authority in order to demonstrate what
he said should be regarded as the essential requirements of a court
"acting judicially," and, in support of the proposition that it is part of
the requirements of natural justice that the judgment of a foreign court,   C
which is rendered for enforcement, be reached by that court "acting
judicially." He referred in particular to *Local Government Board v.
Arlidge* [1915] A.C. 120 and in particular to passages in the speech of
Viscount Haldane L.C. at p. 132, of Lord Shaw of Dunfermline, at
p. 138, of Lord Parmoor, at p. 142, and of Lord Moulton, at p. 150.
That case was concerned with the validity of a closing order under
section 17 of the Housing, Town Planning etc. Act 1909 and with the      D
procedure on appeal to the Local Government Board. An example of
the statements relied upon is that of Lord Parmoor, at p. 142:

     "Whether the order of the Local Government Board is to be
     regarded as of an administrative or of a quasi-judicial character
     appears to me not to be of much importance, since, if the order is
     one which affects the rights and property of the respondent, the   E
     respondent is entitled to have the matter determined in a judicial
     spirit, in accordance with the principles of substantial justice."

   In our view, no significant assistance is to be derived from this case,
or other decisions upon the requirements of natural justice in
administrative law cases, where the requirements of substantial fairness
depend upon the subject matter and the context. It is sufficient, in our   F
view, to derive the requirements of natural justice for the purposes of
enforcement of a foreign judgment and the special defence thereto of
breach of natural justice from the principles stated in *Pemberton v.
Hughes* [1899] 1 Ch. 781 and relied upon by Scott J., namely: did the
proceedings in this foreign court offend against our views of substantial
justice?
   The notion of substantial justice must be governed in a particular   G
case by the nature of the proceedings under consideration. The purpose
of an in personam monetary judgment is that the power of the state
through the process of execution will take the defendant's assets in
payment of the judgment. In cases of debt and in many cases of contract
the amount due will have been fixed by the acts of the parties and in
such cases a default judgment will not be defective for want of judicial   H
assessment. When the claim is for unliquidated damages for a tortious
wrong, such as personal injury, both our system and the federal system
of the United States require, if there is no agreement between the

A    parties, judicial assessment. That means that the extent of the defendant's obligation is to be assessed objectively by the independent judge upon proof by the plaintiff of the relevant facts. Our notions of substantial justice include, in our judgment, the requirement that in such a case the amount of compensation should not be fixed subjectively by or on behalf of the plaintiff.

B    We do not find it necessary to decide whether, if the local rules provide for service by the plaintiff of notice of a specific sum claimed for damages, a default judgment may be entered for such a sum without proof of judicial assessment and without there being breach of any requirement of natural justice. Scott J. thought that there could be no objection to such procedure and we think that in most cases that would be right. The matter does not arise for decision in this case and we express no concluded view. We would however not exclude the possibility

C    of a defence being upheld if the facts justified the conclusion that, making due allowance for different levels of awards and of substantive law, the amount of the actual award was irrational.

Mr. Falconer relied upon Scott J.'s finding that there would be no breach of natural justice in proceedings for a default judgment for unliquidated damages if judgment were entered for the specific sum claimed by the plaintiff. It was submitted that such a claim had in effect

D    been made by the 205 plaintiffs in these proceedings because their pleading placed a limit upon the damages claimed in the sum of $100m. We see no force in that point. The maximum of $100m. would, as we understand it, prevent the court from entering judgment for any larger sum but there is nothing to show that the limit was intended to mean, or

E    would be understood by any person familiar with procedure in the federal courts as meaning, that the $100m. represented a sum which the plaintiffs asserted to be the total of their estimated claims and for which the court would be empowered to give judgment without proof of the amount of injury and loss suffered.

*The "legitimate expectation" point*

F    At first sight there appeared to us to be some force in Mr. Falconer's criticism of the relevance of this concept in this case. It was accepted by Mr. Playford that reliance by the defendants had not been pleaded or proved with reference to any subjective expectation on their part that the assessment of damages on the application for the default judgment would proceed according to any particular method. We would also

G    accept that the adoption of a particular method of assessment of damages by the foreign court, would not per se amount to an effective defence, as a breach of natural justice under our law, merely because it was shown that, by reference to the procedural rules of the foreign court, the defendant might (on an objective basis) reasonably have expected that a different method would be used. So to hold would be to

H    introduce, under the concept of reasonable expectation, a rule that breach by the foreign court of its own rules of procedure renders the foreign judgment unenforceable as offending our concepts of substantial justice. It is clear law that mere procedural irregularity, on the part of the foreign court and according to its own rules, is not such a ground of

568

defence. *Pemberton v. Hughes* [1899] 1 Ch. 781 itself was an example of    A
mere procedural irregularity.

