**A.C.** AND PRIVY COUNCIL. 471

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Viscount
Simonds.

sues him not as a dependent or independent tortfeasor but just as a tortfeasor. It may be that, if he is a " dependent " tortfeasor in the sense that he is the servant or agent of a master or principal, the latter may be made vicariously liable, but that does not touch his personal liability. From that he can only escape if there is a contractual relation between him and the cargo owner which provides him with immunity for his tort or a principle of law which entitles him to rely on a contract made by another. The first line of escape depends on the facts of the particular case: the second is denied by the fundamental rule which was reasserted in the *Dunlop* case.[21] I will only add that in the passage that I have cited the Lord Justice uses the word " agents," and, whatever else may be attributed to him, I should hesitate to say that he intended to include independent contractors in that word.

It follows from what I have said that the case of *Cosgrove v. Horsfall*,[22] upon which doubt was cast by counsel for the appellants, was rightly decided, and that Devlin J.'s decision in *Pyrene Co. Ltd. v. Scindia Navigation Co. Ltd.*[23] can be supported only upon the facts of the case, which may well have justified the implication of a contract between the parties.

In the consideration of this case I have not yet mentioned a matter of real importance. It is not surprising that the questions in issue in this case should have arisen in other jurisdictions where the common law is administered, and where the Hague Rules have been embodied in the municipal law. It is (to put it no higher) very desirable that the same conclusions should be reached in whatever jurisdiction the question arises. It would be deplorable if the nations should, after protracted negotiations, reach agreement, as in the matter of the Hague Rules, and that their several courts should then disagree as to the meaning of what they appeared to agree upon: see *Riverstone Meat Co. Pty. Ltd. v. Lancashire Shipping Co. Ltd.*,[24] and cases there cited. It is therefore gratifying to find that the Supreme Court of the United States in the recent case of *Robert C. Herd & Co. Inc. v. Krawill Machinery Corporation*,[25] not only unanimously adopted the meaning of the word " carrier " in the relevant Act, which I invite your Lordships to adopt, but also expressed the view that the

[21] [1915] A.C. 847.
[22] (1945) 175 L.T. 334; 62 T.L.R. 140, C.A.
[23] [1954] 2 Q.B. 402; [1954] 2 W.L.R. 1005; [1954] 2 All E.R. 158.

[24] [1961] A.C. 807; [1961] 2 W.L.R. 278; [1961] 1 All E.R. 495, H.L.
[25] (1959) 359 U.S. 297; [1959] 1 Lloyd's Rep. 305.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Viscount
Simonds.

*Elder, Dempster* decision [26] did not decide what is claimed for it by the appellants.

Finally, I must refer again to the case of *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*,[27] which is fortunately reported also in Lloyd's Reports, fortunately, since the Commonwealth Law Reports are too seldom to be found in counsel's chambers. In that case, in which the facts are not in any material respect different from those in the present case, the late Fullagar J. delivered a judgment with which Dixon C.J. said that he entirely agreed. So do I—with every line and every word of it, and, having read and reread it with growing admiration, I cannot forbear from expressing my sense of the loss which not only his colleagues in the High Court of Australia but all who anywhere are concerned with the administration of the common law have suffered by his premature death. I have already cited one passage from his judgment. Perhaps I may refer also with respectful approbation to those passages in which he asserts the view that the exceptions to the rule in *Tweddle* v. *Atkinson* [28] are apparent rather than real and explains the so-called on-carrier cases, and in which he protests against a tendency by some artifice to save negligent people from the normal consequence of their fault.

I would dismiss this appeal with costs.

LORD REID. My Lords, the case for the respondents is simple. Goods which they had bought were damaged by the negligence of stevedores, who are the appellants. Before the damage occurred the property in the goods had passed to the respondents and they sue in tort for the amount of the loss to them caused by that damage. The appellants seek to take advantage of provisions in the bill of lading made between the sellers of the goods and the carrier. Those provisions in the circumstances of this case would limit liability to $500. They are expressed as being in favour of the carrier but the appellants maintain on a number of grounds that they can rely on these provisions with the result that, though the damage to the respondents' goods considerably exceeded $500, the respondents cannot recover more than the equivalent of that sum from them as damages. We were informed that questions of this kind frequently arise and that this action has been brought as a test case.

In considering the various arguments for the appellants, I think

[26] [1924] A.C. 522.
[27] 95 C.L.R. 43; [1956] 1 Lloyd's Rep. 346.
[28] (1861) 1 B. & S. 393.

it is necessary to have in mind certain established principles of the English law of contract. Although I may regret it, I find it impossible to deny the existence of the general rule that a stranger to a contract cannot in a question with either of the contracting parties take advantage of provisions of the contract, even where it is clear from the contract that some provision in it was intended to benefit him. That rule appears to have been crystallised a century ago in *Tweddle* v. *Atkinson* [28] and finally established in this House in *Dunlop Pneumatic Tyre Co. Ltd.* v. *Selfridge & Co. Ltd.* [29] There are, it is true, certain well-established exceptions to that rule—though I am not sure that they are really exceptions and do not arise from other principles. But none of these in any way touches the present case.

The actual words used by Lord Haldane in the *Dunlop* case [30] were made the basis of an argument that, although a stranger to a contract may not be able to sue for any benefit under it, he can rely on the contract as a defence if one of the parties to it sues him in breach of his contractual obligation—that he can use the contract as a shield though not as a sword. I can find no justification for that. If the other contracting party can prevent the breach of contract well and good, but if he cannot I do not see how the stranger can. As was said in *Tweddle* v. *Atkinson*,[31] the stranger cannot " take advantage " from the contract.

It may be that in a roundabout way the stranger could be protected. If A, wishing to protect X, gives to X an enforceable indemnity, and contracts with B that B will not sue X, informing B of the indemnity, and then B does sue X in breach of his contract with A, it may be that A can recover from B as damages the sum which he has to pay X under the indemnity, X having had to pay it to B. But there is nothing remotely resembling that in the present case.

The appellants in this case seek to get round this rule in three different ways. In the first place, they say that the decision in *Elder, Dempster & Co. Ltd.* v. *Paterson, Zochonis & Co. Ltd.*[32] establishes an exception to the rule sufficiently wide to cover the present case. I shall later return to consider this case. Secondly, they say that through the agency of the carrier they were brought into contractual relation with the shipper and that they can now found on that against the consignees, the respondents. And thirdly, they say that there should be inferred from the facts an implied contract, independent of the bill of lading, between them

H. L. (E.)

1961
———
MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.
———
Lord Reid.
———

[28] [1915] A.C. 847.
[30] Ibid. 853.
[31] 1 B. & S. 393, 398.
[32] [1924] A.C. 522.

H. L. (E.)

1961

———

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

———

Lord Reid.

———

and the respondents. It was not argued that they had not committed a tort in damaging the respondents' goods.

I can see a possibility of success of the agency argument if (first) the bill of lading makes it clear that the stevedore is intended to be protected by the provisions in it which limit liability, (secondly) the bill of lading makes it clear that the carrier, in addition to contracting for these provisions on his own behalf, is also contracting as agent for the stevedore that these provisions should apply to the stevedore, (thirdly) the carrier has authority from the stevedore to do that, or perhaps later ratification by the stevedore would suffice, and (fourthly) that any difficulties about consideration moving from the stevedore were overcome. And then to affect the consignee it would be necessary to show that the provisions of the Bills of Lading Act, 1855, apply.