In our view, however, Scott J. did not so regard or use the point of
reasonable expectation. He made reference to it in dealing with the
question whether what had happened amounted to a breach of the
requirements of substantial justice, and after reference to the fact that
the rules of a court might, in his view, without offending those    B
requirements, provide for the giving of notice of the plaintiffs' estimate
of the recoverable damages and the entry of a default judgment for that
amount in the absence of opposition on the part of the defendant. The
question was to be decided, in the view of Scott J., by reference to the
context in which the alleged procedural defect had occurred. He was, in
our view, not in error in this regard. The fact was that the system of
legal procedure in which Judge Steger had signed the default judgment    C
had not contained any provision for converting an unliquidated damages
claim to a potentially fixed sum for the entry of a default judgment. His
reference to the fact that the defendant in a default action was entitled
to expect that his liability to the plaintiff would be assessed by the judge
on the evidence was not a reference to actual expectation on the part of
these defendants but to the requirements of natural justice against the
background of a system which contains no such provision.    D

We therefore conclude that the defendants have demonstrated, as
Scott J. held, that the method by which Judge Steger came to a decision
as to the amount of the default judgment was by itself contrary to the
requirements of substantial justice contained in our law. If that fact is
regarded as a sufficient and conclusive description of the proceedings of
the Tyler court then, according to the judgment of Atkin L.J. in
*Jacobson v. Frachon*, 138 L.T. 386, 390, that finding would serve to    E
invalidate the judgment. But, as noted above, the Court of Appeal in
*Jacobson v. Frachon* was not required to consider whether, as Mr.
Falconer submits, an opportunity to correct such a defect, provided by
the foreign system of procedure, may either cause such a defect to cease
to be in our law an effective breach of natural justice or, if there is any
difference, cause the defendant to be unable to rely upon it for purposes    F
of impeaching the judgment.

*Requirement of use of remedy in foreign court*

Mr. Playford submitted that proof of this defect in the proceedings of
the Tyler court is a conclusive defence for the defendants, and he
submitted that it is just that it should be so. It is not exorbitant, he said,    G
to require that a default judgment, designed and intended for enforcement
in this country, should comply with so basic a principle as that the
amount of a judgment for personal injuries be fixed in substance by the
court upon the evidence and not in substance by the plaintiff. No
authority establishes, he said, the requirement of use by a defendant of
any local remedy.

We accept that no authority binding this court has been cited to us    H
establishing the proposition for which Mr. Falconer has contended. It is
at least clear that our law does not oblige a defendant who can show
that a foreign judgment has been obtained by fraud to have used any

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    available remedy in the foreign court with reference to that fraud if he is successfully to impeach that judgment in our courts: see *Abouloff v. Oppenheimer & Co.* (1882) 10 Q.B.D. 295 and *Jet Holdings Inc. v. Patel* [1990] 1 Q.B. 335. The position may well be the same in cases where there has been a breach of natural justice of the two primary kinds considered by Atkin L.J. in *Jacobson v. Frachon,* 138 L.T. 386, 392, namely, absence of notice of the proceedings or failure to afford the

B    defendant an opportunity of substantially presenting his case.

     In this judgment, however, we are dealing with a case where, although there was in our view a departure from the basic principles of natural justice in the assessment of the amount of a default judgment, nevertheless (a) the error which led to this departure was an honest error on the part of all concerned; (b) the defendants had proper notice

C    of the proceedings and could have presented their case on its merits if they had chosen to do so, but chose not to do so; (c) the procedural rules applicable in the Tyler court were themselves fair and just; (d) the defendants had the right to apply to set aside the judgment on the grounds that the procedure for the assessment of damages was irregular under the relevant rules and such application would presumably have been allowed if made in due time.

D    Against this background, we are not persuaded that possession of and failure to exercise this right by the defendants can be disregarded as being wholly irrelevant in determining whether the proceedings in the Tyler court, which we think must be viewed as a whole, offend against English views of substantial justice, within the principles stated by Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, as the

E    plaintiffs would submit.