But again there is nothing of that kind in the present case. I agree with your Lordships that " carrier " in the bill of lading does not include stevedore, and if that is so I can find nothing in the bill of lading which states or even implies that the parties to it intended the limitation of liability to extend to stevedores. Even if it could be said that reasonable men in the shoes of these parties would have agreed that the stevedores should have this benefit, that would not be enough to make this an implied term of the contract. And even if one could spell out of the bill of lading an intention to benefit the stevedore, there is certainly nothing to indicate that the carrier was contracting as agent for the stevedore in addition to contracting on his own behalf. So it appears to me that the agency argument must fail.

And the implied contract argument seems to me to be equally unsound. From the stevedores' angle, they are employed by the carrier to deal with the goods in the ship. They can assume that the carrier is acting properly in employing them and they need not know whom the goods belong to. There was in their contract with the carrier a provision that they should be protected, but that could not by itself bind the consignee. They might assume that the carrier would obtain protection for them against the consignee and feel aggrieved when they found that the carrier did not or could not do that. But a provision in the contract between them and the carrier is irrelevant in a question between them and the consignee. Then from the consignees' angle they would know that stevedores would be employed to handle their goods, but if they read the bill of lading they would find nothing to show that the shippers had agreed to limit the liability of the stevedores. There is nothing to show that they ever thought about this or

that if they had they would have agreed or ought as reasonable men to have agreed to this benefit to the stevedores. I can find no basis in this for implying a contract between them and the stevedores. It cannot be said that such a contract was in any way necessary for business efficiency.

So this case depends on the proper interpretation of the *Elder, Dempster* case.[32] What was there decided is clear enough. The ship was under time charter, the bill of lading made by the shippers and the charterers provided for exemption from liability in the event which happened and this exemption was held to enure to the benefit of the shipowners who were not parties to the bill of lading but whose servant the master caused damage to the shippers' goods by his negligence. The decision is binding on us but I agree that the decision by itself will not avail the present appellants because the facts of this case are very different from those in the *Elder, Dempster* case.[32] For the appellants to succeed it would be necessary to find from the speeches in this House a ratio decidendi which would cover this case and then to follow that ratio decidendi.

Before dealing further with that case I think it necessary to make some general observations about the binding character of rationes decidendi of this House. Unlike most supreme tribunals this House holds itself bound by its own previous decisions. That was the decision of this House in *London Street Tramways Co. Ltd.* v. *London County Council.*[33] It was founded on immemorial practice, and the justification given by Lord Halsbury L.C.,[34] with whom the other noble Lords concurred, was " the incon- " venience—the disastrous inconvenience—of having each ques- " tion subject to being reargued and the dealings of mankind " rendered doubtful by reason of different decisions, so that in " truth and in fact there would be no real final Court of Appeal." I have on more than one occasion stated my view that this rule is too rigid and that it does not in fact create certainty. In illustration of that I need go no further than the series of decisions in this House on workmen's compensation. But I am bound by the rule until it is altered.

But I can find no invariable practice with regard to rationes decidendi. In the first place it must be noted that only three years later Lord Halsbury said in *Quinn* v. *Leathem* [35] : ". .. there

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Reid.

---

[32] [1924] A.C. 522.
[33] [1898] A.C. 375; 14 T.L.R. 360, H.L.
[34] Ibid. 380.
[35] [1901] A.C. 495, 506.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Reid.

" are two observations of a general character which I wish to make,
" and one is to repeat what I have very often said before, that
" every judgment must be read as applicable to the particular
" facts proved, or assumed to be proved, since the generality of
" the expressions which may be found there are not intended
" to be expositions of the whole law, but governed and qualified by
" the particular facts of the case in which such expressions are to
" be found.  The other is that a case is only an authority for
" what it actually decides.  I entirely deny that it can be quoted
" for a proposition that may seem to follow logically from it."
And, if one has to assume that every case has a ratio decidendi
to be extracted from the speeches in this House by the ordinary
methods of construction of written documents, I think that quite
a number of cases will be found of which the rationes decidendi
have not in fact been followed.  I give only a few examples which
I happen to have noted from time to time.  They may not be very
modern, but, if there was no unbroken practice, modern pronounce-
ments (in themselves at best only rationes decidendi) cannot
have created a rule preventing your Lordships from exercising the
full traditional jurisdiction of this House.  A fairly recent example
is *Goodman* v. *Saltash Corporation*,[36] and with that I couple a
note by Mr. Macqueen to *Scott* v. *Maxwell* [37] where, having dealt
with the question of previous decisions being binding, he says:
" Notwithstanding all this, it must be owned that one or two well
" known decisions of the House have been tabooed by the profes-
" sion; not, however, by holding them to be wrong, but by making
" out invariably that they have no application to other cases.
" I think, however, it will be found that the House itself has
" never revoked what it has once deliberately laid down on an
" appeal or writ of error."  And very soon after that was said
Lord Chelmsford L.C. said in *Dundee Magistrates* v. *Morris* [38]:
" . . . your Lordships will probably think that *Ewen* v. *Provost of
" Montrose* [39] can only be urged as an authority where the circum-
" stances of the case to which it is sought to be applied are
" precisely similar to the circumstances of that case."

  I would certainly not lightly disregard or depart from any ratio
decidendi of this House.  But there are at least three classes of
case where I think we are entitled to question or limit it: first,
where it is obscure, secondly, where the decision itself is out of
line with other authorities or established principles, and thirdly,

---

[36] (1882) 7 App.Cas. 633, H.L.     [38] (1858) 3 Macq. 134, 155, H.L.
[37] (1854) 1 Macq. 791, 792, H.L.   [39] (1830) 1 Wils. & Shaw 346, H.L.

**A.C.**          AND PRIVY COUNCIL.          477

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Lord Reid.

where it is much wider than was necessary for the decision so that it becomes a question of how far it is proper to distinguish the earlier decision. The first two of these grounds appear to me to apply to the present case.

It can hardly be denied that the ratio decidendi of the *Elder, Dempster* decision [40] is very obscure. A number of eminent judges have tried to discover it, hardly any two have reached the same result, and none of the explanations hitherto given seems to me very convincing. If I had to try, the result might depend on whether or not I was striving to obtain a narrow ratio. So I turned to the decision itself. Two quite separate points were involved in the case. The first was whether the damage to the cargo was caused by bad stowage or by the ship being unseaworthy. This was very fully considered and the decision was bad stowage. On the conditions in the bill of lading this clearly freed the charterer of liability. The other question was whether those conditions were also available as a defence to the shipowner. From the report of the case it would seem that this was not very fully argued, and none of the three noble Lords who spoke devoted more than a page of print to it. They cannot have thought that any important question of law or any novel principle was involved. Lord Finlay said [41] that a decision against the shipowner would be absurd and the other noble Lords probably thought the same. They must all have thought that they were merely applying an established principle to the facts of the particular case.