     It is well established that a defendant, shown to have been subject to the jurisdiction of a foreign court, cannot seek to persuade our court to examine the correctness of the judgment whether on the facts, or as to the application by the foreign court of its own law or, when relevant, of the law of this country. A foreign judgment is not impeachable merely because it is "manifestly wrong:" *Godard v. Gray,* L.R. 6 Q.B.

F    139; *Castrique v. Imrie* (1870) L.R. 4 H.L. 414 and *Robinson v. Fenner* [1913] 3 K.B. 835, 842. In any such case it could be said that there has been a breach of natural justice, but it is not a type of breach which our courts will consider relevant. In effect, their attitude is that the only way in which the defendant can seek to correct an error of substance made by the foreign court is by using such means for correction of error as

G    may be provided under the foreign system.

     This being the position where there has been an error of substance, it would, in our judgment, be anomalous if our courts were obliged wholly to disregard the existence of a perfectly good remedy under a foreign system of procedure in considering whether the defective operation of that procedure has led to a breach of natural justice. And, indeed, from some of the cases on procedural defects, support can be

H    derived from the proposition that, at least with reference to defects known to the defendant before judgment, the defendant can be required to have made use of any remedy available in the foreign court: see, for example, *Reynolds v. Fenton* (1846) 16 L.J.C.P. 15 and *Crawley v.*

570

*Isaacs* (1867) 16 L.T. 529, see particularly at p. 531, where Bramwell B.    A
said (obiter):

> "If the proceedings be in accordance with the practice of the foreign
> court, but that practice is not in accordance with natural justice, this
> court will not allow itself to be concluded by them, but on the other
> hand, if the procedure be in accordance with natural justice, the
> foreign court itself will interfere to prevent the plaintiff taking    B
> advantage of the judgment irregularly and improperly obtained."

Mr. Falconer relied strongly not only on that passage but on dicta of
Fry J. in *Rousillon v. Rousillon,* 14 Ch.D. 351, 370, and of Bray J. in
*Jeannot v. Fuerst* (1909) 100 L.T. 816, 818.

Since the ultimate question is whether there has been proof of
substantial injustice caused by the proceedings, it would, in our opinion,    C
be unrealistic in fact and incorrect in principle to ignore entirely the
possibility of the correction of error within the procedure of a foreign
court which itself provides fair procedural rules and a fair opportunity
for remedy. The court must, in our judgment, have regard to the
availability of a remedy in deciding whether in the circumstances of any
particular case substantial injustice has been proved. However, the
relevance of the existence of the remedy and the weight to be attached    D
to it must depend upon factors which include the nature of the
procedural defect itself, the point in the proceedings at which it occurred
and the knowledge and means of knowledge of the defendants of the
defect and the reasonableness in the circumstances of requiring or
expecting that they made use of the remedy in all the particular
circumstances.    E

We return then to the circumstances of this case, of which the most
relevant seem to us to be the following. First, the defendants who, for
present purposes, we assume were subject to the jurisdiction of the
Tyler court, were duly served with the proceedings; they chose to take
no part in them; they were given notice of the application for the default
judgment; they chose not to attend the hearing of that application; and
they were thereafter served with the default judgment.    F

Secondly, on service of the judgment, the defendants knew the
amount of the award to each plaintiff. It seems that they could have
obtained access to the medical records as to each plaintiff referred to in
the judgment, and advice as to the question whether, upon such
material, the awards appeared excessive according to the law in the
Tyler court.    G

Thirdly, by not attending the application for the default judgment,
the defendants deprived themselves of information as to what occurred
before the court. If they had attended before Judge Steger, the nature
of the proceedings would have been largely apparent. The proceedings
took place in public before the judge, and, at least so far as concerned
the facts that there was no evidence received by the judge in court on
the hearing and no arguments presented to the court, the defendants    H
would have discovered those facts.

Fourthly, it would have been open to them to apply for the judgment
to be set aside if they had formed an intention to contest the amount of

1 Ch.                Adams v. Cape Industries Plc. (C.A.)

A    the awards. It seems to us to be probable at least that, since the method
of assessment adopted by Judge Steger was contrary to the Federal
Rules, an application of this nature made promptly to the Tyler court
would have succeeded.