But when I look for such a principle I cannot find it, and the extensive and able arguments of counsel in this case have failed to discover it. The House sustained the dissenting judgment of Scrutton L.J. in the Court of Appeal (*Paterson, Zochonis & Co. Ltd.* v. *Elder, Dempster & Co. Ltd.*[42]). The majority there did not have to consider this question, but Scrutton L.J. did and he also devoted less than a page to its consideration. His reasoning, though brief, is quite clear, but he gives no reason or authority for the proposition on which he bases his judgment and it is not derived from the argument as reported. He said [43]: " The real " answer to the claim is in my view that the shipowner is not in " possession as a bailee, but as the agent of a person, the charterer, " with whom the owner of the goods has made a contract defining " his liability, and that the owner as servant or agent of the " charterer can claim the same protection as the charterer. Were

[40] [1924] A.C. 522.      [42] [1923] 1 K.B. 420, C.A.
[41] Ibid. 548.      [43] Ibid. 441–442.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Reid.

" it otherwise there would be an easy way round the bill of lading
" in the case of every chartered ship; the owner of the goods
" would simply sue the owner of the ship and ignore the bill of
" lading exceptions, though he had contracted with the charterer
" for carriage on those terms and the owner had only received
" the goods as agent for the charterer." It is true that an
unreasonable proposition is seldom good law, and, perhaps for
that reason, it would seem that that great lawyer did not pause
to consider how great an exception he was making to the rule
that a stranger to a contract cannot take advantage from it. For
he was saying in terms that servants and " agents " can take
advantage of contracts made by their master or " principal."
I would not dissent from a proposition that something of that kind
ought to be the law if that was plainly the intention of the contract,
and it may well be that this matter is worthy of consideration
by those whose function it is to consider amending the law. But
it seems to me much too late to do that judicially.

That this House made an exception to the general principle
seems to me clear: the question we have now to consider is how
wide an inroad did they make. It is very far from clear that any
of those who spoke in this House intended to go all the way with
Scrutton L.J.: if they had intended to do so it would have been
easy to say so. And it is not clear just how far Scrutton L.J.
himself intended to go. The use of the term " agent " is one
difficulty: he cannot have been using that word accurately in its
legal sense. The charterer or anyone else under obligation to do
certain things employs servants or independent contractors and
instructs them to do those things. But they do not act as agents;
they have nothing to do with the party to whom their master or
employer is under contractual obligation; their duty is to
carry out the instructions of their master or employer under
the contracts which they have made with him. But in
the course of carrying out that duty they may by their own
negligence do damage to the property of a third party, the person
who has made a contract with their master or employer. On what
ground are they to be better off than if they had damaged the
property of some other person? On that analysis it becomes still
more difficult to find a legal justification for what Scrutton L.J.
said. And was there any implicit limitation to the rule which he
enunciated? There seems to be no logical reason why it should
be confined to carriage of goods by sea or indeed to carriage of any
kind. If it is a good rule for bills of lading it would seem to be an
equally good rule for all cases where the master or employer has

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Reid.

some protection under a contract and employs someone else to do the things which have to be done under that contract. I must say I have considerable doubt whether Scrutton L.J. can really have intended his rule to be so far-reaching.

In such circumstances I do not think that it is my duty to pursue the unrewarding task of seeking to extract a ratio decidendi from what was said in this House in *Elder, Dempster*.[44] Nor is it my duty to seek to rationalise the decision by determining in any other way just how far the scope of the decision should extend. I must treat the decision as an anomalous and unexplained exception to the general principle that a stranger cannot rely for his protection on provisions in a contract to which he is not a party. The decision of this House is authoritative in cases of which the circumstances are not reasonably distinguishable from those which gave rise to the decision. The circumstances in the present case are clearly distinguishable in several respects. Therefore I must decide this case on the established principles of the law of England apart from that decision, and on that basis I have no doubt that this appeal must be dismissed.

LORD KEITH OF AVONHOLM. My Lords, I agree with the opinions that have just been delivered by my noble and learned friends, Lord Simonds and Lord Reid, and would only say a few words about the *Elder, Dempster* case [44] in view of the importance that has been attached to it in the argument for the appellants.

There was a specialty in that case which did not go unobserved in the course of its decision, in that the ship, the *Grelwen*, had been hired under a time charter to augment a line of vessels owned by Elder, Dempster & Co. Ltd., or its subsidiary shipping companies, engaged in the West African trade. It was in a sense a chance whether the cargo in question in that case was loaded on the *Grelwen* or was carried by one of the other vessels of the Elder, Dempster line. To the shippers it was no doubt a matter of indifference whether their cargoes were carried on one of the regular ships of the line or on the chartered ship. In fact they were probably unaware that the *Grelwen* was a chartered ship and the bills of lading signed for the voyage in question followed the well-known form of bill of lading issued for all the other of the respondents' ships. (See Lord Sumner.[45]) There could thus have resulted the anomaly, on one view of the case, of the cargo-owners recovering damages from the owners of the *Grelwen*, which

[44] [1924] A.C. 522.                [45] Ibid. **564.**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Keith of
Avonholm.

they could not have recovered if their goods had been carried on the other ships, whose owners would have been fully covered against damage resulting from bad stowage. These considerations may have been in some measure irrelevant and they were immaterial if the view of Rowlatt J. and the Court of Appeal (Scrutton L.J. dissenting) that there was unseaworthiness at the start of the voyage had been upheld in this House. But they may well have played their part in leading Rowlatt J. to hold that the contract of carriage under the bills of lading was, exceptionally, between the shippers and the charterers, a finding which was acquiesced in at all later stages of the case. As Fullagar J. pointed out in *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*,[46] this might be thought to lead to the result that the charterers alone were responsible for the bad stowage (though they would, of course, have the benefit of the exemption clause), and that no question of liability of the shipowners could arise. I am not sure that this was not also Lord Sumner's view in the *Elder, Dempster* case,[47] but he preferred to base his decision on bailment. I do not read him as subscribing to the view that if the captain signed the bills of lading as agent for the charterers, that secured immunity for the charterers' servants and agents. Be that as it may, this House was able, on one view or another, to exempt both charterers and owners from liability for bad stowage.

The present case on its facts is far removed from the *Elder, Dempster* case[47] and it is doubtful whether any appeal would have been made to that case but for the principle which Scrutton L.J. in *Mersey Shipping and Transport Co. Ltd.* v. *Rea Ltd.*[48] found himself able to extract from the judgment of this House. This principle does not, I think, materially differ from what he himself enunciated, though in somewhat more limited terms, in his dissenting judgment in the Court of Appeal in the *Elder, Dempster* case,[49] as his ground for exempting the shipowners from liability for bad stowage. I do not repeat the relevant passages from Scrutton L.J.'s judgments which have already been quoted. An agent or servant, acting within the scope of his authority, may, of course, make a contract on behalf of his principal which stipulates for immunity for negligence or tort in the performance of the contract. That would be a contractual stipulation on which the principal could rely. The converse proposition favoured by Scrutton L.J., that the servants or agents of a principal who is

[46] 95 C.L.R. 43, 68; [1956] 1 Lloyd's Rep. 346, 358.
[47] [1924] A.C. 522.
[48] 21 Ll.L.R. 375.
[49] [1924] A.C. 522.

entitled to some contractual immunity for negligence in perform-
ance of his contract could claim the same immunity, does not
appear to me to proceed on any known principle in English law.