Fifthly, however, the defendants, when the judgment was served
upon them, could not and did not know the method by which damages
had been assessed from anything stated in the judgment. The recitals in
B    the judgment were, as Scott J. held, false and misleading: there had
been no hearing at which damages had been assessed. The facts as to
what happened in the Tyler court became known to the defendants at
latest when evidence was given in the proceedings before Scott J. There
was, as we understand it, no evidence from the defendants directed to
the question when they first had knowledge of the method adopted by
C    Judge Steger for assessing damages. There is, however, nothing to
indicate that they were aware of the method adopted at any time before
the date when, after claims were made on them in this country on the
basis of the default judgment, the circumstances in which the judgment
was made were investigated for the purposes of these proceedings.

D    *Conclusion on the natural justice issue*

Giving full force to all these facts, we find it impossible to say that,
because the defendants did not apply to set the default judgment aside,
they could not rely upon the substantial injustice in the proceedings
constituted by the failure of the court to assess the damages judicially upon
the evidence. They did not wish to dispute the amount of the damages
E    award by presenting a case to the Tyler court. We cannot have regard, as
an excuse available to them, to the reason why they chose not to appear,
namely their unwillingness to submit to the jurisdiction of the Tyler court.
However, it cannot, in our view, be required of them that they should
have applied to the Tyler court to contest the amount of damages awarded
when they were necessarily content to leave the amount of the damages to
be assessed by the court. The only complaint which the defendants could
F    thereafter make would be as to procedural irregularity. As to that, as we
have stated, they had at the time of service of the judgment no knowledge.
The defendants were not told before the application for the default
judgment that plaintiffs' counsel intended to invite Judge Steger to accept
the view of plaintiffs' counsel as to the total value of the claim, based upon
an average of $120,000 per plaintiff, and that the plaintiffs would accept in
G    substitution for the assessment of the damages by the judge, such counter-
proposal based upon an average sum per plaintiff as the judge might be
minded to make, from his general knowledge of the proceedings and of the
settlement in the Tyler 2 proceedings to that date and from his knowledge
of national average settlement figures in asbestosis cases.

The fact that information as to the procedural defect would probably
have emerged if Cape had made an application to set the default judgment
H    aside on other grounds, seems to us to be of no relevance. Cape are not to
be treated as having information which they did not have because, if they
had made an application which they had no reason to make, they could
have obtained that information.

572

*Adams v. Cape Industries Plc. (C.A.)* [1990]

A harsh but accurate summary of what happened is, in our judgment, that those acting for the plaintiffs failed to give prior notice to the defendants of the unusual course which they intended to pursue; they chose not to try to prevent Judge Steger from adopting that method of assessment; and they drew up and served a form of judgment which did not reveal what had taken place. That was all done in good faith. There was no dishonest purpose. But the effect upon the defendants was, in our view, that they had at no material time knowledge of any basis for seeking relief from the Tyler court in respect of the defect which Scott J. rightly held to have been demonstrated by them to have occurred in the proceedings in the Tyler court.

The only basis for attributing to the defendants constructive knowledge of the defect, upon which they could reasonably be required to have used any available remedy in the Tyler court, would be that a defendant who has been given notice of the proceedings will be fixed with knowledge of everything which he would have learned if he had attended those proceedings. That, in our judgment, is not an acceptable basis for considering proof of procedural injustice. Plaintiffs can, we think fairly be left to avoid such procedural errors as will prevent enforcement of a judgment in this country.

Accordingly, on the natural justice issue, although for somewhat different reasons, we would uphold the decision of Scott J.

### V *Conclusion*

In the result, while we have some doubts as to whether the judge reached the right conclusion on the country issue, we are satisfied that he reached the right conclusions on the presence issue and the natural justice issue. He was accordingly right, in our judgment, to dismiss the plaintiffs' claims and this appeal likewise must be dismissed.

Finally, we acknowledge our debt to all counsel on both sides for the great assistance which they have given us in this interesting but exceptionally difficult case.

*Appeal dismissed with costs.*
*Leave to appeal refused.*

24 October 1989. The Appeal Committee of the House of Lords (Lord Keith of Kinkel, Lord Griffiths and Lord Ackner) dismissed a petition by the plaintiffs for leave to appeal.

*Solicitors: Nabarro Nathanson; Davies Arnold & Cooper.*

A. R.