It may be difficult to discover any common ratio decidendi in
the speeches of their Lordships who decided the *Elder, Dempster*
case [49] in favour of the owners of the *Grelwen*. But I take the
preferred view of Lord Sumner, which had the support of Lord
Dunedin and Lord Carson, as meaning that in the circumstances
of that case, including the fact that the bills of lading were signed
by the master of the ship, the cargo was received by the ship
and its owners, with the assent of the shippers, on the same
condition as regards immunity in respect of stowage as had been
obtained by the charterers under their contract of carriage. There
is nothing in the facts covered by the present appeal that in any
way corresponds to the facts of that case and no principle to be
derived from the case on which, in my opinion, the appellants can
successfully rely. I agree the appeal should be dismissed.

Lord Denning. My Lords, there are three contracts which
fall for consideration in this case:

(1) *The Bill of Lading*. This evidenced a contract between
the shipper and the carrier whereby the carrier agreed to carry a
drum of silicone diffusion pump fluid by ship from New York to
London and deliver it there to the consignee. In this contract
the carrier stipulated that, in case of loss, damage or delay the
value was to be deemed to be $500 and he was not to be liable
for more than $500 per package " unless the nature and value
" thereof was declared by the shipper in writing before shipment
" and inserted in the bill of lading."

(2) *The Stevedoring Contract*. This was a contract between
the carrier and the stevedores whereby the stevedores agreed to
discharge the vessels of the carrier in the Port of London. The
stevedores agreed to be responsible for any damage to or loss of
cargo while being handled or stowed, unshipped or delivered.
But the stevedores stipulated that they should have " such protec-
" tion as is afforded by the terms, conditions and exceptions of
" the bills of lading." By this stipulation the stevedores clearly
sought to be protected by the same conditions as the carrier was,
so that they too would not be liable for more than $500 a package
on undeclared cargo. It is noteworthy that so far as declared
cargo was concerned, the stevedores agreed " to effect an insurance

[49] [1924] A.C. 522.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Keith
of Avonholm.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

" policy on Lloyds to cover any damage or loss on which a value
" in excess of $500 per package has been declared."

(3) *The Sale of the Goods.* This was a contract between the
shipper and the consignee under which the property in the goods
passed to the consignee whilst the goods were on board the ship.
Thereupon there was transferred to the consignee all rights of suit
and he was subject to the same liabilities in respect of the goods
as if the contract contained in the bill of lading had been made
with the consignee himself.

The shipper did not declare the value of the drum to the
carrier, and its value was not inserted in the bill of lading. If a
declaration of value had been made, the drum would have been
included in a list of special cargo for the use of the carriers and
the stevedores, and, in accordance with the usual practice, it
would have been given special stowage : and it would, no doubt,
have been covered by the insurance policy referred to in the steve-
doring contract. But as there was no declaration of value in
this case, the drum was dealt with as ordinary cargo, both by the
carriers and the stevedores.

The drum was duly carried to London. The stevedores duly
discharged the ship and put the drum into a shed. The consignees
sent a lorry to take delivery of the drum. The stevedores were
in the very act of lowering the drum on to the lorry when they
negligently dropped it and some of the contents were lost. The
drum was worth far more than $500 and the loss was far more
than $500. If the consignee had sued the carrier for the loss,
the consignee could not have recovered more than $500. If the
carrier had sued the stevedores for the loss, the carrier could not
have recovered more than $500. But it is said that the consignee
can sue the stevedores in tort for negligence and recover the full
value (£593 12s. 0d.) from them, despite the fact that the value
was never declared as being in excess of $500 (£179 1s. 0d.).

Now, there are two principal questions in this case which need
separate consideration: The first is whether the stevedores can
rely on the limitation clause in the bill of lading to which they
were *not* parties : The second is whether they can rely on the
protection given by the stevedoring contract to which they *were*
parties.

So far as the first question is concerned the stevedores rely on
the reasoning of this House in the *Elder, Dempster* case,[49] which
was stated by Scrutton L.J. to be that " where there is a contract

[49] [1924] A.C. 522.

**A.C.**          AND PRIVY COUNCIL.                               483

H. L. (E.)

1961

———

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

———

" which contains an exemption clause, the servants or agents who
" act under that contract have the benefit of the exemption
" clause," see *Mersey Shipping and Transport Co. Ltd.* v. *Rea
Ltd.*[50] By " servants or agents " there the Lord Justice clearly
means to comprehend all those who do the actual work in perform-
ance of the contract; " servants " being those under the direct
control of the contracting party, and " agents " being those who
are employed as sub-contractors for the purpose. The books are
full of the use of the word " agent " in that sense: and I propose
in this judgment to continue to use it so. And I think that the
Lord Justice had in mind only exemption clauses in the carriage of
goods. He knew as well as anyone that the law of England has
always drawn a broad distinction between the carriage of goods
and the carriage of passengers: see the classic judgment of the
Court of Exchequer Chamber in *Readhead* v. *Midland Railway
Co.*[51]

My Lords, it is said that, in stating this proposition, for once
Homer nodded and that this great master of our commercial law—
and the members of this House too—overlooked the " funda-
" mental principle " that no one who is not a party to a contract
can sue or be sued upon it or take advantage of the stipulations
or conditions that it contains. I protest they did nothing of the
kind. You cannot understand the *Elder, Dempster* case [52] with-
out some knowledge of the previous law and I would draw the
attention of your Lordships to it.

First of all let me remind your Lordships that this " funda-
" mental principle " was a discovery of the nineteenth century.
Lord Mansfield and Buller J. knew nothing of it. But in the
nineteenth century it was carried to the most extravagant lengths.
It was held that, where a duty to use reasonable care arose out
of a contract, no one could sue or be sued for a breach of that
contract except a party to it, see *Winterbottom* v. *Wright*,[53]
*Alton* v. *Midland Railway Co.*[54] In the nineteenth century if a
goods owner had sought to sue stevedores for negligence, as he has
in this case, he would have failed utterly. The reason being that
the duty of the stevedores to use reasonable care arose out of their
contract with the carrier; and no one could sue them for a breach
of that duty except the other party to the contract, namely, the
carrier. If the goods were damaged, the only remedy of the

---

[50] 21 Ll.L.R. 375, 378.
[51] (1869) L.R. 4 Q.B. 379, 382.
[52] [1924] A.C. 522.

[53] (1842) 10 M. & W. 109.
[54] (1865) 19 C.B.N.S. 213.

H. L. (E.)

1961

———

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

———

Lord Denning.

———

owner of the goods was against the carrier with whom he con-
tracted, and not against the stevedores with whom he had no
contract. If proof were needed that the doctrine was carried so
far, it is provided by the many cases in the middle of the nineteenth
century where the owner of goods sent them by railway for
" through transit " to a destination on another line. The first
carrier carried them safely over his line but they were damaged
by the negligence of the second carrier. It was repeatedly held
that the goods owner had no remedy against the second carrier:
for the simple reason that he had no contract with him. The
owner's only remedy was against the first carrier with whom he
contracted, see *Scothorn* v. *South Staffordshire Railway Co.*[55]:
and not against the second carrier with whom he had no contract,
see *Mytton* v. *Midland Railway Co.*,[56] *Coxon* v. *Great Western
Railway Co.*[57] If the first carrier was exempted from liability by
the conditions of the contract, the goods owner had no remedy
at all: none against the first carrier because he was protected by
the conditions: and none against the second carrier because he
was " not liable at all." It was so held by this House in *Bristol
and Exeter Railway Co.* v. *Collins.*[58] See especially what Lord
Chelmsford said [59] with the entire agreement of Lord Brougham,
and what Lord Cranworth said.[60]

What an irony is here! This " fundamental principle "
which was invoked 100 years ago for the purpose of holding that
the agents of the carrier were " not liable at all " is now invoked
for the purpose of holding that they are inescapably liable, without
the benefit of any of the conditions of carriage. How has this
come about?

The reason is because in the nineteenth century negligence
was not an independent tort. If you wished to sue a man for
negligence, you had to show some special circumstances which
put him under a duty of care towards you. You might do it by
reason of a contract, by a bailment, by his inviting you on to his
premises on business, by his leaving about a thing which was
dangerous in itself, and in other ways. But apart from some such
special circumstances, there was no general duty to use care.
Brett M.R. (afterwards Lord Esher) made a valiant attempt in
*Heaven* v. *Pender* [61] to enunciate such a general duty but he had
failed. Suppose in those days that you tried to show that the

---

[55] (1853) 8 Exch. 341.
[56] (1859) 4 H. & N. 615.
[57] (1860) 5 H. & N. 274.
[58] (1959) 7 H.L.Cas. 194, H.L.

[59] Ibid. 233.
[60] Ibid. 237.
[61] (1883) 11 Q.B.D. 503, C.A.

**A.C.**  AND PRIVY COUNCIL.  485

H. L. (E.)

1961

———

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

———

Lord Denning.

———

defendant was under a duty of care, then if you could only show it by reason of contract, your remedy lay only in contract and not in tort.  But if you could show it, not only by reason of contract, but also for some other reason, as for instance by reason of his inviting you to his premises, you could sue either in contract or in tort.  It was by a development of this principle that, in the "through transit" cases, the courts eventually found a way of making the second carrier liable.  It was held that if, on through transit, the second carrier accepted a person as a passenger, the second carrier was under a duty, irrespective of contract, to carry him with reasonable care, see *Foulkes* v. *Metropolitan District Railway Co.*[62]  Likewise, if a second carrier accepted goods for carriage, so that they were lawfully on his premises, he was under a duty to the owner to use reasonable care, although there was no contract between them, see *Hooper* v. *London and North Western Railway Co.*[63] (overruling *Mytton* v. *Midland Railway Co.*[64]); and *Meux* v. *Great Eastern Railway Co.*[65]  But when the courts found this way of making the second carrier liable, they did not thereby open a way by which the injured person could escape the conditions of carriage.  If he had agreed that the carriage was to be "at owner's risk" for the whole journey, he was held to his agreement, even when he sued the second carrier in tort, see *Hall* v. *North Eastern Railway Co.*,[66] *Barratt* v. *Great Northern Railway Co.*[67]  It has been suggested that in such cases the contract is made with one company for one part of the journey and with the other company for the other part of the journey, see *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*[68] by Fullagar J.; but this explanation cannot stand with the decision of this House in *Bristol and Exeter Railway Co.* v. *Collins*,[69] where it was clearly held that there was only one contract by the goods owner, namely, his contract with the first carrier, and none by him with the second carrier.  This being so, the only acceptable explanation of the "through transit" cases, to my mind, is that the second carrier falls within Scrutton L.J.'s proposition, being an "agent," that is, a sub-contractor employed to carry out the contract of the first carrier, and so entitled to the benefit of the conditions.

This brings me to the *Elder, Dempster* case[70] itself.  It is

[62] (1880) 5 C.P.D. 157, C.A.
[63] (1880) 50 L.J.Q.B. 103.
[64] 4 H. & N. 615.
[65] [1895] 2 Q.B. 387; 11 T.L.R. 517, C.A.
[66] (1875) L.R. 10 Q.B. 437.

[67] (1904) 20 T.L.R. 175, D.C.
[68] 95 C.L.R. 43, 67; [1956] 1 Lloyd's Rep. 346, 357.
[69] 7 H.L.Cas. 194.
[70] [1924] A.C. 522.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Lord Denning.

important to notice that the contract of carriage there was between the shippers and the charterers. The shipowners were not parties to it. The word " shipowners " in the bill of lading designated only the charterers. (That appears from the judgment of Rowlatt J.[71] and *The Okehampton*,[72] which Lord Sumner clearly had in mind.) The charterers performed their contract of carriage by means of a hired ship which they hired from the shipowners. They broke their contract because the master stowed the goods badly and they were damaged. The goods owner sued the charterers but failed against them because the bill of lading contained an exception of bad stowage. He then sought to recover against the shipowners. Now at that time negligence was not an independent tort: and it was not at all easy for the goods owner to say why the shipowners were liable to him. His proper remedy would seem to be against the charterers with whom he contracted and not against the shipowners with whom he had no contract. To overcome this difficulty he said that the shipowners were bailees liable for negligence,[73] or were liable in tort because the goods were lawfully on their ship.[74] He relied on seven cases, especially on the observations of the Court of Appeal in *Hayn Roman & Co.* v. *Culliford*,[75] but Lord Sumner dismissed them as obiter. The speeches in this House make it clear that, in order to make the shipowners liable, the goods owner would have to show " an independent tort uncon-" nected with the performance of the contract " (*per* Viscount Finlay[76]) or a " tortious handling entirely independent of con-" tract " (*per* Lord Sumner[77]). For instance, if the shipowner owned another ship which negligently ran into this one, that would be an independent tort for which the shipowner would be liable: and the exceptions would not avail him. But here the negligence was in the very course of the performance of the contract—" in the course of rendering the very services provided for in the " bill of lading "[78]—and the shipowners were not liable. Two reasons were given for this decision.

*The first reason*, which I give in the words of Viscount Cave[79]: The shipowners " were not directly parties to the contract; but " they took possession of the goods (as Scrutton L.J. says) on " behalf of and as the agents of the charterers, and so can claim

[71] (1922) 12 Ll.L.R. 69, 71–72.
[72] [1913] P. 173, 180; 29 T.L.R. 731, C.A.
[73] [1923] 1 K.B. 420, 427, 441; [1924] A.C. 522, 564.
[74] [1923] 1 K.B. 420, 427; [1924] A.C. 522, 526, 564.

[75] (1879) 4 C.P.D. 182, C.A.
[76] [1924] A.C. 522, 548.
[77] Ibid. 564–565.
[78] Ibid. 548.
[79] Ibid. 534.

H. L. (E.)

1961

───

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

───

" the same protection as their principals." I feel no difficulty about the word " agents " in this context. It is clearly used to denote people employed as sub-contractors to do the work. Such people are entitled to the same protection as their principals. This was the proposition stated by Scrutton L.J. It was clearly approved not only by Viscount Cave but also by Viscount Finlay [80] with the concurrence of Lord Carson.[81] It was treated, too, as a correct proposition by Lord Sumner, with whom Lord Dunedin agreed, for he accepted that " the charterers *and their agents* " were not liable.[82] Lord Sumner's only hesitation seems to have been whether in this case the shipowners took possession of the goods as " agents." They had a possessory lien for hire and might have been in possession on their own account. He put forward, therefore, another reason which he regarded as preferable.

*The second reason.* The shipowners were bailees and liable as such for negligence quasi ex contractu: but they were protected because the bailment to them was not a " bald bailment with " unrestricted liability " but a " bailment upon terms, which " include the exceptions and limitations stipulated in the known " and contemplated form of bill of lading." [82]

These two reasons were complementary and not alternative as is shown by the fact that Lord Carson agreed with both.[83]

My Lords, I am not unduly attached to the strict doctrine of precedent but I should have thought there was good ground here to hold yourselves bound by the first reason in the *Elder, Dempster* case.[84] Just as your Lordships held yourselves bound by a ratio decidendi of three out of five in *Fairman* v. *Perpetual Investment Building Society*,[85] see *Jacobs* v. *London County Council*,[86] and by a ratio decidendi of four out of five in *Nicholls* v. *Austin (Leyton) Ltd.*,[87] see *Close* v. *Steel Company of Wales Ltd.*,[88] so should you be bound by the reasoning in the *Elder, Dempster* case.[89] I confess that I should do my best to distinguish it in some way if I was quite satisfied that it was wrong, but I am not in the least satisfied of this.

It is said that the decision is anomalous and contrary to principle, but that is only because you are looking at it through the

[80] [1924] A.C. 522, 548.
[81] Ibid. 565.
[82] Ibid. 564.
[83] Ibid. 565.
[84] [1924] A.C. 522.
[85] [1923] A.C. 74; 39 T.L.R. 54, H.L.

[86] [1950] A.C. 361, 368–371; 66 T.L.R. (Pt. 1) 659; [1950] 1 All E.R. 737, H.L.
[87] [1946] A.C. 493; 62 T.L.R. 320; [1946] 2 All E.R. 92, H.L.
[88] [1961] 3 W.L.R. 319, 330, 334, 347; [1961] 2 All E.R. 953, H.L.
[89] [1924] A.C. 522.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

spectacles of 1961 and not those of 1924. Since the decision of *Donoghue* v. *Stevenson* [90] in 1932 we have had negligence established as an independent tort in itself. Small wonder, then, that nowadays it is said that the tortfeasor cannot rely for his protection on provisions in a contract to which he was not a party. But the very point in the *Elder, Dempster* case [91] was that the negligence there was not an independent tort in itself. It was negligence in the very course of performing the contract—done, it is true, by the sub-contractor and not by the principal—but if you permit the owner of the goods to sue the sub-contractor in tort for what is in truth a breach of the contract of carriage, then at least you should give him the protection of the contract. Were it otherwise there would be an easy way round the conditions of the contract of carriage. That is how the judges in the *Elder, Dempster* case [91] looked at it and I am not prepared to say they were wrong. I am sure that the profession looked at it, too, at that time in the same way. If the draftsmen of the Hague Rules had thought in those days that the goods owner could get round the exceptions by suing the stevedores or the master in tort, they would surely have inserted provisions in those Rules to protect them. They did not do so because they did not envisage their being made liable at all.

But if you look at the *Elder, Dempster* case [91] with the spectacles of 1961, then there is a way in which it can be supported. It is this: Even though negligence is an independent tort, nevertheless it is an accepted principle of the law of tort that no man can complain of an injury if he has voluntarily consented to take the risk of it on himself. This consent need not be embodied in a contract. Nor does it need consideration to support it. Suffice it that he consented to take the risk of injury on himself. So in the case of through transit, when the shipper of goods consigns them " at owner's risk " for the whole journey, his consent to take the risk avails the second carrier as well as the first, even though there is no contract between the goods owner and the second carrier. Likewise in the *Elder, Dempster* case [91] the shipper, by exempting the charterers from bad stowage, may be taken to have consented to exempt the shipowners also. But I am afraid that this reasoning would not avail the stevedores in the present case: for the simple reason that the bill of lading is not expressed so as to protect the stevedores but only the " carrier." The

[90] [1932] A.C. 562; 48 T.L.R. 494.     [91] [1924] A.C. 522.
H.L.

shipper has therefore not consented to take on himself the risk
of the negligence of the stevedores and is not to be defeated on
that ground. But if the bill of lading were expressed in terms
by which the owner of the goods consented to take on himself
the risk of loss in excess of $500, whether due to the negligence
of the carrier or the stevedores, I know of no good reason why his
consent, if freely given, should not be binding on him. The case
of *Cosgrove* v. *Horsfall* [92] appears to suggest the contrary, but
that was a contract for the carriage of passengers and not for the
carriage of goods: and, as I said in *Adler* v. *Dickson*,[93] it is not
so easy to find an assent by a passenger to take the risk of personal
injury on himself. The mere issue of a ticket or pass will not
suffice.

I suppose, however, that I must be wrong about all this:
because your Lordships, I believe, take a different view. But it
means that I must go on to consider the second question, namely,
whether the stevedores can avail themselves of the protection
clause in their own " stevedoring contract." Here your Lord-
ships are untrammelled by authority. The cases in the High
Court of Australia and in the United States Supreme Court do not
touch the point. The stevedores in those two cases, for aught
that appears, had agreed to do their work on a " bald " stevedoring
contract " with unrestricted liability ": where as here they stipu-
lated that they should " have such protection as is afforded by the
" terms, conditions and exceptions of the bill of lading."

It is said here again that the owners of the goods cannot be
affected by the " stevedoring contract " to which they were not
parties: but it seems to me that we are now in a different branch
of the law. When considering the contract between the carrier
and the stevedores, it is important to remember that the carrier
of goods, like a hirer, is a bailee: and the law of bailment is
governed by somewhat different principles from those of contract
or of tort: for " bailment," as Sir Percy Winfield said, " is more
" fittingly regarded as a distinct branch of the Law of Property,
" under the title Possession than as appropriate to either the law
" of contract or the law of tort," see The Province of the Law of
Tort, p. 100. One special feature of the law of bailment is that
the bailee can make a contract in regard to the goods which will
bind the owner, although the owner is no party to the contract
and cannot sue or be sued upon it. The contract must, no doubt,

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

[92] 175 L.T. 334.                   [93] [1955] 1 Q.B. 158, 184; [1954] 3
                                     W.L.R. 696; [1954] 3 All E.R. 397.
                                     C.A.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Lord Denning.

be of a category which the owner impliedly authorised the bailee to make, such as a contract for repair, storage, loading, unloading or removal; but, provided it is impliedly authorised, the true owner is bound by it. (By " authorised " in this context I do not mean authorised so as to make the owner the principal to the contract. I mean only that the owner *impliedly consented* to the bailee making the contract on his (the bailee's) own behalf.) Thus if a bailee stores goods in a warehouse on his own account, and the warehouseman stipulates for a general lien on the terms usual in the trade, the owner of the goods is bound by it. He cannot claim the goods in defiance of the lien. Again, if the hirer of goods hands them to a furniture remover to be carried to his new home, and the remover stipulates, in the usual way of the trade, for exemption from liability for fire, the remover is entitled to the benefit of the exemption, not only as against the hirer, but also as against the owner. The reason for this may be seen by considering what would be the position if there were no exemption from liability. The bailee would then be able to recover the full value of the goods from the negligent wrongdoer, but he would have to account to the true owner for the proceeds, see *The Winkfield*.[94] If the bailee is to be treated as the owner of the goods for the purpose thus of imposing full liability on the negligent wrongdoer, he is also to be treated as the owner for the purpose of exempting him from liability, at any rate where the true owner has impliedly authorised it. And, just as the original owner cannot sue in defiance of the exemption, nor can anyone who buys the goods from him: for the purchaser takes the goods subject to the subsisting bailment and the rights of anyone validly claiming under it, see *Jowitt & Sons* v. *Union Cold Storage Co.*[95]

A good illustration of these principles is *The Kite*.[96] The lightermen were bailees in possession of the goods. They employed the tug-owners on the usual terms, which included exemption from negligence. This contract was made with the implied authority of the owners of the goods. They were, therefore, bound by the exemption, although they were not parties to the contract and could not sue or be sued on it. Likewise *Pyrene Co. Ltd.* v. *Scindia Navigation Co. Ltd.*[97] It was not strictly a bailment case, but it is covered by the same principles. The buyers employed the shipowners to carry the goods subject

---

[94] [1902] P. 42; 18 T.L.R. 178, C.A.
[95] [1913] 3 K.B. 1; 29 T.L.R. 477.
[96] [1933] P. 154; 49 T.L.R. 525.
[97] [1954] 2 Q.B. 402.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

to the limitation of liability under the Hague Rules. This contract was on the terms usual in the trade and it was made with the implied authority of the seller of the goods. He was not a party to the contract. He could not sue or be sued upon it. But nevertheless he was bound by the limitation contained in it.

Applying this principle, the question is: Did the owners of the goods impliedly authorise the carrier to employ the stevedores on the terms that their liability should be limited to $500? I think they did. Put in simple language, the shipper said to the carrier: " Please carry these goods to London and deliver them " to the consignee. You may take it that they are not worth " more than $500 so your liability is limited to $500. If they " were worth more, we would declare it to you." The carrier carries them to London and says to the stevedores: " Please " deliver these goods to the consignee. They have not been " declared as being in excess of $500, so you need not insure them " for more. You are to have the same protection as I have, " namely, your liability is limited to $500." It is quite plain that the consignee cannot sue the carrier for more than $500, and the carrier cannot sue the stevedores for more than $500. But can the consignee turn round and say to the stevedores: " Although the goods were not declared as being worth more than " $500, yet they were worth in fact $1,500 and I can make you " liable for it " ? I do not think our law permits him to do this. The carrier simply passed on the self-same limitation as he himself had, and this must have been within his implied authority. It seems to me that when the owner of goods allows the person in possession of them to make a contract in regard to them, then he cannot go back on the terms of the contract, if they are such as he expressly or impliedly authorised, that is to say, consented to be made, even though he was no party to the contract and could not sue or be sued upon it. It is just the same as if he stood by and watched it being made. And his successor in title is in no better position.

My Lords, I have dealt with this case at some length because it is the first case ever recorded in our English books where the owner of goods has sued a stevedore for negligence. If the owner can, by so doing, escape the exceptions in the contract of carriage and the limitations in the Hague Rules, it will expose a serious gap in our commercial law. It has great potentialities too. If you can sue the stevedore for his negligence in unloading, why should you not sue the master and officers of the ship for their negligence in the navigation or management of the ship? No

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

longer need you worry about the limitation to £100 or £200 a package. You can recover the value of the most precious package without disclosing its nature or value beforehand. No longer need you worry about bringing an action within one year. You can bring it within six years. Nor are the potentialities limited to carriage by sea. They can be profitably extended to carriage by air and by road and rail. You have only to sue the servants of the carrier for negligence and you can get round all the exceptions and limitations that have hitherto been devised. No doubt the carrying company will stand behind its servants. It will foot the bill, as any good employer would, for the sake of good relations. But when you find that the carrying company has, in the long run, to pay for the damage, you see at once that you have turned the flank of the Hague Rules (for carriage by sea) and the Warsaw Convention (for carriage by air). The exemptions and limitations which are there so clearly given to the " carrier " do not avail his servants and agents when they are sued. By suing them, the goods owner will be able completely to upset the balance of risks as hitherto covered by insurance. No wonder that Parliament has already found it necessary to step in. It has done so in sections 2 and 3 of the Merchant Shipping (Liability of Shipowners and Others) Act, 1958: and sections 1, 5 and 10 and Schedule I, Article 25a of the Carriage by Air Act, 1961, which is not yet in force nor likely to be for some time. But these are only piecemeal efforts of very limited scope. Much more is needed if the law is such as your Lordships today declare it to be. For myself, however, I would not allow this gap to be driven in our commercial law. I would not give the " funda- " mental principle " of the nineteenth century a free rein. It should not have unbridled scope to defeat the intentions of business men. I would stand by the proposition stated by Scrutton L.J. and affirmed, as I believe, by this House 37 years ago.

I would allow this appeal.

LORD MORRIS OF BORTH-Y-GEST. My Lords, the drum which, on May 3, 1957, the stevedores (the defendants) negligently damaged then belonged to the plaintiffs. It had been shipped by consignors in America upon a ship owned by United States Lines Incorporated for carriage to London. It was consigned to the order of the plaintiffs upon the terms of a bill of lading signed on behalf of the shipowners and forwarded by the consignors to the

plaintiffs, who received it on April 1, 1957. The bill of lading contained certain clauses limiting the measure of liability.

To the claim made against them based upon their admittedly negligent act the only defence which the stevedores sought to advance was that their liability was limited. They sought to say that they were in direct contractual relationship with the plaintiffs (either by a contract made expressly or by a contract made impliedly) and that as a result there was a contractual provision, sustained by good consideration, by which their liability was limited. That contention raises issues which depend for their determination upon the facts of this particular case. Their main contention, however, was one which raised far-reaching issues of principle for they asserted that they could claim the benefit of the limitations of liability contained in the contract of carriage to which they were not parties. If, they said, a cargo owner makes a contract with a named carrier which contains a provision which excludes or limits liability, such provision extends to the relief of anyone whom the carrier engages—either as a servant or otherwise—to perform any of his (the carrier's) obligations. The bill of lading, they said, contemplated that there would be vicarious performance of some of the United States Lines' obligations and expressly or impliedly provided that those by whom the obligations of United States Lines would be performed should be entitled to the benefit of the same provisions regarding limitation of liability as United States Lines themselves. Accordingly, they said, the stevedores, on May 3, 1957, when the bill of lading was admittedly still in force, were in the course of performing one part of the carrier's obligations (i.e. the obligation to deliver the drum to the plaintiffs) and could avail themselves of the limiting provisions which were contained in the bill of lading.

The United States Lines (the owners of the ship and the carriers of the drum), had some years previously (in 1952) made a stevedoring contract with the stevedores: it was upon the terms of this contract that the stevedores were acting on May 3, 1957, and at such other times as they were performing services for the shipowners. There was a term in the contract which provided that the stevedores were to have such protection as was afforded by the terms of bills of lading. The existence of that term can have no effect in regard to the issues raised in this appeal. The plaintiffs had no knowledge of the existence of or of the terms of the stevedoring contract. All that the plaintiffs knew or may be taken to have known was that United States Lines were at liberty to engage stevedores. The extent to which or the terms upon

H. L. (E.)

1961
———
MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.
———
Lord Morris of
Borth-y-Gest.

HOUSE OF LORDS    **[1962]**

H. L. (E.)

1961

———

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

———

Lord Morris of
Borth-y-Gest.

———

which United States Lines availed themselves of such liberty was never the plaintiffs' concern.

The broad proposition contended for by the stevedores calls for examination. My Lords, there is a clear pronouncement of your Lordships' House that only a person who is a party to a contract can sue on it (*Dunlop Pneumatic Tyre Co. Ltd.* v. *Selfridge & Co. Ltd.*[98]). If then A (for good consideration) promises B that he will make a gift to C, no claim for the gift can be made by C against A. There will be no difference in principle if A promises B that he will not claim from C that which C ought to pay to him (A). On a claim against him by A, C could not set up the promise which A had made to B. I exclude for present purposes contracts relating to land, and any questions of agency or assignment or trust or any statutory provisions. So if A contracts (for good consideration) with B that he (A) will not sue C if C is negligent, and if C by negligence causes damage to A, C cannot defend himself by asserting a contract to which he is a stranger. This will be so whether C is or is not a servant of B. It will be an a fortiori case if A (for good consideration) promises B that he (A) will not sue B if damage is caused to A by the negligence of C. If A had occasion to sue C the latter could not set up the promise of A to B and even if he could, the promise would not avail for it would only have been a promise not to sue B.

My Lords, the speeches in the case of *Elder, Dempster & Co. Ltd.* v. *Paterson, Zochonis & Co. Ltd.*[99] have often been the subject of close judicial examination. In that case the shipowners received goods from the shippers. In the present case there were no dealings which could properly be said to be dealings between the plaintiffs and the stevedores. Whether or not the view of the facts in the *Elder, Dempster* case [100] which was expressed by Lord Sumner in his speech, a speech which commanded the agreement of Lord Dunedin and of Lord Carson, can be regarded as a satisfactory explanation of the case, the speeches do not contain any statements which are expressed as qualifications of, or which suggest any modifications of, the basic rule which, with the binding force of a pronouncement in your Lordships' House, had been, a few years before, clearly stated in *Dunlop Pneumatic Tyre Co. Ltd.* v. *Selfridge & Co. Ltd.*[101] For better or for worse, that rule was then firmly built into the structure of English law. The stevedores' main contention is, in my view, not tenable.

[98] [1915] A.C. 847.
[99] [1924] A.C. 522.
[100] Ibid. 548.
[101] [1915] A.C. 853.

**A.C.**              AND PRIVY COUNCIL.                    495

When the plaintiffs became holders of the bill of lading (which
incorporated section 4 (5) of the United States Carriage of Goods
by Sea Act, 1936), their rights were limited by the provision that
the " carrier " would not (unless a certain condition was satis-
fied) be liable to a greater amount than $500 per package or
customary freight unit. So far as it incorporated the provisions
of the United States Carriage of Goods by Sea Act, 1936, the
bill of lading did not limit the liability of stevedores but limited
that of the ship and of the " carrier " and I would respectfully
adopt the views expressed in the judgment of the Supreme Court
of the United States in *Robert C. Herd & Co. Inc.* v. *Krawill
Machinery Corporation* [102] to the effect that in the United States
Carriage of Goods by Sea Act the word " carrier " should not be
read as including stevedores engaged by the carrier.

Reliance was also placed upon the limiting provision contained
in condition 24 of the United States Lines' long form of bill of
lading the terms of which were incorporated in the bill of lading.
When condition 24 is being regarded, consideration must also be
given to condition 3 which provided that in the bill of lading the
word " carrier " was to include the ship, her owner, operator
and demise charterer " and also any time charterer or person to
" the extent bound by this bill of lading, whether acting as
" carrier or bailee." These conditions do not avail the steve-
dores, first, because they are not comprehended within the words
that I have quoted and, secondly, because in any event they were
not parties to the contract.

If the United States Lines had been wishing to make or intend-
ing to make some contract as agents on behalf of the stevedores,
there was no reason why that could not have been so stated in
the contract. It is clear that the contract did not state that it was
made by United States Lines on behalf of the stevedores
(Scruttons Ltd.). They are not mentioned in the contract. It
seems to me to be wholly unreal to suggest, in spite of this,
that United States Lines did as to some matters contract as
agents for the stevedores. They did not purport to contract as
such agents. Even apart from this, the process of selecting
which particular terms of the bill of lading might or could form
the substance of the suggested contract would be speculative and
there could be no certainty in defining what would be the obliga-
tions contractually undertaken by the stevedores towards the
plaintiffs.

[102] 359 U.S. 297; [1951] 1 Lloyd's Rep. 305.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Morris of
Borth-y-Gest.

496                    HOUSE OF LORDS          **[1962]**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Morris of
Borth-y-Gest.

Furthermore, I see no rational basis for implying some contract between the plaintiffs and the stevedores. When the plaintiffs were ready to take delivery of the drum and when a landing order in respect of it had been issued, the arrangements made by United States Lines for effecting delivery did not in any way involve the plaintiffs. There were no circumstances out of which it could be implied that the plaintiffs made some contract with the stevedores. Nor does any different result follow from the use of the word " participation " or by asserting that the stevedores were " participating " in the contractual obligations owed by the United States Lines to the plaintiffs. What the stevedores were doing was to perform their own obligations under the contract which they had made with United States Lines. United States Lines had engaged them to do something which they (United States Lines) by the terms of the bill of lading were under obligation to do. The stevedores were not " participating " in anyone else's contract: they were setting out to do only what they, by their own contract with the United States Lines, had undertaken to do.

I would dismiss the appeal.

*Appeal dismissed.*

Solicitors: *Hill, Dickinson & Co.; Ince & Co.*

F. C.

---

[HOUSE OF LORDS.]

H. L. (E.)*

1961
*Nov.* 15, 16;
*Dec.* 19.

RYE   .   .   .   .   .   .   .   .   .   APPELLANT;

AND

RYE   .   .   .   .   .   .   .   .   .   RESPONDENT.

*Landlord and Tenant — Agreement — Oral lease to oneself — Lease of three years or under—Freehold owned by two tenants in common —Whether competent for freeholders to grant lease by parol to themselves — " Conveyance " — Meaning — Whether including oral transactions—Law of Property Act, 1925 (15 & 16 Geo. 5, c. 20), ss. 72 (3) (4), 205 (1).*

By section 72 (3) of the Law of Property Act, 1925: " After the " commencement of this Act a person may convey land to or vest " land in himself."

---

* *Present*: VISCOUNT SIMONDS, LORD MACDERMOTT, LORD REID, LORD RADCLIFFE and LORD DENNING.